THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TEXAS
TYLER DIVISION

\* \* \* \* \*

UNITED STATES OF AMERICA     \*     6:18-CR-16-RWS-KNM-1
       \*     Tyler, Texas
vs.                \*
       \*     2:22 p.m. - 3:43 p.m.
HEON JONG YOO          \*     April 30, 2018

\* \* \* \* \*

**DETENTION HEARING**

BEFORE THE HONORABLE JOHN D. LOVE
UNITED STATES MAGISTRATE JUDGE

\* \* \* \* \*

Proceedings recorded by electronic sound recording
Transcript produced by transcription service

*GLR TRANSCRIBERS*
9251 Lynne Circle
Orange, Texas 77630 \* 409-330-1610

1  **APPEARANCES:**

2  For the United States:

3       MR. L. FRANK COAN, JR.
        **U.S. Attorney's Office (Tyler)**
4       110 N. College, Suite 700
        Tyler, Texas 75702

5  For the Defendant:

6       MR. FRANKLYN 'MICK' MICKELSEN
7       **Broden Mickelsen Helms & Snipes**
        2600 State Street
8       Dallas, Texas 75204

9  U.S. Probation Office:

10      NATHAN MANLEY

11  Deputy Clerk/ECRO:

12      SHARON BAUM

13

14                    **WITNESS INDEX**

15  Government's Evidence:

16      Special Agent James Reed

17          Direct Examination by Mr. Coan.......  6

18          Cross-Examination by Mr. Mickelsen... 23

19          Redirect Examination by Mr. Coan..... 31

20      Task Force Officer Gregory Harry

21          Direct Examination by Mr. Coan....... 32

22          Cross-Examination by Mr. Mickelsen... 44

23      Officer Mike Medders

24          Direct Examination by Mr. Coan....... 46

25          Cross-Examination by Mr. Mickelsen... 54

| | |
|---|---|
| 1 | **P R O C E E D I N G S** |
| 2 | **2:22 P.M. - APRIL 30, 2018** |
| 3 | THE COURT:  Ms. Baum, you may call the case. |
| 4 | DEPUTY CLERK:  I call the Case 6:18-CR-16, |
| 5 | *United States of America vs. Heon Jong Yoo.* |
| 6 | THE COURT:  Announcements. |
| 7 | MR. COAN:  Your Honor, Frank Coan for the |
| 8 | United States. |
| 9 | MR. MICKELSEN:  Mick Mickelsen on behalf of |
| 10 | Mr. Yoo. |
| 11 | THE COURT:  All right, thank you.  We're here |
| 12 | today -- the Court set a hearing on the Government's |
| 13 | Motion for Detention.  I believe my understanding is we |
| 14 | are going to proceed with the hearing today. |
| 15 | Mr. Coan, I believe you have some |
| 16 | witnesses you're going to present in support of your |
| 17 | motion? |
| 18 | MR. COAN:  That's correct, Your Honor. |
| 19 | THE COURT:  All right, how many witnesses do |
| 20 | you have? |
| 21 | MR. COAN:  I have three witnesses. |
| 22 | THE COURT:  All right, any other evidence you |
| 23 | will be presenting? |
| 24 | MR. COAN:  Your Honor, I'll be asking the |
| 25 | Court to take judicial notice of the Indictment.  And I |

1  also intend to proffer briefly from the report issued

2  by Pretrial Services.

3          THE COURT:  All right.  Mr. Mickelsen, any

4  objection to judicial notice of the Indictment or a

5  proffer from the Presentence Report?

6          MR. MICKELSEN:  No objection.

7          THE COURT:  All right.  Any evidence that you

8  will be presenting, Mr. Mickelsen?

9          MR. MICKELSEN:  The only evidence I have, Your

10  Honor, is a report, a mental health assessment of my

11  client.

12          THE COURT:  All right.  Well, I'll receive

13  that when the Government rests on their motion.

14          So, Mr. Coan, you may call your first

15  witness.

16          MR. COAN:  Thank you, Your Honor.  United

17  States calls Special Agent Jim Reed.

18          THE COURT:  All right.  Agent Reed, if you

19  would, as you make your way up here, just pause here a

20  moment and let Ms. Baum swear you in.

21          DEPUTY CLERK:  Do you solemnly swear the

22  testimony you will give in this case now in hearing

23  will be the truth, the whole truth, and nothing but the

24  truth, so help you God?

25          THE WITNESS:  Yes, ma'am.

1      THE COURT:  All right, you may have a seat in

2   the witness box.

3           All right, Mr. Coan, you may proceed.

4      MR. COAN:  Thank you, Your Honor.

5   **SPECIAL AGENT JAMES REED, CALLED BY GOVERNMENT**

6                  **DIRECT EXAMINATION**

7   **BY MR. COAN:**

8   Q.  If you would, state your name for the record,

9   please.

10  A.  James Reed.

11  Q.  And how are you currently employed?

12  A.  Special Agent with the ATF out of Tyler, Texas.

13  Q.  And tell the Court a little bit about how long

14  you've been here and where you went to school.

15  A.  I've been a Special Agent since January 2014, been

16  in Tyler since the summer of 2014, have a Bachelor

17  Degree and Master's Degree from Texas A&M University.

18  Q.  Thank you.  In the course and scope of your

19  employment with ATF, have you become involved in an

20  investigation concerning an individual by the name of

21  Heon Jong Yoo?

22  A.  Yes, sir.

23  Q.  All right, let's talk a little bit about Mr. Yoo.

24  Just generally, approximately how old is he?

25  A.  Approximately 24 years old.

1  Q.   All right.  And where was he born?

2  A.   Our records indicate he was born in South Korea.

3  Q.   All right.  And he's present today, so he came to

4  the United States at some point; is that correct?

5  A.   Yes, sir.

6  Q.   All right.  Is he a United States citizen?

7  A.   No, he is not.

8  Q.   All right.  Does he have legal status here in the

9  United States?

10  A.   Yes, we -- the documents we have show he's a legal

11  permanent resident.

12  Q.   All right, and that occurred -- he obtained that

13  status approximately 2009; is that correct?

14  A.   Yes, sir.

15  Q.   And he is not a naturalized United States citizen;

16  is that correct?

17  A.   He is not a naturalized United States citizen.

18  Q.   All right.  To your knowledge, does he have any

19  claim of derivative citizenship?

20  A.   We've been told he has no derivative claim of

21  United States citizenship through his parents.

22  Q.   Okay.  Are you aware of any employment that Mr. Yoo

23  had at the time of his arrest?

24  A.   Through our investigation and talking with others,

25  Mr. Yoo has informed people that he has been, off and

1  on, employed with the driving companies Uber and Lyft.

2  Q.   To your knowledge, does Mr. Yoo have any military

3  service?

4  A.   Documents and records indicate that he tried to

5  enlist on two occasions:  On September 2015 in New

6  Jersey and January of 2016 out of Texas.

7  Q.  All right.  And was he accepted or denied on those

8  occasions?

9  A.   He's been denied both times.  In fact, the Army

10  considered him not psychologically suited for the

11  position of a U.S. soldier.

12  Q.   All right.  Has your investigation revealed any

13  information about Mr. Yoo's immediate family?

14  A.   All indications from our investigation show that he

15  has no immediate family in the Eastern District of

16  Texas.

17  Q.   Okay.  And based on your investigation, are you

18  able to estimate when Mr. Yoo came to live within the

19  Eastern District of Texas?

20  A.   Our estimation shows it would probably be fall of

21  2016 to attend school here.

22  Q.   All right.  And to your knowledge, does he own a

23  home?

24  A.   No, all indications are that he has continually

25  rented the entire time he's been here.

1  Q.   Based on your investigation and the investigation

2  of others involved in this case, have you become aware

3  of any mental health issues --

4  A.   Yes.

5  Q.   -- that Mr. Yoo has?

6  A.   We have numerous documents and medical records that

7  show chronic multiple hospitalizations where numerous

8  qualified medical professionals have deemed him

9  dangerous to himself and to others.

10  Q.   All right, let's talk about a few of those.

11         Are you familiar with an occasion in April of

12  2013 when Mr. Yoo was brought to the emergency room of

13  a hospital in the Piscataway, New Jersey area by a

14  Rutgers University Police?

15  A.   Yes, sir.  The records show that he was brought to

16  the hospital after threatening to shoot his resident

17  counselor.  There on the medical records it shows he

18  was diagnosed with bipolar disorder, aggressive

19  homicidal ideation, and explosive personality disorder.

20  They deemed him -- a certified mental health official

21  deemed him to be a danger to himself, danger to others,

22  there was notes that he wanted to try to purchase

23  weapons at that time, and he was involuntarily

24  committed to an inpatient facility.

25  Q.   All right.  Are you familiar with an incident in

1   September of 2015, again in the general area of

2   Piscataway, New Jersey, when Rutgers University Police

3   brought Mr. Yoo to the Rutgers University Behavioral

4   Health Care Center?

5   A.   Yes, sir.  The records from that show that he was

6   brought there after repetitive disruptions, homicidal

7   threats, shouting "Death to the Middle East."  They

8   noted he presented as aggressive and threatening.  They

9   required chemical and physical restraints.  He was

10  diagnosed with a mood disorder, again deemed by a

11  mental health official to be a danger to himself, a

12  danger to others.  They noted he continually emitted

13  facts.  There was a reference to a 2011 hospitalization

14  that we don't have records for that showed him -- that

15  noted he wanted to shoot people with a gun.  And again,

16  he was involuntarily committed to an inpatient facility.

