1                IN THE UNITED STATES DISTRICT COURT
              FOR THE EASTERN DISTRICT OF TEXAS
2                        TYLER DIVISION

3   UNITED STATES OF AMERICA     )
                                             DOCKET NO. 6:18cr16
4        -vs-                    )
                                             Texarkana, Texas
5                                )   2:06 p.m.
    HEON JONG YOO                            October 10, 2018
6
                    TRANSCRIPT OF MOTION HEARING
7         BEFORE THE HONORABLE ROBERT W. SCHROEDER III,
                  UNITED STATES DISTRICT JUDGE
8
                    A P P E A R A N C E S
9

10   FOR THE GOVERNMENT:

11   MR. LAUREL FRANKLIN COAN, JR.
     MR. LUCAS R. MACHICEK
12   ASSISTANT U.S. ATTORNEYS
     110 North College, Ste. 700
13   Tyler, Texas  75702

14   FOR THE DEFENDANT:

15   MR. HEON JONG YOO
     PRO SE
16   101 E. Methvin St., Ste. 559
     Longview, Texas 75601
17
     STANDBY COUNSEL:
18
     MR. JEFF LYNN HAAS
19   ATTORNEY AT LAW
     100 E. Ferguson, Ste. 908
20   Tyler, Texas 75702

21
     COURT REPORTER:          MS. SHEA SLOAN
22                            FEDERAL OFFICIAL REPORTER
                              211 W. Ferguson
23                            Tyler, Texas 75702

24
     Proceedings taken by Machine Stenotype; transcript was
25   produced by a Computer.

1                              INDEX

2

3    WITNESS                DIRECT    CROSS    REDIRECT

4    JAMES REED              30        53

5    MATTHEW LACK            99        113

6    HEON JONG YOO          144       149       166

7

8                         * * * * * * * * * *

9                          EXHIBIT INDEX

10

11   DEFENDANT'S HEARING
     EXHIBIT NO.            DESCRIPTION              PAGE
12
         1           UNSWORN DECLARATION OF      177
13                   KU YEONG JEONG

14       2           UNSWORN DECLARATION OF      177
                     SOYOUN JEONG
15

16       3           TYLER POLICE DEPARTMENT     177

17                   REPORT

18       4           DETAINEE TRANSACTION        177
                     HISTORY
19
         5           GREGG COUNTY JAIL           178
20                   GRIEVANCES

21       6           GREGG COUNTY SHERIFF'S      178
                     OFFICE RECEIPT
22
         7           SEALED GRAND JURY           178
23                   TESTIMONY - JAMES REED

24

25

```
 1                    P R O C E E D I N G S
 2              THE COURT:  Please be seated.
 3              Mrs. Schroeder, if you would, call the case for
 4    us.
 5              THE CLERK:  Docket No. 6:18cr16, United States of
 6    America vs. Heon Jong Yoo.
 7              THE COURT:  Announcements for the record.
 8              MR. COAN:  Your Honor, good afternoon.  Frank Coan
 9    for the United States.  I am joined at counsel table by my
10    co-Counsel, AUSA Lucas Machicek; and Special Agent Jim Reed
11    with ATF.
12              THE COURT:  Good afternoon, Mr. Coan.  Welcome.
13              Mr. Yoo, I know that you are here this afternoon
14    and representing yourself.
15              MR. YOO:  Yes, sir, I am.
16              THE COURT:  All right.  You may be seated.
17              Mr. Haas, you have been appointed by Judge Mitchell
18    as Standby Counsel in this matter, and I note your presence
19    this afternoon.
20              MR. HAAS:  Thank you, Your Honor.  This may be a
21    good time to delineate the parameters of my responsibilities.
22    Unfortunately, I was Standby Counsel in a death penalty
23    case and --
24              THE COURT:  Mr. Haas, let me suggest you go to the
25    podium.
```

1              MR. HAAS:  Sure.

2              MR. YOO:  Your Honor --

3              THE COURT:  Mr. Yoo, if you are going to address

4     the Court, you need to be standing, please.

5              MR. YOO:  Your Honor, after him I would like to

6     address the Court, please.

7              THE COURT:  I will allow you to do that.

8              MR. YOO:  I appreciate it.

9              MR. HAAS:  Basically, Your Honor, I got a call from

10    Judge Mitchell's office.  I, obviously, wasn't at the hearing

11    when Mr. Yoo was allowed to represent himself, and I was

12    appointed as Standby Counsel.

13            It is my understanding that there are basically

14    three roles that Standby Counsel fills.  The first role,

15    Standby Counsel can argue case -- or argue motions in front

16    of the Court, but can't do anything that infringes on the

17    Defendant's right in front of a jury.

18             THE COURT:  I agree with that.

19             MR. HAAS:  The second role is basically being a

20    gofer for the Defendant.

21            The third role is basically doing nothing but

22    waiting until, or if, the Defendant relinquishes his right to

23    self-representation or the Court terminates that right under

24    Indiana v. Edwards.

25             And I was a little bit confused because earlier I

1   was sitting out in the gallery, and I was asked to sit at

2   Counsel table, so I think it would be a good idea, just so

3   Mr. Yoo understands and I understand, just what my roles are,

4   what am I supposed to do.

5          THE COURT:  Well, I didn't appoint you as Standby

6   Counsel, Mr. Haas.

7          MR. HAAS:  I understand.

8          THE COURT:  And I certainly don't know what other

9   understandings you may have been under at some point.  I am

10   relatively new to the case, although it is set for trial next

11   month, as you know.

12          I agree with you that those, in general, are the

13   three, you know, types of categories that Standby Counsel may

14   fall into.  I think to some extent it depends on how the case

15   develops and to some extent it depends on what Mr. Yoo's

16   wishes are.

17          My concern, in particular, is, if Mr. Yoo's motion

18   to appeal the detention ruling is denied and he remains in

19   detention pending trial, he is going to need some assistance

20   in preparation for trial.  And that would be a role I would

21   hope you as a member of this Court and as duly-appointed

22   Standby Counsel would be able to fulfill.

23          MR. HAAS:  And I have visited with Mr. Yoo about

24   that.  I have told him that I certainly would be willing to

25   print off case law, provide any resources so he can

1    adequately prepare his defense.

2            THE COURT:  All right.

3            Mr. Yoo, I'll be glad to hear from you.

4            MR. YOO:  Yes, sir.  Your Honor, I would like to

5    address the Court.  I would like three points.  First of all,

6    where is Ms. Tina Simmons, my witness, is she here?

7            THE COURT:  I don't know.

8            MR. YOO:  She is supposed to be here from the 1st

9    Choice Bail Bonds.  I called her and she agreed to be here.

10           THE COURT:  I don't know, is Ms. Simmons in the

11   courtroom?  It doesn't appear that she is in the courtroom.

12           MR. YOO:  Would someone contact her?

13           MR. HAAS:  You know what --

14           THE COURT:  Did you subpoena her for -- to compel

15   her attendance this afternoon?

16           MR. YOO:  No, sir.  I mean, she did tell me up to

17   yesterday that -- that she was going -- she was going to be

18   here actually.

19           THE COURT:  Perhaps she will come in shortly.

20           MR. YOO:  Yes, sir.

21           Second, pursuant to Federal Rules of Criminal

22   Procedure Rule fifty -- I'm sorry, Rule 49, 49 -- 49(a),

23   Alfa:  A party must serve on every other party any written

24   motion, written notice, designation of record on appeal, or

25   similar paper how made.  Service must be made in a manner

 1   provided for a civil action.

 2          I would like to take -- I mean, request the

 3   Court to take --

 4          THE COURT:  Mr. Yoo --

 5          MR. YOO:  Official notice.

 6          THE COURT:  -- Mr. Yoo, I don't mean to interrupt

 7   you, but I will have some preliminary comments I want to make

 8   about how I hope the afternoon will proceed.  What I was

 9   hoping you were wanting to do at this point was to respond to

10   what Mr. Haas said initially.  I will be glad to hear any

11   argument you have to make about anything else at a later

12   point in the afternoon.

13          But before we get into the preliminaries, do you

14   have anything you want to say with respect to Mr. Haas's

15   statements to the Court earlier or your view of his role of

16   Standby Counsel?

17          MR. YOO:  Yes, sir.  Since Gregg County Jail lacks

18   law library Internet access or any adequate method of

19   communication, I need it, I strongly need adequate    Standby

20   Counsel to be my legal assistant, yes, sir.

21          THE COURT:  Thank you, Mr. Yoo.  I have

22   anticipated -- obviously, I have read your appeal in this

23   case, your motion to appeal detention.

24          MR. YOO:  Yes, sir.

25          THE COURT:  You make reference in that motion to

 1   the law library facilities, and that is something that I am

 2   taking under advisement, and I am investigating what other

 3   opportunities there may be for you to be housed at a facility

 4   where you can have those resources available so that you can

 5   prepare your case for trial.

 6           In the meantime and until he is released, my view

 7   of it is that Mr. Haas should continue to play that role for

 8   you and to provide any assistance and advice he can do -- he

 9   can provide for you in terms of preparing your case for

10   trial.

11           MR. YOO:  Yes, sir.

12           THE COURT:  All right.  Very well.

13           MR. YOO:  Thank you, sir.

14           THE COURT:  All right.  So any comments by the

15   Government with respect to any of that, Mr. Coan?

16           MR. COAN:  No, Your Honor.  Thank you.

17           THE COURT:  All right.

18           Now, let me make just a couple of comments before

19   we proceed.  As I have mentioned earlier, this matter is set

20   for jury selection and trial beginning November the 13th of

21   2018 at 9:00 a.m. in Tyler.  We are set for a pretrial

22   conference in -- also in Tyler on November the 5th,

23   approximately a week before that.

24           There is a chance we may move that pretrial

25   conference to Texarkana.  We will just see how the

1  calendaring for that week proceeds.  But at this point it is

2  set in Tyler.

3        I have very carefully gone through the motion for

4  appeal of the detention order that Mr. Yoo has filed, as well

5  as the Government's response.

6        Just by way of background -- and I don't know that

7  this is necessary, but I think that -- I want to make sure I

8  understand exactly procedurally where we are today --

9  Mr. Yoo, the Defendant, was charged in a federal --

10        You may be seated, Mr. Yoo.

11        -- was charged in a federal criminal complaint on

12  April 6th, 2018, with violations of 18 USC Section 922(a)(6)

13  related to false statements during the purchase of a firearm,

14  and 18 USC Section 924(a)(1)(A) with respect to false

15  statements concerning information required to be kept by a

16  federal firearms licensee.

17        He was arrested that same day and brought before

18  Judge Love for an initial appearance.  Mr. Hawk of the Public

19  Defender's Office was appointed to represent him.

20        The Government did move for detention, and a

21  hearing was held shortly thereafter on April the 12th.

22        The -- or a hearing was set for April 12th.

23        In the meantime, Mr. Yoo and Mr. Hawk executed a

24  waiver of the detention hearing.  That was on April the 9th.

25  And Judge Love entered the detention order the following day.

1            On April 18th of 2018, the Grand Jury in the

2    Eastern District of Texas returned a seven-count Indictment

3    against Mr. Yoo.  He was charged with five violations of

4    924(a)(1)(A) and two violations of 922(a)(6).  The

5    924(a)(1)(A) counts carry terms of imprisonment of up to five

6    years and the 922(a)(6) counts carries a term of imprisonment

7    of up to ten years.

8            Judge Love held an initial appearance and

9    arraignment, and Mr. Yoo was present for that, along with his

10   newly-retained Counsel Mr. Hawk -- I think had filed a motion

11   to withdraw, which was -- or a motion to substitute, which

12   had been granted; and a Mr. Mickelson and Mr. Broden were

13   retained, I think, personally to represent Mr. Yoo going

14   forward.

15           During the hearing on April the 23rd, the initial

16   appearance and arraignment, Mr. Yoo's attorney requested that

17   the matter of detention be reopened, and a detention hearing

18   was set for April 30, 2018.

19           The detention hearing, in fact, did go forward on

20   that day, and there was testimony presented, I believe, from

21   three law enforcement witnesses.

22           And the Court thereafter determined that the

23   grounds for detention were present in the case and ordered

24   the Defendant detained until trial.

25           Now, following that, as I said, Mr. Yoo filed a

| | |
|---|---|
| 1 | motion to appeal the detention, which is Docket No. 47 in the |
| 2 | case.  And the Government thereafter filed a response to |
| 3 | that, Docket No. 58. |
| 4 | I don't believe a reply has been filed to that. |
| 5 | Has it, Mr. Yoo? |
| 6 | MR. YOO:  It has, sir, actually. |
| 7 | THE COURT:  A reply has been filed? |
| 8 | MR. YOO:  Yes. |
| 9 | THE COURT:  So having said those preliminary |
| 10 | comments, we are, of course, on a de novo review of the |
| 11 | detention order.  And I am certainly open to the parties' |
| 12 | thoughts about how we proceed. |
| 13 | Obviously, I have read the transcript from the |
| 14 | detention hearing before Judge Love and am permitted to rely |
| 15 | upon that transcript, but I am also sensitive to the fact |
| 16 | that the Government may wish to put on its witnesses today, |
| 17 | considering this is a de novo hearing. |
| 18 | Mr. Coan? |
| 19 | MR. COAN:  Thank you, Your Honor. |
| 20 | The Government does have witnesses present and |
| 21 | available to testify.  This is a de novo review, as the Court |
| 22 | is aware and has stated for the record. |
| 23 | The Government believes that there is a sufficient |
| 24 | record on which the Court could rule on the pending motion. |
| 25 | However, we are willing to put forth witness |

1     testimony if the Court is interested in that.  I will add

2     that we have a law enforcement witness, and we have a

3     third-party witness, who are both present.

4           Special Agent Jim Reed is the law enforcement

5     witness.  And I would say, in all candor, if he testified

6     this afternoon, it would be largely consistent with the

7     testimony that was offered on April 30th, 2018, and certainly

8     the basis for Judge Love's detention order, if the Court is

9     willing to hear that testimony.

10          THE COURT:  I guess I -- I don't have strong

11    feelings about it, Mr. Coan.  If I had my druthers, I think

12    probably the better practice would be to put the witness on,

13    and let me hear him and observe him, and then give Mr. Yoo an

14    opportunity to ask him questions he wants, of the witness.

15          Is that acceptable --

16          MR. COAN:  That's why --

17          THE COURT:  -- to the Government?

18          MR. COAN:  That's why -- I'm sorry to speak over

19    you.  That is why we have the witnesses here and available,

20    and we are ready to proceed as the Court --

21          THE COURT:  Mr. Yoo, how does that sound to you?

22          MR. YOO:  Objection, Your Honor.  Coan actually

23    served me no witness list.  Actually, he uploaded the witness

24    list on -- on 5th.  For unknown reasons, it was rejected.

25    And then Coan refiled the witness list on the 9th.

1              Pursuant to the Federal Rules of Criminal
2    Procedure, Rule 49, both parties must be served -- served
3    paperwork in order for both parties to, like, you know,
4    prepare for like cross-examination.  This is a -- a direct
5    violation of my due process.  I would like every single one
6    of his witnesses be stricken.  And I would like Coan to be
7    sanctioned --
8              THE COURT:  Mr. --
9              MR. YOO:  -- under the Rules of Federal Civil
10   Procedure, 11 Bravo --
11             THE COURT:  Mr. Yoo, this motion this afternoon is
12   -- or this hearing this afternoon relates to your appeal of
13   the detention.  So let's try to focus your arguments on
14   that.
15             MR. YOO:  Yes, sir, so --
16             THE COURT:  So my recollection, and I could be
17   corrected by either of you gentlemen, was that you had made a
18   request that the witnesses for today's hearing be disclosed
19   prior to today's date.
20             MR. YOO:  Yes, sir.
21             THE COURT:  And the Court granted that order,
22   correct?
23             MR. YOO:  Yes, sir.  I actually sent Coan a
24   personal mail four weeks ago.  And since -- since he didn't
25   disclose any witness list following that, I -- I filed the

 1    motion to compel.  And then --

 2               THE COURT:  Which the Court granted.

 3               MR. YOO:  Yes, sir.

 4               THE COURT:  So the witnesses were disclosed, I

 5    think, well in advance of today's hearing.

 6               MR. YOO:  Negative, sir.

 7               THE COURT:  I'm sorry?

 8               MR. YOO:  Negative, sir.  The first -- Coan

 9    uploaded his first witness list on the 5th, October 5th,

10    which was rejected by the docket.  And then -- for unknown

11    reasons, it was rejected.  And then he filed another witness

12    list on the 9th.  That is not an adequate time to prepare

13    for, like, such things as, like, the cross-examination.

14               So, yes, I would like every single one of those

15    witnesses be stricken.

16               THE COURT:  That will be denied.

17               All right.  The question that I have for you is,

18    Mr. Yoo, I know you want to make an argument in support of

19    your motion to appeal the detention.

20               Would you prefer to make that now?  Would you

21    prefer to have the testimony come in, and then after you have

22    had an opportunity to ask any questions on cross-examination

23    you want to, give a short summation of your argument?

24               How is it you would like to proceed?

25               MR. YOO:  I would like to make some of it now.

1           THE COURT:  You would like to make what?

2           MR. YOO:  Some of those arguments now.

3           THE COURT:  Okay.

4           MR. YOO:  I would like the Court to take judicial

5    notice pursuant to the Federal Rules of Evidence Rule 201 of

6    3142 -- sorry, US -- 18 USC 3142.

7           And the Judge Love's pretrial -- temporary

8    detention order pursuant to this code is unlawful since it is

9    as -- such person is and was at the time the offense was

10   committed, released pending trial for a felony under federal,

11   state, or local law, released in the imposition or execution

12   of sentence, appeal -- sorry -- appeal of sentence or

13   conviction or completion of sentence.  Offense under federal,

14   state, or local law, probation or parole for any offense in

15   the federal, state, or local law.

16           (B) is not a citizen of the United States or

17   lawfully admitted for permanent residence, as defined under

18   Section 101 Alfa (20) of Immigration and Nationality Act of

19   8 U.S. Code 1101 Alfa (20).

20           And (2) such person may flee or pose a danger to

21   any other person or the community.

22           Your Honor, I would like to make some exhibits

23   here.

24           THE COURT:  Some what?

25           MR. YOO:  Exhibits.

1           THE COURT:  Well, I will allow you to present

2   testimony -- I mean, I will allow you to put into evidence

3   whatever you want to when we get into the point where we are

4   taking testimony.

5           So the way this will work is, if you want to make a

6   little preliminary statement right now, I am glad to hear

7   that.  And then Mr. Coan may do the same.

8           I will allow Mr. Coan to put the Government's

9   witnesses on.  I will give you an opportunity to

10  cross-examine those witnesses.

11          When Mr. Coan has presented the Government's

12  evidence, I will allow you to put on any evidence you want,

13  whether in the form of testimony from the witness stand or

14  any exhibits that you want to get admitted into the record.

15          And then following that, I will give you both an

16  opportunity to follow up.  That is kind of how I envision the

17  afternoon going.

18          MR. YOO:  Yes, sir, again, I would like to continue

19  with my preliminary.

20          THE COURT:  Sure.

21          MR. YOO:  So pursuant to federal -- sorry.  18 USC

22  3142, I was actually entitled to bail since initial

23  appearance.  I have no criminal history.  I am not risk of

24  flight nor danger to the others.  And at any given point of

25  this case, Coan failed to prove, prove that I am -- I am

1   either a flight risk or a danger to the --

2            THE COURT:  Mr. Yoo, I am going to require Mr. Coan

3   to address you as Mr. Yoo.  Let me suggest that you address

4   him as Mr. Coan.

5            MR. YOO:  All right.  Yes, sir.

6            And if you look at the section Foxtrot and --

7   sorry, section Echo, it describes the categories of defendant

8   subject to detention.  Section Foxtrot (1) and (2), it

9   describes categories of Defendants subject to detention

10  hearing.

11           So, pursuant to them, I am -- I am neither charged

12  with a crime, that crime for which the maximum sentence is

13  life imprisonment or death, an offense for which a maximum

14  term of imprisonment is ten years or more, is prescribed in

15  the Controlled Substance Act and the Controlled Substances

16  Import and Export Act, and any felony if such a -- if such

17  person has been convicted of two or more offenses described

18  in subparagraphs (A) through (C) of this paragraph -- where

19  two or more state or local offenses that would have been

20  offenses described in Paragraphs (A) through (C) of this

21  paragraph if a circumstance giving rise to the federal

22  jurisdiction had existed or a combination of such offenses or

23  any felony that is not otherwise a crime of violence that

24  involves a minor victim or that involves the possession or

25  use of a firearm or destructive device or any other dangerous

1   weapon or involves a failure to register under Section 2250

2   of Title 18 of United States Code; or

3            (2) Upon motion of attorney for the Government or

4   upon the judicial officer's own motion in the case that

5   involves:

6            (A) a serious risk that such person will flee, or

7            (B) a serious risk that such a person will obstruct

8   or attempt to obstruct justice or threaten, injure, or

9   intimidate or attempt to threaten, injure, or intimidate a

10  prospective witness or juror.

11           Actually, during the beginning of this case, I was

12  none of that, sir.  I was not charged with any possession

13  and -- of a firearm even and a -- Mr. Coan completely failed

14  to prove that I -- I am a serious risk that such person will

15  flee or a serious risk that such person will obstruct or

16  attempt to obstruct justice, threaten, injure, or intimidate,

17  or attempt to threaten, injure, or intimidate a prospective

18  witness or juror.

19           Around 2018-09-20, upon my motion arguing strictly

20  from this code, motion for emergency -- emergency motion for

21  pretrial release, as I described to this code, I requested

22  for immediate -- sorry, not immediate -- emergency pretrial

23  release pursuant to 18 USC 3142, letter and color of law.

24           Well, to get in the way of that, Mr. Coan actually

25  filed a Superseding Indictment that he had been threatening

1   me with for three months to coerce me, coerce me into taking

2   an unconscionable plea deal, which is a possessing a --

3   possessing a firearm as a prohibitive person.

4          922 Golf (4), having been committed to a mental

5   institution knowingly and willingly possess a firearm that

6   will affect interstate commerce.

7          However, I also have a strong defense for that,

8   sir.  So -- and in terms of James -- Special Agent Reed and

9   Mr. Lack, I would like -- I would like to strike those two

10  witnesses pursuant to Federal Rules of Criminal Procedure 49,

11  Rule 49, and then I can prove that Agent Reed is actually

12  highly incompetent.  He had been misleading the Grand Jury,

13  so -- and he had submitted numerous false hearsay into

14  record, so pursuant to Rule 602 and the -- 607 of the Federal

15  Rules of Evidence, I would like to impeach that witness.

16          THE COURT:  Well, you will have an opportunity to

17  cross-examine the witness, but you do understand, of course,

18  that the normal Rules of Evidence do not apply in this

19  proceeding this afternoon, do you not?

20          MR. YOO:  Yes, sir, but --

21          THE COURT:  So the hearsay objection --

22          MR. YOO:  Objection.

23          THE COURT:  I'm sorry?

24          MR. YOO:  Yes, sir, yes, sir.

25          THE COURT:  The hearsay objection, I certainly

1   understand and appreciate that, and, you know --

2           MR. YOO:  Yes, sir.

3           THE COURT:  -- it may go to the, you know, balance

4   of the testimony, but it is not -- it is not rules concerning

5   the admissibility of evidence --

6           MR. YOO:  Yes, sir, but I am pretty sure --

7           THE COURT:  Hold on.  Let me finish.  Doesn't apply

8   to the presentation or the consideration of information at

9   this hearing.

10          MR. YOO:  But I am pretty sure that Rule 49 of the

11  Federal Rules of Criminal Procedure apply, sir.  Are you

12  practicing law from the bench, sir?

13          THE COURT:  No, I am not practicing law from the

14  bench.  And the last thing I am doing is giving you legal

15  advice.  I am not going to give you legal advice.

16          MR. YOO:  Yes, sir.

17          THE COURT:  What I am trying -- I was trying to

18  explain to you one of the reasons that that is not at least a

19  valid objection at this point is that the Rules of Evidence

20  don't apply in a proceeding like this, so your objection with

21  respect to hearsay of the testimony that came in during the

22  detention hearing is really not a valid basis to object.

23          MR. YOO:  Yes, sir.  Well, I am not -- I am not

24  asking for a legal counselor, sir.  I am asking you a

25  procedural due process basis.

1        THE COURT:  So what is your question?

2        MR. YOO:  That I wasn't served any paperwork from

3   Coan, and I do believe that is a valid reason to strike any

4   witnesses.

5        THE COURT:  And what kind of paperwork?

6        MR. YOO:  Witness list, sir.  I was never given a

7   witness list, and I actually submitted paperwork to the Gregg

8   County mail staff saying that I have not received any mail

9   yesterday.  Unsworn declaration.  They still haven't signed

10  it, but it is over here.

11       THE COURT:  Okay.  Do those complete your

12  preliminary remarks?

13       MR. YOO:  Yes, sir.  Oh, and one more thing.

14  Pursuant to Illinois vs. Allen, 397 U.S. 337 (1970), I would

15  like these foot restraints to be removed also, sir.

16       THE COURT:  Well, I am not familiar with the case.

17  You had filed a motion that asked for your hands to be

18  unshackled during the course of the hearing this afternoon.

19  That seemed like a reasonable request to me.

20       The Marshal Service made other arrangements in

21  order to comply with your request and at the Court's order.

22  So I permitted them to do that.

23       MR. YOO:  Yes, sir.  Well, I actually filed a

24  motion to be restraint-free pursuant to this court case and

25  also presumption of innocence, in that there are -- there

1   are, as you said, witnesses here, so -- so, therefore, the --

2   the bias principle might still apply, you know that --

3            THE COURT:  I'm sorry?

4            MR. YOO:  That witnesses might be bias just like

5   the jury, based on restraints and the jail.

6            THE COURT:  I will take a look at that case.

7            MR. YOO:  Yes, sir.

8            THE COURT:  Okay.  Do those complete your

9   preliminary remarks?

10            MR. YOO:  Yes, sir.

11            THE COURT:  All right.  You may be seated.

12            MR. YOO:  Thank you, sir.

13            THE COURT:  Mr. Coan, do you wish to make any

14   preliminary remarks at this time?

15            MR. COAN:  Thank you, Your Honor.  Just briefly.

16            The best I can tell Mr. Yoo is first arguing that

17   there should have never been a detention hearing.  But there

18   was.  And he was ordered detained pending trial, by

19   Judge Love on April 30th, 2018.

20            And the finding by Judge Love at that time was that

21   there is no condition or combination of conditions that could

22   reasonably assure the Defendant's appearance at required

23   proceedings or the safety of the community.

24            And the specific grounds cited by Judge Love at the

25   conclusion of the April 30th hearing was the nature of the

1  charges pending against Mr. Yoo; his mental health history;

2  the repeated instances of threats he had made against

3  individuals and groups; his threats to injure, kill people,

4  and shoot people; his alleged misrepresentations about his

5  citizenship; and his ties to the country of South Korea.

6          Nothing has changed with respect to the facts since

7  April 30th of 2018.

8          MR. YOO:  Objection.

9          MR. COAN:  The Defendant is --

10          THE COURT:  Mr. Yoo, this is a preliminary

11  statement.  Mr. Coan did not interrupt you when I allowed you

12  to make your preliminary statement, so I will ask you to

13  withhold any objection to anything that Mr. Coan has to say.

14  I will give you an opportunity at the conclusion of the

15  hearing to make any additional comments you wish to make.

16          MR. YOO:  Yes, sir.

17          THE COURT:  Mr. Coan, you may proceed.

18          MR. COAN:  Thank you, Your Honor.

19          Nothing has changed factually on the issues of

20  flight or safety of the community since April 30th of 2018.

21          And so the Government would ask that the Court deny

22  the Defendant's motion?

23          Thank you.

24          THE COURT:  All right.  Thank you, Mr. Coan.

25          All right.  The Government may call its first

1  witness.

2         MR. YOO:  Your Honor, I would actually like to

3  contact my witness.

4         THE COURT:  I'm sorry?

5         MR. YOO:  I would actually like to contact my

6  witness to make sure she is going to be here.

7         THE COURT:  We have started this hearing.  I am not

8  sure how you want to do that.  Do you want to perhaps --

9         MR. YOO:  Take a break.

10         THE COURT:  Mr. Haas, could you assist Mr. Yoo in

11  this regard in contacting the witness?

12         MR. HAAS:  Judge, I have no idea who the witness is

13  or how to contact the witness; but if Mr. Yoo gives me that

14  information, at the Court's request, I will attempt to do

15  it.

16         THE COURT:  Thank you, Mr. Haas.

17         Let's go off the record.

18         (Recess was taken at this time.)

19         THE COURT:  All right.  Please be seated.

20         Okay.  Mr. Yoo, were you able to reach your

21  witness.