17  Q.   All right.  Was there another incident in the fall

18  of 2015, October 2015, again in the Piscataway, New

19  Jersey area, involving Mr. Yoo and hospitalization or

20  the need for psychiatric evaluation?

21  A.   Yes, sir.  He walked into the counseling center and

22  placed a utility knife on the table.  The file notes

23  that he was delusional, medication non-compliance, not

24  taking his medication, was transported by the ER to

25  ambulance with police escort and discharged with a

1   followup psychiatric appointment.

2   Q.   So, on that occasion, October 2015, he was not

3   involuntarily committed based on your investigation?

4   A.   That's what the records reflect, yes, sir.

5   Q.   Let's fast forward to November of 2017 here in the

6   Eastern District of Texas.  Describe for the Court, if

7   you will, the need for a response by the Texas Rangers

8   to Mr. Yoo's residence.

9   A.   The Texas Rangers had to respond due to threats

10  they received that Mr. Yoo was going to travel to kill

11  blacks and Jews according to the reports to DC.  He was

12  evaluated by the Crisis Intervention Officer in Smith

13  County Sheriff's Department.  A warrant was issued and

14  they were taking him to the East Texas Medical Center

15  for mental health evaluation.  Again, medical

16  professionals deemed him harmful to others.

17  Involuntary hospitalization was recommended.  However,

18  no beds were available and he was released.

19  Q.   All right.  Special Agent Reed, if you would, just

20  briefly for purposes of the record, give us an overview

21  of how an individual goes about purchasing a firearm in

22  the United States from a Federal Firearms Licensee.

23  A.   So all Federal Firearms Licensees who sell guns

24  are required to have the person buying the gun fill out

25  the ATF Form 4473, which is the Firearms Transaction

1   Record.  This form contains important information which

2   is required that the person fill out in order to

3   purchase that weapon.  With that form, it includes on

4   that form the way that the FFL submits a check through

5   the FBI's National Instant Criminal Background Check

6   System, commonly called NICS.  That system determines

7   whether someone or not can purchase a firearm.  They

8   either get a "Proceed," in which the firearm is given;

9   a "Delayed," in which they have to wait a period of

10  time until NICS can figure out whether they're denied

11  or not, or a straight-up "Denial" and they're

12  prohibited from transferring the firearm.

13          It's important to note that NICS checks are

14  not required when the person has presented a permit or

15  license that the ATF has deemed a valid alternative to

16  the NICS requirement.  That 4473 has a certification on

17  the bottom that says this is a federal form.  It puts a

18  notice that lying on this form is a felony under

19  federal and also possibly state law.  You sign on the

20  form saying that you have acknowledged that all the

21  information on the form is true and that you have read

22  and understand all the information on the Form 4473.

23  Each of the individual FFLs retain those forms in their

24  own stores for a specified period and those will become

25  the official records of the firearms transaction.

1  Q.   Let's talk a little bit about the Form 4473.   It

2  requires buyers to provide some basic identifying

3  information; is that right?

4  A.   Yes, sir, it has basic information that lets the

5  person know exactly who was the person purchasing the

6  weapon.

7  Q.   Right, so someone -- the prospective buyer's name

8  and their address; is that right?

9  A.   Yeah, name, address, place of birth, where they're

10 living, Social Security number, that kind of

11 information.

12 Q.   Do you have to state whether you're a citizen of

13 the United States?

14 A.   Yes, sir, that's under -- the next section of the

15 form talks about your legality of actually purchasing

16 the weapon.  So it answers questions, such as are you a

17 felon, the 922 prohibitors, and then also asks

18 questions that are reliable -- that are important for

19 the legality of that purchase, including a citizenship,

20 because there are certain restrictions regarding

21 citizenship in purchasing a firearm that have to be

22 met.  So that's considered one of those questions that

23 is important for determining the legality of the sale

24 of the firearm.

25 Q.   Let's talk a little bit about licensing in the

1   state of Texas regarding possession, carrying,

2   ownership of a handgun.  Are you familiar with the

3   license or permit that's issued by the Texas Department

4   of Public Safety?

5   A.   Yes, sir, they issue a Texas License to Carry

6   Handgun, commonly referred to as an LCH.  It lets that

7   person carry that handgun anywhere that's not

8   explicitly prohibited by the state law.  And that is

9   that same document that allows a person to go into a

10  firearms business, Federal Firearms Licensee, and

11  purchase a weapon without a NICS background check.  It

12  allows them to carry the gun both concealed and open in

13  the state of Texas, except in places where you see

14  signs like the 3006 or 3007 notice.  And it's licensed

15  again by the Texas Department of Public Safety.

16  Q.   All right, so the DPS, Department of Public Safety,

17  issues a License to Carry Handgun and a prospective

18  buyer presents that to a Federal Firearms Licensee

19  dealer.  And because ATF recognizes the Texas license,

20  is the dealer required to conduct a NICS background

21  check?

22  A.   No, they're not once you present a valid or what

23  they perceive to be a valid LCH.

24  Q.   Okay.  As part of your investigation, have you

25  researched the defendant's acquisition and possession

1  and use of a DPS issued license to carry a handgun?

2  A.  Yes, sir.

3  Q.  All right.  And if you would, just identify for the

4  Court approximately when Mr. Yoo applied for the state

5  permit?

6  A.  On or about February 7, 2016.

7  Q.  Okay.  And the application has a number of

8  questions associated with it or basic identifying

9  information; is that right?

10  A.  Yes, sir.

11  Q.  All right.  And one of the questions asks whether

12  the applicant has received psychiatric treatment; is

13  that correct?

14  A.  Yes, sir.

15  Q.  All right.  And you've reviewed Mr. Yoo's

16  application; is that right?

17  A.  Yes, sir.

18  Q.  And what was his response to the question about

19  whether he had received psychiatric treatment?

20  A.  Mr. Yoo answered "No" to this question.

21  Q.  All right.  A permit was issued to Mr. Yoo

22  approximately when?

23  A.  On or about May 24, 2016.

24  Q.  Okay.  And at some point Mr. Yoo's License to Carry

25  Handgun in the state of Texas was revoked; is that

1   correct?

2   A.   Yes, sir.  On or about September 28, 2016, the

3   Texas Department of Public Safety had mailed a letter

4   to Yoo informing him that his License to Carry Handgun

5   was being revoked.  According to the letter,  the

6   Medical Advisory Board of the Texas Department of State

7   Health Services had determined that he was not capable

8   of exercising sound judgment with respect to  the proper

9   use and storage of a handgun.  The letter advising under

10  Texas law, he had to surrender his LCH within 10 days

11  upon receipt of the notice unless he requested a

12  hearing, and he did request a hearing on or about

13  October 6, 2016.

14  Q.   Was a hearing, in fact -- did a hearing, in fact,

15  take place regarding the revocation of Mr. Yoo's

16  License to Carry Handgun?

17  A.   Yes, sir.  Yes, sir, I can get it for you.

18        So a hearing took place before Smith County,

19  Texas Precinct 2 Justice of the Peace on or about March

20  15, 2017, and the judge issued an order affirming the

21  revocation of his LCH the same day.

22  Q.   And did the file from the Department of Public

23  Safety indicate whether a copy of that order was mailed

24  to Mr. Yoo?

25  A.   Yes, sir, the file indicates a copy was mailed.

1  Q.   All right, did Mr. Yoo surrender his License to

2  Carry Handgun as required?

3  A.   No, sir.

4  Q.   Okay.  At any point did -- was his License to Carry

5  Handgun seized by state law enforcement officials?

6  A.   Yes, sir.  On or about October 29, 2017, when the

7  Texas Rangers, the same thing referred to earlier, they

8  took possession of his LCH.

9  Q.   So, when they responded to the threat report in

10  late November 2017, they also took possession of

11  Mr. Yoo's revoked License to Carry Handgun?

12  A.   Yes, sir.

13  Q.   All right.  The Indictment in this case concerns

14  seven purchases or attempted purchases of firearms that

15  took place within the Eastern District of Texas; is

16  that correct?

17  A.   Yes, sir.

18  Q.   And have you reviewed the ATF Form 4473s that

19  correspond with each of the seven counts?

20  A.   Yes, sir, I have.

21  Q.   Okay.  So let's talk about Count One, September

22  13th of 2016, concerning Superior Firearms in Tyler --

23  that's located in Tyler, Texas; is that right?

24  A.   Yes, sir, it is a federally licensed firearm dealer

25  in Tyler, Texas.

1  Q.  All right.  And how was Mr. Yoo's -- well, let me

2  back up.  So, on the form, does it indicate that

3  Mr. Yoo was the prospective buyer?

4  A.  Yes, sir, it does.

5  Q.  And did he sign the form?

6  A.  Yes, sir, he did.

7  Q.  Okay.  And how is "Country of Citizenship" listed

8  on this form?

9  A.  He listed his citizenship as a citizen of the

10  United States of America.

11  Q.  All right, was a -- was a NICS check performed by

12  Superior Firearms in connection with the September 13,

13  2016 attempted purchase?