22         MR. YOO:  Yes, sir.  He was.  Ms. Simmons said that

23  she was up here on 4th, but no one actually told her that

24  court has been rescheduled, so I would like -- I would like

25  Court's approval for her to testify electronically, if that

1    is possible.

2          THE COURT:  Mr. Yoo, I have had that request a

3    number of years.  My practice is that a witness who intends

4    to testify in a hearing or the trial of a matter must be

5    present in the courtroom to do so.

6          I will allow you to provide an affidavit subsequent

7    to this hearing that contains the -- what the testimony would

8    have been of the witness if she had been here and present and

9    testifying in the courtroom.

10          MR. YOO:  So, the Government has two witnesses

11    ready and at disposal, but I am completely witnessless.  I

12    mean --

13          THE COURT:  That's what it looks like.

14          MR. YOO:  Sir, if I was out on bail, I would have

15    properly notified her, so, I mean -- so, I mean, I would like

16    for you to reconsider -- I would like to file a motion to

17    reconsider electronic testimony, sir.

18          THE COURT:  I don't -- I don't allow that.  In

19    order to have somebody testify --

20          MR. YOO:  Yes, sir.

21          THE COURT:  -- we have them in the courtroom so

22    that we can observe their demeanor and observe their body

23    language and to have them present and sworn in in front of

24    the court reporter.

25          MR. YOO:  Yes, sir.

```
1              THE COURT:  So --

2              MR. YOO:  She did --

3              THE COURT:  I can't allow that.  So, as I said, as

4    an alternative, I will permit you to file an affidavit --

5              MR. YOO:  Yes, sir.

6              THE COURT:  -- that contains what her testimony

7    would have been had she been here.

8              MR. YOO:  Yes, sir.  Also before we resume, I would

9    like to address the Court in one more issue.

10             THE COURT:  Okay.  Very briefly.

11             MR. YOO:  Yes, sir.  Why is Mr. Coan having

12   ex parte communication not only with this Court but also with

13   courts outside of -- out of this jurisdiction, like other

14   jurisdiction, such as Middlesex County Superior Court?  I

15   actually have evidences of it.

16             Mr. Coan filed motion to compel any documents --

17   documents related to my mental health in that court as an

18   ex parte communication.  I believe that is a grounds -- that

19   is a grounds -- grounds for sanction.

20             THE COURT:  Mr. Yoo, explain to me how that is

21   relevant to today's proceeding.

22             MR. YOO:  Because -- because, obviously, Mr. Coan

23   might have any other ex parte communications that I would not

24   know about that I am not prepared for any cross-examination

25   nor rebuttal about, properly.
```

1          THE COURT:  Mr. Coan, do you want to address that?

2          MR. COAN:  Your Honor, as part of the Government's

3    investigation, which is standard practice, there were Grand

4    Jury subpoenas issued.  One of the Grand Jury subpoenas was

5    issued to the adjustor for Middlesex County in New Jersey.

6    There was partial compliance with the Grand Jury subpoena.

7          And, in order to bring about complete compliance, a

8    full response to the subpoena, the Government filed a motion

9    to compel, which was granted by Judge Mitchell.  And then

10   that order was provided to the adjustor for Middlesex County,

11   and then full compliance with the Grand Jury subpoena was

12   made.

13         THE COURT:  Okay.  And do you have any intention

14   this afternoon of using any of that evidence with respect to

15   this hearing?

16         MR. COAN:  We are not going to be introducing any

17   evidence from those --

18         THE COURT:  Very well.  Thank you.

19         Mr. Yoo, your motion will be denied.

20         MR. YOO:  Yes, sir.  I would like for my foot

21   restraints to be removed pursuant to Illinois vs. Allen.

22         THE COURT:  And I heard your argument on that, and

23   I explained to you what my view was about that.  I did grant

24   your request to have your hands unshackled, but I am going to

25   rely on the Marshal Service to make a determination about

```
 1    what is best in the alternative, and they have made a
 2    decision.  So I am going to allow your legs to be shackled.
 3           You may, during the course of your
 4    cross-examination of the witnesses, if you choose to
 5    cross-examine the witness, proceed to the podium.  And I am
 6    told you that will be able to do that without trouble.
 7           MR. YOO:  Yes, sir.
 8           THE COURT:  Okay.  Now, let me explain one more
 9    thing to you, Mr. Yoo, before Mr. Coan calls the first
10    Government witness.
11           You obviously have a right to make a preliminary
12    statement or an opening statement, which I have allowed you
13    to do today.  You have a right to hear all of the testimony
14    that has -- that will be introduced today.
15           You will have an opportunity to cross-examine the
16    Government's witnesses; and, of course, as you know, you have
17    a right to call any witnesses of your own and to present any
18    evidence that you want to on your behalf.
19           Likewise, I don't know if you have considered this
20    or not, but you also have the right to testify yourself, if
21    you want to do that, and you have a right not to testify
22    yourself, if you want to do that as well.
23           MR. YOO:  Yes, sir.  Oh, one more brief thing,
24    Your Honor.
25           Would you please take a look at my response to
```

1    Mr. Coan's motion?  I mean -- I'm sorry.  Response to

2    Mr. Coan's response regarding --

3            THE COURT:  The reply that we were talking about

4    earlier?

5            MR. YOO:  Yes, sir.

6            THE COURT:  Yes, I will certainly do that.  I can't

7    do it right this minute.  But I will look at the reply, which

8    I am told was filed on October the 5th.  Perhaps that may not

9    be right.  You have told me that you filed a reply to the

10   Government's response, and I will make sure I review the

11   reply, yes.

12           MR. YOO:  To my knowledge, I filed around

13   September 28th.

14           THE COURT:  All right.  Thank you, Mr. Yoo.  I will

15   take a look at it.

16           MR. YOO:  Thank you, sir.  Oh, also emergency

17   pretrial release motion too, sir, if you would like.

18           THE COURT:  All right.  I will take a look at that

19   as well.

20           MR. YOO:  Thank you, sir.

21           THE COURT:  All right.  Now, one other thing,

22   Mr. Yoo, before we proceed, I do want you to understand that

23   to the extent there is any question that is asked of any of

24   the witness this afternoon by the Government's attorneys that

25   you want to object to, I certainly will allow you to make an

1  objection for the purposes of preserving the record, but it

2  has to be a legal objection.  Okay?  So just bear that in

3  mind as we go through the course of the testimony this

4  afternoon.

5          MR. YOO:  Yes, sir.

6          THE COURT:  You are certainly within your rights to

7  object to the question and to object to the testimony itself,

8  but it has to be a legal objection.

9          MR. YOO:  Yes, sir.

10          THE COURT:  Okay.  Mr. Coan, you may call your

11  first witness.

12          MR. COAN:  Thank you, Your Honor.  The United

13  States calls Special Agent James Reed to the stand.

14          (Witness sworn.)

15          THE COURT:  Mr. Coan, you may proceed.

16          MR. COAN:  Thank you, Your Honor.

17          JAMES REED GOVERNMENT'S WITNESS, SWORN,

18                     DIRECT EXAMINATION

19  BY MR. COAN:

20  Q.   Good afternoon.

21  A.   Good afternoon, sir.

22  Q.   Would you state your name for the record, please?

23  A.   James Reed.

24  Q.   And how are you currently employed?

25  A.   I'm a Special Agent with the ATF out of Tyler, Texas.

```
 1   Q.   And how long have you been with ATF?

 2   A.   Since January of 2014.

 3   Q.   In the course and scope of your employment with ATF, did

 4   you become involved in an investigation regarding an

 5   individual by the name of Heon Jong Yoo?

 6   A.   Yes, sir, I did.

 7   Q.   All right.  Let's talk a little bit about Mr. Yoo.

 8             How old is he?

 9   A.   25 years old.

10   Q.   And where was he born?

11   A.   South Korea.

12   Q.   He came to the United States at some point; is that

13   right?

14   A.   Yes, sir.

15   Q.   And is he a United States citizen?

16   A.   No, sir, he is not.

17   Q.   Does he have legal status in the United States?

18   A.   Yes, sir.  My understanding is he is a legal permanent

19   resident and has been since 2009.

20   Q.   Is he a naturalized U.S. citizen?

21   A.   According to Homeland Security, he is not.

22   Q.   Does he have any claim of derivative citizenship?

23   A.   According to Homeland Security, he does not have any

24   claim of derivative citizenship.

25   Q.   To your recollection, was he employed at the time of his
```

| | |
|---|---|
| 1 | arrest in connection with this case, which was on April 6th |
| 2 | of 2018? |
| 3 | A.   At the time of his arrest, individuals described his |
| 4 | employment as off-and-on driving for the rideshare companies |
| 5 | like Lyft or an Uber-type company. |
| 6 | Q.   Has he served in the military in the United States? |
| 7 | A.   Records show he has not served in the military, though |
| 8 | he has tried to enlist on two separate occasions. |
| 9 | Q.   All right.  And -- |
| 10 | MR. YOO:  Objection. |
| 11 | THE COURT:  What is the objection? |
| 12 | MR. YOO:  I've actually tried to enlist -- enlist |
| 13 | seven different -- sorry.  There were seven different |
| 14 | recruiters, and I was denied -- |
| 15 | THE COURT:  Mr. Yoo.  Mr. Yoo, your objection has |
| 16 | to be based on the law.  I will allow you to cross-examine |
| 17 | the witness at the appropriate time, but this is |
| 18 | not -- making a statement is not a legal objection. |
| 19 | MR. YOO:  He swore in, sir. |
| 20 | THE COURT:  I'm sorry? |
| 21 | MR. YOO:  He swore in -- |
| 22 | THE COURT:  He is, and you will have an opportunity |
| 23 | to cross-examine him, but we are in the direct examination by |
| 24 | the Government at this point. |
| 25 | MR. YOO:  Yes, sir. |

1          THE COURT:  Mr. Coan, you may continue.

2          MR. COAN:  Thank you, Your Honor.

3    BY MR. COAN:

4    Q.   The two attempted enlistments by Mr. Yoo that you are

5    aware of, were those denied?

6    A.   Yes, sir, they were.

7    Q.   All right.  And are you aware of the reasons that those

8    attempts were denied?

9    A.   I have a report from the Institute of Forensic

10   Psychology for an independent Army screening.  This was the

11   September 19th, 2015.

12          And on that report the final conclusion of that

13   report stated that it was the professional judgment of

14   Mr. Gallegos, Ph.D. licensed psychologist, that this person

15   Heon Yoo did not possess the psychological characteristics

16   deemed necessary to perform the duties sought for and is not

17   psychologically suited for the position in the United States

18   Army.

19   Q.   Has your investigation revealed any affiliations that

20   Mr. Yoo has with militias or other military-style groups?

21   A.   Multiple individuals we have interviewed have stated

22   that Mr. Yoo has claimed to be a member of some sort of

23   militia and claims rank in that militia.

24   Q.   Are you familiar with any of the activities associated

25   with the militia, Mr. Yoo's involvement with the militia?

```
 1   A.   He has attempted to recruit various individuals,

 2   including business owners and -- business employees in Tyler,

 3   Texas to his militia, and has stated himself as the leader of

 4   the local fascist party.  But that is the extent of what we

 5   have decided -- we have been able to figure out from

 6   individuals of his militia.

 7   Q.   Does Mr. Yoo have any family residing in the Eastern

 8   District of Texas?

 9   A.   I am not aware of any family Mr. Yoo has in the Eastern

10   District of Texas.

11   Q.   Mr. Yoo came to the Tyler area sometime in late 2016; is

12   that correct?

13   A.   That's my understanding, sir.

14   Q.   And was one of the reasons he came to the Tyler area was

15   to attend school?

16   A.   Yes, sir.

17   Q.   All right.  To your knowledge, is he still enrolled in

18   any school in Tyler, Texas?

19   A.   To my knowledge, he is not.

20   Q.   And does he own a residence within the Eastern District

21   of Texas?

22   A.   To my knowledge, he does not own a residence in the

23   Eastern District of Texas.

24   Q.   As part of your investigation, did you become aware of

25   any mental health issues associated with Mr. Yoo?
```

1    A.    Yes, sir.

2    Q.    All right.  And, if you would, just kind of generally

3    describe what the investigation revealed about Mr. Yoo's

4    mental health.

5    A.    We found numerous records of mental health issues,

6    including diagnoses of bipolar disorder, homicidal ideations,

7    medication noncompliance, multiple involuntary

8    hospitalizations, and multiple involuntary commitments.

9    Q.    Let's walk through some of those records.  Let's talk

10   about September of 2012.

11         At that time Mr. Yoo was living in New Jersey; is

12   that correct?

13   A.    Yes, sir, that's my understanding.

14   Q.    And he was enrolled as a student at Rutgers University;

15   is that right?

16   A.    Yes, sir.

17   Q.    Okay.  If you would, tell us about any mental health

18   treatment that he received in or about September 2012?

19   A.    This was a report in which the report states that he

20   said he had been -- sought counseling for depression and

21   suicidal thoughts and had received mental health treatment.

22   Q.    And this information that Mr. Yoo provided was to -- was

23   it to university police?

24   A.    Yes, sir, it was to a university -- Rutgers Police

25   Department.

1  Q.   And what was the reason for the encounter, if you know,

2  between the University Police and Mr. Yoo?

3  A.   This incident was a -- well-being checked due to

4  allegations of alarming comments and inquiries about

5  firearms.

6  Q.   Let's talk about an incident in April of 2013, again, in

7  New Jersey.  Was Mr. Yoo brought to the hospital emergency

8  room by Rutgers University Police?

9  A.   Yes, sir, according to the report.  He was brought to

10  the emergency room at Robert Wood Johnson Hospital by Rutgers

11  police due to reportedly threatening to shoot his resident

12  counselor.

13  Q.   Was a diagnosis rendered at that time regarding

14  Mr. Yoo?

15  A.   Yes -- well, according to the report, there is

16  indications of diagnosis of bipolar disorder, homicidal

17  ideation, and explosive personality disorder.

18  Q.   All right.  Was he examined by certified mental health

19  officials as to whether he presented a danger to himself or

20  to others?

21  A.   Yes, sir.  So a New Jersey certified mental health

22  screener certified him as dangerous to others, and then

23  within that report, dangerous to himself.

24  Q.   All right.  And based on those certifications, was he

25  involuntarily committed?

1  A.   Yes, sir.  We have an involuntary commitment order

2  signed by a judge on the date of 24 of September -- I'm

3  sorry.

4           MR. YOO:  24th of what?

5  A.   On the date of the 8th of April, 2013, an involuntary

6  commitment order signed by a judge.

7  BY MR. COAN:

8  Q.   Okay.  Let's talk about September 2015, still in New

9  Jersey.  Again, Mr. Yoo is transported to the hospital by

10  Rutgers University Police; is that correct?

11  A.   Yes, sir.

12  Q.   And what was the reason for that?

13  A.   It says:  Upon repetitive disruption and homicidal

14  threats, patient was brought to the emergency department for

15  evaluation.

16           The notes say:  Require in-patient hospitalization

17  for safety and stabilization.

18           It says:  Patient presents a danger to others, and

19  he is making terroristic statements publicly on the street.

20           Patient is recommended for involuntary

21  hospitalization for safety and stabilization.

22           He appeared disoriented to circumstances.

23           And it says:  Patient was aggressive, threatening,

24  requiring chemical and physical restraints.  The notes and

25  things say he was shouting, "Death to the Middle East" at a

1  bus stop on College Avenue.

2          He was evaluated for a danger to himself and

3  others.

4  Q.   And what was the finding based upon the evaluation by

5  certified mental health officials?

6  A.   Again, the finding was he was a danger to himself and

7  others.

8  Q.   And based on that determination, was there a

9  recommendation that he be involuntarily committed to an

10 inpatient facility?

11 A.   Yes, there is an involuntary commitment signed by a

12 judge on 24th of September, 2015.

13 Q.   Let's move to November of 2017, here within the Eastern

14 District of Texas.  Did the Texas Rangers respond to a threat

15 allegation involving Mr. Yoo?

16 A.   Yes, sir.

17 Q.   And what was the nature of that alleged threat?

18 A.   The report states that Yoo allegedly made threats to

19 travel to Washington, DC, to kill blacks and Jews.

20 Q.   And based upon that response by the Texas Rangers, were

21 further steps taken -- from a mental health perspective, was

22 he transported to a hospital or treatment facility within the

23 Eastern District?

24 A.   Yes, sir.  The records show that he went to the

25 Andrews Center, the Behavioral Healthcare System and became a

1  patient there at ETMC ER.

2  Q.   All right.  And was a determination made as to any

3  danger that Mr. Yoo presented at that time?

4  A.   The notes show remarks for shooting danger, suicide

5  contentions observation.  Inpatient hospitalization was

6  recommended.

7  Q.   Was he deemed harmful to others at that time by the

8  certified mental health officials?

9  A.   It just says:  Concern.  Client intended to incite

10 violence and was placed on a wait list for inpatient

11 hospitalization.

12 Q.   As part of your investigation, did you determine whether

13 Mr. Yoo has had encounters with law enforcement officials

14 within the City of Tyler or greater Smith County area?

15 A.   Yes, sir.

16 Q.   All right.  And can you estimate for us the number of

17 encounters that Mr. Yoo had with law enforcement since his

18 arrival in Tyler in late 2016?

19 A.   Numerous, sir.

20          THE COURT:  2016 or 2017?

21          MR. COAN:  I'm sorry, since 2016, Your Honor.

22 A.   More than 20 reports have been reported.

23 BY MR. COAN:

24 Q.   Has Mr. Yoo been criminally trespassed from any

25 businesses in the Tyler/Smith County area?

1   A.   Yes, sir, he has.

2   Q.   All right.  Just for record purposes, would you briefly

3   explain what that means to be criminally trespassed?

4   A.   Criminal trespass is a way for a business owner or

5   property owner to formally warn away an individual from their

6   property.  It goes on notice with the police department; and

7   then if you show back up, you can actually be arrested for

8   trespassing.

9   Q.   Could you -- do you have a list of the businesses?

10  A.   Yes, sir.

11  Q.   Okay.  If you could identify those businesses please?

12  A.   All Walmart stores, including Sam's Club in the Tyler

13  area; Panera Bread; Cumberland Place Apartments; and both

14  Tyler Supercuts locations.

15  Q.   All right.  Let's talk about some specific interactions

16  that Mr. Yoo has had with local law enforcement in the

17  Tyler/Smith County area.  Let's talk about an incident

18  occurring on May 1st of 2016 at Spring Creek Barbecue?

19  A.   So on -- this incident was in reference to a suspicious

20  person with a rifle slung over his shoulder with a sign that

21  read:  Southern Lives Matter Too.

22  Q.   Subsequent to that, there was an incident at the Target

23  in Tyler involving Mr. Yoo wearing a Confederate mask; is

24  that correct?

25  A.   Yes, sir.  The report stated he was walking into the

1    store with a Confederate flag mask on.  He was also armed.  I

2    could see a pistol sticking out from the bottom of his shirt.

3    He advised that he had been told by several customers that

4    this individual, Mr. Yoo, was making comments about voting

5    for Trump and made them feel nervous.

6           There was an individual in the store who advised

7    that she heard -- she heard the male state that he was going

8    to get all of the black people in the store while standing in

9    the checkout line.

10          Another individual stated she had heard that he was

11   going to shoot all of the black people in the store, and she

12   should leave.

13   Q.   Subsequent to the incident at Target, was there an

14   incident at the Walmart in Tyler?

15   A.   Yes, sir.  That report states that an Asian male,

16   Mr. Yoo, was going to start killing police officers.  This

17   was the report that -- individual reporting -- the individual

18   who was reporting this went on to say that Mr. Yoo said he

19   believed in Black Lives Matter, and said the organization he

20   was affiliated with was going to start killing police.

21          The officer reviewed the footage and was able to

22   confirm the subject making these comments -- or the person

23   they were talking to was Heon Yoo.

24   Q.   Was there a report made by one of Mr. Yoo's Uber riders

25   in 2017?

1  A.  Yes, sir.  This report states that a fight was

2  instigated by Yoo according to the complainant -- this was

3  the 6th.  I'm sorry.  This is the wrong report.

4       Which report are you talking about, sir?  The

5  August 18th, 2017?

6  Q.  17-017054?

7  A.  Yes, sir.  So that was on August 18th, 2017, made

8  contact with a suspicious person.  This was a complainant.

9  According to the report, the suspicious person was making

10  anti-Jewish statements to the complainant while he was

11  driving in his Uber vehicle.

12       This complainant identified the suspicious person

13  as Heon Yoo.  The complainant said that Yoo stated he hated

14  Jews and Muslims and that he wanted to kill the Jews.  He

15  stated he was part of the Nationalist party and continued to

16  refer to killing Jews.

17       That is the basics of that report.

18  Q.  Let's talk about an incident occurring in December of

19  2016.  Police responded to an incident involving Mr. Yoo, is

20  that correct, December 2nd, 2016?

21  A.  Yes, sir.

22  Q.  All right.  If you would, just describe briefly the

23  circumstances surrounding that incident?

24  A.  Police were dispatched to an aggravated assault in

25  progress.  The caller of the report had stated there were

1  several subjects at their residence and that a gun was

2  pointed at them.

3        When the police came, they identified the different

4  suspects.  The officer located -- detained suspects on the

5  scene and located an AR-15 weapon, another rifle, a shotgun,

6  a handgun, and a machete.

7  Q.   Were law enforcement officials able to determine who the

8  firearms belonged to?

9  A.   The firearms were claimed by -- to my understanding,

10  claimed by Mr. Yoo.

11  Q.   Were any arrests made in connection with this December

12  2nd, 2016, incident?

13  A.   Yes, sir.

14  Q.   Was Mr. Yoo one of the individuals arrested?

15  A.   Yes, sir.

16  Q.   Was he later indicted in Smith County in connection with

17  this incident?

18  A.   Yes, sir.

19  Q.   Was that in January of 2017?

20  A.   Yes, sir.

21  Q.   And he was indicted on a felony charge of aggravated

22  assault with a deadly weapon; is that correct?

23  A.   Yes, sir.

24  Q.   Now, the Indictment was later dismissed; is that

25  correct?

1   A.   Yes, sir.

2   Q.   Are you aware of any pending state criminal charges

3   against the Defendant?

4   A.   It is my understanding that he still has a criminal

5   matter regarding criminal trespassing.

6   Q.   All right.  And, to your knowledge, are there any

7   outstanding state warrants regarding Mr. Yoo?

8   A.   To my understanding, there is a warrant under that

9   charge for failure to appear.

10  Q.   Now, Mr. Yoo was enrolled as a student at the University

11  of Texas at Tyler from approximately January through March of

12  2018; is that right?

13  A.   Yes, sir.

14  Q.   And during that short time period, did Mr. Yoo have any

15  encounters with university police officials?

16  A.   Yes, sir.  It is my understanding after speaking to the

17  university police chief, there were numerous encounters.

18  Q.   Was the first encounter that Mr. Yoo had with university

19  police officials actually on the very first day that he

20  attended class?

21  A.   That I am not aware, sir.

22  Q.   As part of your investigation, were you able to review

23  police reports from the University of Texas at Tyler Police

24  Department?

25  A.   Yes, sir.

1    Q.   And did they also -- the university also uses something

2    known as behavioral intervention reports; is that right?

3    A.   Yes, sir.

4    Q.   And how many of those reports, just an estimate, have

5    been generated or were generated in connection with claims of

6    misconduct on the part of Mr. Yoo in the three months that he

7    was a student at UT Tyler?

8    A.   UT Tyler, estimated between 20 and 25.

9    Q.   And those behavioral intervention reports, what is your

10   understanding of how those come about?  Those are not an

11   actual police report, is it?

12   A.   No, sir.  It is a people report; kind of a "see

13   something, say something" type system.

14   Q.   And then on top of those which are -- they can initiated

15   by anyone at the school, right?

16   A.   Yes, sir.

17   Q.   So, in addition to those 20 to 25, there are additional,

18   specific police encounters with Mr. Yoo in the three months

19   he was a student; is that right?

20   A.   Yes, sir.

21   Q.   Okay.  And there are approximately 10 to 15 of those?

22   A.   Yes, sir.

23   Q.   And one of those involved statements that he made

24   regarding the extermination of Jews; is that right?

25   A.   That was my understanding, sir, yes, sir.

1    Q.   To your knowledge, was Mr. Yoo undergoing any type of

2    mental health counseling while a student at the University of

3    Texas at Tyler?

4    A.   My understanding is he was seeking mental health

5    counseling.

6    Q.   Are you aware of any disciplinary action that was taken

7    by the university as to Mr. Yoo?

8    A.   I am aware they were attempting to take disciplinary

9    action against him around the time of his arrest.

10   Q.   And, to your knowledge, is he currently enrolled at UT

11   Tyler?

12   A.   I have no knowledge that he is currently enrolled.

13   Q.   So, as part of your investigation, were you able to

14   determine whether this Defendant has had encounters with law

15   enforcement officials prior to coming to the Eastern District

16   of Texas?

17   A.   Yes, sir.  I guess a good summary would be that every

18   place -- or the majority -- a lot of the places he has been

19   at with respect to universities, there is numerous police

20   reports generated.

21   Q.   Let's talk about his time in New Jersey at Rutgers

22   University.  That was for the period of 2012 to 2015; is that

23   right?

24   A.   Yes, sir.

25   Q.   Okay.  And then how about police encounters while he was

1  enrolled at the University of Connecticut in the spring of

2  2014?

3  A.   Yes, sir, there are police reports there as well.

4  Q.   Okay.  Are you aware of encounters that Mr. Yoo had with

5  law enforcement officials in the Dallas/Fort Worth area in

6  the 2016 and 2017 time period?

7  A.   Yes, sir.  There were reports from those places, as

8  well.

9  Q.   Okay.  And did those include at Richland College?

10  A.   Yes, sir.

11  Q.   How about Collin County Community College?

12  A.   Yes, sir.

13  Q.   Encounters with the Prosper -- City of Prosper Police

14  Department?

15  A.   Yes, sir.

16  Q.   An incident at the University of North Texas?

17  A.   Yes, sir.

18  Q.   Encounters with the Dallas Police Department?

19  A.   Yes, sir.

20  Q.   Encounters with the City of Plano Police Department?

21  A.   Yes, sir.

22  Q.   All right.  Let's go back to the time period during

23  which Mr. Yoo was at Rutgers University.

24          Are you able to estimate for the Court

25  approximately the number of police reports generated based

1  upon encounters that University Police had with Mr. Yoo?

2  A.    Around 20.

3  Q.    Okay.  Let's talk about an incident in 2013, a student

4  report about Mr. Yoo about his mental condition.  Report

5  13-11986.

6  A.    This was a report where an individual stated that they

7  were afraid Mr. Yoo was going to conduct a shooting.

8  Q.    All right.  How about report number 13-15051?

9  A.    This was -- this was the report that led to Mr. Yoo

10  being transported to the emergency room at the hospital.  In

11  this report the report says that it was reported that --

12  stated, an individual in resident life did not know who they

13  were messing with, according to a summary of the report of

14  what Mr. Yoo stated.

15        And it, again, involved conversations about

16  weapons.  And this was the report that did lead to the

17  hospitalization and then -- within the emergency room for

18  mental health evaluation.

19  Q.    All right.  Let's talk about his time at University of

20  Connecticut, specifically an incident occurring on or about

21  February 27th, 2014, an interaction that Mr. Yoo had with an

22  ROTC commander.

23  A.    So this was a report from the ROTC lieutenant colonel

24  who stated that Yoo self-reported that he was diagnosed with

25  bipolar disorder.  Was referred to the Students of Concern

1   Team by the colonel and was expressing anger and noticeable

2   problems.

3   Q.   All right.  How about an incident occurring on April

4   30th of 2014, involving Mr. Yoo's behavior at a shooting

5   range?

6   A.   This report says they received information about Yoo,

7   who went to a range -- shooting range and was behaving

8   inappropriately with guns at the range.

9        It says:  The gun range has a strict policy not to

10  shoot at the head of the target.  And Yoo shot at the head

11  every time.  When he tried to correct him and told him he

12  would be kicked out, Yoo continued to shoot at the head.  The

13  individual then got Yoo to leave the shooting range.

14       And that is the summary of that report.

15  Q.   Let's talk about the June 26th, 2016, incident requiring

16  a response by the Prosper Police Department, an incident at a

17  Kroger Grocery Store involving Mr. Yoo?

18  A.   The report states and was in reference to Mr. Yoo making

19  threats to shoot people inside Kroger Store.

20  Q.   Does the report note whether he was armed at the time?

21  A.   Yes, sir, it shows that he was armed.  His vehicle was

22  armed.  And also located a .45 caliber pistol.

23  Q.   September 6th, 2016, incident at the University of

24  Texas.

25  A.   This was an incident when he caused a scene on the

1    campus of the University of North Texas.