14  A.  Yes, sir, it was.

15  Q.  All right.  And what was the result of that NICS

16  background check?

17  A.  NICS came back to the FFL and informed them that

18  the transaction was denied, as he had been previously

19  adjudicated mentally defective and\or committed to a

20  mental institution.

21  Q.  All right.  Count Two concerns a November 3, 2016

22  transaction at First Cash Pawn.  Is First Cash Pawn an

23  FFL dealer?

24  A.  It is a Federal Firearms dealer in Tyler, Texas,

25  yes, sir.

1  Q.   All right.  And was Mr. Yoo -- did Mr. Yoo complete

2  a 4473 in connection with this transaction?

3  A.   Yes, sir, he did.

4  Q.   All right, did he sign the 4473?

5  A.   Yes, sir.

6  Q.   All right, and how is his "Country of Citizenship"

7  listed on the 4473?

8  A.   He listed his "Country of Citizenship" as a citizen

9  of the United States of America.

10 Q.   All right, and on that occasion, Mr. Yoo actually

11 purchased some firearms; is that right?

12 A.   Yes, sir.

13 Q.   Okay, how many?

14 A.   He purchased three firearms.

15 Q.   All right.  And what were those firearms?

16 A.   A Ruger LCP 380 pistol, a Ruger 1022 rifle, and a

17 Remington 700 .308 caliber bolt action rifle.

18 Q.   All right, counts Three and Four concern two visits

19 to First Cash Pawn, which, as you mentioned, is an FFL

20 dealer located within the Eastern District of Texas; is

21 that right?

22 A.   Yes, sir.

23 Q.   All right, so the first visit to First Cash Pawn,

24 did Mr. Yoo complete a 4473?

25 A.   Yes, sir.

1  Q.  And did he sign it certifying that it was true and

2  correct?

3  A.  Yes, sir, he did.

4  Q.  How was his "Country of Citizenship" listed?

5  A.  United States of America.

6  Q.  All right.  And was a NICS check performed in

7  connection with this first visit to First Cash Pawn?

8  A.  Yes, sir, it was.

9  Q.  And what was the result?

10  A.  He was denied, having previously been adjudicated

11  as mental defective and\or committed to a mental

12  institution.

13  Q.  And did your -- did your investigation reveal

14  whether Mr. Yoo returned to First Cash Pawn sometime

15  later that day, November 17, 2016?

16  A.  Yes.  For some reason he tried again at the same

17  store, another 4473 to buy.  It was also denied for the

18  same reason.

19  Q.  All right.  And that second visit is Count Four of

20  the Indictment; is that correct?

21  A.  Yes, sir.

22  Q.  All right, Count Five concerns a November 18, 2016

23  transaction, firearms transaction occurring at Academy

24  Sports in Tyler, Texas.  Is Academy Sports a Federal

25  Firearms Licensee dealer?

```
1   A.   Yes, sir, it is.
2   Q.   All right.  In connection with that transaction,
3   did Mr. Yoo complete a Form 4473?
4   A.   Yes, sir, he did.
5   Q.   Did he sign it certifying that it was true and
6   correct?
7   A.   Yes, sir, he did.
8   Q.   And how was his citizenship listed on that 4473?
9   A.   He listed himself as a citizen of the United States
10  of America.
11  Q.   All right.  And was Mr. Yoo, in fact, able to
12  acquire a firearm from Academy Sports on November 18th
13  of 2016?
14  A.   Yes, sir, he did.
15  Q.   All right.  And how many and what type?
16  A.   He bought a M&P 15 rifle from Academy Sports.
17  Q.   All right.  On November -- Count Six concerns a
18  November 6th of 2017 transaction occurring at Cash
19  America Pawn in -- is that located in Tyler, Texas?
20  A.   Yes, sir, it is.  It's a Federal Firearms Licensee
21  out of Tyler, Texas.
22  Q.   All right.  And in connection with -- in connection
23  with that transaction, did Mr. Yoo complete a Form 4473?
24  A.   Yes, sir, he did.
25  Q.   Did he sign it certifying that it was true and
```

1  correct?

2  A.   Yes, sir, he did.

3  Q.   In connection with that transaction, did Mr. Yoo

4  present his Texas issued License to Carry Handgun?

5  A.   Yes, sir, he presented a concealed handgun license.

6  Q.   All right.  And because he presented his License to

7  Carry Handgun, was a NICS check performed?

8  A.   No NICS check was performed.

9  Q.   All right, so this is subsequent to the License to

10  Carry Handgun being revoked; is that correct?

11  A.   Yes, sir, his license had already been revoked at

12  this time and the hearing had been completed.

13  Q.   All right.  And was Mr. Yoo, in fact, able to

14  acquire a firearm from Cash America Pawn on November

15  6th of 2017?

16  A.   Yes, sir, he was.

17  Q.   All right.  And how many and what type?

18  A.   One shotgun.

19  Q.   Okay.  And the next day, Mr. Yoo returned to Cash

20  America Pawn; is that correct?

21  A.   Yes, sir.

22  Q.   All right, and that's Count Seven that concerns the

23  November 7, 2017 transaction.  Did Mr. Yoo complete a

24  Form 4473 in connection with that transaction at the

25  Cash America Pawn?

1  A.   Yes, sir, he did.

2  Q.   And did he sign it certifying that all the

3  information provided was true and correct?

4  A.   Yes, sir.

5  Q.   At the time of the transaction, did Mr. Yoo present

6  his License to Carry Handgun issued by the state of

7  Texas?

8  A.   Yes, sir, he presented a concealed handgun license.

9  Q.   All right.  And because he presented his License to

10 Carry Handgun, was a NICS check performed?

11 A.   No NICS was completed, sir.

12 Q.   Okay.  And was Mr. Yoo able to acquire a firearm

13 from Cash America Pawn on November 7, 2017?

14 A.   Yes, sir, he bought a Mossberg 590 12-gauge shotgun.

15 Q.   Thank you.

16        MR. COAN:  I'll pass the witness.

17        THE COURT:  Thank you.

18          Cross-examination?

19        MR. MICKELSEN:  Yes, Your Honor.

20                    **CROSS-EXAMINATION**

21 **BY MR. MICKELSEN:**

22 Q.   Agent Reed, I have a few questions.

23        With respect to a commitment in -- I believe

24 there were two hospital admissions that you described

25 as commitments in New Jersey; is that correct?

1   A.   Yes, sir, in the documentation they were listed as

2   involuntary.

3   Q.   Okay.  And the first one, can you give me the

4   approximate date?

5   A.   Approximately April of 2013.

6   Q.   And how long was Mr. Yoo in the hospital at that

7   point in time?

8   A.   The records we have are for the transfer, so they

9   did not show the receiving facility.

10  Q.   All right, and when you -- when you describe that

11  as a commitment, I mean, was there some kind of

12  judicial hearing in which he was found?

13  A.   Not being a medical professional, I'm looking at it

14  and it shows -- the medical records say involuntary

15  hospitalization on grounds of danger to self and to

16  others.

17  Q.   Okay, it says hospitalization, not commitment?

18  A.   Yeah, it's involuntary -- basically, they are

19  committing him to a hospitalization involuntarily.

20  Q.   Well, do you understand how that process works?

21  Like in other words, if a police officer takes somebody

22  and says, "I think this person has mental health,"

23  there's a temporary -- they're held for a few days and

24  they get a doctor to say, "We need to observe this

25  person"?

1  A.   Yes, sir.  On these records, the ones I went over,

2  besides the Smith County record, these are all from a

3  medical facility.  It's not a police officer putting a

4  person in the facility; rather, it's the hospital

5  transferring -- medical professional saying this person

6  needs to go to a --

7  Q.   Well, okay, in the same thinking applies.  But

8  opposed to a commitment where there's a judicial

9  finding, it usually --

10 A.   I don't see any -- to answer your question, I'm

11 not seeing any judges signing anything in these medical

12 records.

13 Q.   Okay.  And you have no idea how long he was in?

14 A.   No, sir, I do not.

15 Q.   Okay.  And then subsequent to that, there was

16 another one where there was an involuntary

17 hospitalization?

18 A.   Yes, sir, and that was referencing around September

19 2015, and that one also made reference to a separate

20 2011 hospitalization.

21 Q.   Okay.  In the second New Jersey involuntary

22 hospitalization, do you have any idea how long he was

23 in the hospital?

24 A.   No, sir, I do not.

25 Q.   Okay.  And again, you have no evidence that there

1  was a judicial determination that he should be

2  committed as a danger?

3  A.   No, sir, just the medical diagnosis that he's a

4  danger.

5  Q.   All right.  And then a third time he went to the

6  ER, but apparently they released him from the ER; is

7  that your understanding?

8  A.   Yes, sir, that's what the records indicate.

9  Q.   And then another time there was an admission here

10 in East Texas and, again, they released him from the

11 emergency room, he was not --

12 A.   Yes, sir.

13 Q.   He was not taken to a psychiatric --

14 A.   They recommend, but I guess the facility is full

15 and so he's out.

16 Q.   Now, the -- if I understand it correctly, it would

17 be fair to say that in these hospitalizations he had

18 made sort of vague -- like "Death to all Middle

19 Easterners," or something like that; is that your

20 understanding?