2    Q.   All right.  And, if you would, just generally describe

3    the circumstances of the incident?

4    A.   Mr. Yoo labeled himself a Neo-Confederate and was just

5    making statements that were riling up people on campus, with

6    Confederate flags.  And he stated his intention was to rile

7    up as many liberals as possible.

8    Q.   Was he armed at the time?

9    A.   He told individuals he had a gun.

10   Q.   If you would, just describe briefly for the Court how a

11   resident of the State of Texas goes about obtaining a License

12   to Carry a Handgun permit?

13   A.   They make an application with the Texas Department of

14   Public Safety, and it is online -- it can be an online

15   application -- it is an online application at this time.  And

16   those individuals then submit the correct documents to the

17   state to get a License to Carry.

18   Q.   Did Mr. Yoo apply to obtain a License to Carry a Handgun

19   from the Texas Department of Public Safety?

20   A.   Yes, sir.

21   Q.   In connection with that application, was there a

22   question about whether Mr. Yoo had received psychiatric

23   treatment?

24   A.   What, sir?  Ask the question again, sir.

25   Q.   In connection with that application, was Mr. Yoo

1   required to respond to a question about whether he had

2   received psychiatric treatment?

3   A.   Yes, sir.

4   Q.   And what was his answer to that question?

5   A.   He answered, no, he had not received mental health

6   treatment.

7   Q.   Was a permit issued to Mr. Yoo?

8   A.   Yes, sir, it was.

9   Q.   Was it later revoked by the Texas Department of Public

10  Safety?

11  A.   Yes, sir.  There was an application made by the Texas

12  Department of Public Safety, and then a Smith County Court

13  revoked the License to Carry.

14  Q.   What is the significance of an individual possessing a

15  Texas License to Carry a Handgun permit as to someone's

16  effort to purchase firearms from a federally licensed

17  dealer?

18  A.   The benefit is you do not have to pass a NICS background

19  check.  The License to Carry suffices for the NICS background

20  check, and no NICS check is needed.

21  Q.   Did your investigation reveal purchases and attempted

22  purchases and acquisitions of firearms by Mr. Yoo within the

23  Eastern District of Texas?

24  A.   Yes, sir, it did.

25  Q.   And in connection with some of those transactions, did

1    Mr. Yoo present his revoked License to Carry a Handgun?

2    A.    Yes, sir, he did.

3    Q.    The form that a prospective buyer is required to

4    complete in connection with a firearms acquisition from a

5    federally licensed dealer is called what?

6    A.    It is an ATF Form 4473.

7    Q.    Just, in general terms, what is the type of information

8    that is called for by the form?

9    A.    Firearms transaction record.  The main top section

10   contains biographical information; things like name, date of

11   birth, and place of birth.

12         Then you go to the second part of the form that

13   asks questions, and these concern the eligibility to purchase

14   a firearm and possess a firearm under federal law.  Things

15   like, are you under the actual buyer of the firearm?  Are you

16   a fugitive from justice?  Have you ever been convicted of a

17   crime?  Have you ever been adjudicated mentally defective or

18   been committed to a mental institution?

19         It includes things like citizenship.  The next part

20   of the form concerns the transfer.  And then the last part of

21   the form documents which firearms were being sold and

22   transferred.

23   Q.    The ATF Form 4473s that you reviewed as part of your

24   investigation involving Mr. Yoo's attempted purchases or

25   acquisitions of firearms within the Eastern District of

```
 1    Texas, did that review include examining how Mr. Yoo
 2    responded to the question about citizenship?
 3    A.   Yes, sir, it did.
 4    Q.   And on any of those forms did Mr. Yoo indicate that he
 5    was a United States citizen?
 6    A.   On multiple forms he indicated that he was a United
 7    States citizen.
 8    Q.   On any of the forms that you reviewed, did he indicate
 9    that he was not a United States citizen?
10    A.   Yes, sir, there are forms when he indicates he is not a
11    United States citizen.
12             MR. COAN:  Your Honor, I will pass the witness.
13             THE COURT:  All right.  Thank you, Mr. Coan.
14             Cross-examination?
15             MR. YOO:  Yes, sir, I would like to cross-examine.
16                        CROSS-EXAMINATION
17    BY MR. YOO:
18    Q.   Sir, would you take a look at this?
19             THE COURT:  What is that?
20             MR. YOO:  This is Gun Control Act of 1968.
21    BY MR. YOO:
22    Q.   And I would like for you to turn to Section 178-125 --
23    125 Echo?
24             THE COURT:  I tell you what I will let you do,
25    Mr. Yoo, as we previously discussed, I will let you make any
```

```
 1   argument that you want to make at the conclusion of the

 2   hearing.

 3            But for the purposes of proceeding this afternoon,

 4   I think right now your opportunity is to cross-examine the

 5   witness who is on the stand.

 6            MR. YOO:  Yes, sir.

 7            THE COURT:  All right.  You may proceed to the

 8   podium.

 9   BY MR. YOO:

10   Q.   All right.  So, Special Agent James Reed, so you

11   mentioned citizenship and U.S. Army entrance denial due to

12   forensic -- forensic psychology evaluation by Gallegos; is

13   that correct?

14   A.   Yes, sir.  That is -- the report we have is from the

15   Institute of Forensic Psychology.

16   Q.   Okay  So are you familiar with the Federal Codes 27

17   CFR 478.11?

18   A.   No, sir.

19   Q.   No?

20   A.   Not off the top of my head, no, sir.

21   Q.   All right.  Are you familiar with Addington vs. Texas,

22   441 U.S. 418, happened in 1979?

23   A.   I am not familiar with that off the top of my head, sir.

24   Q.   Are you familiar with NICS Improvement -- NICS

25   Improvement Amendment Act of 2007?
```

1   A.   I have a general familiarity with that, yes, sir.

2   Q.   All right.  Since you are an ATF agent, I would like to

3   ask you this:  Are you familiar with ATF Information

4   3310.4?

5   A.   You would have to reference what that is, sir.

6   Q.   This concerns the definition of adjudicated mentally

7   defective and committed to mental institution regarding

8   924(g).

9           Have I been committed to a mental institution

10  pursuant to those codes?

11  A.   I have an order signed by a judge for the involuntary

12  commitment.

13  Q.   All right.  What -- which date was the hearing?

14  A.   It says, this date is ordered on 24 September, 2015.

15  And my reference, sir, I believe -- I can get it for you --

16  was 8th of April, 2013.

17  Q.   Is it formal commitment, or is it temporary commitment

18  per -- prior to a hearing?

19  A.   The top of the form says temporary order for the

20  voluntary commitment?

21  Q.   Yes, sir.  So -- so you said that April 23rd of 2013 and

22  the -- I believe October 5th of 2015 were the dates for --

23  for the hearing, correct?

24  A.   No.  I said that 24th of September, 2015, and April 8th,

25  2013?

```
 1   Q.   Yes, sir.  But what was the date for a hearing

 2   scheduled?

 3   A.   I am going to have to go through and look at this to

 4   see.

 5   Q.   From my -- from my recollection, the hearing

 6   dates were --

 7           THE COURT:  Mr. Yoo, you can't make statements.

 8   You can only ask questions.

 9   BY MR. YOO:

10   Q.   Okay.  So was I committed following a hearing or not?

11   A.   That I don't know, sir.

12   Q.   Was I been to -- was I -- like, have I been to a

13   hearing?

14   A.   That I don't know, sir.

15   Q.   So -- so can you look up Addington vs. Texas?

16   A.   No, I don't have the ability.

17   Q.   So can you -- can you claim -- can you claim a legal

18   basis that I have actually been formally committed?

19   A.   All I am doing, sir, is reviewing the documents that are

20   in front of me and presenting them to the Court that this is

21   an involuntary commitment order signed by a judge.

22   Q.   All right.  So are you familiar with RUPD Report

23   13-15051?

24   A.   Can you say that again, sir?

25   Q.   Are you familiar with RUPD Report 13-15051?
```

1  A.    I probably can reference that report if you hold on one

2  second.

3              (Pause in proceedings.)

4  A.    This is the 13-15051, sir?

5  Q.    Yes, sir.

6  A.    Yes, sir.

7  Q.    So you are familiar with it?

8  A.    Yes, sir.

9  Q.    Did you give a full report when you were testifying as a

10  witness right now?

11  A.    I read from the report, yes, sir.

12  Q.    Full report?  At the end of it, what does it say?  You

13  did not specifically --

14  A.    I can read the entire report for you if you would like,

15  sir.

16  Q.    Proceed, sir.

17  A.    On Thursday, April 4th, 2013, at 2100 hours, I was

18  dispatched to the Livingston Dining Hall on report of a

19  suspicious person.  On scene, I spoke with dining staff

20  Mr. Panagioti, Pete Dafnos, and Ms. Stefanie Oates.  They

21  advised that Mr. Heon Jong Yoo, a Rutgers student, swiped in

22  to get a meal and was overheard talking about guns, buying

23  guns, making guns, and that his family sells guns.  They

24  stated that he was discussing with his two friends and the

25  conversation was overheard by Mr. Oates.  It was reported --

 1 | Ms. Oates, excuse me.

 2 |     It was reported that Yoo stated that an individual

 3 | from the residence life did not know who they were messing

 4 | with.  Yoo did not specifically threaten to cause any harm to

 5 | anyone or state he was going to.

 6 |     Upon further investigation, it was discovered that

 7 | Heon Jong Yoo was removed from Rutgers housing and was now

 8 | residing off campus.  I contacted Yoo via phone, and Yoo

 9 | stated he was now residing at 15 North at the Colonial Tower

10 | in New Brunswick.

11 |     I arrived at the Colonial Tower and was met by Of

12 | Officer Pilesky and Rutgers Emergency Service Lt. Schleck.  I

13 | advised Yoo that RUPD was there for a well-being check and

14 | have him speak with Emergency Services.

15 |     I asked Yoo if he owned any weapons, guns, or had

16 | either in his current residence.  He stated, no.

17 |     Yoo was brought up to his room where Lt. Schleck

18 | conducted an evaluation.  While the evaluation was being

19 | conducted, Officer Pilesky and I were in sight and sound

20 | during the evaluation.

21 |     Yoo had two friends in his apartment, Patrick

22 | Coates and Darien Schreffler.  Both were with Yoo today when

23 | he swiped into his Livingston Dining.

24 |     Yoo had a stutter when speaking, but it became more

25 | apparent the more excited he became.  Yoo expressed a strong

1   desire to purchase guns legally in a manner which seemed to

2   obsess over the issue of obtaining a gun.

3           After speaking with Yoo, Lt. Schleck proceeded to

4   contact APS.  It was deemed that Yoo needed to be transported

5   to the Robert Wood Johnson Hospital for further evaluation.

6           Yoo stated he would voluntarily go to the Robert

7   Wood Johnson Hospital because he did not want this incident

8   to affect his chances of obtaining a gun.

9           While preparing for transport, Yoo changed his

10  clothing and put on a three-piece suit.  Yoo voluntarily was

11  transported to the Robert Wood Johnson Hospital via Rutgers

12  ambulance.  I followed the ambulance to Robert Wood Johnson's

13  Hospital.

14  Q.   Okay.  So when you were testifying under Mr. Coan's

15  inquiries just now --

16          MR. YOO:  So sorry.  Sorry, Your Honor.

17  BY MR. YOO:

18  Q.   -- interrogatories just now, you -- you omitted the "did

19  not threaten anyone" part; is that correct?

20  A.   I don't believe I did mention that.

21  Q.   So you did not give me a full -- full report; is that

22  correct?

23  A.   I did not read the full report until just now, sir.

24  Q.   I mean, when you were answering his interrogatory?

25  A.   He was asking me about this report and its relationship

1    to why you were taken to the hospital, which on that report

2    states that you attempted harm against a resident advisor.

3    According to the report, this shows where that threat comes

4    from, so that's why --

5    Q.    So do those reports contradict each other?

6    A.    No, sir, my understanding -- my belief is they do not.

7    Q.    So -- so you are saying that I didn't -- did not

8    specifically threaten to harm or kill anyone and threatened

9    to kill -- kill his RA, do they not contradict each other?

10   A.    No, I am just reading from both reports.  One report

11   says a statement in this.  The other says that -- stated an

12   individual from residence life did not know who they are

13   messing with.  My understanding is that is what both reports

14   say, and that is what I am presenting.

15   Q.    Can it be a lawsuit?  Because you know who my

16   grandfather is, correct?  You know my family is wealthy,

17   correct?  So can that be referring to a lawsuit, a legal

18   action?

19   A.    Oh, I don't know.  I am just reading what the report

20   says, sir.

21   Q.    Okay.

22   A.    I was not here any of these times.  I am just gathering

23   the facts as an investigator and presenting those facts from

24   the report and how they link up.  So why -- if there is a

25   report of a emergency room visit, and this is the report I am

1    reading why and responding to what the report stated and what

2    the other report stated and the Court -- for the Court's

3    consideration.

4    Q.   All right.  So when -- when the reports contradict each

5    other, is that report credible if -- since that hospital

6    report directly mentions that RUPD told them that I

7    threatened to kill my RA; is that correct, sir?

8    A.   Let me check, sir.

9         It states action the -- per APS note, which I

10   assume is another screening service.  It says:  Brought to

11   Robert Wood Johnson Hospital ER by Rutgers Police due to a

12   report of him threatening to shoot his resident counselor.

13        That is the only note that I have to go by on that

14   part of the report.

15   Q.   Okay.  Can you tell me the definition of a

16   terroristic -- terroristic threat?

17   A.   Not in New Jersey, sir.

18   Q.   Okay.  Do you know if I -- I received any criminal

19   charges pursuant to this report?

20   A.   I have not uncovered any criminal charges concerning

21   this report, sir --

22   Q.   If there were -- if there were an evidentiary basis that

23   I made this credible threat, wasn't I subject to a

24   terroristic threat charge?

25   A.   I am not -- I am not familiar with that, sir.  I am just

1   reading the reports.

2   Q.   Okay.  Proceeding.  So you are also familiar where

3   the -- when I got locked up at the short-term facility back

4   in 2015, correct?

5   A.   Yes, sir.  I believe I read from a report in which

6   Robert Wood Johnson requested -- are you talking about the

7   requiring chemical and physical restraints --

8   Q.   Yes.

9   A.   -- and then requested the inpatient hospitalization for

10  safety and stabilization.

11  Q.   All right.  First of all, do you have a personal

12  knowledge of what happened?

13  A.   No, sir.  Again, all I do as an investigator in this

14  case is look at these reports is all I have to go by and see

15  the numerous statements of medical professionals who are

16  licensed under oath -- my understanding is all medical

17  professionals under oath to accurately report, and this is

18  what is in this report, sir.

19          It says:  Past history of mood disorder, repetitive

20  disruption, and homicidal threats.  Requires inpatient

21  hospitalization for safety and stabilization.  Patient is

22  minimizing.  Omitting facts.

23          These are medical professionals writing this, sir.

24  That is why I am reporting what the medical professionals

25  said.

1    Q.    Medical, quote, unquote, professionals.  Okay.  So in

2    that report, does it ever mention that I have been to a psych

3    back in 2011 due to, say, homicidal threat?

4    A.    It does.  It says:  Patient presented to Robert Wood

5    Johnson in 2011 after stating he wanted shotguns to shoot

6    people.

7    Q.    I am pretty sure there is a -- would you please take a

8    look at the report by Daniel Boutsikaris or something?

9    A.    I don't know which report you are referring to, sir.

10   Q.    From -- to my recollection, he does say that I have been

11   committed before for homicidal threats back in 2011.  Do you

12   know where I physically was back in 2011?

13   A.    No, sir, I don't.

14   Q.    So was I in New Jersey back in 2011?

15   A.    I just said I did not know where you were, sir.

16   Q.    So is that report credible?

17   A.    Again, sir, my analysis of the report is to read what is

18   on the report.  It is written by medical professionals at the

19   Rutgers State University in New Jersey University Behavioral

20   Health Center.  They are signed and dated by medical

21   professionals.  I assess that as credible, in that a medical

22   professional writes that -- the statements appear multiple

23   times.  And I am just presenting what these reports say to

24   the report.

25   Q.    So you are saying medical -- it is impossible for a

1   medical professional to be politically biased and then lie on

2   the reports that commit perjury?

3   A.   No, sir.  I would never say that anything is impossible.

4   Q.   Okay.  Okay.  I believe that you stated that I was

5   transported to the hospital due to making terroristic threats

6   such as, "death to the Middle East"; is that correct?  And --

7   A.   Are you talking --

8   Q.   -- homicidal ideation; is that correct?

9   A.   That is what the report stated.  Shouting, "death to the

10  Middle East."  And it says:  Patient upon arrival to the ER

11  continued to present aggressive and threatening, requiring

12  chemical and physical restraints?

13  Q.   Yes, sir.  I am fully aware of that report.

14       Is Middle East a person?  So like can I -- is it

15  physically possible for me to kill Middle East?  Kill a place

16  called Middle East?  Is it physically possible?

17  A.   I don't believe I can answer that question.

18  Q.   Huh?

19  A.   That is a hypothetical that I don't know.

20  Q.   So Middle East is not a person, correct?

21       What is the definition of a homicidal ideation?

22  A.   Wanting to kill people.

23  Q.   Kill people, right?  Is Middle East people?

24  A.   It could be, sir.

25  Q.   How?

1    A.   Well, simply, there is people from the Middle East, so

2    killing Middle East could be killing people from the Middle

3    East.  You are asking a hypothetical question.  I'll give you

4    a hypothetical answer.

5              Sir, yes, in my training and experience, oftentimes

6    individuals who have hate and want to commit violence against

7    groups of people refer to those people by the places they

8    come from.

9    Q.   There is a difference between saying, "death to Middle

10   East" and "death to a Middle Eastern."  Also there is a

11   difference in saying "death to Middle East," and then "I am

12   going to kill Middle Easterns," correct?  Those two

13   statements are completely separate, correct?

14   A.   Yes.  There is a possibility it could be separate, or

15   they could be the same depending on the individual making

16   those statements.

17   Q.   Exactly.  Did I make -- pursuant to that, did I make any

18   homicidal threats?  Or was I just expressing my political

19   views as showing hatred toward a Middle Eastern culture and

20   the policies of those nations?

21   A.   I don't know in this circumstance, sir.  All I have

22   is -- to go by is this report in front of me which states:

23   Was brought with a past history of mood disorder and

24   voluntary hospital.  Making terroristic threats by stating,

25   "death to the Middle East."  That is all I have to go by is

| | |
|---|---|
| 1 | that report.  I was not there at the time when you made those |
| 2 | threats, sir, so I cannot answer the question what was going |
| 3 | on. |
| 4 | Q.   Also back in 2015 was I temporary committed pursuant |
| 5 | to -- prior to a set court hearing date, or was I formally |
| 6 | committed following a hearing?  Those two are very |
| 7 | different? |
| 8 | A.   The report I am reading says:  Temporary order for the |
| 9 | involuntary commitment of adult. |
| 10 | Q.   So you do not have any court hearing record of 2015 |
| 11 | either? |
| 12 | A.   I do not have one in front of me, sir, no. |
| 13 | Q.   However, to my knowledge, I have been entered into NICS |
| 14 | database as adjudicated mentally defective and committed -- |
| 15 | had been committed to a mental institution, correct? |
| 16 | A.   That is my understanding, you are in the NICS database |
| 17 | as being under that flagged category. |
| 18 | Q.   Okay.  So is that record truthful and lawful pursuant to |
| 19 | 27 CFR Section 478.11 and pursuant to Addington vs. Texas? |
| 20 | A.   That is a question I can't answer.  I can't speculate on |
| 21 | the lawfulness -- |
| 22 | Q.   All right.  Moving on.  So let's talk about militia.  Is |
| 23 | forming a militia illegal? |
| 24 | A.   No, sir, it is not. |
| 25 | Q.   Is possessing firearms illegal? |

```
 1  A.    No, sir, it is not.

 2  Q.    It is not, right?  Okay.  Is having a political view --

 3  views illegal?

 4  A.    No, sir.

 5  Q.    Are you aware of the -- are you aware of the political

 6  ideology known as a constitutional fascism?

 7  A.    No, sir.

 8  Q.    So what is my fascist party's name?

 9  A.    I don't know, sir.

10  Q.    American Nationalist Party.  And are you aware of the --

11  our ideology?

12  A.    No, sir.

13  Q.    So why are you submitting this as a credible evidence

14  that I am a threat to the society?

15  A.    Well, I will give you the answer since you asked, sir.

16  The support is that you have a group of individuals outside

17  who can help you once you get out, whether to flee as a

18  flight risk, also provide you weapons.

19        You have shown, through the documents I provided,

20  that you are willing to lie to acquire weapons legally.  But

21  these groups who are involved with weapons can provide you

22  weapons in an informal manner presenting a danger to the

23  community based on your extensive mental health history, as

24  well as your flight risk.

25        These individuals -- when you are a leader of an
```

 1    organization, oftentimes members of that organization will

 2    help the leader of the organization to do things like escape

 3    and acquire firearms.

 4            That is why it is, in my judgment, that you are a

 5    danger to the community -- as an agent -- and a flight

 6    risk.

 7    Q.   I will come back to that.  So before I come back to

 8    that, let's go over certain police reports.

 9            So you said that there were numerous police reports

10    from Rutgers, UConn, DFW area, Richland College, UT Tyler,

11    and all those, correct?

12    A.   Yes, sir.

13    Q.   And then on June 16 -- June 26th, 2016, you mentioned

14    Prosper Police Report about me threatening to shoot people,

15    correct?

16    A.   Yes, sir.

17    Q.   Did you give the full report for that report?

18    A.   I just read the initial.

19    Q.   Or does it -- does it say down there that Hank has

20    never -- like -- like.  Sorry?

21            Another witness saying that he has never -- he or

22    she has never heard such a threat?

23    A.   I just read the initial narrative, sir.

24    Q.   So why don't you subpoena the one here to testify for

25    that -- I mean not -- testified said that I -- I threatened

1   to shoot people if this is a credible report?

2   A.   I am just reading from the report.  I don't have --

3   Q.   Okay.  Well, let's go over September 6th, 2016, report.

4        So at University of North Texas to rile as many

5   liberals as possible, I was armed, right?  Did I have a CHL

6   at that time?

7   A.   I would have to go back and cross-reference.  I believe

8   the report that I have in front of me stated that you said

9   you had a concealed to carry weapon on campus.

10  Q.   Did the police examine my concealed handgun license?

11  A.   I'm not sure.  I don't recall.

12  Q.   Up to my recollection, yes, they did.  Did they arrest

13  me?

14  A.   I don't recall.  I don't believe so.

15  Q.   Okay.  So was I illegally and unlawfully brandishing a

16  firearm -- a firearm in a threatening manner?

17  A.   I don't know, sir.  I was not there.

18  Q.   Did the police say that I was brandishing my firearm in

19  a threatening manner?

20  A.   I don't believe so.

21  Q.   Okay.  So on numerous occasions you gave -- you did not

22  give full report.  You selectively chose certain phrases to

23  testify against me?

24  A.   I read from the summary of the report, yes, sir.

25  Q.   Okay.  So you said that I have over 70 police reports

1   against me, right; is that correct?

2   A.   That number sounds to be in the correct range.

3   Q.   Correct?  Have I ever been even charged with a violent

4   crime --

5   A.   Yes.

6   Q.   -- excluding the perjured testimony in front of the

7   Grand Jury by Lucas Machicek?

8           MR. COAN:  Your Honor, I just ask that Mr. Yoo

9   allow the witness to answer the question.

10          THE COURT:  Mr. Yoo, you have to give the witness

11  an opportunity to respond to your question before you ask the

12  next question.  Okay?

13          MR. YOO:  Yes, sir.

14          THE COURT:  Try not to step over his response.

15          MR. YOO:  Apologize, sir.

16  BY MR. YOO:

17  Q.   Have I ever been charged with a violent crime?

18  A.   Yes, sir.

19  Q.   On which occasion?

20  A.   The occasion was the aggravated assault in Smith County,

21  Texas.

22  Q.   Okay.  Are you familiar with Mr. Machicek?  That's how I

23  say it, or Machicek (different pronunciation)?

24  A.   I am familiar with him, yes, sir.

25  Q.   Are you aware of his testimony in front of a Grand

1   Jury?

2   A.   No, sir, I am not privileged to that Grand Jury.

3   Q.   He told Grand Jury that I -- I pointed my handgun at

4   Darrell Franklin and threatened to kill him, thus committing

5   aggravated assault.  Is that accurate pursuant to the Tyler

6   PD police report?

7   A.   I believe -- I can't answer that question because I was

8   not there to answer -- to know that is what he said.

9   Q.   Do you have the aggravated assault Tyler PD report by

10   Sgt. A. Colby, Agent Reed?

11   A.   I believe I have that Tyler PD report that I can pull up

12   for you, yes, sir.

13           (Pause in proceedings.)

14   A.   I have the report, sir.

15   Q.   Yes, sir.  So you have the report by Sgt. A. Colby,

16   correct, Tyler PD?

17   A.   By who, sir?

18   Q.   Sgt. A. Colby, Colby?

19   A.   Let me get there.  There are several supplements.  Let

20   me make sure I am at the right location for you, sir.

21   Q.   Oh, before we proceed, can you tell me which section

22   describes aggravated assault in the Texas Penal Code?

23   A.   Hold on.  Let me find this report for you, sir.

24           (Pause in proceedings.)

25   A.   All right.  I have the report.  What was your --

1    Q.   All right.  So before we begin, are you familiar with

2    Texas Penal Code for aggravated assault, can you tell me the

3    code name?

4    A.   On the incident report it is listed as 22.02.

5    Q.   22.02.  Do you know what it says?

6    A.   You'd have to refresh my memory, sir.

7    Q.   Do you want me to read it out to you?

8    A.   Not particularly, but -- unless -- I'm not familiar with

9    it, but --

10   Q.   Okay.  So -- so you are not familiar with the code,

11   correct, like word by word?

12   A.   I am not trained in Texas police crimes.

13   Q.   Does it say any one of us four, including Matt Lack, you

14   know, actually hurt someone?  Like, did anyone get physically

15   injured during the commission of this crime?

16   A.   It is my understanding that no one was physically hurt

17   during the commission of this crime.

18   Q.   Okay.  Did anyone actually aimed the pistol at the

19   residents and threaten to kill them or seriously

20   injury -- cause serious bodily harm?

21   A.   I don't know the intent of the individuals involved in

22   this, sir.

23   Q.   So -- so what does that Tyler PD report say?  Does it

24   say that -- whether anyone actually like made death threats

25   or of -- threats of serious bodily injury?

| | |
|---|---|
| 1 | (Pause in proceedings.) |
| 2 | A.   It stated that -- what was the question again?  Can you |
| 3 | refresh my memory on the question, sir? |
| 4 | Q.   Does it say that any one of us four either -- I |
| 5 | mean -- sorry. |
| 6 | Does it ever say that any one of us four actually |
| 7 | threatened to cause death or bodily -- serious -- serious |
| 8 | bodily harm, injury, upon Darrell Franklin and his family? |
| 9 | A.   I don't know if it specifically says that.  It says that |
| 10 | there was a threatening with -- individual with a handgun, |
| 11 | which in my understanding, in my judgment, not trained in |
| 12 | Texas law but in just general violent crime, threatening |
| 13 | someone with a handgun is a serious threat of bodily injury. |
| 14 | In fact, as a law enforcement, if someone threatens me with a |
| 15 | handgun, I can reply with deadly force because that is deadly |
| 16 | force. |
| 17 | Q.   Correct.  But -- but do they actually have any proof? |
| 18 | A.   That would be a question that -- that I can't -- I'm not |
| 19 | a jury, sir. |
| 20 | Q.   So do you know the difference between an aggravated |
| 21 | assault and an unlawful brandishing of a firearm? |
| 22 | A.   You would have to refresh my memory on the difference of |
| 23 | that. |
| 24 | Q.   Okay.  So the aggravated assault would be, you know, me |
| 25 | pointing a gun at you and saying, "I am going to kill you |

1  with this gun."  That would be aggravated assault, correct,

2  because the person that does -- of that definition like

3  threatening to cause serious bodily harm.

4       Unlawful brandishing of a firearm would be just

5  holding the gun and not making the specific threat.

6       So -- and then what was my role in it?  I do

7  believe that I took the pistol away from Matt Lack, is that

8  correct, Darrell Franklin's testimony?

9  A.   I believe you provided the pistol.  And then under -- he

10 said that you took it from him placing it in his trenchcoat

11 after it was pointed at him.

12 Q.   Placed it in his trenchcoat?

13 A.   I'm reading, it says, he pulled it out for a third time,

14 and you took it from him, placing it in his trenchcoat.

15 Q.   Okay.  Does it say that I provided Matt Lack a firearm?

16 Does it clearly say that I provided Matt Lack a firearm?

17 A.   I believe that is from my understanding of a further

18 investigation on this incident.