21 A.   For one of them, sir, there was a "Death to the

22 Middle East," repeated disruptions.  Another one, the

23 reference is threatening to shoot his resident

24 counselor, resident assistant.  And the other one, the

25 same one that referenced the Middle East, makes a

1  reference to wanting to shoot people with guns.

2  Q.   Wanting to shoot people with guns?

3  A.   Yes, sir.

4  Q.   Apart from this threat to his resident counselor,

5  do you know of anything that was specific, like, "I'm

6  going to go to a mosque" or "I want to" -- or sort of

7  these vague expressions of hostility, that you know of?

8  A.   Not that I know of, just vague.

9  Q.   Now, when he was arrested, you seized his computers

10 and phone; right?

11 A.   Yes, sir.

12 Q.   Have you looked at that information at all?

13 A.   They're still undergoing forensic analysis.

14 Q.   So you're not familiar with anything on them?

15 A.   No, sir, not to my knowledge.

16 Q.   So, again, apart from these sort of vague

17 expressions of hostility, you know, "Death to all

18 Muslims, death to Americans," whatever it might be, the

19 specific one that you know about is the threat to the

20 resident counselor?

21 A.   And the other reference to wanting to use a gun to

22 shoot people.  That was --

23 Q.   Was it directed towards anybody?

24 A.   It says, "In 2011 patient wanted to use a gun to

25 shoot people.  This resulted with him being

1  hospitalized at Carrier Clinic and requires inpatient

2  hospitalization for safety and stabilization as he's a

3  danger to society."

4  Q.   Okay.  Let me ask you about the 4473 form.

5  A.   Yes.

6  Q.   First of all, there is no prohibition against

7  non-U.S. citizens from acquiring a gun, is there?

8  A.   Oh, there are different classes of American

9  citizens -- or non-citizens who can acquire a firearm.

10  So a illegal immigrant, for instance, cannot acquire a

11  firearm.  Certain kinds of visas cannot acquire a

12  firearm, but --

13  Q.   Permanent residents.

14  A.   Permanent residents can, yes, sir.

15  Q.   Okay.  And when they ask about your U.S.

16  citizenship status, is the goal to determine whether or

17  not you're a U.S. citizen or a permanent resident and

18  general identification purposes?

19  A.   Yes, sir.  So, if you're not a U.S. citizen and you

20  check the box for "Other," you're required to provide

21  your alien identification number, which would let the

22  people -- let you know your legal status to buy a

23  firearm, because an illegal immigrant would not have an

24  A-number.

25  Q.   And other -- apart from his U.S. citizenship, was

 1  his identification information correct on the form?

 2  A.   On all the forms, no, sir.

 3  Q.   What did he misrepresent?

 4  A.   There are places where he puts his place of birth

 5  as Fort Worth, Texas on two occasions.

 6  Q.   Well, I guess I can associate that with his

 7  citizenship, but I'm talking about like who I am, his

 8  name --

 9  A.   Yes, sir.

10  Q.   -- his residence, that is --

11  A.   Something besides questions regarding his

12  citizenship and place of birth, that I have not seen

13  any -- in terms of like he hasn't tried to buy under a

14  different name of anything.

15  Q.   Okay.  Now, you've talked about how his concealed

16  license was revoked.

17  A.   Yes, sir.

18  Q.   They mailed the Notice of Revocation to him?

19  A.   Yes, sir.  He answered that notice.

20  Q.   He answered the notice that they were seeking to

21  revoke it.

22  A.   Yes, sir.

23  Q.   And then they had the hearing.  Do you know if he

24  was present at the hearing?

25  A.   I do not, no, sir.

1  Q.   Okay.  And then I assume you reviewed court records

2  that indicated that the notice was mailed to him?

3  A.   Yes, sir.

4  Q.   Of the actual order of revocation?

5  A.   There's DPS records that show that that order was

6  mailed, attached and mailed to him.

7  Q.   When was that mailed, roughly?

8  A.   I believe it was almost simultaneous with the court

9  order or the next day.

10 Q.   Yeah, but do you know what month and year that was?

11 A.   I believe it was probably sometime around March of

12 2017?

13 Q.   Okay.  And apart from that mailing, at this point

14 in time you don't have any proof that he actually

15 received the notice that his license had been revoked?

16 A.   I don't.  Only that -- the only thing I have seen

17 is that the order is on the Smith County website.

18 Q.   Okay.  Now, when you arrested Mr. Yoo, all of his --

19 there were several weapons seized from his apartment;

20 correct?

21 A.   Yes, sir, that's correct.

22 Q.   And those are -- those are in the custody of the

23 Government now?

24 A.   Yes, sir, the AFT has possession of them.

25 Q.   All right.  So, as it stands, ostensibly, he does

1  not have any weapons in his possession?

2  A.   Not that I'm aware of, sir.

3  Q.   Okay.

4  A.   Though there are weapons he purchased that we have

5  not accounted for.

6         MR. MICKELSEN:  All right, I'll pass the

7  witness.

8         THE COURT:  All right, thank you.

9            Any redirect?

10        MR. COAN:  Just a couple briefly, Your Honor.

11                   **REDIRECT EXAMINATION**

12 **BY MR. COAN:**

13 Q.   Special Agent Reed, we reviewed the transactions

14 that are the subject of the Indictment in this case.

15 And you had reviewed the Form 4473s that have been

16 completed and signed by Mr. Yoo in connection with each

17 of those seven transactions; is that correct?

18 A.   Yes, sir.

19 Q.   All right, did you review any other Form 4473s

20 regarding firearms transactions involving Mr. Yoo?

21 A.   Yes, sir.

22 Q.   On any of those Form 4473s, did Mr. Yoo correctly

23 state that he was not a citizen of the United States?

24 A.   Yes, sir, there were multiple occasions when he

25 correctly placed his citizenship as South Korea and

1  provided his A-number as required.

2          MR. COAN:  All right, no further questions,

3  Your Honor.

4          THE COURT:  Thank you.

5              Any further cross-examination?

6      MR. MICKELSEN:  No further questions.

7          THE COURT:  Thank you, Agent.  You may return

8  to your table.

9              Mr. Coan, you may call your next witness.

10         MR. COAN:  Thank you, Your Honor.  The United

11 States calls Task Force Officer Greg Harry to the stand.

12         THE COURT:  All right.  And, Officer, if you

13 can come up here and be sworn as a witness.

14         DEPUTY CLERK:  Do you solemnly swear the

15 testimony you will give in this case now in hearing

16 will be the truth, the whole truth, and nothing but the

17 truth, so help you God?

18         THE WITNESS:  I do.

19         THE COURT:  Have a seat in the witness box.

20             All right, Mr. Coan, you may proceed.

21     MR. COAN:  Thank you, Your Honor.

22     **OFFICER GREGORY HARRY, CALLED BY THE GOVERNMENT**

23                  **DIRECT EXAMINATION**

24 **BY MR. COAN:**

25 Q.  Good afternoon.

1  A.   Afternoon.

2  Q.   Could you state your name for the record, please.

3  A.   Gregory Harry.

4  Q.   And how are you currently employed?

5  A.   I'm employed by the Tyler Police Department here in

6  Tyler, Texas.  I also serve on the Federal Bureau of

7  Investigation's Joint Terrorism Task Force.

8  Q.   All right, what's your position with the Tyler

9  Police Department?

10 A.   I'm assigned as a detective in our Special

11 Investigations Unit.

12 Q.   All right.  In the course and scope of your

13 employment, have you come to be involved in an

14 investigation concerning an individual by the name of

15 Heon Jong Yoo?

16 A.   Yes, sir.

17 Q.   Do you know that individual by any other names?

18 A.   Several names:  Hank Yoo, Henry Yoo, also Henry

19 Sherman Parker.

20 Q.   As part of your investigation, have you become

21 familiar with the encounters between Mr. Yoo and the

22 Tyler Police Department?

23 A.   Yes, sir.  There have been multiple.

24 Q.   All right, can you approximate the number of police

25 encounters for which reports were issued regarding

1  Mr. Yoo?

2  A.   There's been over 20 reports.

3  Q.   Okay.  And has Mr. Yoo ever been criminally

4  trespassed from any establishments in the city of

5  Tyler?

6  A.   Yes, sir.  My records indicate that there's five

7  separate locations -- I guess actually six:  All

8  Wal-Marts within the city of Tyler.  There's one Sam's

9  Club, two Tyler Supercuts -- that's a haircut place --

10  the Panera Bread Restaurant and the Cumberland Place

11  Apartments.

12  Q.  All right.  If you would, just for purposes of the

13  record, explain what it means to be criminally

14  trespassed.

15  A.   Sure.  So all these places are private

16  establishments.  An owner representative of the

17  facility, if they do not want you on their property

18  any more, they issue what we call a Criminal Trespass

19  Warning to the subject, basically saying you are no

20  longer permitted on this property or premises.  Most

21  oftentimes, that warning is issued in front of a police

22  officer and then is documented in our reporting system

23  at the Tyler Police Department.

24  Q.  All right, thank you.  You mentioned that there are

25  more than 20 documented police encounters with Mr. Yoo.