19 Q.   Further investigation.  So even if I did provide Matt

20 Lack a firearm, I did not commit aggravated assault, neither

21 Matt Lack committed aggravated assault.  So pursuant to

22 the -- the -- the letter and the spirit of the Texas Penal

23 Code, if Matt Lack -- if your -- your investigative --

24 investigative analysis is correct, Matt Lack committed

25 unlawful brandishing of a firearm, and then I committed

 1   unlawful transfer of a firearm.  Is that correct?

 2   A.   I can't make a judgment on that, sir.

 3   Q.   If your -- your -- your personal investigative data is

 4   inaccurate, Matt Lack committed theft of a firearm and

 5   unlawful brandishing of a firearm, none of which was

 6   aggravated assault committed on my part; is that correct?

 7   Because I did not point the gun at him, did I?

 8   A.   I don't know.  I was not there, sir.

 9   Q.   Did the police report say that I pointed the gun, or the

10   victim's statement?

11   A.   The report does not say that you pointed a gun at the

12   individual.

13   Q.   So I have not committed any -- any violent -- any

14   violent crimes?

15   A.   A Grand Jury charged you with the crime, sir.

16   Q.   Yes, after perjured testimony from Lucas Machicek, are

17   you aware of that?

18   A.   Again, I am not privy to his testimony, sir.  I can just

19   see that a Grand Jury charged you with aggravated assault

20   with a deadly weapon.

21   Q.   Do you have my discovery, sir?  Do you have access to

22   every single one of my discovery files?

23   A.   If we are talking about the same information, I

24   should.

25   Q.   His testimony was in my discovery files.  Why haven't

1  you reviewed it, sir?

2  A.   I would have to refresh my memory.  I don't believe

3  Grand Jury proceedings -- I have not received that report

4  myself.  But there are lots of investigators on this case.

5  Q.   So -- so -- so -- so did I commit an aggravated

6  assault?

7  A.   Again, sir, I am not a jury.  I can't decide your fate,

8  whether you are guilty or not guilty of this crime.

9  Q.   So what was the disposition of the case?

10 A.   It states the case was dismissed.

11 Q.   Correct.  Did I have any other charges of a violent

12 crime?

13 A.   I don't -- I have never seen any other charges of a

14 violent crime.

15 Q.   Not of a terroristic threat, correct?

16 A.   Not to my knowledge, no, sir.

17 Q.   So you are telling me that I had 70-plus police reports

18 against me, oh, yeah, I feel uncomfortable.  He threatened to

19 kill me, he threatened to kill this, he threatened to kill

20 that.  I have zero criminal charges, zero criminal

21 complaints, and zero criminal affidavits.

22 A.   I have not seen any other criminal affidavits relating

23 to a terroristic threat.  But I have seen multiple police

24 reports, if that is your question, yes, sir.

25 Q.   So are you trying to admit perjured hearsay into the

1  record?  Are you attempting to admit perjured hearsay into

2  our record?

3  A.    I take it you are accusing me of perjury when everything

4  I am saying is reading off reports, sir.  So I take a big

5  offense to that because that is a question against my honor.

6          But, yes, sir, I am reading off multiple police

7  reports from where you have been involved in those, and all I

8  can do is read the reports.  I wasn't at the scene.  But the

9  totality of all of these reports suggests that some people

10  are reporting it for some reason.  I am pointing them out to

11  the Court as we have received them.  That is all I have done,

12  sir.

13  Q.    No, sir.

14  A.    Nowhere have I made up any information about you in

15  this.  I am simply reading from the reports.

16  Q.    At this hearing I am not -- I am not accusing you of

17  perjuring yourself.  I am accusing those individuals who

18  filed the report.  Possibly, okay, possibly accusing them of

19  perjury, and I am accusing you of --

20  A.    No, sir, you accused me --

21  Q.    -- incompetency.

22  A.    You accused me of perjury, so that is why I put it on

23  the record.

24  Q.    Moving along.

25          THE COURT:  Mr. -- Yes.  Let's move along,

1    please.

2    BY MR. YOO:

3    Q.    Moving on.  So license to carry a handgun.

4    A.    Yes, sir.

5    Q.    So it says that -- what was the -- what did they say the

6    grounds to revoke my license to carry -- carry a handgun

7    was?

8    A.    I don't have the direct in front of me, but I believe it

9    was because the Texas State Medical Board had ruled you were

10   no longer medically qualified to carry a handgun, and lied on

11   your application.

12   Q.    Based on which -- which legal basis?

13   A.    There was a report I saw where the Medical Board of

14   Texas, I believe it was three different doctors signed off on

15   that?

16   Q.    Yes.  What was the reason?

17   A.    I can get the report for you probably.

18   Q.    Yes, sir.  Proceed?

19            THE WITNESS:  Do we have that?

20            (Pause in proceedings.)

21            MR. COAN:  Your Honor, may I approach?

22            THE COURT:  You may.

23            (Document given to the witness.)

24   A.    It says:

25            You have been ineligible for license under

1    Government Code Section 411.172(a)(7) and

2    Section 4111.72(a)(14) [sic].

3         The department now amends and adds additional

4    ground for revocation, Government Code Section 411.186(a).

5         The department shall revoke a license issued under

6    this section if the license holder was not entitled to a

7    license at the time it was issued.

8    BY MR. YOO:

9    Q.   Okay.  Why wasn't I -- why wasn't I entitled?

10   A.   I am, again, reading from the claim.

11        It says:  The Texas Department of Public Safety

12   asserts the decision to revoke a license is supported by a

13   preponderance of the evidence.  A statement made against his

14   own interest, the licensee, was not allowed due to mental

15   reasons.  And you failed to disclose any treatment in any

16   mental health institution during your application process in

17   2006.

18   Q.   So.  Okay -- so --

19   A.   Then it says -- sorry -- Medical Board notified the

20   department that the licensee was ineligible for license under

21   Government Code 411.172 --

22   Q.   So during that time was I ordered to be under

23   treatment?

24   A.   I don't know, sir.

25   Q.   Okay.  So -- so are you familiar with the procedure for

```
 1   revocation of license and suspension of Texas CHL license?
 2   A.   I have a working knowledge, yes, sir.
 3   Q.   So one of the affidavits for my -- my license of
 4   revocation says that -- that my -- what was it?  One of the
 5   affidavits say that -- that -- that I have been indicted --
 6   or, no, I'm sorry, I've been charged with aggravated assault.
 7   Is that correct?
 8   A.   Yes.  Under the section that says "additionally" via --
 9   pursuant to Government Code 411.187?
10   Q.   Yes, sir.  Also are you -- sorry.  Are you still
11   testimony?  I mean --
12   A.   If you want me to, I can continue to read that section
13   of the affidavit, sir.
14   Q.   Okay.  So are you aware of the fact that I actually
15   submitted expert witness testimony by Dr. Andrew Daren, who
16   evaluated me for eight-plus hours and found nothing wrong
17   with me, him advocating me retaining my CHL.  And Medical
18   Advisory Board completely disregarded his expert testimony
19   possibly and potentially based on their political bias.
20   A.   I have no idea how the Medical Board makes their
21   decisions.  I can just see that the Medical Board said you
22   were no longer able to possess a handgun for judgment -- not
23   capable of exercising sound judgment with respect to the
24   proper use and storage of a handgun.  But I have no idea how
25   the Medical Board makes their determinations.
```

1   Q.   Did they prove that I lacked sound judgment?

2   A.   Again, sir, I have no idea how the Medical Board makes

3   their decisions. The only thing I have in front of me is

4   that the Medical Board of Texas wherever -- this Medical

5   Board said that you do not have sound judgment with respect

6   to the proper use and storage of a handgun.

7   Q.   Do they submit any evidentiary basis like evidence?

8   A.   Again, sir, I don't know how the Medical Board of Texas

9   works.

10   Q.   Okay. So moving on.

11       I believe that under an Indictment of a felony or a

12   charge of a Class A or B misdemeanor, a License to Carry a

13   Handgun is a subject -- is subject to suspension, not

14   revocation; am I correct?

15   A.   I believe that is what it says, at least according to

16   this -- again, I am not familiar with the exact wording of

17   the law. But, according to the document I have in front of

18   me, it says: The department shall suspend a license under

19   this section if the license holder is charged with a

20   commission of Class A or B equivalent.

21   Q.   Did --

22   A.   Or an offense -- or a felony under Information or

23   Indictment, yes, sir.

24   Q.   Did they postpone my appeal hearing following the

25   Indictment, and did they issue suspension of my license

1   following the felony Indictment?  Because I do believe March

2   17th my aggravated assault case was still pending, correct?

3   A.   I would have to check on when your case was dismissed,

4   but -- your dismissal was in June of 2017.

5   Q.   All right.  So it was still pending Indictment, correct,

6   which means they should have postponed the hearing and

7   suspended my license?

8   A.   Again, I don't know the procedure.  I just know that a

9   judge in Smith County revoked your license.

10  Q.   In your knowledge, was it pursuant to proper due

11  process, in your knowledge?

12  A.   I have no knowledge of whether due process was followed,

13  only the records that show in March the judge issued an order

14  affirming the revocation of your license to carry.

15  Q.   Okay.  Moving on.

16          So Texas Rangers -- so Texas Rangers -- so do you

17  know a person who reported me to Texas Rangers stating that I

18  made threat to kill all Jews and the blacks in Washington,

19  DC?

20  A.   I believe it was in the report, yes, sir.

21  Q.   Why didn't you file subpoena on her, Kim Allen?

22  A.   I have a report from the Texas Department of Public

23  Safety, Texas Rangers, sir.

24  Q.   Do you know if this is a truthful, truthful report by

25  Kim Allen?

1  A.    I don't know.  All I know is that it is a Texas Rangers

2  report.  And in my experience in dealing with the Texas

3  Rangers, they are very credible and thorough, and I have

4  never, in my experience, come across a Texas Rangers report

5  that is false, sir.

6  Q.    Okay.  So Texas Rangers did not affirm or confirm --

7  like affirm or even confirm the fact that I actually made

8  these threats, correct?

9  A.    All I have in the report, it says in regard to

10  conversations -- it says while -- you talking to the Rangers,

11  it says, while I was there, I did say that -- and it goes

12  into talking about -- you not having personal actions but

13  that you were talking about groups in general.

14  Q.    So groups in general, that is not a terroristic

15  threat?

16  A.    Again, it is entirely context based, sir.

17  Q.    So nothing applies to my personal actions.  And are you

18  familiar with David Bigg's report?

19  A.    Yes, sir, I have it front of me, yes, sir.

20  Q.    Does that report state that I was a president of a

21  socialist party?

22  A.    It does say a member of a socialist party.

23  Q.    So, which is exactly opposite of my political ideology

24  as a right-wing capitalist and fascist and a

25  constitutionalist, correct?

```
1   A.   Again, I am not qualified to make a political --

2            THE COURT:  Mr. Yoo, can you help me with the

3   relevancy here?

4            MR. YOO:  I mean, sir, Agent Reed submitted a bunch

5   of irrelevant --

6            THE COURT:  How is this line of inquiry relevant to

7   the determination I have to make on your appeal of the

8   detention hearing?

9            MR. YOO:  Because, sir, I am trying to strike the

10  credibility.  Are you objecting in behalf of the prosecution,

11  sir?

12           THE COURT:  No.  I am trying to regulate the

13  conduct of this hearing, and I am trying to understand

14  how -- what the relevancy of this is.  If you can demonstrate

15  what it is, I will allow you to continue.  I am just having a

16  hard time seeing it right now.

17           MR. YOO:  I am trying to say that -- that all of

18  these reports -- reports of me allegedly being a threat to

19  the society is actually not credible at all.

20           THE COURT:  All right.  Well, why don't you

21  continue.

22           MR. YOO:  Yes, sir.

23  BY MR. YOO:

24  Q.   All right.  Do you know who from the Andrews Center

25  evaluated me?
```

 1   A.   It says case reviewed with Dr. Behrooz -- something of

 2   that nature.

 3   Q.   That is from ETMC, sir.  From Andrews Center, sir?

 4   A.   I don't have that on this report.

 5   Q.   Camille Prinz, what is the illegal basis for not issuing

 6   subpoena on her if you wanted to prove that I am a threat and

 7   this is a credible report?

 8   A.   Again, sir, I don't -- I collect reports in front of me

 9   and look at the totality of those reports, and I present them

10   to the Court.

11         My -- you know, my answer is that the

12   investigation, I investigated you on your violations of

13   federal firearms laws.  And in the course of the evaluation,

14   I have come across this evidence provided by other

15   investigators, and I am simply providing it the Court, and --

16   Q.   I -- sorry -- sorry.  I will address that.

17         So criminal trespass.  Ticket, right, and the

18   failure to appear warrant?  So I believe the trial -- that

19   trial was set sometime during May; is that correct?

20   A.   I would have to look at the record, but that sounds

21   correct, sir.

22   Q.   Was I able to attend that trial?

23   A.   I don't know, sir.

24   Q.   Well, where was I back in May 2018?

25   A.   I believe you were in the Gregg County Jail, sir.

1    Q.   Exactly.  Whose responsibility is it for -- to transfer

2    me to the Court?

3    A.   It would probably fall under the United States Marshal

4    Service.  I don't know though.

5    Q.   Did they offer to transport me?

6    A.   I don't know, sir.

7    Q.   Okay.  So what is a criminal trespass?

8    A.   As I mentioned earlier, criminal trespass is when a

9    property owner or a property manager makes a formal complaint

10   and says this individual is no longer allowed back on my

11   property.  It is logged in the system.  And then when that

12   individual shows back up at the property, it serves as --

13   they could be arrested for coming back on criminal

14   trespass.

15   Q.   So did they file -- sorry.  Did they serve me with

16   paperwork that I have been criminal trespassing?  Did Walmart

17   serve me any paperwork?

18   A.   My understanding is that is not how the process works.

19   But from some of the reports I have gone into, it does say

20   you were notified.

21   Q.   So did I knowingly and willingly trespass into that

22   property?

23   A.   I don't know, sir.

24   Q.   Is this a violent crime?

25   A.   Is criminal trespass a violent crime?

```
 1   Q.   No.

 2   A.   Is that what you are asking, sir?

 3   Q.   Yeah.

 4   A.   No, sir.  I don't believe it is not under federal --

 5   Q.   So --

 6             THE COURT:  Hold on.

 7   Q.   -- it is a Class B misdemeanor --

 8             THE COURT:  Mr. Yoo, you can't start asking a

 9   followup question until the witness has been allowed to

10   answer your first question.  All right?  So y'all don't step

11   on top of each other.

12             MR. YOO:  I sincerely apologize, sir.

13   BY MR. YOO:

14   Q.   So this is not a violent crime?

15   A.   No, under most definitions of violent crime --

16   Q.   So this --

17   A.   -- criminal trespass is not a violent crime.

18   Q.   So this is a Class B misdemeanor, if I recall?

19   A.   I believe that is correct, sir.

20   Q.   All right.  So moving on.

21             So I was out on bail back in -- pending more

22   serious charge of aggravated assault; is that correct?

23   A.   Again, I don't have that in front of me, sir, but I

24   believe that is correct.

25   Q.   Does aggravated assault guarantee deportation of
```

1  permanent residents?

2  A.   I am not an immigration agent, so I don't know.

3  Q.   Yes.  Did I ever break a bond condition while I was on

4  bail?

5  A.   I don't know, sir.

6        MR. YOO:  Actually, yeah -- actually, Your Honor, I

7  would like to address it when I am testifying -- testifying

8  for myself.

9  Q.   Did I commit any violent crime while I was out on bail,

10  to the best of your knowledge?

11  A.   To the best of my knowledge, you did not.

12  Q.   Did I miss a single court date?

13  A.   I don't know, sir.

14  Q.   Did I flee?

15  A.   I don't believe so, sir.

16  Q.   I didn't flee pending a much serious charge.

17        So going back to what you said -- oh, sorry.

18  Please answer the question.  So I did not flee pending a much

19  more serious charge than the charge that I am facing right

20  now?

21  A.   I am not -- again, I don't know exactly your condition,

22  but I have no understanding that you fled.

23  Q.   Okay.  Did my followers supply me with any safe haven to

24  safely be a fugitive from justice or supply me with any

25  weapons?

1   A.   I don't know, sir.

2   Q.   Was I armed while I was out on bail?

3   A.   I don't know, sir.

4   Q.   So you have --

5   A.   I know you were armed when I arrested you in April of

6   two thousand -- this year, but I don't know if you were armed

7   any time during that time.

8   Q.   Was I out on bond -- so did I have a bond condition back

9   saying I wasn't supposed to own any guns?

10   A.   I don't know that, sir.

11   Q.   So you have no evidentiary basis to back up your belief

12   that my -- my followers would -- would arm me or help me

13   flee?

14   A.   No, sir.  I just have an understanding that your

15   followers are willing to do things for you and to answer to

16   your commands to do things, and I have experience with that

17   of you demanding your followers to do things.

18        I have interviewed some of your associates and

19   followers who believe that you -- they would do things for

20   you, and I have known your followers to do things for you in

21   the past.

22   Q.   Can you name one?

23   A.   We have -- Bo Walker is one of your followers.  The

24   other followers' names we have come across Romello Hodge and

25   other unidentified individuals.

1    Q.   Bo Walker is my coach, sir, not my follower.  And when

2    did you interview Romello Hodge?

3    A.   I have not interviewed Romello Hodge.

4    Q.   How do you know of his presence?

5    A.   Through investigative means.

6    Q.   So you mentioned two names, Bo Walker and Romello Hodge.

7         You interviewed Bo Walker, correct?

8    A.   Yes, sir.

9    Q.   Did he say that he was going to help me be a fugitive

10   from justice?

11   A.   No, sir.

12   Q.   Okay.  Did he say that he was going to supply me with --

13   with -- with weapons if I have a bond condition saying I am

14   not supposed to own any weapons?

15   A.   He did not say that exact wording, sir.

16   Q.   Okay.  So your only knowledge is that he had friendly

17   disposition of me?

18   A.   Yes, he stated you were the leader of this group.

19   Q.   Can I get a copy of that interview?

20   A.   I am sure you can, yes, sir.

21   Q.   All right.  So -- so about federal firearms charge, what

22   does -- what does -- sorry.  Does 924(a)(1)(A) state that any

23   false statement on ATF 4473 form?

24   A.   What was the question, sir?  I don't understand the

25   question.

1  Q.   Does 924(a)(1)(A) state that any false statement on ATF

2  Form 4473?

3  A.   Hold on one second, sir.  It is knowingly making false

4  statements and representations to a dealer licensed under

5  Chapter 44, Title 18, United States Code.  With respect to

6  information required by the provisions of Chapter 44 of

7  Title 18 of United States Code to be kept in the record of a

8  dealer, is a violation of 924(a)(1)(A).

9  Q.   So, basically, this is a charge regarding me making a

10 false statement regarding some information that has to do

11 with dealer and the record keeping, correct --

12 A.   Yes, sir.

13 Q.   -- required to be kept?

14 A.   You made false statements on an ATF Form 4473.

15 Q.   Yes.  Does the charge say any false statement regarding

16 the -- sorry.  Any false statement on the ATF Form 4473, like

17 any and all statement, any?

18 A.   The cite would be:  Indictment states you knowingly made

19 false statements and representations to a dealer under the

20 provisions of Chapter 44 of Title 18, United States Code with

21 respect to the information required by the provisions of

22 Chapter 44, Title 18, to be kept in the record of a dealer.

23 And the Defendant did execute Bureau of Alcohol, Tobacco,

24 Firearms, and Explosives Form 4473 firearms transaction

25 record and falsely listed his country of citizenship as

1   United States of America when, in fact, he is not and at the

2   time of the false statements a United States citizen.

3   Q.   Okay.  So it is a false statement regarding information

4   required to be kept by FFL record keeping, not any false

5   statement on ATF 4473 form, correct?

6   A.   I don't know -- I don't understand your question, sir.

7   Q.   Well, those two are vastly different, sir.  Any false

8   statement would be like, oh, yeah, if I say my favorite color

9   is brown and when my favorite color actually is blue, but I

10  just felt like brown -- felt like brown that day and I

11  answered brown, I would be guilty of that charge.  However,

12  required to be kept by FFL record pertains to specific

13  information?

14  A.   Yes, sir.  The 4473 form itself, which is the Government

15  in its entirety, includes a warning of perjury.  It is an

16  official Government form.  That form is required by law to be

17  kept by all federal firearms licensees, so the records

18  required to be kept by the dealer is the 4473 form.

19  Q.   The entire form, every single question on that form?

20  A.   Is subject to having to be answered truthfully and

21  completely as noticed on the bottom of the form.

22  Q.   So every single question on that form is -- so are you

23  saying that every single question on that form

24  pertains -- sorry.  Pertains to information -- required to be

25  kept by FFL at record keeping, and do you swear this under

1    the penalty of perjury?

2    A.    I don't understand what you are asking me.  I will read

3    you from the form:  ATF Form 4473, which is required to be

4    kept by federal firearm licensees, the purpose of this form,

5    the information and certification on this form are designed

6    so that a person licensed under 18 USC subsection 923 may

7    determine if he or she may lawfully sell or deliver a firearm

8    to the person in identified in Section A and to alert the

9    buyer of certain restrictions on the receipt and possession

10   of firearms.  This form should only be used for the sell or

11   transfer when the seller is licensed under 18 USC 922.

12          It goes on.  And then it talks about -- that's on

13   all of the different versions of this form.  So that is the

14   purpose of the ATF Form 4473 --

15   Q.    Yes, but --

16   A.    -- it says:  I sign and certify the answers and the

17   sections are complete, and I have read the notices,

18   instructions, and definitions of ATF Form 4473.

19   Q.    Sir, are -- sir, are you familiar with -- wait.  Are you

20   still --

21   A.    Oh, no.

22   Q.    Are you familiar with 922(b)(5)?

23   A.    You have to refresh my memory.

24   Q.    922(b)(5), I have it out here.

25          All right.  So it shall be unlawful for any

1   licensed importer, licensed manufacturer, licensed dealer, or

2   licensed collectors to sell or deliver (5) any or -- sorry --

3   any firearm or armor-piercing ammunition to any person unless

4   the licensee notes in his record, required to be kept

5   pursuant to Section 923 of this chapter, the name, age, and

6   place of residence of such person if the person is an

7   individual, or the identity and principal and local places of

8   businesses of person if the person is a corporation or other

9   business entity.

10          Did I make false and misleading statements

11  regarding these three information; name, age, place of

12  residence, and --

13  A.   I --

14  Q.   -- and address?

15  A.   I don't know if what you are referring to is the

16  ATF 4473, but you did make false information on the

17  ATF 4473.

18  Q.   It says word by word on 922 Bravo (5) required to be

19  kept pursuant to Section 923 of this chapter?

20          THE COURT:  Mr. Yoo -- Mr. Yoo, I think you are

21  sort of getting to some of the underlying facts that the

22  Government will seek to prove at the trial of this case.  But

23  I am having trouble following how it is relevant to today's

24  proceeding.  Can you help me understand that?

25          MR. YOO:  Yes, sir.  The Government is trying to

 1  use the -- the charges that I am allegedly -- sorry.  Federal

 2  criminal codes that I am allegedly charged of to prove that I

 3  am a -- that I am danger to the community or flight risk.

 4  So --

 5           THE COURT:  I agree.  But we are not going to reach

 6  a determination on whether you are guilty of the crimes that

 7  you have been indicted for --

 8           MR. YOO:  Yes, sir.

 9           THE COURT:  -- until we have the trial, and the

10  jury will make that determination.

11           MR. YOO:  Yes, sir.  All right.  May I continue?

12  BY MR. YOO:

13  Q.   So did I have -- can you prove the fact that I had any

14  intent of deception by filling out of these forms?

15  A.   Yes, sir.

16  Q.   Oh, really?

17  A.   Well, I mean, I can show that you checked you are a

18  United States citizen when you are not a United States

19  citizen.  That is deceptive because you are not a United

20  States citizen.

21  Q.   But intent of deception for which purpose?

22  A.   I don't intend to know why you filled out these forms

23  incorrectly, only that you checked the box that you are a

24  citizen of the United States country, when it is clear that

25  you understand you are not a citizen of this country, so your

1  intent to deceive is clear, in that you checked the box

2  multiple times and also did it correctly sometimes.

3         So the question of whether or not you have checked

4  this box and lied on this form is right here on this form

5  here, sir.  You are not a United States citizen, but you

6  checked the box --

7  Q.    So --

8  A.    -- you were a United States citizen.

9  Q.    Sorry.  Sorry.

10  A.    No.

11  Q.    So that is the only part that I actually, quote,

12  unquote, put the false information on, correct?  Not address,

13  not Social Security number?

14  A.    No, in fact, there are other false place -- false

15  informations on the form.  One time you placed your birth as

16  Fort Worth, Texas, spelled F-O-R-T.  Another time you placed

17  your birth as Ft. Worth, Texas with the abbreviation

18  Ft. Worth, F-T Worth, so that is, obviously, not where you

19  were born, sir.

20  Q.    So, based on those two informations, you are telling me

21  that it makes -- it makes a huge difference in ability for a

22  law enforcement agency to track me down in case a violent

23  crime were to occur, which is the purpose of Gun Control Act

24  of 1968?

25  A.    All I know is that as an ATF agent looking at this

```
 1   Form 4473, you have provided false information multiple times
 2   on a firearms transaction record with regarding the transfer
 3   of firearms, in violation of federal law.
 4   Q.   Well -- okay.  Are you aware of the affidavit for record
 5   custodian of Brian Allen Parker?
 6   A.   You have to refresh my memory.
 7   Q.   Brian Allen Parker is a NICS record custodian who wrote
 8   an affidavit.  And on that record, every single one of those
 9   seven counts on my Indictment has been registered on the
10   correct day to the NICS transaction record.  So, again, what
11   was my intent to deceive?
12   A.   I don't believe these things were on the NICS record.
13            THE COURT:  Hold on just a moment.
14            Mr. Coan?
15            MR. COAN:  Your Honor, I have tried to be patient.
16   We are far afield from the questions of whether or not he is
17   a danger or a flight risk.  We are litigating trial issues --
18            THE COURT:  Absolutely.  I will sustain the
19   objection.
20            Mr. Yoo, move on.
21            MR. YOO:  Okay.
22   BY MR. YOO:
23   Q.   All right.  So -- so the conclusion to this
24   cross-examination, I have not been charged with a terroristic
25   threat, and I have not been charged with -- I have not been
```

```
 1    charged with a single violent crime other than that
 2    aggravated assault, which was, you know, based on a lie,
 3    correct?
 4    A.    I do not know if you have been charged with a
 5    terroristic threat, and the aggravated assault is the only
 6    other charge that I know that is a serious violent crime.
 7    Q.    Which was dismissed?
 8    A.    Yes, sir.
 9    Q.    And that which, according to the police report, I did
10    not point a gun or threaten anyone?
11    A.    That's correct.
12    Q.    Okay.  And -- and -- sorry.  And -- and if there were
13    any evidentiary basis, don't you think I would have been
14    charged with a terroristic threat?
15              MR. COAN:  Your Honor --
16    A.    I don't know.
17              THE COURT:  Hold on.
18              Mr. Coan?
19              MR. COAN:  Argumentative.
20              THE COURT:  I will sustain the objection.  I don't
21    think it is particularly relevant, but --
22              MR. YOO:  All right.  This -- this concludes my
23    cross-examination, Your Honor.
24              THE COURT:  Thank you very much.
25              Mr. Coan, any redirect?
```

```
 1              MR. COAN:  No, Your Honor.  May this witness be
 2    excused?
 3              THE COURT:  Yes.  The witness may step down.
 4              Let's take a short recess before we continue with
 5    the next witness.
 6              (Recess was taken at this time.)
 7              THE COURT:  Please be seated.
 8              Mr. Machicek, you may call your next witness.
 9              MR. MACHICEK:  Thank you, Your Honor.  The United
10    States called Matthew Lack.
11              THE COURT:  Come forward and have Ms. Schroeder
12    swear you in.
13              (Witness sworn.)
14              THE COURT:  Come forward.
15          MATTHEW LACK, GOVERNMENT'S WITNESS, SWORN,
16                      DIRECT EXAMINATION
17    BY MR. MACHICEK:
18    Q.   Good afternoon, Mr. Lack.  How are you today?
19    A.   I'm fantastic.  Thank you for asking.
20    Q.   For the purposes of the record, would you please state
21    your full name?
22    A.   Matthew Douglas Lack.
23    Q.   And, Mr. Lack, where do you reside, what city?
24    A.   Tyler, Texas.
25    Q.   What do you do for a living in Tyler, Texas?
```

1  A.    I do marketing for a small business in Tyler.

2  Q.    Do you know the gentleman seated over here, the

3  Defendant in this case, Heon Jong Yoo?

4  A.    I do.

5  Q.    And how is it you know Heon Jong Yoo?

6  A.    I was friends with him for a short while before becoming

7  involved in a crime with him.