 1   Over what time period are we talking about?

 2   A.   The first document the Tyler Police Department has

 3   with Mr. Yoo was on May 1st of 2016, and the 22

 4   incidents is roughly through I would say the beginning

 5   of or right up to April of 2018.

 6   Q.   So just a little under two years?

 7   A.   Yes, sir.

 8   Q.   Approximately two years?

 9   A.   That's correct.

10   Q.   Okay.  All right, so the first encounter is this

11   beginning of May 2016.  Let me ask you -- we're going

12   to talk about a few of these examples here.  Let me ask

13   you about an October 12, 2016 incident at the Target

14   Store here in Tyler.  If you would, just describe to

15   the Court what happened on that occasion.

16   A.   Sure.  Tyler Police Officers were dispatched to the

17   Tyler -- excuse me, to the Target here in South Tyler

18   after people called our dispatch and said that there

19   was a subject wearing a confederate flag mask with a

20   pistol sticking out.  Upon arrival and during their

21   kind of field investigation, witnesses told officers

22   that Yoo was commenting.  Mr. Yoo was commenting that

23   he was going to go tell all the black people in the

24   store to come to the checkout line.  Witnesses also

25   told officers that Mr. Yoo stated that he was going to

1   "kill all the black people in the store."

2   Q.   All right.  Let's talk about a November 6, 2016

3   incident at Wal-Mart here in Tyler.

4   A.   Yes, sir.  Mr. Yoo was again at Wal-Mart.  Officers

5   were called as he was using bad language there.  Some

6   of the -- well, it was told to officers that Mr. Yoo

7   stated that he was going to be killing a police officer

8   and he believed in the Black Lives Matter Movement.  He

9   also claimed that an organization he was a member of

10  was going to start killing cops.  There was no further

11  mention of that organization in the report.

12  Q.   All right.  On August 18, 2017, there was an

13  incident between Mr. Yoo, who was an Uber driver at the

14  time, and one of his riders; is that correct?

15  A.   Yes, that's correct.

16  Q.   All right.  And tell us about that.

17  A.   I guess during the ride, the rider reported to the

18  Tyler Police Department that Mr. Yoo stated that he

19  hated all Jews and Muslims and that he wanted to kill

20  all the Jews.

21  Q.   All right, there was an incident on December 2nd

22  of 2016 within the city of Tyler involving Mr. Yoo; is

23  that correct?

24  A.   That's correct.

25  Q.   The police had to respond to a report; is that

1  accurate?

2  A.   Yes, sir, of an aggravated robbery.

3  Q.   All right.

4  A.   Or excuse me, an aggravated assault.

5  Q.   All right.  If you would, just briefly describe for

6  the Court the circumstances regarding that incident on

7  December 2, 2016.

8  A.   Officers were called to the area in reference to

9  an aggravated assault.  En route, they were given

10  description of a suspect vehicle and basically stated

11  that four subjects had confronted several people at

12  this residence and that a handgun was displayed.

13  Officers located a vehicle matching that description.

14  Mr. Yoo was found to be the operator of that vehicle

15  along with three other subjects.

16       During a search of the vehicle, several

17  firearms were located, including a handgun, a shotgun,

18  a semi-automatic rifle, and body armor.  During their

19  investigation, witnesses stated that one of the

20  individuals in the vehicle had displayed a firearm

21  during their confrontation of several black male

22  subjects at a house on Old Omen Road, if I'm not

23  mistaken.

24  Q.   Okay.  And was Mr. Yoo arrested?

25  A.   He was and charged with aggravated assault with a

1  deadly weapon.

2  Q.   All right, and that's a felony in the state of

3  Texas; is that correct?

4  A.   Yes, sir, it is.

5  Q.   Was Mr. Yoo subsequently indicted?

6  A.   He was.

7  Q.   That occurred approximately when?

8  A.   There were two separate indictments.  One was

9  approximately January 26, 2017.  And then there was

10  another, basically a re-indictment, on April 20th of

11  2017.  Upon discussing that matter with the Smith

12  County District Attorney's Office, there apparently was

13  some confusion as to Mr. Yoo's co-conspirators.  They

14  mistakenly placed one of the victim's names as a

15  co-conspirator on the original indictment on January

16  26th, and so they re-indicted it to correct that error.

17  Q.   Okay.  And what was the disposition of that case?

18  A.   It was ultimately dismissed on or about July 27th

19  of 2017.

20  Q.   Does -- based on your investigation, have you been

21  able to determine whether there are any pending state

22  criminal charges against Mr. Yoo?

23  A.   There is at least one:  A criminal trespass

24  offense, a Class B misdemeanor, which that incident

25  stemmed from a February 4, 2018 incident, in which

1   Mr. Yoo was seen at the Wal-Mart in Tyler, Texas by an

2   off-duty Tyler Police Department Officer.  His presence

3   there on the premises was in violation of a criminal

4   trespass warning, as we discussed earlier, that was

5   issued on or about November 12, 2016.

6   Q.   All right.  And a warrant was obtained for his

7   arrest; is that right?

8   A.   That's correct.

9   Q.   He was arrested?

10  A.   He was on or about February 9th of 2018.

11  Q.   All right.  And then charges were ultimately filed

12  in state court; is that correct?

13  A.   That's correct.  And they are is still pending.  I

14  believe a case currently is set to take place on or

15  about May 23rd of 2018.

16  Q.   All right.  As part of your investigation, have

17  you conducted any research regarding Mr. Yoo's conduct

18  before coming to the Eastern District of Texas?

19  A.   I have.

20  Q.   Are you aware of any documented misconduct and

21  encounters with law enforcement officials that occurred

22  prior to him relocating to the Eastern District of

23  Texas?

24  A.   There is extensive documentation of contacts that

25  Mr. Yoo has had with law enforcement agencies, not just

 1  within the state of Texas, but also in New Jersey and

 2  Connecticut, stemming back to at least 2012.

 3  Q.   All right.  You were able to -- your investigation

 4  has revealed encounters with law enforcement at Rutgers

 5  University; is that correct?

 6  A.   That's correct.

 7  Q.   And that took place during the period of 2012 to

 8  approximately 2015; is that right?

 9  A.   That's correct.

10  Q.   All right.  How about University of Connecticut?

11  A.   Correct.  There have been encounters there as well

12  with Mr. Yoo.  In 2014 is when these incidents are

13  documented.

14  Q.   All right.  And were you able to locate records of

15  law enforcement encounters with Mr. Yoo in the

16  Dallas\Fort Worth area?

17  A.   Yes, sir, that's correct.  There have been numerous

18  contacts with Mr. Yoo and other law enforcement

19  agencies, to include the Richland College Police

20  Department; the Collin College Police Department; the

21  Plano, Texas Police Department; the Prosper, Texas

22  Police Department; and the Dallas Police Department, so

23  far.

24  Q.   All right.  Were you able to obtain copies of these

25  reports that you've described from the various law

1  enforcement agencies?

2  A.   Yes, sir, I have -- the only agency I do not have

3  reports for currently at this time is the Plano Police

4  Department.

5  Q.   All right.  And can you approximate for the Court

6  the number of police reports from Rutgers University

7  Police Department regarding Mr. Yoo?

8  A.   Again, over 20.

9  Q.   All right.  How about University of Connecticut

10  Police Department?

11  A.   The University of Connecticut only pulled one case

12  number.  However, that report has been supplemented 17

13  times.  Some agencies, that's what they do, they just

14  pull one case number.  Then as more information is

15  gleaned to the case, they will supplement it later.

16  Q.   All right, let's talk about an incident occurring

17  at the University of Connecticut, to which the

18  university police responded on April 30th of 2014.  If

19  you would, describe for the Court what occurred in that

20  situation.

21  A.   The investigation revealed that a former Marine who

22  apparently befriended Yoo, Mr. Yoo, he described his

23  behavior at a shooting range they attended together.

24  He mentioned that Mr. Yoo would shoot at the head of

25  every target -- or excuse me, at the head of the target

1  every time, even though range policy specifically

2  prohibited such contact.  The report indicates that

3  Mr. Yoo was made aware of this policy, but continued to

4  shoot at the head regardless.

5  Q.   I think you mentioned that there was an encounter

6  between members of the Prosper Police -- Prosper, Texas

7  Police Department and the defendant; is that correct?

8  A.   Yes, sir, that is correct.

9  Q.   And was that in June 2016?

10 A.   Yes, sir.

11 Q.   All right.  If you would, describe to the Court the

12 circumstance surrounding that encounter.

13 A.   The Prosper, Texas Police Department responded to

14 a Kroger Grocery Store somewhere in that area after

15 reports that there was a subject who stated that he was

16 going to shoot people.  A description was given that

17 the subject was with a truck that had a large

18 confederate flag dangling from it.

19       Upon arrival, officers contacted Mr. Yoo in

20 the parking lot with that vehicle and explained kind of

21 what happened.  According to the reports, witness

22 statements were that Mr. Yoo had stated that the Black

23 Lives Matter Movement and their members should be

24 labeled as a terrorist organization and that the

25 Federal Government and the United States Military

1  should be able to kill them all.  He also had made

2  mentioned during that investigation to the officers

3  that he had tried to get in the Army, but was denied

4  for mental issues.  During their contact, they

5  determined that Mr. Yoo was, in fact, carrying a

6  concealed handgun at that time, a 1911 .45 caliber

7  pistol.  They also located an AR-15 rifle in the back

8  of the vehicle.