8  Q.    Were you also a roommate of his for a period of time?

9  A.    I was.

10  Q.    Okay.  And during the period of time that you all had

11  this friendship and the period of time that you were

12  roommates, did you know Mr. Yoo to possess numerous

13  firearms?

14  A.    Absolutely.

15  Q.    During the time that y'all were friends and roommates,

16  did you know Mr. Yoo to make statements about firearms,

17  specifically altering serial numbers?

18  A.    Absolutely.

19  Q.    Did you know Mr. Yoo to make statements regarding

20  silencers and their use of obscuring forensic analysis of

21  ballistics?

22  A.    On multiple occasions.

23  Q.    Did you experience Mr. Yoo to express anger and

24  violence?

25  A.    On multiple occasions.

Q.   Can you explain to the Court instances in which you
experienced personally Mr. Yoo's violent activities?

A.   Several instances.  One being the most important, at
least to me physically.  I think I had slept late, and he
asked me if I would have gotten up earlier than the time I
slept till.

The kitchen was a bit out of order, and commanded
me -- not asked -- parentheses on that "commanded me" -- to
clean it or I would be punished.  And I said, no, because I
didn't appreciate the way I was being talked to.  I felt like
an animal.

And then he presumed to command me to do pushups;
and when I wouldn't do that, he put my left arm in a hold, my
left arm specifically.  And as he did that, something tore or
ripped.

And after the incident, I have had several
occasions where I have had to call an ambulance because I
have woken up because my shoulder has been out of place, and
I can't put it back in myself, and the pain is excruciating.
And that is what happened there.

Q.   And so it is my understanding then that in the roommate
relationship that you had with Mr. Yoo, you were expected to
perform certain tasks; is that right?

A.   Yes, sir.

Q.   And failure to perform those tasks were met with rage on

1  his part?

2  A.    Yes, sir, and physical abuse, as well as mental abuse.

3  Q.    You were made to do things like pushups?

4  A.    Correct, yes, sir.

5  Q.    And you described for the Court just now an incident

6  where you were physically assaulted by Mr. Yoo?

7  A.    Yes, sir.

8  Q.    During the course of your friendship and this roommate

9  relationship with Mr. Yoo, did he make statements about his

10 family having great wealth?

11 A.    Yes, on multiple occasions.

12 Q.    And did he describe his family's wealth as an asset to

13 him if it were to come upon him that he found himself in

14 trouble with law enforcement?

15 A.    Yes, on multiple occasions.

16 Q.    And how did he express to you that his family's wealth

17 would impact the situation where he were confronted by law

18 enforcement?

19 A.    I believe that his family's wealth would impact him

20 greatly and -- in an attempt to flee the United States and

21 seek refuge in a country that is not here.  I believe also

22 his wealth would be used to hide -- to hide him.  His family

23 could be used and utilized to hide him and provide him with

24 weaponry as well.

25 Q.    Are you aware of any other friendships, affiliations, or

1    associations held by Mr. Yoo that would allow him to hide

2    himself from law enforcement or arm himself against law

3    enforcement?

4    A.    Absolutely.

5    Q.    And what are those affiliations or associations?

6    A.    During my time with Hank, I soon began to realize that

7    the friendships that he had developed and the people that he

8    associated himself with were people that striked fear in me

9    and made me very nervous about my own safety, as well as the

10   safety of others in the City of Tyler, which is where we were

11   residing at the time.

12        I know that the people that he was in contact with

13   or in a friendship with could provide him with weaponry or

14   vice versa, him -- them with weaponry to hurt people.

15        I know that the people he were with had no regard

16   for the law.  As a matter of fact, had a disregard for the

17   law and didn't really care what it took to accomplish their

18   goals.

19   Q.    And is there any specific organization that you are

20   familiar with that Mr. Yoo associated with during your time

21   as roommate or friendship relationship that would meet the

22   description that you've just provided to the Court?

23   A.    Absolutely.  I recall being told on occasion about the

24   Smith County Lightfoot.  I'm not very familiar with what it

25   is, where they are located, or the numbers that they have in

1  their organization.  But I know that they are to be feared

2  and are able to -- to get things taken care of that needed to

3  be taken care of based on their idealistic views.

4  Q.   Okay.  And, specifically, their views or ideology, what

5  would that associate with in your estimation?

6  A.   I had never heard someone say that the Jews were -- it

7  was a good thing that the Jews were slaughtered in the

8  numbers that they were.

9       I had never met someone that idolized Adolf Hitler

10 until I met Hank.  And fear was developed in me at that point

11 because Hitler slaughtered many innocent, not only Jews, but

12 Muslims and Christians as well.  And he loved the fact that

13 Hitler did what he did, and it almost seemed as he wanted to

14 reiterate it into 21st Century America here in the U.S.

15 Q.   During your time of friendship in living with Mr. Yoo,

16 did he ever make any statements to you about his mental

17 health history?

18 A.   Absolutely.

19 Q.   Did he make statements or admissions to you that he had

20 been previously committed for mental health treatment?

21 A.   Yes, sir.

22 Q.   Did he describe to you instances in which he had

23 attempted to enlist in the Army and was rejected on the basis

24 of his mental health evaluation?

25 A.   Yes, sir.

1  Q.   Specifically, I want to talk to you about some of the

2  activities that Mr. Yoo engaged in during the time that you

3  knew him and lived with him.

4       Obviously, you are the person in the courtroom who

5  has spent the most time and knows Mr. Yoo best, and I want to

6  talk to you a little bit about some of the activities that

7  you witnessed him engaged in, perhaps activities that you may

8  have participated in yourself.

9       Was there ever any attempt on the part of Mr. Yoo

10  to incite altercations or violence with specific

11  individuals?

12  A.   On multiple occasions in Tyler.

13  Q.   And how would Mr. Yoo achieve that?

14  A.   We would get in his black Ram, a four-door, jacked-up

15  truck, and we would head to a predominantly African American

16  neighborhood in Tyler, and he would start to play specific

17  songs that related to the olden days where blacks were

18  segregated and even before that where they were held in

19  slavery.

20  Q.   And, in your opinion, why was he doing that in those

21  communities?

22  A.   I think his hopes were to incite rage in an African

23  American individual or a Muslim individual of any kind,

24  enough to the point where they would want to react, and he

25  would be able to react with deadly force.

1  Q.    Let's talk about the December 16th -- or, I am sorry,

2  December 2016 incident in Smith County on McDonald Road.

3  Were you involved in that incident?

4  A.    Yes, sir, I was.

5  Q.    In fact, were you one of the co-defendants who was

6  indicted for aggravated assault with a deadly weapon, out of

7  that incident?

8  A.    Yes, sir, I was.

9  Q.    And did you enter a guilty plea to the charge of

10  aggravated assault with a deadly weapon, from that

11  Indictment?

12  A.    Yes, sir, I did.

13  Q.    Were you placed on deferred probation as a result of

14  that guilty plea?

15  A.    Yes, sir, I was.

16  Q.    And are you currently on deferred probation?

17  A.    I currently am, yes, sir.

18  Q.    Now, with reference to that offense, did it involve an

19  incident where you pointed a gun at another individual during

20  a verbal altercation?

21  A.    Yes, sir.

22  Q.    And that is the conduct that you pled guilty to?

23  A.    Yes, sir.

24  Q.    Who provided you with that firearm?

25  A.    Heon Jong Yoo, or otherwise known to us as Hank.

1  Q.   And how did you arrive at the location where you pointed

2  the gun at the victim?

3  A.   Hank said that we should take his truck, and that he

4  would drive and provide transportation.

5  Q.   Did any other individuals accompany you and Mr. Yoo to

6  that location?

7  A.   Yes, sir.

8  Q.   Who were they?

9  A.   Carlos and Jesse.

10  Q.   Carlos would be Carlos Jose Hernandez; is that

11  correct?

12  A.   Yes, sir.

13  Q.   And, unfortunately, since that incident he has passed

14  away; is that correct?

15  A.   Yes, sir.

16  Q.   And Jesse, does that refer to Jesse Roger Long?

17  A.   Yes, sir.

18  Q.   When Carlos and Jesse accompanied you and Mr. Yoo to the

19  location where the aggravated assault occurred, did Mr. Yoo

20  supply any other or provide any other individuals with

21  firearms or accessories?

22  A.   Yes, sir.

23  Q.   Who and with what?

24  A.   He provided Jesse Long with an AR-15 semi-automatic

25  rifle with a fully-loaded magazine.  He also provided him

 1  with a machete, and then he also provided him with an armored

 2  vest.

 3  Q.   And during the course of that incident, what was

 4  Mr. Yoo's role in that altercation?

 5  A.   The goal was to get my vehicle back.  I strictly wanted

 6  to go over there and verbalize my concern and, hopefully,

 7  maybe, you know, threaten them with the police getting

 8  involved, and that, hopefully, they would turn over my

 9  vehicle at that point, and then there would be no other

10  altercation, and we would leave.

11       Hank wanted to take it further, which I was very

12  uncomfortable with.  But at the same time I feared him, so I

13  felt like I had no choice.

14  Q.   And when you refer, for clarification sake, to getting

15  your vehicle back, you suspected the individuals at the

16  residence had stolen your vehicle; is that correct?

17  A.   Yes, sir.

18  Q.   And you wished to go and confront them about that

19  suspected theft?

20  A.   I did, in a professional manner.

21  Q.   And whose idea was it to carry firearms to that verbal

22  altercation?

23  A.   Hank, or Heon Jong Yoo.

24  Q.   So the fact that he came up with the idea to take

25  firearms to the location, the fact that he supplied those

 1   firearms to the individuals going to that location, the fact

 2   that he supplied you with means of transportation to that

 3   location, is it fair to say that he aided, assisted, or

 4   perhaps encouraged the commission of that offense?

 5   A.   Absolutely.

 6   Q.   Let's talk now a little bit about your personal

 7   opinions.  You've made some expressions here that have been

 8   very clear to the Court, but I want to make sure that we

 9   clarify those for the purposes of this hearing.

10        Are you afraid of Hank Yoo?

11   A.   Absolutely.

12   Q.   Having been his roommate, having been his friend before,

13   do you fear that he might hurt you or a member of your

14   family?

15   A.   Absolutely.  May I make a statement; is that okay?

16   Q.   Yes, sir.

17   A.   During my time having a friendship with Hank, I invited

18   him to Thanksgiving feast at my family's house in Brownsboro,

19   Texas.  Us being raised Christian we were told to help when

20   it was necessary, so I decided that he should come and spend

21   Thanksgiving with me versus alone.

22        He showed up at the house and immediately began

23   scaring my family members, people who have not done a wrong

24   in their life, people who love the Lord and love their

25   community and have worked hard their entire lives to have

1    what they have.

2          The fear that was struck into my grandmother, who

3    is now 69, if I am not mistaken, was immense; and it was felt

4    by everybody in the room, including my other family members.

5          He rattled off about Hitler and how Hitler should

6    be worshiped instead of killed, that he should have been

7    idolized, and that Jesus is not real and that he is fake and

8    that he will burn, even if he was real.

9          He said that Jews should have been slaughtered.

10   That is the way it should have been.  That is the way it

11   happened the way it did.

12         He held his hand up on many occasions -- I'm not

13   going to do it because I find it very disrespectful -- but

14   the way Hitler would hold his hand up, he did it probably 15

15   or 20 times during his time at my grandmother's residence.

16         My grandmother pulled me to the corner and said,

17   Matt, I love you, but you need to take him home.  And, as

18   soon as you do that, you are more than welcome to come back

19   and finish Thanksgiving with the family.  And I did.  I took

20   him home.  And I was too embarrassed to go back because of

21   the person that I had brought into my grandmother's

22   household.  And that is when it began to become very serious

23   to me the cost of hanging out with Hank.

24   Q.   Did your grandmother take any security measures

25   subsequent to that date out of fear for Hank Yoo?

1  A.   She did.  She purchased about a $1500 ADT security

2  system complete with cameras and motion sensors.

3  Q.   I want to talk to you a little bit about the period of

4  time that you were out on bond.  You were charged with

5  aggravated assault with a deadly weapon during the same

6  period of time that Mr. Yoo was charged with the same crime;

7  is that correct?

8  A.   Yes, sir.

9  Q.   And so it is fair to say that both of you were out on

10  bond at the same time?

11  A.   Yes, sir.

12  Q.   During that period of time, did you travel to Mr. Yoo's

13  apartment in an attempt to obtain some of your belongings

14  that were still inside.

15  A.   Yes, sir.  Me and my friend Austin Moseley, he

16  accompanied me there to Hank's residence.

17  Q.   And when you arrived at the residence in an effort to

18  obtain the property that you had left behind in that

19  residence, what did Hank Yoo do when you arrived?

20  A.   I was met with the barrel, the front end of a 12-gauge

21  shotgun.  I did not go there with force or to fight.  I went

22  there to procure some of my belongings so I could forever be

23  done with this gentleman, and I was met with deadly force.  I

24  was scared for my life.

25  Q.   So, if someone were to testify that while Mr. Yoo was

```
 1   out on bond and prohibited from possessing firearms, that
 2   would not be an accurate statement, would it?
 3   A.   No.
 4   Q.   Because you have witnessed him possessing firearms while
 5   out on bond; is that correct?
 6   A.   Absolutely.
 7   Q.   Now, it is also fair to say that during the course of
 8   your friendship, however ill-conceived, and your relationship
 9   as a roommate, that you engaged in some conduct that you are
10   not proud of; is that correct?
11   A.   Absolutely.
12   Q.   That you felt influenced by Mr. Yoo, and for that period
13   of time at least, you shared some of the same ideologies as
14   him?
15   A.   I did, yes, sir.
16   Q.   Do you regret that period of time in your life?
17   A.   Very, very much so.
18   Q.   Are you embarrassed by it?
19   A.   Absolutely.
20   Q.   And as you complete your term of probation out of Smith
21   County, Texas, are you making every effort to reform yourself
22   from that period in your life?
23   A.   Absolutely.  I have had a year successful on probation.
24   I have been taken off of intensive supervision and put on
25   monthly reporting.  I am no longer tempted by alcohol or drug
```

 1   use.  I am engaged to a beautiful woman, sitting in the back

 2   of the room back there.  I have got a dog.  I purchased my

 3   first vehicle and am responsibly paying the notes on it.  I

 4   attend church every Sunday, and I work a full-time job.

 5              MR. MACHICEK:  Thank you, Your Honor.  We will pass

 6   the witness.

 7              THE COURT:  Thank you.

 8              Cross-examination.

 9                        CROSS-EXAMINATION

10   BY MR. YOO:

11   Q.   So, Matt -- sorry, Mr. Lack.  You mentioned intent of

12   deadly force against you in early 2017, correct?

13   A.   Correct.

14   Q.   Which month was it?

15   A.   Well, I got out on bond nine days after I was

16   incarcerated.  And if I was incarcerated in December, I would

17   have had to have gotten out sometime late December or early

18   January, so it would have had to have been January or

19   February.

20   Q.   Early January.  When did you sign -- when did we sign

21   the bond condition?

22   A.   I do not recall.

23   Q.   February 24th; do you recall now?

24   A.   I did just say December, January, or February.

25   Q.   No.  You said January when this incident occurred.  I

```
 1    actually filed a police -- police report against you, you

 2    tried to break into my residence, actually?

 3    A.   I did not try to break into your residence.  I was

 4    simply there to procure something that belonged to me.

 5    Q.   Well -- well, I am not trying to prove one way or the

 6    other.  The important thing is firearm.  January of 2017,

 7    this is pre-Indictment, we were not on bond condition,

 8    correct?  So we were not on bond condition that would

 9    prohibit us from owning a firearm?

10    A.   I was on bond conditions immediately after I was

11    released.  I was in Judge Skeen's Court, and I was

12    immediately put on bond conditions.

13    Q.   My records suggest that it is actually different.

14              MR. MACHICEK:  Your Honor, I'm going to object to

15    the Counsel testifying from the podium.

16              THE COURT:  I am going to sustain the objection.

17              Mr. Yoo, any statement that you want to make --

18              MR. YOO:  Yes, sir.

19              THE COURT:  -- I will receive that at the

20    appropriate time.

21              MR. YOO:  Okay.

22              THE COURT:  But in terms of this witness,

23    cross-examination is limited to questions.

24    BY MR. YOO:

25    Q.   Do you know when my bond conditions were signed?
```

| | |
|---|---|
| 1 | A.   I do not.  I was told not to contact you.  It was a |
| 2 | violation of my bond conditions. |
| 3 | Q.   Oh, okay.  So -- so in terms of -- now, again, so let's |
| 4 | talk about bond conditions.  Did your bond condition include |
| 5 | refraining from possession of firearm? |
| 6 | A.   Yes. |
| 7 | Q.   Okay.  So do you have personal knowledge that I was |
| 8 | possessing a firearm after I signed the bond condition? |
| 9 | A.   I do. |
| 10 | Q.   After I signed the bond condition? |
| 11 | A.   I do. |
| 12 | Q.   Which date? |
| 13 | A.   After you were put on bond conditions is when I was |
| 14 | traveling to your residence to claim some of the belongings |
| 15 | that were mine, and I was met with a 12-gauge shotgun. |
| 16 | Q.   The early January that was -- are you saying -- are you |
| 17 | claiming that the early January was when I was put under my |
| 18 | bond condition? |
| 19 | A.   I do not recall or even have any knowledge that you |
| 20 | were -- when you were put on bond conditions because I was |
| 21 | told not to have any contact with you. |
| 22 | Q.   Sir, you said -- you just said you have personal |
| 23 | knowledge of me possessing a firearm even on bond condition |
| 24 | after -- so because you knew that I possessed a firearm |
| 25 | during early January when you traveled to my residence to get |

1    your belongings; is that correct?

2    A.    Yes.

3    Q.    Okay.  So -- so which belongings were you trying to

4    retrieve?

5    A.    I had a set of books that were there, due to my home

6    schooling program that I had not finished, due to my mother

7    passing, on schedule.  So, when I moved in with Hank, I

8    brought them with me in an attempt to finish and got

9    distracted and was never able to finish.

10   Q.    Do you recall which books?

11   A.    I believe one of them was an American literature and

12   then an accounting book.

13   Q.    Did you file a police report against me?

14   A.    I did not.

15   Q.    Why?

16   A.    I didn't want to mess with it anymore.

17   Q.    Really?  So you --

18           THE COURT:  Mr. Yoo, how is this relevant?

19           MR. YOO:  Because he is -- he is trying to prove

20   that I held -- how is it not relevant, Your Honor?

21           THE COURT:  Explain to me how it is.

22           MR. YOO:  Because if there is no police report, it

23   is just hearsay.

24           THE COURT:  I don't see how that is really

25   important.  I mean, I can take the testimony.  We can take

 1    the testimony, you know, without regard to the traditional

 2    Rules of Evidence.  So maybe you don't understand that.  But

 3    he can testify to hearsay.

 4            MR. YOO:  I understand, but are you trying to

 5    object on behalf of the prosecution?

 6            THE COURT:  No, sir, I am not.  I am trying to

 7    conduct the hearing as efficiently and productively as

 8    possible, and I just don't see how this is relevant.

 9            MR. YOO:  I am questioning the credibility of this

10    witness, sir, because --

11            THE COURT:  I will give you a little latitude if

12    that is what you are doing.

13            MR. YOO:  Yes, sir.  Because even his own FBI

14    report that I have here, he just contradicted his

15    statement.

16            THE COURT:  All right.  Well, let's use that

17    then.

18            MR. YOO:  Yes, sir.

19    BY MR. YOO:

20    Q.   Okay.  So -- so you said that my kitchen was messy, and

21    I was ordering you to -- to clean it, correct?

22    A.   Correct.

23    Q.   You refused and I physically assaulted you?

24    A.   Correct.

25    Q.   In here it says I physically assaulted you for

```
 1    disagreeing with your views.  Which statement is correct?

 2    A.    They are both correct.

 3    Q.    They are both correct?

 4    A.    Yes.

 5    Q.    Did you or any of your family members file a single

 6    police report against me?

 7    A.    No, they did not.

 8    Q.    Okay.  Moving on.

 9          So do you -- are you familiar with function of a

10    silencer?

11    A.    A little bit, yes, correct.

12    Q.    What is the function -- what is a function of a

13    silencer?

14    A.    I would assume to suppress the sound a firearm would

15    make and to promote stealth and also to disfigure the round

16    that would come out of a -- the projectile that would come

17    out of a weapon, so that it could not be identified by a

18    third party.

19    Q.    H'm.  Okay.  And then you said that you have a personal

20    knowledge of me trying to scratch out serial numbers?

21    A.    I do.

22    Q.    Do you -- do you have a personal knowledge whether I

23    scratched out any of my firearms' serial number?

24    A.    I do not.

25    Q.    So -- so -- okay.  When -- or -- around which date did
```

```
 1    your grandmother purchase security measures?

 2    A.    That I do not recall.

 3    Q.    Okay.  So on -- on late September or early October of

 4    2016, you -- you Long -- not Long.  I'm sorry -- you,

 5    Demetrio, and Chavez went to Dallas, correct?

 6    A.    I did go to Dallas, correct.

 7    Q.    Yes.  Did your grandmother -- sorry.

 8          How did you have the money to spend in Dallas?

 9    A.    I had money from my savings, and then my grandmother

10    supplemented a little bit for the trip.

11    Q.    Did your grandmother install the security measure

12    because you stole $5,000 out of her wardrobe --

13            MR. MACHICEK:  I'm going to object to relevance.

14            THE COURT:  What is the relevance here, Mr. Yoo?

15            MR. YOO:  What is the relevance?  Because he is

16    trying to say that his grandmother purchased security

17    measures because she was in fear for her life of me.

18    However, she filed zero police reports against me.  And also

19    she didn't even file a criminal trespass order.

20            THE COURT:  What does the question that is pending

21    got to do with that argument?

22            MR. YOO:  Because he is trying to prove that I am a

23    threat to the --

24            THE COURT:  Move on, Mr. Yoo.

25    BY MR. YOO:
```

1   Q.   So, Smith County Lightfoot, what is their ideology?

2   A.   I would assume the same as yours, based on what you told

3   me at the time that I resided with you.

4   Q.   Would you please describe it?

5   A.   That Jews should be slaughtered -- I've said this

6   earlier.  Jews should be slaughtered, and they were

7   slaughtered because that is the way it needed to be and that

8   is why it happened, and that it needs to happen to Muslims

9   and Christians, as well, and that you don't care what it

10  takes to get it done, as long as you get it done.

11  Q.   Which is what ideology?

12  A.   Your party's ideology -- you said you have a party,

13  correct.  I would only assume that those two would be

14  incorporated in some manner, or why would you have a party?

15  Q.   Uh-huh.  Okay.  So are you aware of the fact that most

16  Smith County Lightfoot members are Christians?

17  A.   I do not associate myself with Smith County Lightfoot

18  members, so I would not know that.

19  Q.   Do you have personal knowledge that I -- knowledge that

20  I have -- have formally sworn into Smith County Lightfoot?

21  A.   I have the personal knowledge that you told me while I

22  resided with you.  Now, proof, I don't have.

23  Q.   That I swore in?

24  A.   Yes.

25  Q.   H'm.  And you have proof?

1  A.   I was also told that you have rank in said organization

2  by yourself and other people on the Skype calls that you made

3  numerous nights talking about people needing to kill

4  themselves and belittling people and belittling several

5  different races and different types of people, all based on

6  their color, not because they did anything to you, because of

7  what your views are or your people's views or Smith County

8  Lightfoot's views.

9  Q.   Solely based on color?

10            MR. YOO:  Your Honor, how is this relevant?

11            THE COURT:  Ask a question, Mr. Yoo.  Please

12  proceed.

13  BY MR. YOO:

14  Q.   Okay.  Solely based on color.  Do you know -- so you

15  mentioned Hitler; is that correct?

16  A.   I did.

17  Q.   Are you familiar with the definition of a national

18  socialism?

19  A.   I don't incorporate myself with any of that, so, no, I

20  don't.

21  Q.   Are you familiar with the difference between national

22  socialism and constitutional fascism?

23  A.   I don't incorporate myself with any of those, so, no, I

24  don't.

25  Q.   Well, which -- which -- what kind of races am I against?

1   A.    From the time that I lived with you, any person that is

2   not white or Aryan -- as you say you are yourself -- black,

3   Jews, and anyone that doesn't live in the U.S., which is,

4   quite frankly, quite a few different races and different

5   cultures who have done nothing to bother you.

6   Q.    I describe myself as 100 percent Aryan?

7   A.    You did on multiple occasions, multiple occasions; more

8   than 100, at least, I would have to say.

9   Q.    Are you aware of the race and the color of the second in

10  command of my political movement?

11          MR. MACHICEK:  Your Honor, I'm going to object to

12  relevance yet again.

13          THE COURT:  Sustained.

14          Move along, Mr. Yoo.

15          MR. YOO:  Hold on.  Hold on.  So -- hold on.

16  Objection.  Sorry.  Counter objection, Your Honor.  So --

17  so -- Mr. Machicek and then Mr. Lack are trying to prove that

18  I am a threat to certain color of people due to strong --

19  strong hatred based on nothing but their races.  How is this

20  not relevant?

21          THE COURT:  Well, what the race is of a person who

22  is in an organization that you are allegedly involved in

23  seems to me completely irrelevant to the decisions before the

24  Court today.

25          MR. YOO:  Yes, sir.

1     THE COURT:  Move along.

2     MR. YOO:  Motion to strike his testimony.

3     THE COURT:  Move along.

4   BY MR. YOO:

5   Q.   Okay.  So -- so let's talk about the aggravated assault

6   case.

7   A.   Okay.

8   Q.   Are you familiar with Texas Penal Code 5,

9   Section 22.02?

10  A.   I am not.

11  Q.   You are not?

12  A.   No, I am not.

13  Q.   To your knowledge, did anyone commit an aggravated

14  assault?

15  A.   I believe I committed aggravated assault by going there

16  with a firearm.  The intent to harm someone in the State of

17  Texas, as far as I'm concerned, and was told, is considered

18  assault.  I took ownership for that.

19  Q.   Did you actually intend to hurt someone?

20  A.   Yes.  I went there angry and just pissed because someone

21  had stolen my property.  Was it the right thing?  No.  But I

22  did go there angry.

23  Q.   Okay.  Which jacket were you wearing at that time?

24  A.   One of yours.

25  Q.   One of mine.  Can you describe it?

| | |
|---|---|
| 1 | A.   I do not remember what it looked like.  I believe it was |
| 2 | a Carhartt jacket, if I am not mistaken. |
| 3 | Q.   I do believe that it was a U.S. Army hoodie, correct? |
| 4 | MR. MACHICEK:  Your Honor, I'm going to object to |
| 5 | him testifying from the podium. |
| 6 | MR. YOO:  Well -- well -- well, no, I mean -- |
| 7 | THE COURT:  Mr. Yoo, questions only, sir.  You can |
| 8 | testify later on if you want. |
| 9 | MR. YOO:  I was asking a question, Your Honor. |
| 10 | THE COURT:  Well, I am going to sustain the |
| 11 | objection to your last question.  You can ask another |
| 12 | question. |
| 13 | MR. YOO:  Okay. |
| 14 | BY MR. YOO: |
| 15 | Q.   Give me one moment, sir, hold on. |
| 16 | (Pause in proceedings.) |
| 17 | Q.   So on the police -- on the actual police report itself, |
| 18 | it was said that -- it was said that -- |
| 19 | THE COURT:  Let me let him get his question out |
| 20 | first.  Go ahead. |
| 21 | BY MR. YOO: |
| 22 | Q.   On the actual police report, you said that you |
| 23 | mistakenly put firearm, and then left it there in the jacket, |
| 24 | correct? |
| 25 | A.   Correct. |

```
 1   Q.   And now you are saying that -- now you are saying that I

 2   transferred you the firearm, correct?

 3   A.   Now I am being truthful and not covering for anybody.

 4   And as hard as it is to be honest because I am scared of what

 5   the punishment will be -- I know that being honest is the

 6   best policy.  So, yes, you did provide me that firearm, as

 7   well as Jesse.

 8   Q.   What kind of deal were you offered by Mr. Machicek?

 9   A.   That's none of your business.

10   Q.   It's none of my -- my -- my business.  Did Mr. Machicek

11   ever tell you that if you testified against me or did

12   Mr. Coan ever tell you that if you testified against me, they

13   are going to -- because you just admitted that your

14   sentence -- your probationary conditions had been reduced,

15   correct?

16   A.   What I am saying is that I went there with the intent to

17   hurt somebody.  The firearm was not accidentally placed in a

18   jacket.  It's kind of hard to accidentally place a firearm in

19   a jacket that you put on.  You can feel it.

20        Second, you provided me that firearm in hopes that

21   we would incite some violence and in hopes that you would be

22   able to commit an act of violence and defend yourself in a

23   court of law because you went there, and they instigated,

24   when the truth is we went there to instigate.  I went there

25   because I was angry.
```

1    You provided me with a firearm, and I acted very

2  unprofessionally, and I made my bed and now I am lying in it.