9  Q.  All right.  As part of the investigation, did you

10 become aware of an incident involving Mr. Yoo on the

11 campus of the University of North Texas?

12 A.   Yes, sir.

13 Q.   All right, and that occurred in September of 2016;

14 is that right?

15 A.   That's correct.

16 Q.   All right.  If you would, just describe for the

17 Court the circumstance surrounding that incident.

18 A.   On or about September 9th of -- or excuse me, 6th

19 of 2016, Mr. Yoo was seen bringing a confederate flag

20 to the campus of UNT where he was not a student at

21 that time.  He took position on campus engaging other

22 students in -- basically trying to engage them in

23 debate.  The UNT paper there on the campus quoted

24 Mr. Yoo as saying that he was "proud to be prejudiced,"

25 and that his purpose there, he told them that he

1   intended to rile up "as many liberals as possible."

2          He also mentioned that he was banned at that

3   time from four separate universities.  Doesn't

4   specifically say which.  He also made reference to

5   students and apparently to the police that he was

6   carrying a concealed handgun at that time.  There's no

7   indicator that the handgun was displayed.  However,

8   UNT PD did request and receive a copy of Mr. Yoo's

9   concealed handgun license to verify that.

10         MR. COAN:  I'll pass the witness.

11         THE COURT:  Cross-examination?

12         MR. MICKELSEN:  Just a few questions.

13                   **CROSS-EXAMINATION**

14  **BY MR. MICKELSEN:**

15  Q.  I may have misunderstood you.  You referred to an

16  incident at a Wal-Mart.  Did -- you made a reference

17  to Black Lives Matter.  Was Mr. Yoo saying he was

18  supportive or opposed to that?

19  A.   The report indicates that he was supportive of the

20  Black Lives Matter Movement and that he was going to

21  start shooting police.

22  Q.  And then at other times he said that he's opposed

23  to the Black Lives Matter?

24  A.   That's correct.

25  Q.  All right.  The aggravated assault charge, you said

1  that was dismissed in July 2017?

2  A.   That's correct.

3  Q.   Do you know why it was dismissed?

4  A.   You'd have to consult with the Smith County

5  District Attorney's Office on that.  I was --

6  Q.   To your knowledge, do you have any idea why?

7  A.   I was -- it was indicated to me that there was a

8  problem with the victim, that he had a Fifth Amendment

9  right for another offense.

10 Q.   On any of the occasions apart from this aggravated

11 assault charge, is he -- there's basically a lot of

12 police reports.  Is there any time that he's

13 brandishing a firearm?

14 A.   Depends on what your definition of "brandishing" is.

15 Q.   Frightening somebody with it, pointing it, waving

16 it.

17 A.   No.

18        MR. MICKELSEN:  That's all I have.

19        THE COURT:  All right, thank you.

20             Mr. Coan, anything further?

21        MR. COAN:  No, Your Honor.  May this witness

22 be excused?

23        THE COURT:  Yes.

24             Any objection, Mr. Mickelsen?

25        MR. MICKELSEN:  No.

```
 1            THE COURT:  Officer,  thank you very much for
 2  your testimony.
 3            THE WITNESS:  Thank you, Your Honor.
 4            THE COURT:  Mr. Coan, you may call your next
 5  witness.
 6            MR. COAN:  Thank you, Your Honor.  United
 7  States calls Mike Medders to the stand.
 8            THE COURT:  All right.  Mr. Medders, if you
 9  would do the same, as you've been observing.  Stop here
10  at the witness stand before you proceed to the witness
11  box.
12            DEPUTY CLERK:  Do you solemnly swear the
13  testimony you will give in the case now in hearing will
14  be the truth, the whole truth, and nothing but the
15  truth, so help you God?
16            THE WITNESS:  I do.
17            THE COURT:  You may have a seat.
18              Mr. Coan, you may proceed.
19            MR. COAN:  Thank you, Your Honor.
20        OFFICER MIKE MEDDERS, CALLED BY GOVERNMENT
21                   DIRECT EXAMINATION
22  BY MR. COAN:
23  Q.  Good afternoon.
24  A.  Good afternoon.
25  Q.  Would you state your name for the record, please.
```

1  A.   Mike Medders.

2  Q.   Could you spell it?

3  A.   I'm sorry, it's M-i-k-e, the last name is Medders,

4  M-e-d-d-e-r-s.

5  Q.   Thank you.  And how are you currently employed?

6  A.   I'm currently employed as the Chief of Police at

7  the University of Texas in Tyler.

8  Q.   And how long have you been in that position?

9  A.   Twelve and a half years.

10  Q.   All right.  Would you tell the Court a little bit

11  about your education, where you were before the

12  University of Texas Tyler Police Department.

13  A.   Prior to the University of Texas Tyler Police

14  Department, I worked with the Palestine, Texas Police

15  Department from 1990 until 2005.  I served beginning as

16  a police cadet going to the East Texas Police Academy.

17  I worked my way up from patrolman and I became

18  Assistant Chief of the department.

19  Q.   I would venture to guess the Court is familiar with

20  the University of Texas at Tyler, but for purposes of

21  the record, would you describe the university a little

22  bit, its size, number of students, that type thing.

23  A.   The University of Texas Tyler is located here in

24  Tyler, Texas.  It has 10,500 enrolled students, 1500

25  resident students.  We have a Tyler campus, a Palestine

1   campus, a Longview campus, as well as a Houston

2   extension.

3   Q.   In the course and scope of your employment as

4   Chief of the UT Tyler Police Department, did you become

5   involved in a student by the name of Heon Jong Yoo?

6   A.   Yes, I did.

7   Q.   And do you know that individual by any other names?

8   A.   Hank.  Hank Yoo.

9   Q.   All right.  Let's talk a little bit about, just for

10  record purposes again, is Mr. Yoo currently enrolled as

11  an undergraduate student at UT Tyler?

12  A.   Not currently.

13  Q.   Not currently.  At one time was he enrolled as an

14  undergraduate?

15  A.   Yes, he was.

16  Q.   Okay.  And when did he become enrolled?

17  A.   January 19th was the first notice I had of his

18  enrollment.  That day, or within a day or two, was

19  January 19th.

20  Q.   Okay, January 19th of 2018?

21  A.   2018.

22  Q.   All right.  And have you or members of your

23  department, officers within your department at UT

24  Tyler, had encounters with Mr. Yoo?

25  A.   Numerous.

1  Q.   Okay, were those documented in reports issued by

2  your department?

3  A.   Yes, they are.

4  Q.   Okay, can you approximate the number of police

5  encounters that you or members of your department have

6  had with Mr. Yoo?

7  A.   We generated two case reports, official case

8  reports, 11 what we called Field Incident Reports where

9  we respond to something that doesn't include the level

10 of the case.  The main case file has been supplemented

11 13 to 15 times.  And in addition, the university has

12 generated 22 Behavioral Intervention Reports from

13 members of the university community.

14 Q.   All right.  If you would, explain to the Court

15 what a Behavioral Intervention Report is or how that's

16 generated or who initiates it.

17 A.   We have what's called a Behavioral Intervention

18 Team on campus that intakes reports of any type of

19 troubling behavior from a student.  We have a committee

20 that meets regularly.  So anyone can go online and

21 submit one of these reports.  We receive them from

22 students, staff, and faculty.

23 Q.   You testified that Mr. Yoo became enrolled as an

24 undergraduate student at UT Tyler on or about January

25 19th of 2018; is that correct?

1  A.   That's correct.

2  Q.   What was the date of the first police encounter by

3  members of your department with Mr. Yoo?

4  A.   The first report was January 19th.  We didn't

5  encounter Mr. Yoo on that date.

6  Q.   All right.  You gave us an approximate number of

7  the documented police encounters with Mr. Yoo while

8  being a member of the university community.  Let's talk

9  about a few examples of those.

10        If you would, describe for the Court the

11  circumstances surrounding a February 2, 2018 incident.

12  A.   You said, repeat, February 2nd?

13  Q.   Yes.  Was there an encounter between Mr. Yoo and an

14  African-American student on campus?

15  A.   Okay, I have a report, one report from February

16  2nd.  I actually have two, but one is that Mr. Yoo made

17  disparaging comments about Martin Luther King, Jr. in

18  the presence of an African-American student as she

19  passed by.  It appears the comments were meant to draw

20  a reaction.

21  Q.   Is there a documented encounter with an

22  African-American student in which Mr. Yoo is alleged to

23  have commented about possession of a firearm on campus?

24  A.   Yes, there is.

25  Q.   All right.  What's the date of that?

1  A.   The actual date, I think we were advised of that

2  on February 22nd.  It allegedly occurred about a week

3  earlier, so approximately February 15th.

4  Q.   All right.  If you would, describe the

5  circumstances surrounding that incident to the Court.

6  A.   It was reported to us that Mr. Yoo became involved

7  in a conversation with a black male student about the

8  group Black Lives Matter, and the black male was

9  apparently chastising Mr. Yoo for his disparaging

10 remarks.  Mr. Yoo told the black male that he has a

11 First Amendment right to free speech and that he also

12 has a Second Amendment right to carry a firearm, and

13 that he carries a firearm in his backpack on campus.