3  So, no, I am not lying.

4    And I've never met Mr. Machicek or the other -- I

5  have met Mr. Machicek, but I haven't met the other gentleman

6  before in my entire life except for this day.  So how is it

7  possible for him to offer me anything?  I didn't see

8  Mr. Machicek until five minutes before this whole thing

9  started.  He didn't have time to offer me anything.

10 Q.   Because you had regular meetings with Mr. Davidson; is

11 that correct?

12 A.   I have had two meetings with Don Davidson.

13    MR. MACHICEK:  And, Your Honor, I'm going to

14 object.  This breaches attorney/client privilege.

15 Mr. Davidson is this witness's attorney.

16    THE COURT:  All right.  Let me -- Mr. Yoo, hold on

17 just a moment.

18    I'm certainly not your lawyer, and I'm not trying

19 to give you legal advice.  But, in general, discussions

20 between a client and an attorney are protected by the

21 attorney/client privilege.  And if you testify to that, you

22 could potentially waive that privilege and create other

23 problems for yourself.

24    So, again, I am not giving you legal advice; but to

25 the extent the question calls for any privilege, I think you

1  should be careful about how you answer it.

2          THE WITNESS:  Thank you, Your Honor, for the

3  advice.

4          MR. YOO:  I wasn't forcing him, sir.  He

5  volunteered all of those informations.

6          THE COURT:  Ask your next question, Mr. Yoo.

7  BY MR. YOO:

8  Q.   Okay.  So did you -- did you on multiple -- multiple

9  occasions use, take possession of my firearm without my

10 consent?

11         MR. MACHICEK:  Object to relevance.

12         THE COURT:  What is the relevance, Mr. Yoo?

13         MR. YOO:  What is the relevance, sir?

14         THE COURT:  Yes.

15         MR. YOO:  Oh, wait.  Because he said that I gave

16 him the firearm, which is completely not true, and --

17         THE COURT:  I will give you a little latitude.

18         MR. YOO:  Yeah.

19         THE COURT:  Restate the question.

20         MR. YOO:  Oh, Your Honor, actually due to that --

21 due to that objection, I -- I find -- find this -- this

22 Defendant and this Counsel to be in violation of -- abuse

23 of -- of discretion, bias, and incompetence in the criminal

24 conspiracy.  I would like for this testimony to be

25 stricken.

```
 1              MR. MACHICEK:  I am going to object to the

 2   Defendant testifying from the podium.

 3              THE COURT:  I'm going to sustain the objection.

 4              Mr. Yoo, I'll permit you to make argument at the

 5   appropriate time.  Right now we are in the cross-examination

 6   of this witness's testimony.  You may proceed.

 7              MR. YOO:  Yes, sir.

 8   BY MR. YOO:

 9   Q.   So -- deadly weapon.  Deadly force.

10              So pertaining to certain tasks, failure to resolve

11   it, resulted in violence, correct?

12   A.   Can you --

13   Q.   While you were my roommate, if I gave you an order

14   pertaining to certain tasks, while you have failed -- failed

15   to resolve it, resulted in violence, correct?

16   A.   Physical and emotional, yes.

17   Q.   Okay.  So did you inform your family?

18   A.   I did.

19   Q.   Did they call the police?

20   A.   It is not their responsibility to call the police.  It

21   was mine.  I didn't feel it necessary.  I went along with it.

22   I took it, pretty much.

23   Q.   Is it -- did you take it because you felt embarrassed,

24   or did you take it because of lack of evidentiary basis?

25   A.   No, I took it because I needed a place to stay.  And I
```

1    was so distraught about my mother passing, I didn't want to

2    be at home with the rest of my family.

3            A kid that gets bullied at school, he takes it for

4    a certain period of time. And that is what you were to me

5    while I was with you, was an absolute bully, physically and

6    emotionally.

7    Q.   If you were -- if you were legitimately threatened -- if

8    you were legitimately threatened for your life, limb,

9    eyesight, and your -- your safety, why did you stay with me

10   for a month-and-a-half?

11           THE COURT:  Hold on for objection.

12           MR. MACHICEK:  Your Honor, I'm going to object to

13   this entire line of questioning as speculative, irrelevant,

14   and generally asked and answered.

15           THE COURT:  I generally agree with that.  I will

16   permit the witness to answer this question.

17           And then, Mr. Yoo, I think it's time to move on.

18           MR. YOO:  Counter objection, Your Honor.

19           THE COURT:  I have sustained the objection, and I

20   am going to permit the witness to answer this question.  And

21   then I think after that it is time to move on.

22           MR. YOO:  All right.

23           THE COURT:  Do you recall the question?

24           THE WITNESS:  I don't.  Could you repeat, please?

25   BY MR. YOO:

1  Q.   Why did you stay with someone that you felt -- if you

2  felt I was a danger to life, limb, eyesight, and the safety

3  of you and the people around you, why did you stay with me?

4  A.   The fear of being homeless.  Like I said, I wanted a

5  place to stay that wasn't with family because I felt

6  uncomfortable to be with family at the time because of my

7  mother's horrible passing.  I took it.  I took the abuse.

8        And I didn't want to live in my car.  I wanted to be

9  some place that had utilities, such as a bathroom and

10 plumbing.  And I took it.  That was the consequence of me

11 staying with you was something wrong with my left shoulder.

12 I wake up two nights out of the week with a dislocated

13 shoulder in screaming pain because of the way you treated me

14 and the many, many, many times you put your hands on me.

15       I remember the time that we were on our way to

16 Beaumont, and I had to pull my SUV over for fear of wrecking

17 because of you putting your hands on me.

18       We had a Chandler police officer walk up and say:

19 Is everything okay?  And I had to say:  Yes, Officer, it is

20 okay.  Just for fear of not having any more trouble with law

21 enforcement.  You abused and bullied and have scarred me, and

22 I am so sick at my stomach to have to be in your presence

23 right now, but I know it is the right thing to do.  And I

24 have come clean about the truth about the charge in December,

25 and I'm coming clean about the things that you have done that

1    are not right.

2    Q.   Chandler Police.  Can you provide me the date of that

3    police report?

4    A.   I don't have to.

5    Q.   You don't have to?

6    A.   No, I don't.

7    Q.   So that was -- you said that -- you said that was on the

8    way to Beaumont?

9    A.   Correct.

10   Q.   Is Chandler on the way to Beaumont?

11   A.   We were on our way to my grandmother's house before we

12   head to Beaumont.  You leave Tyler, you go through Chandler,

13   you enter Brownsboro.

14            THE COURT:  Mr. Yoo?

15            MR. YOO:  Sorry.

16            THE COURT:  Let's move along.

17   BY MR. YOO:

18   Q.   So Chandler, correct?

19   A.   Correct.

20            MR. MACHICEK:  Your Honor, I believe the Court just

21   instructed --

22   Q.   Does your --

23            THE COURT:  Mr. Yoo?

24            MR. YOO:  Yes, sir.

25            THE COURT:  Move along.

```
 1             MR. YOO:  Okay.

 2   BY MR. YOO:

 3   Q.   So concluding this -- actually, do you have a hospital

 4   report of that dislocated shoulder?

 5   A.   I didn't go to the hospital.

 6   Q.   You just said that you went to the hospital, correct?

 7   A.   No, I said I was brought to an ambulance where it was

 8   popped back in.  I may have not stated it was popped back in,

 9   but during my lift onto the ambulance, my shoulder popped

10   back in due to me raising it up, and I said there was no

11   longer a reason for me to go.  But that doesn't excuse what

12   you did.

13   Q.   Do you have a report for -- for that ambulance?

14   A.   I do not.  Unfortunately, ETMC does not provide a report

15   unless you are carried on the gurney, into the ambulance, and

16   into the hospital is there a reason to file a report.

17   Q.   So let me ask you for one last time.  Do you have any

18   factual evidentiary basis to claim anything that you have

19   just said on the stand?

20   A.   If I wasn't so scared of popping my shoulder out of

21   place right now, I would do it, but it hurts super bad.

22   Q.   Was your shoulder popped out of place because of me or

23   because of those robbers who assaulted you?

24   A.   Because of you.

25   Q.   Because of me?
```

```
 1   A.    Because of you.

 2   Q.    Can you --

 3   A.    I went to --

 4   Q.    -- please provide me a factual evidentiary basis --

 5              THE COURT:  Mr. Yoo, you have violated my

 6   instruction about five times now.  Don't step over the

 7   witness's answers.  All right.  We have to give him an

 8   opportunity to get his answer out before you begin your next

 9   question.

10              I will also ask the witness to let him get his

11   question out before you begin your answer.

12              THE WITNESS:  I apologize.

13              THE COURT:  Everybody just settle down a little

14   bit.  I hope we are near the end.

15              MR. YOO:  Certainly.

16   BY MR. YOO:

17   Q.    Do you have factual evidentiary basis consisting of

18   police report, criminal affidavits, or any criminal trespass

19   warnings by your family or any of that, do you have

20   anything?

21   A.    I do not.

22   Q.    Do you have anything other than what would be construed

23   as hearsay?

24   A.    Only what I have as hearsay.

25              MR. MACHICEK:  And, Your Honor, I'm going to object
```

1    to a misstatement of the law.  His testimony from the witness

2    stand is, in fact, substantive evidence.

3            THE COURT:  Sustained.

4            Anything else, Mr. Yoo?

5            MR. YOO:  No, sir.  I have stated my points.

6            THE COURT:  All right.  You may be seated.

7            Any redirect, Mr. Machicek?

8            MR. MACHICEK:  No further questions.

9            THE COURT:  All right.  You may stand down.

10           Any additional witnesses on behalf of the

11   Government?

12           MR. COAN:  No, additional witnesses, Your Honor.

13           Two quick things before the Government rests.  One

14   is, I simply ask the Court to take judicial notice of the

15   Superseding Indictment in this case.

16           THE COURT:  Yes.  I know there was a Superseding

17   Indictment filed on September 20th, Docket No. 84; is that

18   correct?

19           MR. COAN:  Yes, Your Honor.

20           THE COURT:  All right.

21           MR. COAN:  The second thing is that the Government

22   proffered from the Pretrial Services Report at the April

23   30th, 2018, hearing.  Rather than going back through that

24   again, I would just ask the Court to take that into

25   consideration in connection with your ruling.

1          THE COURT:  Mr. Coan, I do not believe I have a

2    copy of that report.  If you could provide me one, that would

3    be much appreciated.  You don't have to file it -- I mean,

4    you don't have to give it to me today, but if you will get it

5    filed on the docket, that will be fine.  I searched the

6    docket and could not -- could not locate it.

7          MR. COAN:  Your Honor, I actually don't have a copy

8    of the Pretrial Services Report.  That is pursuant to the

9    policies of the Probation Department.  They maintain

10   possession of those bond reports.

11         THE COURT:  Was it provided to Judge Love?

12         MR. COAN:  It was.  I don't know if he retained it.

13   But we had the report available at the time of the April

14   30th, 2018.

15         THE COURT:  Perhaps if the officer in the courtroom

16   has a copy of it, I might just review it while we are here.

17         PROBATION OFFICER MANLEY:  May I approach, Your

18   Honor?

19         THE COURT:  Yes, please.  Thank you.

20         Okay.  Mr. Coan, anything else?

21         MR. COAN:  The only other matter, just

22   housekeeping, may Mr. Lack be finally excused?

23         THE COURT:  Yes, he may be excused.

24         MR. COAN:  Thank you, Your Honor.

25         THE COURT:  Thank you very much.

```
 1            Mr. Yoo.

 2            MR. YOO:  Yes, sir.  Do I have permission -- sorry.

 3   Do I have permission to make my own arguments now?

 4            THE COURT:  Yes, you may.  And if you seek to

 5   introduce testimony, I think the best way to do that is from

 6   the witness stand.

 7            MR. YOO:  Yes, sir.  I would like to make

 8   certain -- certain exhibits.

 9            THE COURT:  All right.

10            MR. YOO:  Undue burden caused by the -- caused by

11   the detention on the Defendant actually.

12            MR. HAAS:  Excuse me, Your Honor.  Before Mr. Yoo

13   gets -- I understand the Court doesn't like phones in the

14   courtroom.  If I could just step outside to do a quick text,

15   it will take about five seconds.

16            THE COURT:  Be happy to permit you to do that.

17            MR. HAAS:  Thank you.

18            (Pause in proceedings.)

19            MR. HAAS:  Thank you, Your Honor.  I appreciate

20   everybody's patience.

21            THE COURT:  Thank you, Mr. Haas.

22            Okay.  Mr. Yoo, you may proceed.

23            MR. YOO:  Before I proceed, would you take a look

24   at my motion, emergency motion for pretrial release.

25            THE COURT:  I will -- that has been filed on the
```

1    docket, and I will -- and I will review that prior to issuing

2    my decision in this matter.

3              MR. YOO:  Yes, sir, hold on.  I have a couple of

4    exhibits over here.  These are two exhibits from my own

5    family members --

6              THE COURT:  Hand it to Mr. Haas, and Mr. Haas can

7    hand it up.

8              All right.

9              MR. YOO:  These are numerous requests forms that I

10   filled out to Gregg County Jail regarding my opportunity --

11   no, so sorry.  My ability to adequately represent myself.

12             This is the -- this is the proof that -- that even

13   as a Pro Se Defendant, making copies of legal work causes

14   undue burden.  This is the pending police report that says

15   once I am out on bail, I am to check my storage unit to tell

16   them what is missing that -- that I need to update.

17             This is the transaction records of what I -- you

18   know, of like phone calls that I purchased, how much money

19   that I have used -- used preparing my -- my defense.

20             THE COURT:  Okay.

21             MR. YOO:  And regarding subpoena, Your Honor, I

22   actually -- I actually -- I actually filed a financial

23   affidavit a long time ago.

24             THE COURT:  Yes, I have been made aware of that,

25   Mr. Yoo.  I noticed that there is some material that has not

1  been provided, so I was going to address that at the

2  conclusion of the hearing today.  I am going to ask, perhaps,

3  for some additional information in that regard.  We can

4  discuss that later.

5          MR. YOO:  All right.  So may I testify --

6          THE COURT:  You may and I do -- I think I have to

7  instruct you -- of course, I am not your lawyer, I'm not

8  giving you legal advice, but I am permitting you to take the

9  stand --

10          MR. YOO:  Yes, sir.

11          THE COURT:  -- if you wish to testify.  But, you

12  know, anything you say on the stand could, of course, be used

13  against you --

14          MR. YOO:  Yes, sir.

15          THE COURT:  -- in a subsequent proceeding, either

16  in this case or in another matter.  So I know you are

17  representing yourself with standby assistance from Mr. Haas,

18  but I just want to make sure you have thought through the

19  potential ramifications of that by testifying here.

20          MR. YOO:  Before I testify, I would like to address

21  one thing to the Court.

22          THE COURT:  All right.  Did you understand what I

23  just said, Mr. Yoo?

24          MR. YOO:  Yes, sir.

25          Today when I arrived, I was put in the holding cell

```
 1    fully cuffed, fully restrained.  And then they said it is

 2    a -- the Marshal said it is a procedural thing.  I asked -- I

 3    asked the Marshals to provide me the code for that procedure.

 4    They have failed -- they -- they have failed to do so.

 5              THE COURT:  Okay.

 6              MR. YOO:  Supervisor Deputy Brian Leach, I have

 7    asked for his badge number.  He has failed to provide me --

 8              THE COURT:  What would you like me to do, Mr. Yoo?

 9              MR. YOO:  Huh?

10              THE COURT:  What would you like me to do about it?

11              MR. YOO:  This is -- this is another -- this is

12    another consideration.

13              THE COURT:  I understand, but it is not really --

14              MR. YOO:  I would like you to take --

15              THE COURT:  I understand.  And you are welcome to

16    file a motion about it, on the docket.  That's not really

17    something that I can address right now.  We are here to give

18    you an opportunity to present your argument and any testimony

19    you choose to, with respect to your appeal of the detention

20    motion.

21              MR. YOO:  Yes, sir.  May I?

22              THE COURT:  Yes.

23              MR. HAAS:  May I put something on the record very

24    quickly, Your Honor?

25              THE COURT:  I'm sorry?
```

1          MR. HAAS:  May I put something on the record very

2     quickly?

3          THE COURT:  Yes.

4          MR. HAAS:  I am in this murky ocean of Standby

5     Counsel and especially with the recent Supreme Court case of

6     McCoy that came out, and I certainly can't tell even a

7     retained client of mine what to do, let alone someone that I

8     am Standby Counsel.

9          However, I do want the record to be known that I

10    did visit with Mr. Yoo and, basically, gave him the general

11    landscape of the law, just like the Court did.  So it is his

12    decision to testify.  I had no input in that whatsoever.

13         MR. YOO:  Yes, sir.  He also did say that

14    Judge Mitchell specifically told him that his role was to

15    step in if either the Court revokes my right to

16    self-representation or if I forfeit my right to

17    self-representation.  And he is to do nothing.

18         And I asked him for his cell phone number, and he

19    said he will provide his cell phone number.  Reason being, I

20    called his office like 13 times, right?

21         THE COURT:  Are you asking -- what are you asking

22    me, Mr. Yoo, are you asking Mr. --

23         MR. YOO:  Mr. Haas.

24         THE COURT:  Are you asking Mr. Haas?

25         MR. YOO:  Yes.

1          THE COURT:  Are you unsatisfied with Mr. Haas's

2     performance?

3          MR. YOO:  As for now, yes, actually.  But...

4          THE COURT:  Well --

5          MR. YOO:  I am not sure if I would like to withdraw

6     Counsel yet.

7          THE COURT:  Well, I am going to give -- I mean, I

8     think Mr. Hawk was originally involved in this, and then you

9     had two retained Counsel and you dismissed them.  And then

10    Mr. Van Cleef, I think, was also retained by you, and you

11    have dismissed him.  Now we are on Mr. Haas.

12         MR. YOO:  Yes, sir.

13         THE COURT:  I certainly -- you know, that is your

14    right to do that.

15         MR. YOO:  Yes, sir.

16         THE COURT:  But I hope you understand we intend to

17    go to trial in this case in November.  And so the fact that

18    you decide you are not happy with Mr. Haas's services as

19    Standby Counsel on the eve of trial will not be grounds for a

20    continuance.  You do understand that, do you not?

21         MR. YOO:  Yes, sir, I am not asking for any

22    continuance, sir.

23         THE COURT:  Okay.

24         MR. YOO:  Yes, sir.

25         THE COURT:  Well, the Court, I think, if I

 1    understand Judge Mitchell's order and certainly my view of it

 2    is that the Court is assisted in some respects by having

 3    Standby Counsel because in the event that I determine under

 4    certain circumstances and under, you know, the right

 5    conditions that you have forfeited your right to represent

 6    yourself, we will proceed with the trial with Standby

 7    Counsel.

 8         So, in my view, Standby Counsel is a necessity.

 9    And, you know, I certainly will review anything you want to

10    file on the docket, but I have seen nothing today during the

11    course of the afternoon that suggests to me Mr. Haas has not

12    provided you with good legal advice when you have asked for

13    it.

14         MR. YOO:  Well -- well, he didn't answer any of my

15    phone calls, nor -- but, I mean, today he was adequate, I

16    will say.

17         THE COURT:  We are really having a discussion that

18    is better suited for another day, Mr. Yoo.

19         MR. YOO:  Yes, sir.  So -- all right.

20         THE COURT:  Hold on.  Do you -- do you understand

21    that if you testify right now from the witness stand, not

22    from the podium, from the witness stand, do you understand

23    that if you testify, anything you say can be used against you

24    in the course of this proceeding or any other proceeding?

25         MR. YOO:  Yes, sir.  Who is going to ask questions?

```
 1            THE COURT:  Mr. Haas, do you intend to ask any

 2   questions?

 3            MR. HAAS:  No, sir.

 4            THE COURT:  I think, perhaps, the way to proceed

 5   Mr. Yoo, this is a somewhat unusual situation.  I think we

 6   probably all will agree with that.

 7            MR. YOO:  Certainly.

 8            THE COURT:  Narrative answers and narrative

 9   testimony is generally not permitted; but given the situation

10   that we are in and Mr. Haas's desire not to ask those

11   type -- those questions, I will permit you to testify in the

12   form of a narrative.

13            So we will swear you in, and you can testify to

14   whatever you think is relevant and important.  And then once

15   that is completed, you will have -- the Government will have

16   an opportunity to cross-examine you, and you will, you know,

17   need to respond to those answers -- those questions, and then

18   I will give you a chance to step down following that, and I

19   will be happy to hear any argument that you want to say.

20            MR. YOO:  Yes, sir.

21            THE COURT:  But in terms of testimony itself, I

22   think it is better handled in a narrative form from the

23   witness stand.

24            MR. YOO:  I would like to proceed in the

25   narrative.
```

```
 1          THE COURT:  All right.  Any questions about what I
 2   am suggesting?
 3          MR. YOO:  No, sir.
 4          THE COURT:  Mr. Coan, any objection to that?
 5          MR. COAN:  No, Your Honor, within the bounds of
 6   relevancy to the issues before the Court today.
 7          THE COURT:  Thank you.
 8          If you would, please, raise your right hand.
 9          (Oath administered to Mr. Yoo.)
10          MR. YOO:  I do, ma'am, in the name of
11   President Washington and Andrew Jackson.
12          THE COURT:  Please be seated.
13          All right.  Mr. Yoo, you may proceed.
14          MR. YOO:  Yes, sir.
15              HEON JONG YOO, DEFENDANT, SWORN,
16                   DIRECT EXAMINATION
17          MR. YOO:  So I would like to make -- I would like
18   to request the Court to take -- take judicial notices of a
19   couple of cases.
20          THE COURT:  Well, again, Mr. Yoo, we have been over
21   this a couple of times.  I will give you an opportunity to
22   present any argument, any legal argument that you want to
23   make.  But right now what I am interested in is hearing your
24   testimony that I can consider for the purposes of your appeal
25   of the detention ruling.
```

1          MR. YOO:  Yes, sir, so, the main question is

2     whether I am a flight risk and a danger to the community.

3     Correct, sir?

4          So after -- so after seven years of training in

5     mixed martial arts and the combatives on and off and after

6     nearly three years of firearm possession, if I was a threat

7     to myself or the others, why haven't I been charged with a

8     single count of terroristic threat, and why I haven't been --

9     ever been convicted?

10          And, yes, because I have never -- I do not have any

11     criminal convictions.

12          Also, aggravated assault is a guaranteed

13     deportation for a -- a permanent resident, from my

14     understanding, and that is what I have been told, which means

15     I still did not locally run, you know, locally flee while I

16     was under the pretrial bail of aggravated assault.

17          Also, I only have one bond violation that was --

18     that was not regarding firearms, that was not regarding me

19     being danger to myself or others.  That was actually

20     traveling outside of Smith County for work purposes, which I

21     self-reported at the Smith County Pretrial Office.

22          And I was arrested by Marshals at the Smith County

23     Pretrial Office and brought to Smith County Jail again, and

24     then I bonded out again on -- a week later, and I haven't

25     violated any pretrial bond -- bond conditions other -- other

1    than I have passed every single urine analysis since I don't

2    drink nor -- nor doing any drugs.

3            And in terms of countering Matt Lack's testimony,

4    my second in command in my movement is actually a black

5    person.  So -- and, to my knowledge, forming a political

6    party nor a militia is illegal, nor possessing a firearm is

7    illegal.  So I do not believe that that should be -- that

8    should be construed as being a danger to the society.

9            And I have no intention of fleeing because I

10   actually -- once I bond out, I plan to file motion for leave

11   to appeal or motion to stay the case to appeal the unlawful

12   and the frivolousness entries and to appeal the -- appeal my

13   CHL status, and, basically, to take care of all malicious

14   entries and things against me in absolutely lawful manner.

15           I was not aware of this adjudicated mentally

16   defective or committed to a mental institution entry until

17   this case because I -- when I filed inquiry/appeal to NICS on

18   early January 2016, they did not state that I had been

19   entered in as adjudicated mentally defective or committed to

20   a mental institution.

21           And, to the best of my knowledge, this is the

22   reason why I have been denied, I have been denied from the

23   military.  I have wanted to join the military since I was in

24   middle school.  So once I am on bail, I plan to pursue

25   proper -- proper procedure to get those two records removed

1  on the -- on the basis of, you know, what the definition of a

2  formal commitment is.

3  　　　　And I do not intend to flee, sir, because South

4  Korea has an extradition agreement with the United States, I

5  believe, and my family being -- being -- my mother's side

6  grandfather was actually an attorney general, and he would

7  never disrespect the judicial system like by helping me flee.

8  　　　　And in that sworn -- sorry, not sworn, unsworn

9  declaration, it says that my family will financially support

10  me while I am on bail, so I will have a place to stay, and I

11  will have food to eat.

12  　　　　So I can be subject to ankle monitoring, I can be

13  subject to a surety bond to make sure I am not a flight risk

14  or danger to the community, sir.

15  　　　　And also I have never -- I swear under the penalty

16  of perjury I don't have any intention of harming anyone

17  physically unless it is in self-defense.  And -- yeah.

18  　　　　Also -- also in terms of my bail condition and my

19  previous aggravated assault case, I have showed up at every

20  single court appearances.  I do not intend to dodge any court

21  appearances nor trial because I really believe that I am

22  innocent.

23  　　　　And I -- yes, sir, I do not have any intention of

24  flight nor hurting someone else.  And all of my firearms are

25  confiscated by the ATF.  And -- and in terms of 60-plus

1    police reports against me, most of them were abuse of

2    discretion and bias by the -- the police.  But even then, I

3    was never arrested, sir.

4           And, you know, preparing for legal defense in Gregg

5    County Jail caused me tremendous amount of effort and money,

6    causing me undue burden and irreparable harm, and then -- but

7    still I believe I am winning this case.

8           So imagine what I can do if I am on bail having

9    access to Internet and a law library.  Since the Gregg County

10   Jail does not have a law -- law library, I could pay for the

11   phone call.

12          And, yeah, I mean, there are much more serious

13   cases out there, people who are actually a danger to the

14   society who are out on bail.  I am not a danger to the

15   society.  I do not have any criminal record whatsoever.

16          How -- that is impossible if I am actually a danger

17   to society, considering the fact that there are more than 60

18   police reports against me.  I do not have any vendetta to go

19   after those people in an illegal and unlawful fashion such as

20   in a violent manner.

21          And then I intend to do everything lawfully and

22   honestly.  That is why I solemnly swear -- or I solemnly

23   affirm that I will not flee nor cause harm -- cause physical

24   harm to anyone else while I am on bail.  I am just going to

25   focus on this legal case, so I can get back to living my

 1    life.  I do believe that having a political view is not a

 2    crime.

 3              THE COURT:  Okay.  Mr. Yoo, is that all?

 4              MR. YOO:  Yes, sir.

 5              THE COURT:  Cross-examination.

 6                    CROSS-EXAMINATION

 7    BY MR. COAN:

 8    Q.   Is it the second in command of your political party or

 9    of your militia who you were talking about?

10    A.   Romello Hodge.

11    Q.   What?

12    A.   Romello Hodge.

13    Q.   And what is that person's name?

14    A.   Hodge.

15    Q.   First name?

16    A.   Romello.

17    Q.   I think you mentioned during your testimony that your

18    family is willing to provide you with financial support?

19    A.   While on bail, yes, sir.

20    Q.   Are they willing to provide you with financial support

21    right now?

22    A.   They are providing me financial support by putting money

23    into my commissary, but those are inadequate for legal

24    defense regarding the case that I am facing right now.

25    Q.   And the commissary is the money that you use to pay for

1   your phone bill and your copies; is that right?

2   A.   Phone time, copies, and food -- commissary food because

3   the Gregg County Jail actually, like, severely lacks behind

4   in federal standards of detention.  They don't have adequate

5   food provided.  So it is an undue burden.

6   Q.   I'm sorry, it's a what?

7   A.   It is an undue burden.

8   Q.   Have you -- have you ever acquired a firearm at a gun

9   show?

10  A.   No, sir.

11  Q.   Have you ever acquired a firearm from another

12  individual?

13  A.   Yes, sir.

14  Q.   All right.  How many times have you done that?

15  A.   Around three.

16  Q.   Have you ever been diagnosed with a mental illness?

17  A.   Would you clarify that?  Have I ever been -- have I ever

18  consented to evaluation and a diagnosis, or have I ever been,

19  like, Court ordered to put under treatment for a -- for a

20  diagnosis, no, sir.