14 Q.   To your knowledge, has Mr. Yoo undergone any type

15 of mental health counseling while at the University of

16 Texas at Tyler?

17 A.   Yes.

18 Q.   Are you aware of any disciplinary action that's

19 been taken by the university against Mr. Yoo?

20 A.   Yes, I am.

21 Q.   All right.  And if you would, describe the nature

22 of any such disciplinary action.

23 A.   Mr. Yoo was placed under sanction on or around

24 February 20th for a period of 30 days.  That sanction

25 was that he could only go to class, be in the parking

1  lots of the building he was going to class in, go

2  straight to class, and leave, and go to his counseling

3  appointments with a police escort.

4  Q.   In the few months here that Mr. Yoo has been at the

5  University of Texas Tyler, how would you characterize

6  his effect on the campus life?

7  A.   My opinion is that he's literally held the

8  university hostage for two months with his disruptive

9  behavior.  We responded numerous times to Mr. Yoo's

10 disruptive behavior.  Mr. Yoo knew how not to cross us,

11 the police, and how not -- or he knew how to avoid

12 going to jail.  In my opinion, he knew just how far he

13 could push things before it would result in his arrest

14 or result in criminal activity.

15 Q.   What makes you say that?  What's an example?

16 A.   Because, I mean, one example is whenever -- the

17 very first time I met with him, he talked about his

18 First Amendment right to free speech.  I explained to

19 him the difference between free speech and language

20 that would tend to incite a breach of the peace, which

21 would obviously result in criminal activity.  He

22 advised me at that point that he loves the police, that

23 he supports the police, and he's definitely not here to

24 cause us any problems and that he would abide by

25 whatever advice we gave him.  That's just one example

1  of his cooperation with us.

2         Another example would be, after we received a

3  report of the firearm, we had an encounter with Mr. Yoo

4  where we waited for him to come to class because we

5  wanted to verify whether or not he would -- that he was

6  carrying a firearm in his backpack.  He voluntarily

7  consented to a search of that backpack, which was

8  negative for firearms.

9         And any time that we dealt with Mr. Yoo, you'd

10 have to say that he was respectful towards us as police.

11 Q.  Based on your investigation or the investigation of

12 officers under your supervision, are you aware of any

13 threats of violence that Mr. Yoo has made while at UT

14 Tyler?

15 A.  He's made numerous threats or hate -- I would

16 characterize it as hate speech towards certain groups:

17 Jews, Muslims, single unwed mothers, supporters of

18 Black Lives Matter.  Numerous people had reported him

19 making statements concerning "All Jews should die,

20 Israel should be nuked."  He wishes that they could all

21 be "rounded up and put in the same place so they would

22 be easy to exterminate."  Same way with Muslims, that

23 type of talk about Muslims.  He made several of our

24 Veterans very nervous, going into the Veterans Resource

25 Center and telling them how envious he was of them

 1 | because they probably got to go kill Muslims in their
 2 | military duties.
 3 |       Again, just many statements toward groups of
 4 | people that he did not feel had a right to exist --
 5 | those were his words -- and that they should be
 6 | exterminated.  So he's made a lot of people on campus
 7 | nervous, including our Muslim Student Association.
 8 | Q.  As the Chief of Police there responsible for the
 9 | safety of the students, did he make you nervous?
10 | A.  Yes, he made me nervous.
11 | Q.  Did you consider him a danger?
12 | A.  Yes.
13 |       MR. COAN:  I'll pass the witness.
14 |       THE COURT:  Thank you.
15 |       Any cross-examination?
16 |       MR. MICKELSEN:  Yes.
17 |             **CROSS-EXAMINATION**
18 | **BY MR. MICKELSEN:**
19 | Q.  You say he engaged in a lot of hate speech, that's
20 | clear; correct?
21 | A.  Correct.
22 | Q.  Did he engage in violence?  Did he attack anybody
23 | on the campus?
24 | A.  No, sir.
25 | Q.  Did he brandish a weapon or a weapon at anybody?

```
 1   A.   No, sir.
 2   Q.   So, in fact, he was always cooperative with police?
 3   A.   He was cooperative with the police, other than
 4   repeating his behavior that we advised him against, and
 5   that would be engaging --
 6   Q.   Which is basically don't express your hate speech?
 7   A.   Correct.  Hate -- well, don't let it reach into
 8   criminal activity.  Don't let it reach into an
 9   incitement.
10   Q.   Did it?
11   A.   It very easily could have.  We were there many
12   times that Mr. Yoo didn't even know we were there just
13   as a precautionary measure before his classes.
14   Q.   I mean, it seems like, right, what's going on in
15   Tyler, at least where the rubber hits the road, I mean,
16   he is exercising a First Amendment right.  He's
17   entitled to express his hate speech, he's not entitled
18   to engage in criminal conduct.
19          Did you ever make an arrest?
20   A.   No, we did not.
21   Q.   You said he was receiving counseling at school?
22   A.   Yes.
23   Q.   Do you know if -- do you know, did he have some
24   kind of diagnosis?
25   A.   No, I'm not aware, I'm not privy to that
```

1  information.

2  Q.   Okay, fair enough.

3          MR. MICKELSEN:  That's all I've got.

4          THE COURT:  Thank you.

5              Any redirect?

6          MR. COAN:  No, Your Honor.  Thank you.  May

7  this witness be excused?

8          THE COURT:  Mr. Mickelsen, any objection to

9  this witness being excused?

10          MR. MICKELSEN:  No, Judge.

11          THE COURT:  All right, thank you, Chief.  You

12  may step down and you may be excused.  Thank you for

13  your testimony.

14              All right.  Mr. Coan, I believe, is that

15  all your witnesses you're going to be calling?

16          MR. COAN:  Those are all the Government's

17  witnesses, Your Honor.

18          THE COURT:  All right, any other evidence the

19  Government has to present?

20          MR. COAN:  If I may just briefly proffer the

21  Pretrial Services Report, Your Honor?

22          THE COURT:  Yes, go ahead.

23          MR. COAN:  All right.  Your Honor, just

24  briefly, again, the United States is moving for

25  detention in this case on the grounds that there is no

1    set of conditions that can reasonably assure the

2    appearance of the defendant at future court proceedings

3    or that can protect the safety of the community.

4              Pretrial Services agrees with that

5    position and has recommended detention in this case.

6    According to the Pretrial Services Officer, the

7    defendant poses a risk of non-appearance based on the

8    offense charged, his mental health history, the pending

9    charges that were described earlier, the state charges,

10   as well Mr. Yoo's ties to a foreign country.  The

11   witnesses did not elaborate too much  on Mr. Yoo's ties

12   to a foreign country.  That's explored more in the

13   background section of the Pretrial Services Report, the

14   section regarding family ties.  Mr. Yoo obviously was

15   born in South Korea, hails from there.  Members of his

16   family, both immediate and extended, are located in

17   South Korea.

18             As well, regarding the danger that Mr. Yoo

19   presents to the community, the Pretrial Services

20   Officer believed that the following supported that

21   position:  The nature of the pending federal criminal

22   charges; the seven-count Indictment, all which charge

23   false statements and misrepresentations made in

24   connection with the acquisition of firearms in the

25   Eastern District of Texas; again, reference to

1  Mr. Yoo's mental health history; and also safety

2  concerns for the community.

3          I note for the record that the mental

4  health history that was -- that was described by the

5  witnesses was denied by the defendant during his

6  interview with the Pretrial Services Officer.  So the

7  mental health history and any incidents of treatment or

8  hospitalization, whether voluntary or involuntary, are

9  not included in the Pretrial Services Report because

10 that's based on a self-report by the defendant and so

11 do not serve as a basis for the Pretrial Services

12 Officer's conclusion.

13          And with that, the United States rests.

14          THE COURT:  All right.  Mr. Mickelsen, you

15 said you had a proffer that you would like to make?

16          MR. MICKELSEN:  Yes, Your Honor.  May I

17 present this to you?

18          THE COURT:  Yes, you may.  Now, are you

19 proffering this, are you offering this as an exhibit,

20 or --

21          MR. MICKELSEN:  Do you mind if I just offer

22 this as an exhibit?  I'll offer it as an exhibit.

23          MR. COAN:  No objection, Your Honor.

24          THE COURT:  All right, so we'll mark this as

25 Defendant's Exhibit 1 for this hearing, no objection to

1  being admitted.

2        MR. MICKELSEN:  And then, Your Honor, I guess

3  essentially what I'd like to do is talk a little bit

4  about that exhibit and then just some of the issues

5  that I think are -- if I may do that?

6        THE COURT:  You may do that.

7        MR. MICKELSEN:  What I want to say about that

8  exhibit essentially is that is a full cognitive

9  neurological assessment that is recent.  There is no --

10  according to this neurological assessment, there is no

11  mental illness present.  There's notably high IQ.

12        I think what is problematic about the --

13  Mr. Yoo has never considered himself to have a mental

14  illness.  What is happening is he is exercising his

15  First Amendment right to engage in hate speech.  As

16  deplorable as that might be, that does not make him

17  insane or mentally ill.  That has led to his temporary

18  admission into psychiatric units and then his

19  subsequent release within days.  He didn't report that

20  to Pretrial Services because he doesn't agree that

21  there is a mental illness.