21  Q.   No, that was not the question.

22  A.   Could you repeat it?

23  Q.   The question was, have you ever been diagnosed with a

24  mental illness?

25  A.   So by -- purely by -- by medical staff.

1  Q.   Is it, yes, you have been diagnosed with a mental

2  illness?

3  A.   Purely by medical staff, yes.

4  Q.   Have you ever been prescribed medication for your

5  diagnosed mental illness?

6  A.   Purely by medical staff, yes, but that -- the admission

7  itself was based on lies and unlawful.

8  Q.   So that is a "yes" you have been prescribed medication

9  for your mental illness?

10 A.   Yes.

11 Q.   Are you taking medication as prescribed, today?

12 A.   No, sir, I am not required to.

13 Q.   Have you ever taken the medication prescribed to you for

14 your diagnosed mental illness?

15 A.   When I was a minor.

16 Q.   Since April of 2013, have you taken any prescription

17 medication for a diagnosed mental illness?

18 A.   No, sir.

19 Q.   Were you involuntarily committed for inpatient treatment

20 in April of 2013 in the State of New Jersey?

21 A.   Further define, please.

22 Q.   Were you involuntarily committed in the State of New

23 Jersey for inpatient treatment?

24 A.   No, sir, because according to Addington vs. Texas,

25 commitment cannot happen without -- a formal commitment

1    cannot happen without due process and a hearing, actually.

2    Q.    When --

3    A.    Have I ever received a temporary -- temporary

4    confinement order which was labeled as commitment,

5    prior to -- I mean, in preparation of a hearing, yes.

6    Q.    Were you hospitalized in April of 2013 in the State of

7    New Jersey --

8    A.    As I --

9    Q.    I'm sorry.  Let me finish.

10   A.    Sorry.

11   Q.    Because doctors determined that you were a danger to

12   others?

13   A.    Based on lies and based on -- yes.  They even

14   contradicted the RUPD police report.

15   Q.    Is it a "yes" or "no," were you involuntarily

16   committed?

17   A.    Was I hospitalized, yes.  And while I'm on bail, I

18   intend to challenge that, sir, legally.

19   Q.    Okay.  Were you -- when you were hospitalized, were you

20   there voluntarily or involuntarily?

21   A.    Well -- okay.  So Rutgers police, okay, they came to me

22   and informed me --

23   Q.    Hold on.  Just whether you were there voluntarily or

24   involuntarily?  You have already had the opportunity to

25   testify.  I would just like you to answer the question.

```
 1   A.   I am trying to -- I am trying to -- I am trying to get
 2   to the point here because the Rutgers police report says both
 3   times I went there voluntarily.  However, the hospital
 4   reports say both times I was there involuntarily.  So I am
 5   trying to tell you what is the correct one.
 6             In terms of Rutgers police, yes, I consented to be
 7   transported there because they told me that I was not fully
 8   informed; I did not give them fully, informed consent.  But,
 9   yes, in terms of that police report, referring to the police
10   report, I went there voluntarily.
11   Q.   The question was, when you were hospitalized at the
12   Carrier Clinic in April of 2013, was it involuntary?
13   A.   Are you trying to trap me into committing perjury?
14   Because, yes, Carrier Clinic reports say involuntarily, but I
15   am trying to get to the root of the problem here.
16             THE COURT:  Just try to answer the questions,
17   Mr. Yoo.
18   BY MR. COAN:
19   Q.   Were you hospitalized in the State of New Jersey in
20   September of 2015 at the Carrier Clinic?
21   A.   Yes.
22   Q.   And when you were -- when you were brought to the
23   hospital, did you have to be chemically and physically
24   restrained?
25   A.   The medicine -- I was actually not --
```

1  Q.   Just, I'm sorry just "yes" or "no"?

2  A.   No.  Did I have to be, no.  Was I and have I been?  Yes.

3  Because I was arguing for my constitutional rights against --

4  against the nurse.

5  Q.   And during that visit, medical professionals and mental

6  health officials determined that you were a danger to others;

7  is that right?

8  A.   Yes, they did say that based on perjured -- no, not

9  perjured.  False information.

10  Q.   Then because of that finding, you were then

11  involuntarily committed to inpatient treatment --

12  A.   Temporarily -- temporarily committed.

13  Q.   Just "yes" or "no," were you involuntarily committed --

14  A.   Are you trying to -- are you trying to directly

15  violate --

16          THE COURT:  Mr. Yoo, Mr. Yoo, you don't get to ask

17  the questions here.  This is cross-examination.  Mr. Coan has

18  a question pending, and he is allowed an answer.  Okay?

19          MR. YOO:  Yes, sir.

20  A.   Pursuant to 27 -- 27 C -- CFR 478.11 the definition of

21  a -- committed to a mental -- mental institution and

22  Addington vs. Texas, 441 U.S. 1st 18, I was not committed.

23  Q.   Okay.  That is legal argument.  I am asking you a

24  factual question.  Were you involuntarily committed to a

25  mental health facility because you had been deemed to be a

1  danger to others?

2  A.   That is a factual statement, sir.   That is a definition

3  of commitment to a mental institution.

4  Q.   "Yes" or "no"?

5  A.   No, I was not committed because, according to this --

6  this -- the definition of commitment is a formal commitment

7  following a court hearing.

8           So I -- so, no, I was not committed -- by the ATF

9  definition, I was not committed.   Stop trying to entrap me,

10  sir.

11  Q.   Would you mind giving us that case cite again, just so

12  we can have it for the record.

13  A.   Addington vs. Texas, 441 U.S. 418 (1979).   Also

14  ATF 843310.4, NICS Improvement Act of -- NICS Improvement

15  Amendment Act of 2007.

16  Q.   Are you familiar with the immigration consequences of

17  conviction on the charges that are currently pending against

18  you?

19  A.   Yes.   These are not aggravated felonies, so I cannot be

20  deported.

21  Q.   Are you aware that a conviction for a violation of

22  Title 18, United States Code, Section 922(g) is an aggravated

23  felony?

24  A.   How is that --

25  Q.   Are you aware?   Are you aware?

1   A.   No.   Is that an aggravated felony?

2   Q.   Did you apply for a license to carry a handgun in the

3   State of Texas?

4   A.   Yes, I did.

5   Q.   And that was in, roughly, February 2016; is that

6   right?

7   A.   Yes.

8   Q.   Do you recall answering a question about whether you had

9   ever previously received psychiatric treatment?

10  A.   Yes.

11  Q.   And do you recall answering "no" to that question?

12  A.   Yes, because I have never consented to any psychiatric

13  treatment.

14  Q.   Your license to carry a handgun was issued in, roughly,

15  May of 2016; is that right?

16  A.   Yes.

17  Q.   And it was later revoked in September of 2016; is that

18  right?

19  A.   Yes.

20  Q.   You received a letter informing you that your license to

21  carry a handgun permit had been revoked; is that right?

22  A.   Yes.

23  Q.   And you were given the reasons why the revocation took

24  place; is that right?

25  A.   They said I am incapable of -- of exercising sound

```
 1   judgment?

 2   Q.   So, yes --

 3   A.   Yes.

 4   Q.   -- you were advised of the reasons?  Yes?

 5   A.   Yes.

 6   Q.   You were also advised that you could request a hearing

 7   to contest the revocation?

 8   A.   Yes.

 9   Q.   Did you request the hearing?

10   A.   Yes.

11   Q.   A hearing took place; is that right?

12   A.   Against my due -- proper due process, yes.

13   Q.   Okay.  So "yes" a hearing took place?

14   A.   Again, against my proper due process, yes.

15   Q.   Your objection is noted.  But did a hearing take place

16   on your revocation?

17   A.   Do I have to repeat myself, sir?  I said, yes.

18   Q.   And at the conclusion of that hearing, a Court order was

19   entered affirming the revocation of your license to carry a

20   handgun in the State of Texas; is that right?

21   A.   Again, not following the Texas Government Code regarding

22   Texas License to Carry, which is a Government Code,

23   Chapter 4 -- 411, yes.  It was unlawfully revoked as a

24   result.  And also due to ineffective counseling by

25   Jason Parrish says -- Parrish saying that, don't attend it --
```

```
 1   you can get that license back after disposition of the
 2   case.
 3   Q.   You didn't file a motion for reconsideration of that
 4   court order, did you?
 5   A.   I haven't, no.
 6   Q.   You didn't file an appeal of that revocation order, did
 7   you?
 8   A.   I haven't, but I intend to now.
 9   Q.   Did you ever present your revoked License to Carry a
10   Handgun permit when you attempted to acquire firearms from
11   licensed dealers?
12   A.   Yeah.
13   Q.   How many times did you do that?
14   A.   Two.
15   Q.   Each time did you know that the permit had been
16   revoked?
17   A.   Hold on.  Did you ask, in order to purchase or acquire?
18   Because one was purchased and one was exchanged.
19   Q.   Acquire?
20   A.   Acquire, yeah.
21   Q.   So on two occasions you presented a revoked Texas
22   License to Carry a Handgun permit in connection with
23   acquiring firearms from licensed dealers; is that right?
24   A.   Yes.
25   Q.   And those -- those two instances occurred within the
```

1    Eastern District of Texas; is that right?

2    A.    Yes, but it was unlawfully revoked.

3    Q.    Ultimately, the Texas Rangers -- well, let me back up.

4          When you were sent a copy of the order letting you

5    know that the revocation had been affirmed, you were told by

6    the Department of Public Safety that you were to surrender

7    your carry permit; is that right?

8    A.    Yes.

9    Q.    Okay.  Did you surrender it at any point before November

10   of 2017?

11   A.    No.

12   Q.    In fact, the Texas Rangers had to seize it from you on

13   November 29th of 2017; is that right?

14   A.    Yes.

15   Q.    Have you ever falsely represented that you were a

16   citizen of the United States?

17   A.    Yes -- yes.

18   Q.    Have you ever falsely represented that you are a citizen

19   of the United States in connection with the acquisition of

20   firearms?

21   A.    In terms of materiality to the unlawfulness to acquire

22   firearms, no.  But have I ever stated that I was a U.S.

23   citizen on an ATF 4473 form, yes.

24   Q.    Have you ever falsely represented your citizenship in

25   connection with the acquisition of firearms?

1    A.    Yes.

2    Q.    And did you do so when you were attempting to acquire

3    firearms from federally licensed dealers?

4    A.    Yeah.

5    Q.    And were those federally licensed dealers located within

6    the Eastern District of Texas?

7    A.    Yes.

8    Q.    In how many instances -- could you estimate for us in

9    how many instances you falsely represented your citizenship

10   to federally licensed firearms dealers in connection with the

11   acquisition of firearms?

12   A.    Around four, sir, because one count on the Indictment,

13   those are actually the same counts.  Yeah, those are actually

14   the same.  I do believe that back then one -- one was

15   canceled.  Like, one -- one document was supposed to be

16   trashed.

17   Q.    Do you recall attempting to acquire firearms from a

18   licensed dealer called Fort Worth Gun, in January of 2016?

19   A.    Yes.

20   Q.    And Fort Worth Gun is located in Grandview, Texas; is

21   that right?

22   A.    Yes.

23   Q.    And is it your understanding that Fort Worth Gun is a

24   federally licensed firearms dealer?

25   A.    Yes.

1   Q.   All right.   Do you recall what firearms you attempted to

2   acquire from Fort Worth Gun on January 19th of 2016?

3   A.   I do believe a shotgun.

4   Q.   Okay.   And do you recall completing ATF Form 4473 in

5   connection with that attempted acquisition from Fort Worth

6   Gun?

7   A.   Yes.

8   Q.   Do you recall listing your country of citizenship as

9   South Korea?

10  A.   Yes, I do believe so, to the best of my knowledge.

11  Q.   Were you able to acquire the shotgun in connection with

12  that transaction with Fort Worth Gun?

13  A.   No.

14  Q.   Did you -- this is prior to you having the license to

15  carry a handgun permit; is that right?

16  A.   Correct.

17  Q.   And so were you told by the dealer why -- why the

18  transaction had been denied?

19  A.   No.   They -- they said NICS denied it, and here is

20  where -- they were given -- asked the reason why they deny it

21  and appeal it, which I did so.

22  Q.   What is your understanding of what the role of NICS is

23  in -- with respect to firearms transactions?

24  A.   To see if I am eligible to be purchasing a firearm or

25  not.

 1   Q.   So a firearms dealer -- someone tries to buy a firearm

 2   from a licensed dealer, and then the dealer contacts the FBI,

 3   the NICS division of FBI.  Is that right?

 4   A.   Yes.

 5   Q.   And then NICS will respond back as to whether or not the

 6   individual is eligible for the purchase based on their

 7   criminal history or other prohibited factors?

 8   A.   Yes.

 9   Q.   Is that your understanding?

10   A.   Yes.

11   Q.   Okay.  So were you advised by either the dealer or

12   someone there at Fort Worth Gun that you could appeal the

13   denial of this transaction?

14   A.   Yes, which I tried to do so.

15   Q.   Okay.  So you did, you appealed it to the FBI, right?

16   A.   Yeah.

17   Q.   Okay.  And what did you say, why did I get denied,

18   basically?

19   A.   Basically, why did I get denied?

20   Q.   Okay.  And then do you remember receiving a letter from

21   the FBI in January of 2016 that responded to your appeal?

22   A.   Yes, basically saying all of the reasons why I can be

23   denied.

24   Q.   Okay.  Do you recall the letter stating that the reason

25   for the denial is under one of the following federal

```
 1    prohibitions under Title 18, United States Code, Sections 921
 2    and 922?
 3    A.    I am aware of it, yes.
 4    Q.    Okay.  And what was the result of the appeal?
 5    A.    They did not give me any reason why I was denied.  Had I
 6    known the reason, back then I actually had a pending Army
 7    contract, I would have immediately challenged it.
 8    Immediately.
 9    Q.    All right.  But the appeal -- was the appeal denied, or
10    was it granted?
11    A.    I appealed, and they said:  We reaffirm the denial.
12    Q.    The denial of the attempted --
13    A.    Yes.
14    Q.    -- acquisition of the firearm?
15    A.    Yes, but they never gave me a reason for it, no.
16    Q.    Other than the letter that they sent you in January of
17    2016 that stated the reason for the denial?
18    A.    No.  They -- they did not -- not provide me a specific
19    thing that -- what they labeled me as.  And I also -- I
20    believe I -- to the best of my knowledge, I am not sure, I
21    believe I told them of the mental health assessment report by
22    Andrew Daren, which proves that I am completely sane and
23    completely free of any mental defect because it might be --
24    it might be something to do with the Rutgers and Carrier.
25              And on top of that, later on I actually had my
```

```
 1   family attorney -- I actually have a family attorney right
 2   now in process of removing those unlawful, involuntary
 3   confinement records, actually.
 4   Q.   But those records were in place on April 6th of 2018; is
 5   that right?
 6   A.   April 6th of 2018?  No.  Those -- no -- what?  Those
 7   involuntary confinement records -- I was not aware of the
 8   involuntary, so on this --
 9   Q.   Just, to your knowledge, were those orders in place on
10   or prior to April 6th of 2018?
11   A.   Prior to, yes, but -- but I was trying to attack the
12   hospital records, not -- I was not aware of any Court order
13   or, like, anything.  Also, because since I have never been to
14   a hearing and I was discharged prior to hearing, well prior
15   to hearing.
16   Q.   Are you currently enrolled as a student at the
17   University of Texas in Tyler?
18   A.   No, I am currently enrolled as a student in the American
19   Public University System.
20   Q.   Were you -- were you expelled from UT Tyler?
21   A.   Yes, they said I did not --
22   Q.   Just "yes" or "no," were you expelled from UT Tyler?
23   A.   I am trying to explain --
24   Q.   I just want you to answer --
25   A.   Anything can be used against me, so I am trying to
```

1  explain.

2  Q.   Well, that's --

3  A.   Because --

4  Q.   Hold up, Mr. Yoo.  Hold on.

5          THE COURT:  Just a moment.  Just a second.  Let's

6  not talk over each other.

7          Mr. Yoo, let's have -- I am going to ask Mr. Coan

8  to ask the question again.  To the extent you can answer with

9  "yes" or "no," I suggest you do that.

10          MR. YOO:  Yes.

11          THE COURT:  If you can't, tell us that you can't

12  answer it that way.  All right?

13          MR. YOO:  Yes, sir.

14  BY MR. COAN:

15  Q.   Yes --

16  A.   The --

17          THE COURT:  Hold on.  Mr. Coan is going to ask the

18  question again.

19  BY MR. COAN:

20  Q.   Were you expelled from UT Tyler?

21  A.   Yes.

22          MR. COAN:  I'll pass the witness.

23          THE COURT:  All right.  Mr. Yoo, do you have any

24  additional testimony that you would like to provide as, I

25  guess, redirect testimony in the form of a narrative, based

1    on any of the questions Mr. Coan asked in cross-examination?

2            MR. YOO:  Yes, sir.

3                         REDIRECT EXAMINATION

4            MR. YOO:  So I was not -- I was completely unaware

5    of this NICS entry until -- until this case.

6            Now, since I am aware of it, while I am on bail, I

7    plan to remove it, appeal it and remove it.

8            Also, in terms of UT Tyler, you know, why I was

9    expelled, they said that they expelled me -- on the record

10   they said they expelled me because I did not disclose the

11   information that I have attended University of Connecticut.

12           I did not feel the need to.  I have not obtained

13   any -- any credits from University of Connecticut.  Every

14   single college that I have obtained taken credits from, I did

15   disclose.  And I did disclose current GPA also.

16           And I do believe that Mr. Coan's questions were

17   highly misleading and malicious and frivolous because he

18   seems -- he seems to be completely legally incompetent to

19   comprehend the difference between a temporary commitment and

20   a formal commitment.

21           THE COURT:  Mr. Yoo, that is really not -- that is

22   not necessary.  You can make whatever statement you want to

23   make, but let's don't make this personal.

24           MR. YOO:  Yes, sir.

25           Well, I am not making it personal, sir.  I am just

1    strictly speaking on the legal basis.  On the NICS

2    Improvement Amendment Act of 2007, discharge is counted as a

3    relief because, you know, since I have not been committed

4    pursuant to a hearing -- you know, I am happy to go through a

5    legal authority to be relieved of, you know, quote, unquote,

6    commitment.

7              And I do believe that -- that -- that term there is

8    unlawfully placed because I believe they have -- a temporary

9    confinement is not formal commitment.

10             It says on 27 CFR 478.11, the definitions,

11   commitment is -- a formal commitment in person in the mental

12   institution for temporary observation should not be

13   considered as committed.

14             I mean -- I mean, if I -- if I was actually truly

15   homicidal and extremely dangerous to others, why was I

16   released within a week or two weeks?  And then following that

17   I was allowed to -- I was allowed to board a plane without

18   supervision of sky marshals.

19             And, yeah, in terms of that, even -- the hospital

20   reports even contradict the police reports.

21             So I do believe that -- that all -- yeah, I have

22   legitimate grounds to get these records completely stricken.

23   And that is why I need bail, sir.  It is nearly impossible to

24   file the -- file -- go through proper -- I would say proper

25   chain to get these records removed.

1          And then I don't intend on calling attorneys for

2     these -- I would like to represent myself on -- on these two.

3          Also, in terms of citizenship, I am a permanent

4     resident, sir.  I mean, most of the times in the law,

5     permanent residents are categorized as citizens.  So,

6     therefore, you know, since I -- since I have every right that

7     a citizen does except for suffrage and running for an office,

8     I believe, and certain other privileges, such as I do believe

9     that without a waiver I cannot attend United States Military

10    Academy if I am not a citizen -- I need a waiver -- I do

11    believe that it doesn't make any material difference, and it

12    is not in the information required to be kept pursuant to the

13    federal codes and -- yes.  Wait.

14         Do I make my arguments now?

15         THE COURT:  If you have finished with your

16    testimony, you may step down.  And I'll be glad to hear any

17    arguments you have.

18         MR. YOO:  Yes, sir.

19         (Testimony of Mr. Yoo concluded.)

20         MR. YOO:  Your Honor, I would like to request the

21    Court to take judicial notice of United States vs. Salamak.

22    It happened in 2017, October.

23         I believe that he was a pedophile, and there

24    is a -- there is a -- an article saying that he actually

25    requested -- a single mother with 8-year-old daughter, that

1  he is willing to pay her to have sex with her 8-year-old

2  daughter.  He was a New Jersey prison guard.

3       And then I do believe that a single mother turned

4  out to be an FBI agent.  He was placed on 125,000 secured

5  bond and was placed on paid leave.

6       Pursuant to the Federal Rules of Evidence,

7  Rule 201, I would like the Court to take judicial notice of

8  United States vs. David Wayne Trotter, production of child

9  pornography, $150,000 secured bond.  This happened in North

10 Texas.

11      Another -- another judicial notice of 2018-09-05,

12 United States vs. Justin Lee -- not Justin Lee.  Dusty Lee.

13 Federal hate crime, assault.  He was put on ankle bracelet

14 and curfew.

15      Recent case, I believe still pending case, United

16 States vs. Corrujedo, Texarkana 2018.  I believe this -- both

17 defendants lived out of state, and this was the -- this was

18 an unsecured bond, and then both defendants were released,

19 and this was a big drug case.  These were -- these people

20 were middlemen, to the best of my knowledge.

21      Also, United States vs. Galusha, a child

22 pornography case, unsecured bond.

23      Actually -- people who are actually

24 danger -- people who are actually a -- people who are

25 actually a danger to others get released on bail every single

1    day.  I do believe that there are -- there are definitely

2    conditions which will secure that I will not flee, and I will

3    not pose danger to the others.

4              THE COURT:  What would those conditions be?

5              MR. YOO:  I am -- I am willing to agree to all

6    reasonable conditions such as ankle monitoring, house arrest,

7    secure bond, curfew -- if not house arrest, curfew.  I don't

8    even need to go to a grocery store.  My family is willing to

9    support me.  Yeah.

10             And I also would like to change my venue to

11   Houston.  Once I change my -- my venue to -- sorry to South

12   Texas, I will establish a permanent residence there, so I

13   would -- and I would immediately report to the proper

14   authorities every single place that I would stay at.

15             So in terms of -- yeah, so house arrest; if not,

16   curfew would be adequate conditions.

17             Also I do not intend on owning any weapons

18   whatsoever, not just firearms but including, but not limited

19   to, bladed weapons or anything that might be construed as a

20   weapon or can be used as a weapon, such as a baseball bat.

21             And also the biggest thing about this bail is, in

22   order to make sure that my due process is observed by

23   allowing me access to adequate chains to file necessary

24   appeals.

25             I mean, upon release I would like to file motion

1  to, like, stay the case pending appeal.  And, yes, I would --

2  until that appeal is through, I am willing to agree to all

3  reasonable bail conditions.

4          And in terms of this state warrant, I do believe

5  that I can also take care of that too.  I do not -- I do not

6  intend to flee.

7          Also I do not have connections in East Texas, sir,

8  except for Bo Walker, as Special Agent Reed described.

9  Except for him, I do not personally know anyone that owns

10 property that would help me to become a fugitive from

11 justice.  I do not intend that.

12         I also do not -- if I am not -- placed on house

13 arrest, I do not intend to leave a city where I am supposed

14 to stay at without -- without noticing the proper authority

15 first.

16         If I absolutely have to, such as, hey, I need to go

17 down to Austin for a court hearing, then that is basically --

18 I absolutely have to go there, right?  Then I will inform the

19 proper authority well in advance.  I always have high respect

20 for the law enforcement actually.  So and --

21         THE COURT:  Okay.  Thank you.  Anything in

22 addition?

23         MR. YOO:  In addition, I do believe that my -- my

24 charges and my sentence do not carry significant sentence.  I

25 was actually out on bail for a much more serious charge, and

1  I still did not flee.

2         I do believe that this is not an aggravated charge,

3  sir, because it is a simple possession charge.  I did not

4  aggravatedly -- aggravatedly assault anyone.

5         THE COURT:  Okay.

6         MR. YOO:  Yes, sir.  And I would like to make a

7  request for judicial notice of Bail Reform Act of 1984,

8  18 USC, Section 3142.  I was actually -- you know, on the

9  Section (d) I believe they classify citizens along with

10 permanent residents in terms of temporary detention.

11        Also, I was actually entitled to bail since initial

12 hearing, with proper conditions.  I do believe that my

13 emergency pretrial release motion was submitted on 19.

14 Mr. Coan filed the Superseding Indictment to the Grand Jury

15 on 19, and it was -- it was -- I was indicted on the 20th.

16        I do believe that was a retaliatory action by

17 Mr. Coan to deny me guaranteed pretrial release.

18        THE COURT:  Okay.  Thank you.  Anything else?

19        MR. YOO:  No, sir.

20        THE COURT:  Okay.  Let me make a couple of notes

21 for the record.

22        Mr. Coan, I will give you an opportunity --

23        MR. YOO:  Oh, wait.  One more.

24        Tina Simmons and David A. Beddingfield, my bail

25 bonds agent for the ag assault case, they would be more than

 1   willing to vouch for me that I am not a flight risk nor a

 2   danger to the --

 3            THE COURT:  Okay.  That was actually one of the

 4   things I wanted to ask you about, Mr. Yoo.  I think you had

 5   attempted to get Ms. Simmons here, and perhaps she came on

 6   the day this hearing was previously set.

 7            MR. YOO:  Yes, sir.

 8            THE COURT:  And I told you that I wouldn't permit

 9   her to testify electronically, but that if you wanted to

10   submit an affidavit containing the substance of what her

11   testimony would have been, that I would be happy to receive

12   that, subject, of course, to any objection the Government may

13   have in that regard.

14            Let me ask you this, Mr. Yoo:  How long do you

15   think it would take you to get an affidavit from Ms. Simmons

16   for the purposes of evaluation?  And let me explain, I am

17   not -- you are being held subject to an order of

18   Judge Love's.  We have had this hearing today.  I want to

19   consider the presentations that have been made by you and by

20   the Government.

21            And my intention is to put a ruling out, a written

22   ruling with my findings as soon as possible.  But I certainly

23   want to give you an opportunity to submit any additional

24   affidavits you want.

25            MR. YOO:  Within a week, sir.

1          THE COURT:  All right.  So that would be -- do you

2    think you could do it by Monday?

3          MR. YOO:  If you grant me bail today, I can do it

4    by tomorrow.

5          THE COURT:  Well, I am not going to do that today.

6    We are going to continue you under the previous order of

7    detention entered by Judge Love --

8          MR. YOO:  Yes, sir.

9          THE COURT:  -- after the previous hearing.  And you

10   have filed an appeal of that detention hearing.  That is the

11   purpose of today is to present argument and evidence in that

12   regard.

13         I am going to consider what has been presented over

14   the last several hours, and I'll be putting out a written

15   order.  But the sooner you get that affidavit to me, the

16   sooner I can put my order out.

17         I am suggesting if you get it to me by Wednesday I

18   will have it -- or by Monday, I can have the order out

19   relatively quickly, the next day or so following that.

20         Do you think Monday is possible for submission of

21   Ms. Simmons's affidavit?

22         MR. YOO:  Monday?  I will try my best to get it by

23   Monday.  But, I mean, if she can submit electronically, that

24   would be great actually.  Actually then she can probably do

25   it by end of this week.

| | |
|---|---|
| 1 | THE COURT:  All right.  Well, I think perhaps |
| 2 | Mr. Haas can assist in that regard.  If the affidavit is |
| 3 | provided to him, he can get it filed electronically on the |
| 4 | docket. |
| 5 | Mr. Haas, is that agreeable? |
| 6 | MR. HAAS:  Yes, sir.  I would advise the Court and |
| 7 | your staff knows -- I am -- I don't know if the Court knows |
| 8 | or not, but I have a brief in a capital murder case actually |
| 9 | arising from the Telford Unit -- I am sure the Court is |
| 10 | probably aware of that situation -- it is due tomorrow.  I |
| 11 | may have to get an extension until Friday if the Court will |
| 12 | give me one. |
| 13 | THE COURT:  Oh, absolutely, yes. |
| 14 | MR. HAAS:  So I just want to tell Mr. -- that I |
| 15 | will do what I can, but I am working around that brief. |
| 16 | THE COURT:  That will be fine. |
| 17 | MR. YOO:  Yes, sir. |
| 18 | THE COURT:  You understand his concern? |
| 19 | MR. YOO:  Yes, sir.  So -- |
| 20 | THE COURT:  Hold on.  So you get that to Mr. Haas, |
| 21 | and Mr. Haas will get it filed electronically, and we will |
| 22 | issue our order shortly after that. |
| 23 | Now, second thing, there were handed up before I |
| 24 | think you took the stand, Mr. Yoo, a number of documents. |
| 25 | And I want to identify those documents, and we are going to |

 1  file them as exhibits to this hearing.