22        And there are his family, who has

23  substantial resources, trying to gather their medical

24  evidence, but in the short time frame I had, this was

25  the only report I was able to find.  And quite frankly,

1 his family has been concerned about the number of

2 police contacts, why he's engaging in this hate speech,

3 and why is it leading to these arrests.  They've been

4 trying to find out what is going on with him, why he is

5 doing that.  And the medical professionals, they are

6 not finding any evidence.  Just because somebody has

7 latched onto disagreeable or reprehensible ideas, even,

8 does not make them mentally ill.

9           Now, I think that also goes to the danger

10 issue.  I appreciate the Chief of Police from the Tyler

11 Police Department explaining what was going on there.

12 There is contact after contact after contact with the

13 police.  That is because he is -- it is clear that

14 Mr. Yoo has made a habit of going out into the public,

15 into the public square, and engaging in hate speech,

16 which is divisive and has led people to call the police

17 and led to these confrontations.  There is no criminal

18 history in this case so far.  There have been arrests.

19 There has been a charge that's been dismissed.  There's

20 one pending criminal trespass case.

21           Now, there's ties to a foreign community,

22 there's no question.  Mr. Yoo is a national of South

23 Korea.  I think it's almost -- there's just no real

24 risk of flight here given the facts.  Really, what is

25 going on is his extreme loyalty, probably misplaced

1  patriotism, has led to him asserting he is a U.S.

2  citizen when he's not.  Be that as it may, I think

3  there are conditions that can address all of these

4  concerns adequately.  He can surrender his passport,

5  that can be a condition.  He can be put on electronic

6  monitoring.  He has the means.  He doesn't have to

7  work.  He doesn't have to leave his apartment apart

8  from getting groceries.  He probably could even have

9  those delivered.

10            His firearms have been seized and

11  surrendered.  There is -- there is -- I do agree, given

12  the nature of this case, it does make sense that the

13  Court would be concerned, but I think the Court should

14  be sensitive to the First Amendment aspects of this

15  case.  I think we should not take the fact that a man

16  engages in hate speech and use that as a basis to deny

17  him his liberty when these are pending charges.

18            Also, I think the Government -- we talked

19  about this a little bit, I won't get into a Guideline

20  analysis.  This is not the case in which the Guidelines

21  are high.  We are talking about an allegation charge of

22  false representations made on these forms.  He's not a

23  prohibited person, as far as we know under the law.  If

24  he had been, then the Guidelines would be really high.

25            In all the cases I've researched, looking

1  into this issue, every single time that's what in

2  reality is going on.  Somebody is lying on these forms,

3  disguising who they are or who they're getting the guns

4  for because those people are prohibited from having a

5  gun.  That was not the case here.  This is a man who

6  has engaged in hate speech and who crossed a red line,

7  indeed, by making false statements on these firearm

8  forms.  But given that he's not a prohibited person,

9  the Guidelines would be relatively low.

10          And I think given the fact that the Court

11  can impose conditions, I get it, they should be strict.

12  But electronic monitoring, surrender the passport, no

13  guns, and counseling, all of this which can be provided

14  through Pretrial Services, I think that the Court, if

15  it can find adequate conditions to protect the public

16  and ensuring the appearance of the defendant, the Court

17  should impose those conditions.

18          THE COURT:  All right, thank you.

19          Anything further from either side?

20          MR. COAN:  Your Honor, may I briefly argue in

21  response?

22          THE COURT:  Sure, go ahead.

23          MR. COAN:  All right.  This isn't always the

24  case, Your Honor.  I happen to agree with a number of

25  the comments made by my counterpart.  This is not a --

1   this is not a First Amendment case.  The defendant has

2   not been charged with a hate crime.  There is no

3   testimony elicited indicating that he had been subject

4   to state or federal arrest for any type of hate crime.

5   And that's not -- that's not the Government's position.

6   And I would venture to say that that's not the position

7   of Pretrial Services Department that because an

8   individual says distasteful things, that that in and of

9   itself indicates that an individual presents a danger

10  to himself or to the community.

11            In this particular set of circumstances,

12  it is a combination of factors, as the Court is aware,

13  under 3142(g).  There are a host of factors the Court

14  is asked to look at in analysis of this question of

15  release.  And it is the totality of the circumstances,

16  that is the Government's position, that indicates that

17  there is no set of conditions that would reasonably

18  assure the defendant's appearance or ensure the safety

19  of the community.  It is the combination of we can call

20  it hate speech.  But when there is hate -- and I'm

21  not -- I'm not going to stand up here and try to be a

22  constitutional scholar.  That's not what this is about.

23  But there is hate speech and then there are threats of

24  violence, which are expressions of homicidal ideation,

25  and then there is documented mental illness.

1           Now, the defendant is denying and, in

2   fact, denied under oath to Your Honor that he had ever

3   received treatment for mental issues.  We know from the

4   testimony that that is false.  He has been diagnosed

5   with a disorder, bipolar disorder.  That is a mental

6   illness.  So he may deny it, but the evidence is to the

7   contrary.  He has a mental illness, he has expressed

8   homicidal ideation, he has expressed threats of

9   violence, and he has lied and made misrepresentations

10  in order to acquire firearms.  That combination is

11  volatile and that is the Government's position as to

12  why this individual presents a danger.

13          On the issue of flight, it's not the --

14  it's not the what's the potential Guideline range.

15  There will be an argument down the road about whether,

16  in fact, this individual is a prohibited person.  I can

17  tell you that the Federal Government believes that he

18  is a prohibited person.  That's why he was denied those

19  firearm purchases on the transactions that Special

20  Agent Reed testified about.  Because according to the

21  FBI, he is a prohibited person as reported by the state

22  agency in the state of New Jersey.  Now, he has not

23  been charged with that.  That is not our argument

24  here.  That will affect his exposure which will be a

25  consideration on the issue of flight.  The other

1  consideration is, again, I'm not an immigration

2  specialist, but there may be immigration consequences

3  given his non-citizenship status based  upon the end

4  result of this -- of this criminal case.

5          Your Honor, I appreciate the assessment

6  offered by defense counsel.  It occurred in 2015.  And

7  as they say, there's a lot of water that's gone under

8  the bridge since 2015, as you've heard testimony from

9  the Government's witnesses today.  For those reasons,

10 as well as the reasons articulated by the Pretrial

11 Services Officer, the Government would submit that

12 they said there is no set of conditions that would

13 reasonably assure the appearance of the defendant or

14 ensure the safety of the community.  And for that

15 reason, the Government would ask that the Motion for

16 Detention be granted.

17          THE COURT:  All right, thank you.

18          MR. COAN:  Thank you, Your Honor.

19          THE COURT:  All right.  In considering this

20 motion, I first want to note that I've considered the

21 Pretrial Services Report that's been prepared and

22 recommended that the defendant be detained.  I've also,

23 of course, considered the testimony that I've heard

24 today, and I'll say there are several things that stand

25 out to me.

1          First of all, there is -- there are

2    concerns that I have with regard to the defendant's

3    mental health.   Now, that may remain to be fleshed out

4    entirely.   I am in receipt of this Defendant's Exhibit

5    1.   But on balance, the testimony related to the

6    defendant's mental health gives me serious concerns

7    that conditions can't adequately address those concerns.

8          Further, in the balance are these -- the

9    testimony that I've heard regarding the defendant's

10   course of conduct, repeated instances of threats

11   towards individuals and groups, specifically of

12   shooting people.   I'm not focused on hate speech, what

13   I would characterize as hate speech, hating a person,

14   hating a group.   I'm focused on what I've heard are

15   threats to injure, kill people, shoot people.   So that

16   factors heavily in my consideration of the Government's

17   Motion for Detention.

18         Also, factoring in heavily are the nature

19   of the charges here, which involved essentially false

20   statements made by the defendant to obtaining firearms.

21   And that was done on repeated occasions, done after

22   administrative and judicial assessment by the state of

23   Texas with regard to whether this defendant should

24   possess a concealed handgun license.   And false

25   statements were further made after those proceedings.

1   So I do not find based upon all of those considerations

2   there can be conditions that would assure the safety of

3   the community here.

4            I further find that the defendant's ties

5   to South Korea are concerning.  But furthermore, that

6   the defendant allegedly falsely indicated his

7   citizenship repeatedly is concerning to me.  So I

8   likewise find that the Government has shown by a

9   preponderance of the evidence that there are no

10  conditions here that would adequately assure the

11  defendant's appearance in this case.

12           So, considering all the information that

13  I've assessed here, that I've referenced, I do find the

14  Government's motion should be granted for those reasons.

15           All right, anything further from the

16  Government?

17          MR. COAN:  No, Your Honor.  Thank you.

18          THE COURT:  Anything further from the

19  defendant?

20          MR. MICKELSEN:  No, Your Honor.

21          THE COURT:  All right, thank you.  The

22  defendant is remanded to the custody of the United

23  States Marshals and we are adjourned.

24          *[3:43 p.m. - Proceedings adjourned]*

25

C E R T I F I C A T I O N

    I certify that the foregoing is a correct
transcript of the electronic sound recording of the
proceedings in the above-entitled matter.


/s/ Gwen Reed

8-15-18