 2          MR. YOO:  Sir, one question, sir.

 3          THE COURT:  Yes.

 4          MR. YOO:  You haven't made your decision yet?

 5          THE COURT:  No, I have not.  I am going to rely on

 6  the testimony that was presented at the previous detention

 7  hearing from Judge Love, the transcript of which I have read.

 8          I am going to rely on your appeal, which I have

 9  reviewed, and I will review again.  And I will rely on the

10  response that the Government has filed, as well as your

11  reply.

12          Also, obviously, I will consider the testimony that

13  was presented over the course of the afternoon today, as well

14  as the argument that you have presented and the argument I

15  expect Mr. Coan to present.

16          In terms of the exhibits, you handed up two unsworn

17  declarations, which are both dated September 22nd of this

18  year.  One is of Soyoun Jeong, and the other is of Ku Yeong

19  Jeong.

20          Did I pronounce those correctly?

21          MR. YOO:  Soyoun Jeong and Ku Yeong Jeong is my mom

22  and my grandfather.

23          THE COURT:  Your mom and your grandfather.

24          And so your grandfather is Ku Yeong Jeong; is that

25  right?

1          MR. YOO:  Yes, sir.

2          THE COURT:  All right.  We will mark that as

3   Exhibit No. 1 to your -- Defendant's Exhibit No. 1 to this

4   afternoon's hearing.  And the affidavit or declaration of

5   your mother we will mark as Exhibit 2 to this afternoon's

6   hearing.

7          You also handed up an incident investigation report

8   from the Tyler Police Department dated August 28th, 2018.

9   Would that be correct?

10          MR. YOO:  Yes, sir.

11          THE COURT:  Okay.  We will mark that as Exhibit 3

12   to this -- Defendant's Exhibit 3 to this afternoon's hearing.

13          You also handed up a detainee transaction

14   hearing -- transaction history, which is a multipage document

15   that, I gather, delineates the charges you have incurred

16   placing phone calls from the facility where you are being

17   held; is that correct?

18          MR. YOO:  Yes, sir.

19          THE COURT:  And we will mark that as Exhibit 4 to

20   the hearing, Defendant's Exhibit 4.

21          You also handed up a series of Gregg County Jail

22   requests and grievances related to your efforts to do legal

23   research in this matter.  Is that a fair description of what

24   these documents are?

25          MR. YOO:  Yes, sir.

```
 1              THE COURT:  We will mark those as Defendant's
 2   Exhibit 5 to this afternoon's hearing.
 3              And then, finally, an invoice -- or a receipt from
 4   the Gregg County Sheriff's Office concerning some copies, I
 5   gather, that were made a couple of days ago.  And is that an
 6   accurate description of what that document is, Mr. Yoo?
 7              MR. YOO:  Yes, sir.
 8              THE COURT:  All right.  That will be marked as
 9   Exhibit 6 to this afternoon's hearing.
10              Okay.  Mr. Yoo?
11              MR. YOO:  Yes, sir, I would like to make one more
12   exhibits regarding one of the motions that I actually
13   filed --
14              THE COURT:  All right.
15              MR. YOO:  -- since my mail is very, very slow.
16              THE COURT:  Yes, sir.
17              MR. YOO:  It is a transcript of the Grand Jury
18   proceedings, Grand Jury testimony.
19              THE COURT:  Okay.
20              Mr. Coan, does this need to be filed under seal?
21              MR. COAN:  Yes, Your Honor.
22              THE COURT:  Any objection to its being filed as
23   Exhibit 7, Defendant's Exhibit 7 to this afternoon's hearing
24   as long as it is filed under seal?
25              MR. COAN:  No objection, Your Honor.  But just to
```

| | |
|---|---|
| 1 | clarify, is it the Grand Jury testimony of Special Agent |
| 2 | James Reed? |
| 3 | THE COURT:  It appears to be, yes. |
| 4 | MR. COAN:  From this case? |
| 5 | THE COURT:  It appears to be, yes. |
| 6 | MR. COAN:  I just wanted to confirm. |
| 7 | THE COURT:  Yes. |
| 8 | MR. YOO:  A couple of more things from Your |
| 9 | Honor. |
| 10 | THE COURT:  Hold on, Mr. Yoo.  It looks like maybe |
| 11 | there is a -- some. |
| 12 | MR. YOO:  Oh, yeah. |
| 13 | THE COURT:  Slides that were presented with respect |
| 14 | to the testimony, or is this something other -- |
| 15 | MR. YOO:  That's part of it. |
| 16 | MR. COAN:  It is an exhibit to the testimony, Your |
| 17 | Honor. |
| 18 | THE COURT:  All right.  Mr. Yoo, what else? |
| 19 | MR. YOO:  Yes, Your Honor.  I believe on -- I do |
| 20 | believe on a couple of orders that I have here, I would like |
| 21 | to make a formal objection on a couple of orders by |
| 22 | Judge Mitchell. |
| 23 | THE COURT:  Okay.  This is really not the time to |
| 24 | do that.  We are here for a hearing on the appeal of your |
| 25 | detention ruling -- or the detention ruling that Judge Love |

1  entered.

2          I don't know whether you filed anything objecting

3  to what Judge Mitchell may have ruled, but I'm certainly

4  happy to review anything, any formal objection you want to

5  make on the docket, but I don't really think our time is well

6  spent doing that here.

7          MR. YOO:  Yes, sir.

8          THE COURT:  All right.  Anything other than that?

9          MR. YOO:  Negative, sir.

10         THE COURT:  Okay.  I am going to give Mr. Coan an

11 opportunity to present any brief argument he wants to, and

12 then we will see where we are.

13         MR. YOO:  Yes, sir.

14         THE COURT:  You may be seated.

15         MR. COAN:  Thank you, Your Honor.

16         And I will be brief.  My apologies to the Court

17 staff for the duration of the hearing and the late hour this

18 evening.

19         Your Honor, I state at the outset that there was

20 not anything really new here.

21         On April 30th, 2018, we had the detention hearing

22 that took place after the Defendant had waived his right to a

23 detention hearing, was permitted to reopen it, and then we

24 litigated the issue in front of Judge Love, evidence was

25 presented, proffers were made with respect to a report from

1    Pretrial Services, and Judge Love entered an order finding

2    that -- well, entered a ruling that Mr. -- there was no

3    condition or combination of conditions that could reasonably

4    ensure Mr. Yoo's appearance at required proceedings or

5    reasonably assure the safety of the community.

6            Again, nothing has changed.  What has happened

7    today is Mr. Yoo has made clear his desire to relitigate

8    state court orders that were entered in the State of New

9    Jersey involuntarily committing him to treatment based upon a

10   finding that he was a danger to others.

11           He would like to relitigate the revocation of his

12   Texas License to Carry a Handgun permit.

13           He would like to relitigate the Indictment returned

14   against him by a Grand Jury in Smith County, Texas.

15           He would like to relitigate the denial of firearms

16   transactions by NICS based upon determinations that he is a

17   prohibited person.

18           He would like to relitigate 60 to 70 offense

19   reports that have been prepared in connection with encounters

20   he has had with law enforcement from New Jersey to East Texas

21   over the course of five years.

22           The evidence before the Court demonstrates by a

23   preponderance of the evidence that Mr. Yoo presents a flight

24   risk.  He is not a United States citizen.  He faces multiple

25   felony charges.  If he is convicted, there will be

1     immigration consequences for those convictions.

2            His alleged criminal conduct involves the use of

3     false statements and misrepresentations and deception to

4     evade federal requirements.

5            He has admitted that he has no ties whatsoever to

6     the Eastern District of Texas.  He is a flight risk.

7            On the issue of danger, the record is extensive

8     with respect to the mental health history, the threatened

9     violence.  His mental health issues over the course of his

10    life have necessitated treatment, hospitalization, and

11    involuntary commitments.

12            MR. YOO:  Objection.

13            MR. COAN:  What is perhaps more troubling than the

14    fact that he has this mental health history is the fact that

15    he denies the mental health history and has made

16    misrepresentations about the mental health history,

17    specifically with respect to attempt to acquire firearms.

18            He lied when he acquired his license to carry --

19    when he applied for a License to Carry Handgun permit in the

20    State of Texas, and he lied on every ATF Form 4473 --

21            MR. YOO:  Objection, Your Honor.

22            MR. COAN:  -- that he completed.

23            THE COURT:  Mr. Yoo, this is --

24            Hold on, Mr. Coan.

25            This is legal argument.  Mr. Coan is making his

1    argument.  I gave you an opportunity to make your argument.

2    He is making his argument.

3            MR. COAN:  Thank you, Your Honor.

4            Most specifically on the danger issue, Your Honor,

5    are three factors.  It is this combination -- I pointed this

6    out to Judge Love back in April.  It is this combination of

7    three factors.  It is his mental health history, it is his

8    attempts to incite violence, and his desire to acquire and

9    possess firearms.

10           And those three things cannot be viewed in

11   isolation.  It is the totality of the circumstances that

12   demonstrates by clear and convincing evidence that he is a

13   danger to the community.

14           You heard the testimony from Mr. Lack about, why is

15   it that Mr. Yoo wants to engage in this conduct where he

16   spews hate speech?  It is to provoke some type of encounter

17   that will allow him to then respond with deadly force.

18           And if you noted, I appreciated Mr. Yoo's

19   assurances to the Court about how he wouldn't flee or how he

20   wasn't a danger to the community; but what I found

21   particularly telling, was his reservation on the issue of

22   harm to others.

23           I can assure -- I am paraphrasing -- I can assure

24   the Court that I will not harm others unless it is in

25   self-defense.  And that is precisely the reason that he is a

1  danger.

2          Your Honor, the Government would ask that the Court

3  deny Mr. Yoo's motion appealing Judge Love's detention order.

4          Thank you very much.

5          THE COURT:  Thank you, Mr. Coan.

6          Okay.  A couple of things before we recess:  I

7  appreciate everyone being here.  I know it has been a long

8  day, but we are near the end.

9          I do want to ask you, Mr. Yoo, in terms of going

10  forward, Judge Mitchell, of course, has made a determination

11  that you have waived the right to your counsel -- or to

12  counsel, and that you have done that in a knowing and

13  voluntary way.

14          MR. YOO:  Yes, sir.

15          THE COURT:  You, of course, do have a

16  constitutional right to self-representation, and you have

17  demonstrated that you intend to exercise that right.  And, as

18  I said, Judge Mitchell has found that that was a knowing and

19  voluntary waiver.

20          In light of my sort of recently becoming involved

21  in the case, I want to satisfy myself and make it clear on

22  the record that you are fully aware of the hazards and the

23  disadvantages to representing yourself in this matter.

24          Is it still your desire to represent yourself in

25  the trial of this case?

1          MR. YOO:  Yes, sir, it is.

2          THE COURT:  All right.  I want to ask some

3    questions that Judge Mitchell may have asked, but I would

4    just like to follow up and have you answer them for me as

5    well.

6          Have you studied law prior to this case?

7          MR. YOO:  Self-study, sir.

8          THE COURT:  All right.  And what did this consist

9    of?

10         MR. YOO:  Just looking up stuff on the Internet,

11   looking into dictionary.

12         THE COURT:  All right.  Have you ever represented

13   yourself in any previous criminal action?

14         MR. YOO:  No, sir.  I do not have much criminal

15   action.

16         THE COURT:  All right.  Do you understand that you

17   are charged with eight counts, the first four -- the first

18   seven counts relate to falsely listing information on

19   firearms transaction records, and the eighth count relates to

20   violating 922(g)(4) and 924(a)(2) with respect to possessing

21   a firearm by a prohibited person?

22         MR. YOO:  Yes, sir.

23         THE COURT:  Do you understand that is what you have

24   been charged with?

25         MR. YOO:  Yes, sir.

1          THE COURT:  All right.  And you understand that if

2    you are found guilty on Counts 1 through 7, you could face

3    imprisonment of not more than five years, a fine of not more

4    than $250,000, and a term of supervised release of not more

5    than three years, in addition to a $100 special assessment?

6          MR. YOO:  Yes, sir.

7          THE COURT:  With respect to Count 8, do you

8    understand that if you are found guilty of that, the Court

9    could sentence you to imprisonment for not more than ten

10   years, a fine of not more than $250,000, and a term of

11   supervised release of not more than three years, as well as a

12   $100 special assessment.

13         MR. YOO:  Yes, sir.

14         THE COURT:  All right.  And do you understand that

15   if you are found guilty of more than one of these crimes, the

16   Court can order that the sentence be served consecutively,

17   that is, one right after the other?

18         MR. YOO:  Yes.

19         THE COURT:  All right.  And you -- do you also

20   understand that there are Advisory Sentencing Guidelines that

21   may have an effect on your sentence if you, in fact, are

22   found guilty?

23         MR. YOO:  Yes, sir.

24         THE COURT:  And do you understand that if you

25   represent yourself in this matter, putting aside any

1  assistance that Mr. Haas can provide to you, you really are,

2  in terms of the trial of the case when we actually get to the

3  trial, you are on your own in terms of what actually happens

4  in the courtroom?  Do you understand that?

5          MR. YOO:  Yes, sir.  Yes, sir.

6          THE COURT:  Okay.  I can't tell you or give you any

7  advice about how you should try your case when we get to the

8  trial.  Do you understand that?

9          MR. YOO:  Yes, sir.

10         THE COURT:  You seem to have some degree of

11  familiarity, in my observations of you this afternoon, with

12  the Federal Rules of Evidence.  Have you gained that

13  familiarity in the way you described for me earlier as having

14  studied the law by self-study?

15         MR. YOO:  No, sir.  After I have been indicted, I

16  actually purchased a few books -- I mean, I'm sorry, my

17  friends purchased these three books for me.

18         THE COURT:  Have you read those Rules of Evidence?

19         MR. YOO:  Yes.

20         THE COURT:  Do you understand that the Rules of

21  Evidence will govern at the trial what may or may not be

22  introduced?

23         MR. YOO:  Yes, sir.

24         THE COURT:  And that, in representing yourself in

25  this matter going forward at the trial, I am going to expect

1   you to abide by those rules, which can be very technical?

2            MR. YOO:  Yes, sir.

3            THE COURT:  And they may not be rules that you have

4   much experience with.

5            MR. YOO:  Yes, sir.

6            THE COURT:  And you understand that I am not going

7   to relax the requirements of those rules to be complied with

8   just because you represent yourself?

9            MR. YOO:  Yes, sir.

10           THE COURT:  Same question with respect to the

11  Federal Rules of Criminal Procedure, what is the basis of

12  your knowledge or familiarity with the Rules of Criminal

13  Procedure?

14           MR. YOO:  I have extensively studied it and

15  examined it after I have been indicted, sir.

16           THE COURT:  All right.  And you understand, just

17  like the Federal Rules of Evidence, that the Rules of

18  Criminal Procedure will govern in substance how the case is

19  tried when it is tried next month, and that you are going to

20  be bound by those rules, and that I am not going to relax

21  those rules for your benefit just because you are

22  representing yourself?

23           MR. YOO:  Yes, sir.

24           THE COURT:  All right.  I have to tell you, having

25  reviewed some of the filings and having watched your

1    performance this afternoon, I will say that you have treated

2    me with nothing but respect, and I think you have done the

3    same for others here present in the courtroom as well.  So

4    don't misunderstand what I am saying.

5         MR. YOO:  Yes, sir.  Only the person who was most

6    irrational was Matt Lack.  He was actually emotionally

7    compromised.

8         THE COURT:  Well, without commenting on that,

9    Mr. Yoo, all I can tell you is that you have treated me with

10   respect this afternoon, and I think you have treated the

11   attorneys for the Government with respect as well.

12        MR. YOO:  Yes, sir.

13        THE COURT:  But I do have to advise you, Mr. Yoo,

14   that a trained lawyer will defend you far better than you are

15   going to be able to defend yourself.

16        I think it is unwise of you to try to represent

17   yourself in this matter.  You have some familiarity with the

18   law, but it is not very much.  It seems to me you -- I

19   recognize you are doing your best, but you are quite

20   unfamiliar with court procedure.  I don't think you are

21   familiar with the Rules of Evidence.  And I strongly urge you

22   not to try to represent yourself.

23        However, that does seem to be your desire, and you

24   have a constitutional right to do that.  So with those

25   comments and in light of the penalty that you could

1    potentially suffer if you are found guilty in this, and in

2    light of all of the difficulties of representing yourself

3    that I have described, is it still your desire to represent

4    yourself and give up your right to be represented by a

5    lawyer?

6              MR. YOO:  Absolutely, sir.

7              THE COURT:  All right.  Very well.

8              Now, the final thing I need to ask about is the

9    financial affidavit that was submitted back in September.

10             There has been a fair amount of testimony this

11   afternoon, Mr. Yoo, from both you and others, that you are

12   fortunate to have support of your family in a number of

13   different respects.

14             So I am trying to understand exactly, you know,

15   what support you will have in terms of preparation for the

16   trial.

17             And I have to be honest, I am a little bit confused

18   about where we are procedurally.  There was a finding, I

19   think, made by Judge Love at the initial appearance that you

20   would qualify for a CJA attorney.

21             Mr. Hawk was appointed at that point.  Mr. Hawk was

22   subsequently dismissed by you.  And you or your family

23   arranged for representation by private counsel first, two

24   counsel.  And then you dismissed those and replaced them, I

25   believe with Mr. Van Cleef, who has since been dismissed by

1    you as well.

2          And so I am not sure, as we sit here today, whether

3    we are proceeding with -- if Mr. Haas is proceeding as a CJA

4    attorney or exactly what the situation is.

5          Is this an IFP situation we are in?

6          Do you know, Mr. Coan?

7          The reason I am asking is I do have concern about

8    trial preparation in terms of subpoenaing witnesses and how

9    that is going to work.

10          MR. COAN:  Your Honor, I don't know the answer to

11    that.  And I share the Court's confusion about precisely what

12    the Defendant's financial status is.  And I don't know the

13    arrangement with Mr. Haas at this time.

14          I do know that the Federal Public Defender's Office

15    was initially appointed to serve as Standby Counsel.  But I

16    don't know if that was based upon the initial finding that

17    Mr. Yoo qualified for appointed counsel or whether that was

18    just the Court's use of the appointment list for designation

19    of Standby Counsel.

20          THE COURT:  Mr. Yoo, would you like to speak to

21    this?

22          MR. YOO:  Yes, sir.  In terms of my family support

23    while I'm on bail, and as always, they will support me with

24    full residence, like life necessities.

25          However, sir, you do realize that I filed numerous

 1   subpoenas regarding, you know, all of the medical, quote,

 2   unquote, professionals, law enforcement.  So even if my

 3   family is rich, I do not think they can, you know, pay for

 4   all those subpoenaed.

 5          THE COURT:  Right.  And that is kind of where I am

 6   getting on this because I need to understand what your

 7   intentions are in that regard.

 8          Mr. Haas, can you speak to this?

 9          MR. HAAS:  Judge, the only thing I can say is, I

10   was minding my own business and I got a phone call.  And I

11   think because of my experience on the Calvert case,

12   Judge Mitchell asked me to come over.  I did.  This was after

13   the hearing.  And I was appointed, and I believe that we

14   received a CJA appointment.

15          I have never discussed with Mr. Yoo his financial

16   resources or his family's financial resources, what he

17   intended to do.

18          I know that he had at least two retained counsel,

19   at one time, in succession.  And that's all I can tell you.

20          THE COURT:  All right.  Thank you, Mr. Haas.

21          MR. HAAS:  Judge, while I am up here, may I add one

22   other thing?

23          THE COURT:  Yes.

24          MR. HAAS:  I was just told that there actually is

25   like a pretrial set in this case on November 5th.

1          THE COURT:  Okay.

2          MR. COAN:  Yes.

3          MR. HAAS:  And I may have to ask the indulgence of

4    the Court to move that.

5          THE COURT:  We will do everything we can to

6    accommodate your schedule.

7          MR. HAAS:  Thank you.

8          MR. YOO:  Sir?

9          THE COURT:  Yes.

10         MR. YOO:  I would like to make one final

11   objection.

12         THE COURT:  Yeah, let me -- we are not finished

13   with this financial issue though, because, again, I know you

14   have got some significant family resources --

15         MR. YOO:  Yes, sir.

16         THE COURT:  -- and I -- I don't know what they

17   provide you in support, but it seems to me that you can get

18   some support from them in terms of trial support.

19         So, you know, if you want to, you know, subpoena

20   dozens and dozens and dozens of people, I certainly will

21   permit you to do that, subject to any motion for protective

22   order from any of those persons who have been subpoenaed.

23         But if you are asking -- if you don't have the

24   financial resources to do that and you are going to ask the

25   Court to issue those subpoenas, we are going to have to go

 1      through a process where you can describe for me exactly what

 2      the relevancy of their testimony is.

 3              MR. YOO:  Yes, sir.

 4              THE COURT:  And I am going to leave it up to you to

 5      file a motion in that regard.  I think we are all operating

 6      under perhaps a cloud of confusion about whether this is a

 7      CJA Act case or something else.

 8              MR. YOO:  Yes, sir.

 9              THE COURT:  I think Mr. Haas can be appointed and

10      paid for out of CJA funds at the Court's request to serve as

11      Standby Counsel.  But whether, given the financial resources

12      that have been described that you have been provided with by

13      your family, I am not sure it is appropriate for the Court's

14      funds to be used for service and compliance with subpoenas,

15      including witness fees.

16              MR. YOO:  Yes, sir.

17              THE COURT:  So I will look forward to something on

18      that as well.

19              Have I missed anything -- was there something else

20      you wanted to raise, Mr. Yoo?

21              MR. YOO:  Yes, sir, I would like to raise one

22      objection regarding Mr. --

23              THE COURT:  Mr. Coan?

24              MR. YOO:  Should I go to the --

25              THE COURT:  You are fine.

```
 1              MR. YOO:  I would like to make one final objection
 2   in terms of Mr. Coan's statement that I am -- when I say I
 3   did not intend to harm -- I do not intend to harm others ever
 4   except in self-defense.  The right to defend myself is a
 5   guaranteed right by the Constitution and the common law.
 6              So, basically, unless if I am absolutely
 7   necessary -- unless if I absolutely -- it is absolutely
 8   necessary for me to use force, I am not going to use force,
 9   which is in self-defense.
10              I do believe that proves that Mr. Coan does not
11   respect Defendant's rights guaranteed by common and the
12   constitutional law, and I do -- I do -- I respectfully
13   request the Court to take notice of that objection --
14              THE COURT:  All right.
15              MR. YOO:  -- and argument.
16              THE COURT:  Thank you, Mr. Yoo.
17              Mr. Manley, I have reviewed the Pretrial Services
18   report, and I will hand it back to you at this time.
19              PROBATION OFFICER MANLEY:  Yes, Your Honor.
20              THE COURT:  All right.  Mr. Coan, anything in
21   addition on behalf of the Government?
22              MR. COAN:  Your Honor, not on the motion presently
23   before the Court.  But -- and I hate it to keep us here any
24   longer.  But just to address a housekeeping issue.
25              One of the practical complications of a case
```

1    involving a pro se defendant is that -- and Your Honor has

2    referenced it a couple of times today, and that is, really

3    the only way for Mr. Yoo to communicate with opposing Counsel

4    and with the Court is by way of filing a motion.

5              And since Judge Mitchell entered her order allowing

6    Mr. Yoo to represent himself, he has made in excess of 60

7    filings with the Court.

8              And the Government's approach to date has been to

9    review each of these filings and try to determine whether or

10   not there is specific relief that has been requested that

11   would require a response on behalf of the Government.

12             And so, unless the Court instructs otherwise, that

13   will be the practice going forward until we reach trial.  I

14   just didn't want the Court to wonder why there is not a

15   response filed to each of the 60 to 70 filings that are made

16   by the Defendant.

17             THE COURT:  I understand that, and I don't have any

18   concerns with that, Mr. Coan.  I would say we ought to

19   endeavor to establish some filing deadline if the Government

20   does want to file a response to something, so that we don't

21   rule on it before the Government has an opportunity to

22   respond to it.  Do you want to say five days or --

23             MR. COAN:  Well, to date we have just been using

24   the Local Rules with the 14-day response period for those

25   motions where response is required.

1          THE COURT:  My concern, I guess, about that is we

2     are fairly quickly approaching trial, and I just -- you know,

3     we will need to deal with some of those motions, you know, on

4     the eve of trial.  And I -- you know, I am a little bit

5     concerned about the 14-day deadline.

6          My typical practice in the criminal cases that I

7     have worked on is not to expect the Government to file a

8     response unless we ask the Government to do that.  And I am

9     not suggesting we do that here.  You all can certainly use

10    your good judgment to respond to whatever you think is

11    appropriate to.

12         If I have a question about something, I certainly

13    can let you know that I would appreciate a response.  But it

14    is the timing of it that I am somewhat worried about.

15         MR. COAN:  If Your Honor, is agreeable to it, then

16    that arrangement would be acceptable to the Government --

17         THE COURT:  Okay.

18         MR. COAN:  -- is we would await notification from

19    the Court as to the desire of a response, and then file the

20    response within an accelerated period, whether that is ten

21    days or five days or seven days.

22         THE COURT:  That is certainly fine.  That is

23    certainly fine.

24         MR. COAN:  Thank you, Your Honor.

25         THE COURT:  Yes.  Thank you, Mr. Coan.

1           Mr. Yoo?

2           Mr. Haas, anything further?

3           MR. YOO:  Yes, sir.  If I am on bail, I can visit

4    his office and have civilized discussions.

5           THE COURT:  Well, thank you, Mr. Yoo.  Let me

6    suggest, Mr. Haas as your Standby Counsel is really in many

7    ways going to be your conduit to the United States Attorney's

8    Office.

9           MR. YOO:  Yes, sir.

10          THE COURT:  So to the extent that you need to

11   communicate in any way, the best way to do it is by filing a

12   motion or filing a response on the docket, and that way we

13   all get to see it.

14          But in any other instance where you feel like you

15   need to have some communication with them, I suggest that

16   Mr. Haas be your first resource.

17          MR. YOO:  Yes, sir.  I need to have a number so I

18   can reach him with.

19          THE COURT:  Well, if Mr. Haas will provide you with

20   his office number, I think he probably keeps regular office

21   hours, and so I would ask him to provide --

22          MR. HAAS:  I have, Judge.

23          THE COURT:  Yeah, I would ask Mr. Haas to provide

24   you with that.

25          MR. HAAS:  Unfortunately, there is something wrong

```
 1   with the telephone connection.  My office will not accept

 2   collect calls from the Gregg County Jail.

 3        THE COURT:  All right.

 4        MR. HAAS:  And I have actually been thinking about

 5   this for about the last hour when this first came up.  I was

 6   wondering what I was going to do if this Court ordered me to

 7   give Mr. Yoo my cell phone number because I have never defied

 8   a Federal Judge in my life.

 9        What I can do -- I think I have come up with a

10   solution -- I think I can get another phone and give Mr. Yoo

11   that phone number, rather than my personal phone number.

12        THE COURT:  Is that acceptable to you, Mr. Yoo?

13        MR. YOO:  Yes, sir.

14        THE COURT:  That will work.

15        MR. YOO:  I mean, I do not intend to interfere with

16   him spending time with his family at all.

17        THE COURT:  Well, Mr. Yoo, again, I am not going to

18   give you advice, but you clearly have a constitutional right

19   to represent yourself.

20        MR. YOO:  Yes, sir.

21        THE COURT:  And you have demonstrated repeatedly

22   both to Judge Mitchell and to me here this afternoon that you

23   intend to exercise that right and that you are doing so

24   knowingly and voluntarily.

25        MR. YOO:  Yes, sir.
```

```
 1              THE COURT:  However, I strongly encourage you to

 2   listen to what Mr. Haas has to say to you.  He has a

 3   knowledge of the Rules of Criminal Procedure and the Rules of

 4   Evidence that we are going to follow in this trial, that you

 5   don't have.

 6              MR. YOO:  Yes, sir.

 7              THE COURT:  And I think you would do well to listen

 8   to his advice.

 9              MR. YOO:  Yes, sir.

10              THE COURT:  Okay.  Anything else?

11              MR. YOO:  I would like to speak to Mr. Haas

12   privately at the attorney room.

13              THE COURT:  I will permit you to do that.

14              Is that --

15              MARSHAL:  Yes, sir.

16              THE COURT:  We will make those arrangements.

17              All right.  We will be in recess.

18              (Hearing adjourned.)

19

20

21

22

23

24

25
```

1                         CERTIFICATION

2

3              I HEREBY CERTIFY that the foregoing is a true

4   and correct transcript from the stenographic notes of the

5   proceedings in the above-entitled matter to the best of my

6   ability.

7

8   /s/ Shea Sloan _____                    October 29, 2018
    SHEA SLOAN, CSR, RPR
9   Official Court Reporter
    State of Texas No.:  3081
10  Expiration Date:  12/31/18

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25