```
 1              IN THE UNITED STATES DISTRICT COURT
                FOR THE EASTERN DISTRICT OF TEXAS
 2                        TYLER DIVISION

 3   UNITED STATES OF AMERICA     )
                                               DOCKET NO. 6:18cr16
 4        -vs-                    )
                                               Tyler, Texas
 5                               )    8:51 a.m.
     HEON JONG YOO                     November 14, 2018
 6
                           TRANSCRIPT OF TRIAL
 7        BEFORE THE HONORABLE ROBERT W. SCHROEDER III,
             UNITED STATES DISTRICT JUDGE, AND A JURY
 8
                    A P P E A R A N C E S
 9

10   FOR THE GOVERNMENT:

11   MR. LAUREL FRANKLIN COAN, JR.
     MR. LUCAS R. MACHICEK
12   MR. RYAN LOCKER
     ASSISTANT U.S. ATTORNEYS
13   110 North College, Ste. 700
     Tyler, Texas  75702
14
     FOR THE DEFENDANT:
15
     MR. HEON JONG YOO
16   PRO SE
     101 E. Methvin St., Ste. 559
17   Longview, Texas 75601

18   STANDBY COUNSEL:

19   MR. JEFF LYNN HAAS
     ATTORNEY AT LAW
20   100 E. Ferguson, Ste. 908
     Tyler, Texas 75702
21

22   COURT REPORTER:        MS. SHEA SLOAN
                            FEDERAL OFFICIAL REPORTER
23                          211 W. Ferguson
                            Tyler, Texas 75702
24
     Proceedings taken by Machine Stenotype; transcript was
25   produced by computer-aided transcription.
```

INDEX

| WITNESS | DIRECT | CROSS | REDIRECT | RECROSS | FURTHER REDIRECT | FURTHER RECROSS |
|---|---|---|---|---|---|---|
| AUSTIN ROHR | 8 | 19 | 44 | 48 | | |
| BAILEY AVERITT | 50 | 53 | 55 | 56 | | |
| VICTOR MONTALVO | 56 | 60 | | | | |
| CESAR BAHENA | 61 | 64 | | | | |
| PHILLIP OLIVARES | 66 | 71 | 71 | 73 | 74, 75 | 75, 75 |
| MICHELLE THREADGILL | 76 | 83 | | | | |
| MICHAEL MAYFIELD | 84 | 90 | 93 | 93 | | |
| JOHNNIE FOSTER | 94 | 101 | 101 | 102 | | |
| AARON LEE | 106 | 110 | 111 | 113 | 113 | |
| BRIAN BARKER | 115 | 132 | 158 | 164 | | |
| DR. MARY LARSEN | 173 | 199 | 216 | 220 | 227 | 227 |
| JAMES REED | 228 | 246 | | | | |
| JONATHAN HOOSIER | 271 | 280 | | | | |
| WARREN KEENER | 283 | 314 | | | | |

**********

GOVERNMENT RESTS - PAGE 321

1                              EXHIBIT INDEX

2

3    GOVERNMENT'S
     EXHIBIT NO.    DESCRIPTION                         PAGE
4

5         4     ATF FORM 4473 - SUPERIOR FIREARMS     11

6         5     ATF FORM 4473 - FIRST CASH PAWN       59

7         6     ATF FORM 4473 - ACADEMY SPORTS        82

8         7     ATF FORM 4473 - CASH AMERICA PAWN     97

9         9     RECORDS - MIDDLESEX COUNTY ADJUSTER  189

10       17     PERMANENT RESIDENT CARD              269

11       20     MOSSBERG 590 12-GAUGE SHOTGUN        240

12       21     TRACE SUMMARY - MOSSBERG             294

13       22     DPMS LR-308 RIFLE                    240

14       23     TRACE SUMMARY - DPMS                 297

15       24     SMITH & WESSON M&P 15 RIFLE          241

16       25     TRACE SUMMARY - M&P RIFLE            300

17       26     SMITH & WESSON SW40VE .40 CALIBER    242
                PISTOL
18
         27     TRACE SUMMARY - SW40VE               305
19
         28     PARA 1911 EXPERT .45 CALIBER PISTOL  242
20
         29     AMMUNITION BOXES WITH AMMUNITION     243
21              AND MAGAZINES

22       32     RECORDS - FBI, CJISD, NICS           127

23

24

25

1          P R O C E E D I N G S

2               (Defendant present.)

3               (Jury out.)

4               THE COURT:  Please be seated.

5          Good morning.

6               MR. MACHICEK:  Good morning, Your Honor.

7               MR. COAN:  Good morning, Your Honor.

8               THE COURT:  Okay.  So I have been provided with a

9  copy of the Government's final proposed jury instructions.

10              Has a copy been provided to Mr. Yoo?

11              MR. COAN:  Yes, Your Honor.

12              THE COURT:  Okay.  I have not had an opportunity to

13 look at it, but I will hopefully over the lunch break or one

14 of the other breaks during the course of the day and, of

15 course, we were looking at it last night.

16              I think we probably have a full day of testimony

17 today.  We will see where we are at the conclusion of the

18 day, but my guess is Mr. Yoo and Mr. Haas are not going to

19 have any really significant opportunity to review those

20 instructions until this evening.

21              Mr. Yoo, have you provided the Government with any

22 proposed instructions of your own?

23              MR. YOO:  Yes, sir.  And I read the Federal Rules

24 of Criminal Procedure.  And apparently the jury instructions

25 are given after the -- after all of the evidences and the

```
1   witnesses.

2            THE COURT:  That's correct.

3            MR. YOO:  Yeah.  So, if it is not too late, over

4   here is my finalized jury instruction.

5            THE COURT:  Have you provided a copy to them?

6            MR. YOO:  Do you want to take a look at it?

7            THE COURT:  Let me ask, I guess, for the same

8   treatment with respect to the Government's treatment of

9   yours, if you will provide them a copy and they will have an

10  opportunity to look at it over the lunch hour or sometime

11  during the day and this evening, we will make final decisions

12  and let you put your objections, if any, on the record before

13  the jury is instructed.

14           MR. YOO:  Okay.

15           MR. HAAS:  If I could, Judge, I will get my legal

16  assistant over here.  I will give this to her.  She can make

17  some copies, and I will give a copy to the Government.

18           THE COURT:  That will be very helpful, Mr. Haas.

19  Thank you.

20           MR. HAAS:  Thank you.

21           THE COURT:  All right.  What else do we need to

22  take up before we begin?  Anything?

23           MR. COAN:  No additional matters from the

24  Government, Your Honor.

25           THE COURT:  Okay.  From the Defendant?
```

1           MR. HAAS:  Are you ready?

2           MR. YOO:  Yeah.

3           THE COURT:  All right.  Are we waiting on one?

4           COURT SECURITY OFFICER:  Yes, sir.

5           THE COURT:  Mr. Yoo, did you have something that

6    you wanted to raise?

7           MR. YOO:  Yes, Judge, one -- there is one concern

8    that I need to raise about the Government's Exhibit.  It is

9    among the RWJ hospital files.  And then it says I have been

10   admitted in April 2013 and discharged in October 2015, which

11   doesn't make any sense.  I wasn't in there for like two

12   years.  That's pretty defective.

13          THE COURT:  I'm sorry?

14          MR. YOO:  That affidavit for their -- the record

15   custodian is pretty defective.

16          THE COURT:  Well, I mean I will -- we are not to

17   that point yet; but when we get to the point and the

18   Government moves the admission of those exhibits, I will give

19   you an opportunity to argue your objection.  I don't know

20   when that witness will come up, but it will be during the

21   course of the day.

22          And, Mr. Yoo, I will give you an opportunity to,

23   you know, present your argument at that time.

24          MR. YOO:  All right.

25          MR. HAAS:  Judge, just for scheduling purposes, it

1   sounds as if the soonest that we would argue this case would
2   be in the morning?
3          THE COURT:  I'm guessing that.  We will see how
4   long the remainder of the Government's witnesses take.  But
5   really it is nothing more than speculation on my part.  So,
6   Mr. Coan, can you inform us?
7          MR. COAN:  Your Honor, I think that is a realistic
8   estimate of the time table.
9          THE COURT:  Yeah.  I mean, put it this way,
10  Mr. Haas, if it is much later than, you know, 3:30 or 4:00
11  o'clock when we finish the testimony, given the work we need
12  to complete with respect to the jury instructions, I don't
13  think there is enough time in the day to do that, so -- and
14  get the case to the jury by a reasonable hour.  So --
15         MR. HAAS:  I agree.
16         THE COURT:  -- in that event, we would let the jury
17  have an early day of it.
18         MR. HAAS:  Thank you.
19         COURT SECURITY OFFICER:  All present, sir.
20         THE COURT:  All right.  Let's bring the jury in.
21         COURT SECURITY OFFICER:  All rise for the jury.
22         (Jury in.)
23         THE COURT:  Please be seated.
24         Good morning.  Ladies and Gentlemen of the Jury,
25  welcome back.  I hope you all had a pleasant evening.

1          Mr. Coan, at this time you may call the

2    Government's next witness.

3          MR. COAN:  Your Honor, Mr. Machicek.

4          THE COURT:  Mr. Machicek, you may call the

5    Government's next witness.

6          MR. MACHICEK:  Good morning, Your Honor.  The

7    Government calls Austin Rohr.

8          (Pause in proceedings.)

9     AUSTIN ROHR, GOVERNMENT'S WITNESS, PREVIOUSLY SWORN,

10                    DIRECT EXAMINATION

11   BY MR. MACHICEK:

12   Q.   Good morning, Mr. Rohr, how are you today?

13   A.   Good.

14   Q.   Would you please state your full name for the record?

15   A.   Austin Ryan Rohr.

16   Q.   And where are you employed?

17   A.   Superior Firearms.

18   Q.   And what is your title at Superior Firearms?

19   A.   I am the owner.

20   Q.   Where is Superior Firearms located?

21   A.   4520 South Broadway Avenue, right across from the mall

22   in the French Quarter.

23   Q.   Is that here in Tyler, Texas?

24   A.   Yes, Tyler, Texas.

25   Q.   Now, what kind of business is Superior Firearms?

1    A.    We are a federal firearms licensed gun dealer, and we

2    sell all kinds of firearms, gun accessories; ammo, cleaning

3    kits, et cetera.

4    Q.    You mentioned you are a federally-licensed firearms

5    dealer; is that correct?

6    A.    Yes, sir.

7    Q.    Do you mind if we refer to that as an FFL from here on

8    out throughout your testimony?

9    A.    Yes, sir.

10   Q.    All right.  Can you walk the jury through how a person

11   who walks into your store goes about purchasing a firearm?

12   A.    You know, if you are a customer here at our store you

13   are going to walk in and be greeted.  You will go through,

14   and tell us what you are looking for, and we will walk you

15   through whatever kind of firearm meets your needs.

16          At that point when we find the firearm that meets

17   your needs, we are going to hand you a 4473, which is the

18   form that we are required to fill out by the Government, and

19   that is a typical background search.

20          We give you that form.  At that point once you fill

21   it out, we get a copy of your license and your concealed

22   handgun license, and we make sure that everything on your

23   license and your concealed handgun license matches what is on

24   the form before we call it in.

25   Q.    Now, you mentioned the Form 4473.  Is that the

1   ATF Form 4473 that records information about firearms

2   transactions?

3   A.   Yes, sir.

4   Q.   And you indicated that all customers interested in

5   purchasing firearms at your business are required to fill

6   that form out?

7   A.   Yes, sir.

8   Q.   Now, the form, once it is filled out, whether a

9   transaction is denied or completed and a sale is made, are

10   you required as an FFL to keep that form?

11   A.   Yes, sir, until we go out of business.

12   Q.   Okay.  And are you required to keep the entirety of the

13   form or some of the form?

14   A.   The whole form.

15   Q.   You are not allowed to take scissors to the form and cut

16   out some information and just retain some information, are

17   you?

18   A.   No, sir.

19   Q.   The whole thing has to be retained; is that correct?

20   A.   Yes, sir.

21   Q.   Okay.  Now, I want to refer you to a specific form.

22   There is a binder sitting on the table right in front of you.

23   If you will open that the binder to Tab 4, please.

24        Do you recognize the documents that are marked as

25   Government's Exhibit No. 4?

1    A.   Yes, sir.

2    Q.   And is that a 4473 from your store?

3    A.   Yes, sir.

4    Q.   Are you a custodian of records for Superior Firearms?

5    A.   Yes, sir.

6    Q.   And the form that you have there, Government's

7    Exhibit 4, is that a business record from Superior

8    Firearms?

9    A.   Yes, sir.

10   Q.   Was the information contained in it given by a person

11   with personal knowledge of that information?

12   A.   Yes, sir.

13   Q.   And was it made at or near the time of the firearms

14   transaction that is documented there?

15   A.   Yes, sir.

16   Q.   And is it made and kept in the regular course of

17   business at Superior Firearms?

18   A.   Yes, sir.

19        MR. MACHICEK:  Your Honor, I ask -- or I would move

20   that Government's Exhibit 4 be admitted into evidence for all

21   purposes.

22        THE COURT:  Any objection?

23        MR. YOO:  No objection.

24        THE COURT:  Very well.  It will be received.

25   BY MR. MACHICEK:

12

1  Q.   I want to refer you now to the top portion of Page 4001

2  of Exhibit 4.  I am going to zoom into it here a little bit.

3       The information here, who is the transferee on that

4  form?

5  A.   Hank.

6  Q.   Okay.  You referred to the individual who is listed here

7  as Heon Jong Yoo as Hank, do you know that individual to go

8  by the name Hank Yoo?

9  A.   Yes, sir.

10  Q.   Is that individual seated in the courtroom here today?

11  A.   Yes, sir.  Right in front of me.

12  Q.   Would you point him out and describe an article of

13  clothing he is wearing?

14  A.   Black suit.

15       MR. MACHICEK:  Your Honor, I would ask that the

16  record reflect that the witness has identified the Defendant

17  in open court.

18       THE COURT:  It will so reflect that.

19  BY MR. MACHICEK:

20  Q.   Is there a date on this indicating when it was filled

21  out at the top right?

22  A.   Yes, 9-3-16 (sic).  We just put it right at the top to

23  keep it.

24  Q.   Is that September 13th, 2016?

25  A.   Yes, sir.

1   Q.   I want to refer you down to the bottom section of that

2   same page, Box 14.  And it is going to be zoomed in on your

3   screen there.

4        The question regards the transferee's country of

5   citizenship.  Is there an indication given by Mr. Yoo as to

6   his nation of citizenship?

7   A.   Yes, sir.

8   Q.   And what does he indicate on the form?

9   A.   That he is a citizen of the United States of America.

10  Q.   Now, the forms that are filled out during the regular

11  course of business at Superior Firearms, are they done on a

12  computer terminal, on a tablet computer, or are they written

13  out by hand?

14  A.   They are all written out by hand.

15  Q.   Okay.  I want to refer you then to the next page of that

16  exhibit, if you will flip one page over.  At the very top

17  there is a certification and signature block, and I want to

18  ask you about that.

19       When a customer in your store fills out that block

20  and makes that certification, what does it mean to you?

21  A.   It means that they are signing that everything they

22  filled out is truthful and correct.

23  Q.   And is that, in fact, what the certification states,

24  that I certify my answers are true, correct, and complete?

25  A.   Yes, sir.

1   Q.   Does it give warnings about the consequences of making

2   any false oral or written statement or exhibiting any false

3   or misrepresented identification with respect to the

4   transaction?

5   A.   Yes, sir.

6   Q.   Does it indicate that constitutes a federal crime?

7   A.   Exactly, yes, sir.

8           MR. MACHICEK:   Thank you.  I will pass the

9   witness.

10          THE COURT:  Cross-examination.

11          MR. YOO:  Judge, I would like to submit a couple of

12  exhibits.

13          THE COURT:  Okay.  Do you want to do that with the

14  witness or --

15          MR. YOO:  I would like to do that before -- yeah.

16  I would like to do it now actually.

17          THE COURT:  Okay.  What type of exhibits?

18          MR. YOO:  These are -- these are relevant to the --

19          MR. MACHICEK:  May we approach, Your Honor?

20          THE COURT:  Yes.

21          MR. YOO:  -- cross-examination.

22          (Bench conference held.)

23          THE COURT:  What you got?

24          MR. YOO:  So these are yesterday's exhibits.  And

25  at the end I have these.

1      THE COURT:  Okay.  So the exhibits that we dealt

2   with yesterday that were admitted into evidence, I think 1101

3   was your first exhibit.  I think the Government was going to

4   provide us with a clean copy of that --

5      MR. YOO:  922.

6      THE COURT:  -- and we were going to agree to do

7   that.  The other exhibits that were admitted into evidence,

8   Mr. Yoo, were already admitted, so you don't have to

9   reintroduce those.

10      MR. YOO:  Is 924 admitted?

11      THE COURT:  I don't recall whether 924 was admitted

12   as an exhibit or not.

13      MR. MACHICEK:  I remember two exhibits being

14   admitted into evidence, and I would have -- have an objection

15   to the remainder of any of these exhibits under 401 as being

16   not relevant.  They are not pertinent to a fact of

17   consequence that the jury is going to be asked to answer.

18      Because they have no relevance, their admission is

19   by its very nature more prejudicial than probative, as it

20   tends to confuse or mislead the jury as to what their role in

21   this proceeding is.

22      There are questions of law appropriate for the

23   Court to make a determination on, not appropriate for the

24   jury.

25      Furthermore, this witness has no personal knowledge

1    of any of these documents with which he is about to be

2    presented.  I would like to make those objections at this

3    time.

4              MR. YOO:  Objection.  What is the legal basis of

5    these illegal codes not being relevant?  Because you are the

6    one -- you are the one who is intending to mislead the jury

7    by submitting jury instructions that 924(a)(1)(A) is a

8    valid -- ATF 4473 form not information required to be kept.

9    That is actually a lie.  That is prosecutorial misconduct.

10   So I want to the clarify this through these exhibits.

11             No, I want to clarify these.

12             (Attorney conference off the record.)

13             MR. YOO:  This is what -- what defines the term,

14   committed to mental institution.

15             THE COURT:  Mr. Yoo, I will be glad to hear any

16   argument you want to make.  I think the question with

17   respect to -- the question currently is, which exhibits are

18   appropriately used with this witness who has just testified

19   about his personal knowledge based upon his interactions with

20   you.

21             He is a percipient witness, and he has provided his

22   testimony.  You are welcome to cross-examine him about any of

23   that, but it sounds like to me the argument that you are

24   wanting to make really is a legal argument, which I will be

25   happy to hear at the appropriate time.  I don't think that is

1  an appropriate subject for cross-examination of this witness.

2            (Attorney conference off the record.)

3            MR. YOO:  I want to get these in, so we can view

4  them on the screen.

5            THE COURT:  Mr. Yoo, I will be happy for you to

6  present that argument at the appropriate time, but right

7  now --

8            MR. YOO:  Yes, sir.

9            THE COURT:  This is cross-examination of this

10  witness.

11            MR. YOO:  But I just want to like basically do it

12  on the screen.  That is why.

13            MR. COAN:  No, we are not going to do that, Your

14  Honor.  This is -- legal argument can be made to the Court.

15  The statutes don't need to be put into evidence.  They are in

16  the code book.  He can argue that when we argue the charge.

17            But we are not going to -- Your Honor, the

18  Government would object to any questioning of any witnesses

19  about the codes and what they say.  They are not here to

20  read.  These are legal arguments that he can make and almost

21  certainly will make to the Court when we argue the charge.

22            THE COURT:  I'm going to sustain that objection,

23  Mr. Yoo.

24            MR. YOO:  Sir, I am not talking about -- I am not

25  asking them for their legal interpretation, but there is a

1   pattern of so-called the Government's witnesses here.

2   THE COURT:  Well --

3   MR. YOO:  They cannot claim expertise and ignorance

4   of basics of their jobs at the same time.  They cannot be --

5   THE COURT:  Are you talking about the witness, or

6   are you talking about the Government's attorneys?

7   MR. YOO:  Not him per se, but like yesterday's

8   witness ATF agent, he should know the firearms code, but he

9   didn't.

10   MR. COAN:  And he testified to that effect.  And if

11   there is a question about his credibility or the extent of

12   his knowledge, then that is within the purview of the jury.

13   MR. YOO:  He is not --

14   MR. COAN:  You cannot berate the witnesses with the

15   code provisions.

16   MR. YOO:  He is not an expert.

17   THE COURT:  Mr. Yoo, those are all excellent

18   arguments that you will have an opportunity to make in your

19   closing argument to the jury.  Let's go forward with your

20   cross-examination of this witness at this time.  And focus on

21   the facts and what his testimony was and where you believe

22   his testimony is wrong.  And if you think you can impeach

23   him, you know, I am going to give you significant latitude in

24   that regard.

25   MR. YOO:  Yes, sir.

1          MR. YOO:  I just want the jury to, like, see the

2    code themselves.

3          MR. COAN:  Well, the law comes from the Judge, not

4    from you.  Okay?  And we don't introduce the code provisions

5    into evidence.  The law that the jury is going to follow will

6    come in the form of jury instructions that the Judge will

7    provide at the close of the evidence prior to the closing

8    argument.

9          MR. YOO:  Which you misled.  The law comes from the

10   Congress --

11         MR. HAAS:  We are going to argue about that at the

12   jury charge.  Okay?  Come on.

13         (Bench conference concluded.)

14                    CROSS-EXAMINATION

15   BY MR. YOO:

16   Q.   Would you please restate your name, please?

17         MR. MACHICEK:  Objection.  Repetitive.

18         THE COURT:  Overruled.

19   A.   Austin Ryan Rohr.

20   BY MR. YOO:

21   Q.   Thank you.

22         So how long have you been an FFL dealer?

23   A.   As far as personally owning the FFL myself, I have been

24   doing it for nine years.  As far as being in the business, 15

25   years.

1  Q.    So would you claim any form of expertise in like the FFL

2  regulations or any codes?

3  A.    Yes, 15 years of having perfect audits and never having

4  a problem.

5  Q.    So you know -- you know the -- the -- I'm guessing you

6  have a general knowledge of the firearm regulation code; is

7  that correct to say?

8  A.    Yes.

9  Q.    So 924(a)(1)(A) regarding that charge, which

10  informations are required to be kept?

11        MR. MACHICEK:   Your Honor, I am going to object.

12  Again, this is not relevant.  It is not an issue of fact that

13  the jury is to consider in their deliberations, and,

14  therefore, it is by its nature more prejudicial than

15  probative.

16        Furthermore, it is not an issue for the jury to

17  consider.  Issues of law are for the Court to consider.  It

18  is not admissible evidence.

19        MR. YOO:   I'm sorry, what is the legal basis of you

20  claiming it is not admissible evidence and prejudicial when

21  the codes are straightforward and --

22        THE COURT:  Mr. Yoo?

23        MR. YOO:   -- the witness has claimed expertise?

24        THE COURT:  Mr. Yoo, if you want to respond to the

25  Government's objection you can respond to me.

1          MR. YOO:  Okay.  I am sorry, Your Honor, but I

2     don't get it because he just claimed expertise in terms of

3     being -- being well aware of firearm regulations and the

4     codes, and the laws are pretty --

5          THE COURT:  Mr. Yoo?

6          MR. YOO:  -- straightforward, you cannot claim

7     expertise and ignorance at the same time, sir.

8          THE COURT:  Well, the witness hasn't claimed

9     ignorance yet, so let me give you an opportunity to rephrase

10    your question, and let's see if by rephrasing your question

11    you can get around the objection.

12         MR. YOO:  I do not believe that that was a valid

13    objection, Your Honor.

14         THE COURT:  Well, I am giving you an opportunity to

15    rephrase your question so that you can get around the

16    objection that has been made by Mr. Machicek.  So why don't

17    you rephrase your question.

18         MR. YOO:  Okay.

19    BY MR. YOO:

20    Q.   So when customers walk into your store, which form of

21    identification do they usually exhibit?

22    A.   After they decide to buy a firearm, or just as they walk

23    in the store?

24    Q.   After they decide to buy a firearm -- I mean, obviously

25    they don't need to exhibit anything if they are just walking

1   into the store for eye shopping; is that correct?

2   A.   Correct.

3   Q.   Yes.

4   A.   So as they walk into the store, they decide to buy a

5   firearm.  We give them the 4473, and we ask them for their

6   Texas ID, meaning their identification card or driver's

7   license.

8        At that point we also ask them, do you have a

9   concealed handgun license or license to carry?  At that point

10   they will say yes or no.

11   Q.   Okay.  So let me ask you some more questions.  What are

12   the conditions that would prevent someone from purchasing a

13   firearm from you?

14   A.   If you look, it's -- what we do is we hand them the

15   form, and they have question 11A through -- all the way

16   through No. 12 there.  And if they pretty much check "yes" on

17   any of those right there, that at that point says they are

18   not allowed to buy a firearm.  That's when it goes into, are

19   you a fugitive from justice?  Are you mentally disabled?  Are

20   you addicted to marijuana?  Unlawful user?  Dishonorable

21   discharge?  Et cetera.

22   Q.   Have you ever sold a -- so there is -- so I am guessing

23   there is no immigration restrictions -- sorry.  There is no

24   firearm acquisition restrictions based on immigration status

25   regarding permanent residents; is that correct?  Strictly,

1  strictly regarding their immigrant status.

2  A.   No.   If they have the right documentation, then a

3  permanent resident can buy a firearm.

4  Q.   Have you ever sold a gun to a permanent resident?

5  A.   Yes.

6  Q.   Okay.  Which form of ID did they exhibit?

7  A.   They have a driver's license, a permanent residence card

8  that they show us.  At that point we make a copy of it.  We

9  fill it out on the gun form.  And whenever -- since it is a

10  permanent residence and it is a different type of ID, we

11  always make a copy of it in our forms so that if we get

12  audited, that we have no problem and we can show who bought

13  it.

14  Q.   Do you know for a fact that a permanent resident must

15  display his permanent residence card?

16  A.   It is the only way that you can verify that they wrote

17  down the right information.

18  Q.   Okay.  To the best of your knowledge, are permanent

19  residents required to write down their A number in order to

20  pass the background check?

21  A.   Yes, that is Question 15.

22  Q.   Can I see the instructions for A number on the screen,

23  please?

24           THE COURT:  Do we have that?  Do we have it up?

25           Mr. Yoo, if you have a copy of it before you, you

1    can use the screen.

2             MR. YOO:  I believe that is -- hold up.  That is

3    one of the exhibits, Exhibit 3 on Page 5.

4    BY MR. YOO:

5    Q.  So you just said that permanent residents do not have

6    immigration restriction?

7             THE COURT:  Mr. Yoo, it is on the screen now,

8    should be on the screen now.

9             MR. YOO:  So can we magnify Question 12B and 13,

10   please.

11   BY MR. YOO:

12   Q.  All right.  So you just said permanent residents do not

13   have immigration restrictions on -- on their eligibility to

14   purchase a firearm; is that correct?

15   A.  Repeat that again, please.

16   Q.  You said that permanent residents do not have

17   immigration restriction factor in terms of acquisition of

18   firearm; is that correct?

19   A.  As long as they pass the background check.

20   Q.  But you said that an A number is required to run the

21   background check?

22   A.  What number again?

23   Q.  You said that their alien registration number is

24   required to run a background check?

25   A.  You have to verify who the person in front of you is;

1  otherwise, you don't know with who they are.

2  Q.   Then how did I get denied on the background check and

3  get registered to ATF record?

4  A.   So first you came in, you fill out the background check.

5  You gave us a concealed handgun license and a driver's

6  license.  We go the extra mile at our store.  Your concealed

7  handgun license address did not match what you wrote down on

8  the form.

9        So at that point we told you, to us, since the

10  addresses do not match, it is no longer a valid ID.  So at

11  that point we called your gun form in because your license on

12  your ID matched (sic) the gun form.  And by law the address

13  has to match.

14        Since we called it in, we got an immediate denial

15  from the ATF.  And once you get a denial at our store, you

16  have the right to appeal it, but with that being my store, in

17  my opinion, you have no right to be in my store no more.

18  Q.   Oh, I wasn't asking about your right to be in your

19  store.  You just claimed that you need a proper U.S. alien

20  registration number or a U.S. admission number to run a

21  proper background check on a permanent resident; is that

22  correct?

23  A.   Correct.  But you wrote that you were a United States

24  citizen --

25  Q.   Yes.  But once my background check -- once my background

1  check came back as a correct identity of myself?

2  A.    It showed it as a denial, so I am not sure.  They don't

3  tell us -- all they say is, proceed to denial.

4  Q.    Was -- was my transaction record with you registered

5  through the ATF record, to the best of your knowledge?

6  A.    Is it registered?

7  Q.    Yes.

8  A.    Yes.  I mean, once we submit it through the NICS FBI

9  system, at that point they have it.  We keep that form on

10  file forever, and the -- of course, it comes through a

11  denial, so we wrote that it is a denial, and we kept that

12  form in our denial folder.

13  Q.    Ah, so permanent residents do not really have to show

14  their alien registration or U.S. admission --

15          MR. MACHICEK:  Your Honor, I am going to --

16  Q.    -- is that correct?

17          MR. MACHICEK:  -- object at this point to being

18  repetitious.  He has asked this question a number of

19  different times in a number of different ways, and this

20  witness has already answered the question.

21          THE COURT:  Mr. Yoo, I am going to give you a

22  chance ask your question one last time.  If you can rephrase

23  it, that is fine.

24          MR. YOO:  Your Honor, I am trying to strike this

25  witness's credibility.  Now the Prosecution is getting

1  cornered because he just contradicted himself.

2         THE COURT:  Okay.  Well, perhaps, you can

3  demonstrate that for us.  I will give you the opportunity to

4  ask him the question one last time.

5         MR. YOO:  Okay.

6  BY MR. YOO:

7  Q.   Isn't Texas driver's license enough proof to run

8  someone's background check?

9  A.   Yes, but they have to fill out the form truthfully for

10 that to be in effect.

11 Q.   You just said that Texas driver's license is enough --

12        MR. MACHICEK:  I'm going to object --

13 Q.   -- to running a background check?

14        MR. MACHICEK:  -- to him testifying from the

15 podium.

16        THE COURT:  I'm going to sustain the objection.

17        MR. YOO:  Sir, I wasn't testifying, sir.  I was

18 just reiterating --

19        MR. MACHICEK:  I am going to object to the

20 Defendant arguing from the podium.

21        THE COURT:  I am going to sustain the objection.

22        Mr. Yoo, you are limited to asking questions on

23 cross-examination.

24        MR. YOO:  I agree, sir, but I was also addressing

25 his -- his objection to the Court.  That is abuse of

1  discretion, sir.

2      THE COURT:  Mr. Yoo, you are limited to asking

3  questions on cross-examination.  No statements, please.  Can

4  you rephrase your question?

5      MR. YOO:  Yes.

6  BY MR. YOO:

7  Q.   So have I -- so, according to your knowledge, have I

8  given you a false information regarding name, date of birth,

9  and the address?

10  A.   The name, date of birth, and the address match the

11  driver's license you had, not the concealed handgun

12  license.

13  Q.   But I did show you my driver's license; is that

14  correct?

15  A.   Correct.

16  Q.   So can you claim that I had intention to -- intent to

17  deceive in terms of identity?

18      MR. MACHICEK:  I am going to object.  This asks for

19  a legal conclusion.

20      THE COURT:  I agree.  Sustained.

21      MR. YOO:  I am going to object to Prosecution's

22  objection to --

23      MR. MACHICEK:  I object to the Defendant arguing

24  from the podium.

25      THE COURT:  I'm going to sustain the objection.

1    Mr. Yoo, you are limited to asking questions.  And

2 the question that you asked that Mr. Machicek correctly

3 objected to called for a legal conclusion.  The jury will

4 make that determination, not this witness.  So you are

5 limited to asking questions that are appropriate.  Can you

6 ask your next question?

7    MR. YOO:  Your Honor, may I address the Court real

8 quick?

9    THE COURT:  Yes.

10    MR. MACHICEK:  I ask that we approach, Your

11 Honor.

12    MR. YOO:  This is a factual question, Your Honor.

13    (Pause in proceedings.)

14    (Bench conference held.)

15    MR. YOO:  Your Honor, that was very -- Your Honor,

16 that was a very factual question, and he has objected because

17 he is cornered.

18    MR. MACHICEK:  And, Your Honor, the character of

19 the Defendant's questions of this witness are inadmissible

20 under the Rules of Federal Evidence.  He is unable and

21 unwilling to ask an admissible question at this point in

22 time.

23    MR. YOO:  Can you give me the legal basis for it

24 being inadmissible?

25    MR. MACHICEK:  Federal Rules of Evidence.

1          MR. YOO:  Which code -- which rule?

2          MR. MACHICEK:  401 and 403.

3          MR. YOO:  What does it state?

4          THE COURT:  Mr. Yoo --

5          MR. YOO:  He decided the rules.

6          THE COURT:  Mr. Yoo, you are limited to asking

7    questions that are based on this witness's perception or his

8    personal knowledge, okay?  And when you ask questions about

9    what his view of your specific intent to deceive your

10   identity, those go to really legal questions, and they go to

11   questions that are beyond the scope of this witness's

12   testimony.

13          So I am not quite sure where you are trying to go

14   here, but this is really not the witness to do it with.

15          MR. YOO:  Sir, I was trying to ask for his

16   perception?  Was it his perception that I had intend to

17   deceive?

18          MR. MACHICEK:  I would object to that being

19   speculative.

20          MR. YOO:  Well, this witness is kind of

21   speculative.

22          THE COURT:  Well, Mr. Machicek didn't ask questions

23   like that on his direct examination about what his personal

24   opinion was about what you were doing or what you were trying

25   to do or what your goal was or your intent or your motive or

1    anything like that.  This witness is here to testify about

2    the facts.

3          MR. YOO:  He kind of implied my motive to the jury

4    during the opening statement.

5          THE COURT:  Yeah, and that is certainly going to be

6    part of the Government's case when they rest and when they

7    present their closing argument.  But they are not doing it

8    based on this witness's testimony.  This witness's testimony

9    is limited to what he saw and perceived and the documents

10   that you executed.

11         MR. YOO:  Sir, that is what -- I am trying to ask

12   what he perceived, what he perceived as intent to deceive

13   based on me not -- not providing my admission number while

14   providing the correct driver's license number.

15         THE COURT:  Help me understand, Mr. Yoo, why this

16   witness's perception of what you were trying to do is

17   relevant to any fact that the jury is going to be asked to

18   decide.

19         MR. YOO:  Because -- if it says information

20   required to be kept, that is an identifying factor.  If I was

21   intent to -- if my intent was to deceive, I would not give

22   out the proper identifying factors; name, date of birth, and

23   address.

24         THE COURT:  The objection is sustained.  So you can

25   proceed.

1          MR. YOO:  Well, I would -- yeah, I will proceed,

2     but I would reserve my right to appeal.

3          THE COURT:  Very well.

4          (Bench conference concluded.)

5     BY MR. YOO:

6     Q.    All right.  So, to your knowledge, is it possible to

7     check -- run a background check on someone based on name,

8     date of birth, address, and their driver's license?

9     A.    Yes, if they are a U.S. citizen.

10    Q.    Did my -- did my background check come back as like, you

11    know, unknown or fraudulent?

12    A.    Came back as a denial.

13    Q.    Does deny mean fraudulent and unknown?

14    A.    The only -- whenever denial comes back to us, we were

15    instructed by ATF at that point we cannot transfer that

16    firearm to that individual.

17          So I am assuming that there are laws that are not

18    going to tell us your whole background.  At that point we

19    don't get to make that decision or know that information.

20    All we need is a "proceed," "delay," "denial."  Once it is a

21    "denial," you don't get the gun.

22    Q.    Would you explain to me how -- how admission number is

23    relevant to performing a current background check on someone

24    even when the driver's license number is correct?

25          MR. MACHICEK:  I am going to object to relevance,

1  Your Honor.

2          THE COURT:  Mr. Yoo, can you explain how that is

3  relevant?

4          MR. YOO:  He just claimed that admission number is

5  relevant if you are a -- a -- a permanent resident.  But, to

6  my knowledge, everyone's driver's license number is

7  different.  So, to my knowledge, name, date of birth, and the

8  address, and the driver's license number is only pertinent

9  information to run a proper and accurate background check,

10  and I would like to --

11          MR. MACHICEK:  And, Your Honor, I am going to

12  object at this point in time that the Defendant's mistaken

13  beliefs about the state of the law and his statements of the

14  law are not relevant as to this witness's testimony or any

15  fact issue that the jury is going to be asked to answer.

16          MR. YOO:  Oh, sir, would you please -- Your Honor,

17  would you compel Mr. Machicek to provide --

18          MR. MACHICEK:  Object, Your Honor.  This is a

19  violation of motion in limine.

20          MR. YOO:  -- a legal basis.

21          THE COURT:  Mr. Yoo -- Mr. Machicek, give him an

22  opportunity to finish his statement.

23          Mr. Yoo, please finish.

24          MR. YOO:  Would you please -- would you

25  compel -- would you compel Mr. Machicek that his objection

1  that this has no relevance and that I have misperception

2  about the law is actually -- actually aberrant rather than

3  him just objecting because he is cornered.

4      THE COURT:  Mr. Machicek, would you like to

5  respond.

6      MR. MACHICEK:  Your Honor, the legal basis for my

7  objections is found in the Federal Rules of Evidence.  I am

8  objecting because the questions that the Defendant is asking

9  are irrelevant.  They are irrelevant pursuant to Federal Rule

10  of Evidence 401.

11      Because they are irrelevant, they are by their very

12  nature more prejudicial than probative under 403.  They have

13  no basis in any relevant information that this jury is going

14  to be asked to answer.

15      This witness has no personal knowledge, and the

16  Defendant has established by his questioning, no basis for

17  that knowledge for the questions propounded to him.  They are

18  inadmissible questions.

19      THE COURT:  Mr. Yoo, can you --

20      MR. YOO:  Yes, sir.

21      THE COURT:  -- lay a foundation for the witness's

22  testimony and explain to me why it is relevant?

23      MR. YOO:  It is relevant because the entire purpose

24  of the Gun Control Act of 1968, which this charge that I am

25  charged -- charged drives from.  Its purpose is to maintain

1  the identity of the purchaser, to track that someone if -- if

2  the violent crime were to occur and to run a proper

3  background check on -- on that -- that individual.

4       Mr. Machicek's entire argument was -- during the

5  opening statement was that I had intent to deceive in terms

6  of running the background check and recordkeeping.  That is

7  not the case here, Your Honor.  I am trying to directly prove

8  that he was wrong, and that I am directly trying to prove

9  that he has contradicted himself, so he has no credibility.

10      Motion to impeach witness.

11      THE COURT:  Well, Mr. Machicek, anything you want

12  to add?

13      MR. MACHICEK:  I will add one last thing, Your

14  Honor.  I will object under Rule 609 of the Federal Rules of

15  Evidence.  That is improper impeachment.

16      THE COURT:  So, Mr. Yoo, I am going to give you an

17  opportunity to the rephrase your question, and let's see if

18  the witness can respond on the basis of his personal

19  knowledge.

20      MR. YOO:  Yes, sir.

21      THE COURT:  Either based upon his experience in

22  this business or his specific experience with you.

23      MR. YOO:  Sir, that was asking his personal

24  experience in this -- and Rule 609 says impeachment by

25  evidence of a criminal conviction.  I wasn't accusing him of

1   any criminal -- committing any criminal offense.

2            THE COURT:  Okay.  Mr. Yoo, let's just rephrase the

3   question and start over.  Okay?

4            MR. YOO:  Yes.

5   BY MR. YOO:

6   Q.  So, to the best of your knowledge, you know, was there

7   any possibility that a permanent resident might have walked

8   into your store and not displayed alien number?  Any

9   possibility?  Admission number?

10  A.  Yes, there is a possibility an alien walked in our store

11  and did not show us our -- ID to show they were an alien.

12  Q.  But you do require everyone to display their driver's

13  license or any pertinent Government --

14  A.  Correct.

15  Q.  -- ID?

16  A.  And the reason why is, looking at 14, it says:  What is

17  your country of citizenship?  If you check "United States,"

18  that is fine.  It says, list more -- one or more applicable.

19  If you are a citizen of the United States, proceed to

20  Question 16.

21           And then 15 says:  If you are not a United States

22  citizen, what is your U.S. alien issued number (sic)?  So,

23  since you did not put that number, we did not know that you

24  were an alien.

25  Q.  Would you please -- actually, would you please reread

1    the directions for Question 13 of the ATF 4473 form on the

2    Exhibit No. 3?

3    A.    For Question 13 where it says, what is your state of

4    residence?

5    Q.    No.  No.  It is -- it is -- it is the instructions

6    page?

7    A.    Instructions for Question 13?

8    Q.    Yes.  Page 5.

9    A.    Question 13:  State of residence, the state in which the

10   individual resides.  An individual resides in a state if he

11   or she is present in a state with the intention of making a

12   home in that state.  If an individual is a member of the

13   Armed Forces or active duty, his or her state of residence

14   also is in the state in which his or her duty station is

15   located.

16   Q.    I believe that is the wrong form?

17   A.    That is for Question 13.

18   Q.    I was talking about the -- were you -- you are looking

19   at Exhibit No. 4; is that correct?

20   A.    Yes, the forms are all the same though.

21   Q.    So, on this these on -- all right.  Let's pull up the

22   instruction sheet for -- for Exhibit No. 4 instruction page.

23   It is Page 4 and Page 5.

24            THE COURT:  Mr. Yoo, who are you asking to do that?

25            MR. YOO:  The Court, sir.

1          THE COURT:  Well, I don't control that.  If you

2   want to make that request of the Government, if they have

3   that available, you know, we will see whether they are

4   willing to do that.  But that is not something I control.

5          MR. YOO:  All right.  Well then --

6          MR. MACHICEK:  Your Honor, there is an overhead

7   projector to the right of the podium available for the

8   Defendant's use.

9          THE COURT:  Mr. Yoo, you are welcome to use the

10  ELMO.

11  BY MR. YOO:

12  Q.  Okay.  So we are looking at the question, Question 12?

13          THE COURT:  Mr. Yoo, could you rotate it so we can

14  read it?

15          MR. YOO:  Sorry.

16  BY MR. YOO:

17  Q.  So we are looking at Question 11 and 12.  Does it say

18  anything specific about permanent residence?

19  A.  Yes.  It says -- it talks about the permanent resident

20  aliens and non-immigrant aliens there.

21  Q.  What does it say about permanent resident aliens and

22  non-immigrant aliens?

23  A.  Would you like me to read the whole section?

24  Q.  Just that part.

25  A.  The definition does not include permanent resident

1    aliens, nor does it apply to non-immigrant aliens admitted to

2    the United States pursuant to either Visa Waiver Program or

3    regulations otherwise exempting them from the visa

4    requirements.  An alien admitted to the United States under a

5    non-immigrant visa who responds "yes" to Question 11.1 must

6    provide a response to Question 12 indicating whether he or

7    she is under any exception.

8    Q.   So you are talking -- this section (indicating); is it

9    correct?

10   A.   Yes, the section you asked me to read.

11   Q.   So there is no -- so there is no like specific

12   directions for permanent residents; is that correct?  It is

13   only for aliens admitted to United States under a

14   non-immigrant visa; am I correct?

15   A.   Say that again.

16   Q.   So on the -- on the instruction sheet, there is no

17   specific instructions regarding permanent residents, it is

18   just alien admitted to the United States under a

19   non-immigrant visa; is that correct?

20   A.   Correct.

21   Q.   All right then.

22        All right.  So since you are familiar with the --

23   the federal codes -- sorry, the firearm rules, are you

24   familiar with Section 922?

25        MR. MACHICEK:  And, Your Honor, I am going to

1  object that this is a question about the law that is within

2  the purview of the Court.  It is not within the province of

3  the jury.

4         THE COURT:  Where are you going?

5         MR. YOO:  May I address that objection?

6         THE COURT:  Yeah.  I think my question is, what

7  exactly is your question for the witness?

8         MR. YOO:  Because he did claim that he has -- he

9  has extensive knowledge of -- of federal firearms rules.

10        THE COURT:  Right.  But what is it that you are

11 going to ask him?

12        MR. YOO:  922(b)(5).

13        THE COURT:  What are you going to ask him?

14        MR. YOO:  Are you familiar with Section 922 of the

15 Gun Control Act?

16        THE COURT:  And what is your follow-up question?

17        MR. YOO:  Are you familiar with 922(b)(5)?

18        THE COURT:  I know, but help me understand what it

19 is relevant to.

20        MR. YOO:  Earlier I asked did I lie on the name,

21 age, or -- did I give false or misstating information on the

22 name, age, or address?

23        THE COURT:  Okay.

24        MR. YOO:  I was going to pass on the witness after

25 I, you know, question this --

1          THE COURT:  I will give you a little latitude.

2          MR. YOO:  Yes, sir.

3    BY MR. YOO:

4    Q.   Are you familiar with Section 922 of the -- of the Gun

5    Control Act since you claim somewhat of expertise?

6    A.   No, I am not able to memorize every law.

7    Q.   Are you familiar with this section (indicating)?

8          MR. MACHICEK:  Your Honor, I am going to object to

9    the Defendant projecting statutory law in front of the jury

10   that is not relevant to any fact question they will be asked

11   to answer.

12         THE COURT:  What is the section -- for the purposes

13   of the record, Mr. Yoo, what is the section that you have

14   displayed to the witness?

15         MR. YOO:  Sir, he can't claim that.

16         THE COURT:  Mr. Yoo -- Mr. Yoo -- Mr. Yoo, what is

17   the section, for the purposes of the record, that you are

18   displaying to the witness?

19         MR. YOO:  He is an FFL, and he needs to know what

20   informations are required to be kept.

21         THE COURT:  Mr. Yoo, what is the section, for the

22   purposes of the record, that you are displaying to the

23   witness?

24         MR. YOO:  What is the section -- purposes of the --

25         THE COURT:  What is the section?  Can you identify

1   for the record what the section is.

2          MR. YOO:  Oh, okay.  This is 18, United States

3   Code, Section 922, specifically it is (b)(5).  And it

4   describes the three informations required to be kept word by

5   word that a federal firearms licensee is -- is required to

6   maintain in their FFL.

7          THE COURT:  So let's ask that in the form of a

8   question.

9          MR. YOO:  Yes, sir.

10  BY MR. YOO:

11  Q.   Are you familiar with the code -- so -- sorry.  Were you

12  familiar with this code, Section 18, United States

13  Code -- Title 18, United States Code, Section 922 Bravo 5?

14  A.   As far as the -- just Bravo 5, unless the licensee notes

15  in his records, required to kept pursuant to Section 923 of

16  this chapter, yeah, we have to keep it there at our place, at

17  our business entity.

18  Q.   That wasn't my question, sir.  Were you -- were you

19  familiar with this code?

20         MR. MACHICEK:  And, Your Honor, I am going to

21  object once again.  This is irrelevant under 401.  It has no

22  relevance to any fact of consequence the jury is going to be

23  asked to answer.  It is, therefore, more prejudicial than

24  probative as, it is misleading the jury and misstatement of

25  the law.

1      I would ask that this line of questioning be

2  discontinued at this time as inadmissible in evidence.

3      THE COURT:  Mr. Yoo, where is this -- where is this

4  going?

5      MR. YOO:  Sir, this is -- this is the law that I am

6  charged with, and the witness claimed somewhat of expertise

7  in the federal firearms regulations.  I -- and the -- the

8  Prosecution had -- had been attempting to mislead the jury

9  the whole time regarding information required to be kept in

10  a -- records of federal firearms licensee by questioning this

11  witness in a -- in an improper manner.  I just would like to

12  show --

13      THE COURT:  All right.

14      MR. YOO:  -- get your personal knowledge whether

15  this --

16      THE COURT:  Are you trying to impeach the witness?

17      MR. YOO:  Yes, sir.

18      THE COURT:  Okay.  I will give you a little

19  latitude in that regard.  Why don't you rephrase your

20  question.  The objection is overruled.

21      MR. YOO:  Yes, sir.

22  BY MR. YOO:

23  Q.   So --

24      MR. YOO:  Actually, motion to impeach witness based

25  on --

1       THE COURT:  Just ask the question and try to

2   impeach the witness.

3   BY MR. YOO:

4   Q.   Have you ever looked into this law during your federal

5   firearm licensing career?

6   A.   Yes, I have read through the book.  But like I said, I

7   am not capable of memorizing every law in the 600-something

8   pages of that book, so that is why we rely on the ATF with

9   any questions we have and attorneys.

10      MR. YOO:  I will pass the witness.

11                  REDIRECT EXAMINATION

12  BY MR. MACHICEK:

13  Q.   Mr. Rohr, I want to follow up on some of the questions

14  that the Defendant asked you.  He asked you about whether or

15  not citizenship was a question that was important to know

16  about in the process of filling out the ATF Form 4473 and in

17  a firearms transaction.

18      Citizenship, if a person is an illegal alien in the

19  United States, is that a prohibiting factor?

20      MR. YOO:  Objection.  I'm going to directly object

21  to relevance.

22      MR. MACHICEK:  It is responsive to a question

23  propounded by the Defendant during cross.

24      THE COURT:  Overruled.

25  BY MR. MACHICEK:

1  Q.   Are you permitted as an FFL to sell illegal aliens

2  firearms?

3  A.   Yes, legal.

4  Q.   I'm sorry, illegal aliens?

5  A.   Illegal, no.

6  Q.   So, if an individual who is an illegal alien lies on the

7  ATF form and says that they are a U.S. citizen, is it

8  difficult then to ascertain whether or not they are a legal

9  or illegal alien?

10  A.   Yes, we only know what they write down.

11  Q.   Similarly, if an individual is a lawful permanent

12  resident and they do not so designate on the Form 4473, do

13  you have any other way of ascertaining that information other

14  than that individual marking that on the form and providing

15  you with that documentation?

16  A.   No.  We only know what they give us and what they write

17  down.

18  Q.   If you became aware during the process of an individual

19  filling out a Form 4473 that they were providing false

20  answers and false information to you as an FFL, would you

21  proceed with that transaction and sell them a firearm?

22  A.   No, we kindly --

23           MR. YOO:  Objection.  Speculative.  Leading the

24  witness and coaching the witness.

25           THE COURT:  Would you rephrase the question,

1  Mr. Machicek, to avoid the leading objection.  As to

2  speculation, I am going to overrule that.

3  BY MR. MACHICEK:

4  Q.   Where an individual is discovered to have provided false

5  or inaccurate information while filling out Form 4473, what

6  is your store's policy with regards to selling them a

7  firearm?

8  A.   We take that 4473, we file it with denials.  And people

9  that we don't transfer a firearm for, we ask them nicely to

10  leave.  If they don't leave, then we call the police.

11  Q.   In fact, you have the discretion as a business owner and

12  as an FFL to deny the sale of a gun to anyone?

13  A.   Yes.  We have the right to refuse business to anybody;

14  and if I don't feel comfortable, I'm not selling you a gun.

15         MR. YOO:  Objection.  Relevance.

16         THE COURT:  Overruled.

17  BY MR. MACHICEK:

18  Q.   I want to talk to you a little bit about references to

19  statutory law, your familiarity with the numerous gun laws

20  that have been passed by Congress and your responsibilities

21  as an FFL.  But I want to ask you a simple question in

22  relation to your knowledge of laws in general.

23         If you are driving a vehicle down the road, and you

24  come up to a stop sign, what do you do?

25  A.   Stop.

1    Q.   Can you cite the Texas Transportation Code and quote it

2    from memory that says you should stop at a stop sign?

3         MR. YOO:   I am going to object to that for

4    relevance and speculative.

5         THE COURT:   Overruled.

6    BY MR. MACHICEK

7    Q.   Mr. Rohr, can you quote the Texas Transportation Code

8    pertaining to stop signs?

9    A.   No.

10   Q.   I want to refer to Government's Exhibit 4, please.

11   Page 1, bottom of the page, in reference to the citizenship

12   questions.

13        Did the Defendant while filling out this Form 4473

14   indicate that he is a lawful permanent resident?

15   A.   No.   He said he was a U.S. citizen.

16   Q.   Did he provide any A number associated with his lawful

17   permanent residency?

18   A.   No.

19   Q.   The next page.   Did he verify by his signature that the

20   information he provided was true, correct, and complete?

21   A.   Yes, he did.

22   Q.   Was a background check run on the Defendant?

23   A.   Yes.

24   Q.   Why was that background check initiated?

25   A.   Because he was in the process of buying a firearm, and

1    by legal federal law we have to initiate that background

2    check if they do not have a valid concealed handgun

3    license.

4    Q.   And what was the result of that background check?

5    A.   A denial.

6    Q.   And when an individual is denied after a background

7    check is initiated, do you sell that individual a handgun --

8    or a firearm?

9    A.   No.

10             MR. MACHICEK:   I will pass the witness.

11                      RECROSS-EXAMINATION

12   BY MR. YOO:

13   Q.   Three questions.  Is your store policy or is your

14   perception of federal law?

15   A.   Say that again.

16   Q.   Is your store policy or is your federal -- sorry, is

17   your store policy or is your perception a federal law?

18   A.   On what part of my store policy?

19   Q.   Is your store policy in general a federal law?

20   A.   No.

21   Q.   Okay.  So do you know any conditions of my -- do you

22   know of any reasons for my denial, any conditions or

23   reasons?

24   A.   No.  As I stated, we only know what you write down and

25   what they tell us.  Proceed.  Delay.  Denial.

1        MR. YOO:  I am going to reconfirm with this

2   question and pass the witness.

3   BY MR. YOO:

4   Q.   Did I -- did I make a -- did I make a false or a

5   mistaken statement regarding name, age and -- name, age, and

6   address pursuant to 922(b)(5)?

7   A.   To this day I still don't know what your real name,

8   address, or date of birth is.  All I know what you put on

9   that form and what I tell FBI.

10       The FBI is the one that knows that information, not

11  me.  All I do is tell them what you wrote on that form.

12  And at that point they tell me:  Proceed, delay, denial.  If

13  you are denied, we don't sell you a gun.  If we proceed, we

14  sell you a gun, if we decide to.

15  Q.   So -- so to this day you do not have any beyond a

16  reasonable doubt that there was a false name, age, and

17  address?

18       MR. MACHICEK:  Your Honor, I am going to object.

19  That invades the province of the jury.

20       THE COURT:  Let's rephrase the question, Mr. Yoo.

21  BY MR. YOO:

22  Q.   So -- so to this day you do not have any personal

23  knowledge that is not my name, age, and the address?

24  A.   All I know is what you wrote on the gun form.  That is

25  all we know.  I didn't know you as a person.  All I know is

1   what you wrote down and what you signed saying was true.

2            MR. YOO:  I will pass the witness, Your Honor.

3            MR. MACHICEK:  No further questions for this

4   witness.  May this witness be finally excused?

5            THE COURT:  May the witness be excused, Mr. Yoo?

6            MR. YOO:  Yes, sir.

7            THE COURT:  You may step down, Mr. Rohr.

8            The Government may call its next witness.

9            MR. MACHICEK:  Your Honor, the Government calls

10  Bailey Averitt.

11           (Pause in proceedings.)

12           THE COURT:  You may proceed.

13         BAILEY AVERITT, GOVERNMENT'S WITNESS, SWORN,

14                   DIRECT EXAMINATION

15  BY MR. MACHICEK:

16  Q.   Good morning, Mr. Averitt.  How are you today?

17  A.   I am fine, sir.  How are you?

18  Q.   Would you please state your full name for the record?

19  A.   Bailey Curtis Averitt.

20  Q.   Can you introduce yourself for the jury, and tell them

21  where it is you work?

22  A.   I work at Superior Firearms as a sales associate.

23  Q.   Where is Superior Firearms located?

24  A.   4520 South Broadway.

25  Q.   Is that here in Tyler Texas?

1  A.    Yes, sir, right across from the mall.

2  Q.    Is Superior Firearms an FFL?

3  A.    Yes, sir.

4  Q.    Okay.  Do you know an individual by the name of Heon

5  Jong Yoo, also known as Hank Yoo?

6  A.    Yes, sir.

7  Q.    Is he seated in the courtroom today?

8  A.    Yes, sir.

9  Q.    Would you please point at him and identify him by an

10  article of clothing he is wearing?

11  A.    Blue tie.

12          MR. MACHICEK:  Your Honor, I would ask that the

13  record reflect that the witness has identified the

14  Defendant.

15          THE COURT:  It will reflect that.

16  BY MR. MACHICEK:

17  Q.    I am going to ask you about it is that you know Mr. Yoo.

18  A.    Yes, sir.

19  Q.    When did you become acquainted with him?

20  A.    The first time he came in our store to buy a gun.

21  Q.    And at the time that he came into the store to buy a

22  gun, did he fill out a Form 4473?

23  A.    Yes, sir.

24  Q.    Okay.  I will show you what has been marked and admitted

25  as State's Exhibit -- or, I'm sorry, Government's Exhibit

1  No. 4.  It is going to come up on the screen there.

2         Is that the form that you witnessed the Defendant

3  fill out in the store on September 13th, 2016?

4  A.   Yes, sir.

5  Q.   Now, referring to the bottom -- or referring to the

6  store's policy about filling out this form, is it filled out

7  by hand or computer terminal?

8  A.   It is filled out by hand.

9  Q.   As a sales associate in discharging your duties to have

10  a customer fill out this form, do you ever tell them what

11  information to provide?

12  A.   No, sir.

13  Q.   Do you ever assist them in any way, shape, or form to

14  provide specific information?

15  A.   No, sir.

16  Q.   If an individual tells you that they are not a United

17  States citizen, do you tell them to mark they are a United

18  States citizen anyway?

19  A.   No, sir.

20  Q.   I am going to refer to you Box No. 14 on Government's

21  Exhibit No. 4, Page 1?

22         What answer did the Defendant give on this form as

23  to his citizenship?

24  A.   United States of America.

25  Q.   And if you will look at the very next page at the top of

1    the page, did the Defendant at the time that he filled out

2    this form on September 13th, 2016, did he certify that all of

3    the answers given were true, correct, and complete?

4    A.    Yes, sir.

5    Q.    Now, as this transaction progressed, was a background

6    check performed?

7    A.    Yes, sir.

8    Q.    What was the result of the background check?

9    A.    He was denied.

10   Q.    Was he sold the firearm?

11   A.    No, sir.

12          MR. MACHICEK:   Pass the witness.

13                         CROSS-EXAMINATION

14   BY MR. YOO:

15   Q.    What are -- so how long have you been a firearms

16   dealer?

17   A.    I have been in this industry for almost four years.

18   Q.    Four years?

19   A.    Yes, sir.

20   Q.    Have you ever sold a gun to a person with a green card

21   or permanent residency or a U.S. national who is not a

22   citizen?

23   A.    Could you clarify the question, please.  Those are three

24   different types of people?

25          MR. YOO:   May I?

```
 1   BY MR. YOO:

 2   Q.   I believe green card means they can stay here, and

 3   permanent residency is defined --

 4            MR. MACHICEK:   Your Honor, I am going to object to

 5   the Defendant testifying from the podium.

 6            THE COURT:   So I think what Mr. Yoo is doing was

 7   trying to clarify the question.

 8            And to the extent the witness has asked for some

 9   clarification, Mr. Yoo, I will give you an opportunity to

10   provide that clarification.

11            MR. YOO:   Yes, sir.

12            MR. MACHICEK:   Perhaps, Your Honor, my additional

13   objection would be that the question was multifarious.

14   Perhaps he could ask it in three different parts.

15            THE COURT:   Why don't you try that, Mr. Yoo.

16   Separate the question.

17   BY MR. YOO:

18   Q.   Have you ever sold a gun to a U.S. national who is not a

19   U.S. citizen?

20   A.   No, sir.

21   Q.   Have you ever sold a gun to a permanent resident?

22   A.   Yes, sir.

23   Q.   Okay.   On that form, to the best of your knowledge, did

24   I make false or misstated -- misstatements regarding my name,

25   date of birth, and address?
```

1    A.   No, sir.

2              MR. YOO:  I will pass the witness, sir.

3              MR. MACHICEK:  Brief follow-up, Your Honor.

4                        REDIRECT EXAMINATION

5    BY MR. MACHICEK:

6    Q.   Mr. Averitt, referring back to Government's Exhibit

7    No. 4, the bottom of the first page, it is going to be Box

8    14, did the Defendant indicate in that box that he is a

9    lawful permanent resident of the United States?

10   A.   Yes, sir.

11   Q.   I'm sorry.  Did he indicate he was a lawful permanent

12   resident?

13   A.   Citizen, not lawful permanent resident.

14   Q.   Did he provide any green card to you at the time of the

15   transaction?

16   A.   No, sir.

17   Q.   Did he provide you with any A number associated with a

18   legal permanent residency status?

19   A.   No, sir.

20   Q.   If you became aware during a firearms transaction as a

21   salesperson at Superior Firearms that an individual lied

22   about their citizenship on the form, would you sell them a

23   firearm?

24   A.   No, sir.

25              MR. MACHICEK:  Pass the witness.

1      MR. YOO:  Objection, Your Honor.  I invoked the

2   Rule, and Austin Rohr is still in the courtroom.

3      THE COURT:  He has been released, Mr. Yoo.  He is

4   permitted to be in the courtroom.  He has been released.

5      MR. YOO:  Okay.

6                      RECROSS-EXAMINATION

7   BY MR. YOO:

8   Q.  All right.  So, to the best of your knowledge, did I

9   display a fictitious identification?

10  A.  When you handed it to me, we did not assume it was

11  fictitious, no, sir.

12      MR. YOO:  I will pass the witness, sir.

13      MR. MACHICEK:  Your Honor, I have no further

14  questions for this witness.  May he be finally excused?

15      THE COURT:  May he be excused, Mr. Yoo?

16      MR. YOO:  Yes, sir.

17      THE COURT:  You may step down, Mr. Averitt.

18      THE WITNESS:  Thank you, sir.

19      THE COURT:  Call your next witness.

20      MR. MACHICEK:  Your Honor the Government calls

21  Victor Montalva.

22          (Pause in proceedings.)

23          VICTOR MONTALVA, GOVERNMENT'S WITNESS, SWORN,

24                      DIRECT EXAMINATION

25  BY MR. MACHICEK:

1  Q.  Good morning, Mr. Montalva, how are you today?

2  A.  Good morning.  How are you doing?

3  Q.  I am doing just fine.

4      Would you please state your full name for the

5  record?

6  A.  Victor Ruben Montalva.

7  Q.  Where is it that you work, Mr. Montalva?

8  A.  First Cash Pawn on Broadway.

9  Q.  And is that in Tyler, Texas?

10  A.  Yes, sir.

11  Q.  First Cash Pawn, what kind of business is that?

12  A.  It is a pawn shop.

13  Q.  As a pawn shop, do y'all sell firearms?

14  A.  Yes, sir.

15  Q.  Are you a federal firearms licensee?

16  A.  Yes, sir.

17  Q.  Is that an FFL?

18  A.  Yes, sir.

19  Q.  Could you walk the jury through the process that a

20  customer must go through in order to purchase a firearm at

21  your pawn shop?

22  A.  Yes, sir.  So, basically, when a customer wants to come

23  in and buy a firearm, we get their driver's license, match it

24  to our system, make sure everything is current.  If it is not

25  current, obviously they can't buy it.

1       If everything is current on their driver's license,

2    matching our V2, they fill out an E-4473.

3       After they are done with that, we will match the

4    driver's license with the E-4473.  If all that matches, then

5    we will do a NICS background check.  And then NICS will tell

6    if it is a "proceed," "deny," or "delay."

7    Q.   You mentioned a Form E-4473.  Is your business practice

8    to allow a customer to fill out this form at a computer

9    terminal?

10   A.   Yes, sir.

11   Q.   So the E-4473 is an electronic version that y'all use?

12   A.   Yes, sir.

13   Q.   That 4473 form, is it filled out by you, your sales

14   associates, or pawn brokers; or who is that filled out by?

15   A.   It is filled out by the customer.

16   Q.   Are they provided any answers by you, your pawn brokers,

17   or your sales associates to provide on that form?

18   A.   No, sir.

19   Q.   The answers on the form come exclusively from the

20   customers?

21   A.   Yes, sir.

22   Q.   I want to draw your attention to the binder in front of

23   you, and ask you to flip it open to Tab No. 5, please.

24       Tab No. 5 contains what has been previously marked

25   for identification as Government's Exhibit No. 5.  Do you

1    recognize the documents that are contained in there.

2    A.    Yes, sir.

3    Q.    Are those business records from First Cash Pawn that are

4    accompanied by a business records certificate?

5    A.    Yes, sir.

6    Q.    And the certificate was actually signed by you as a

7    custodian of those records; is that correct?

8    A.    Yes, sir.

9           MR. MACHICEK:  Your Honor, at this time we would

10   move to enter Exhibit 5 in its entirety into evidence for all

11   purposes.

12          THE COURT:  Any objection?

13          MR. YOO:  No objections.

14          THE COURT:  It will be received.

15   BY MR. MACHICEK:

16   Q.    Now, Mr. Montalva, the last couple of questions I have

17   for you pertain to the specific facts surrounding this

18   circumstance.  Although you are the custodian of records at

19   First Cash Pawn for these particular records, although you

20   are a manager that trains employees on how to comply with

21   these regulations, you did not engage in any specific

22   transactions with the Defendant, did you?

23   A.    No, sir.

24   Q.    You don't know who Heon Jong Yoo, or Hank Yoo is?

25   A.    No, sir.

1    Q.    Thank you, sir.

2              MR. MACHICEK:  I will pass the witness.

3              THE COURT:  Cross-examination?

4                           CROSS-EXAMINATION

5    BY MR. YOO:

6    Q.    To the best of your knowledge, have you ever sold a

7    firearm to a permanent resident?

8    A.    To a permanent resident?

9    Q.    Yes, sir.

10   A.    Yeah.

11   Q.    What would -- what factors would deny an individual from

12   purchasing a firearm from you?

13   A.    What will get them denied, a felony, not a permanent

14   resident.  Those are the only ones I know of.

15   Q.    Sir, to the best of your -- to the best of your

16   knowledge, did I state a fictitious name, age, address, or

17   exhibit a fictitious identification?

18             MR. MACHICEK:  Your Honor, I am going to object.

19   The witness has already indicated he has personal knowledge

20   of the specific transaction --

21             THE COURT:  I will sustain the objection.

22             MR. YOO:  I reserve my right to appeal.

23             I will pass the witness.

24             THE COURT:  Any redirect?

25             MR. MACHICEK:  No, redirect, Your Honor.

1          THE COURT:  You may step down.

2          May this witness be excused?

3          MR. YOO:  Yes, sir.

4          THE COURT:  All right.  Call your next witness.

5          MR. MACHICEK:  Your Honor, the Government calls

6   Cesar Bahena.

7          THE COURT:  You may proceed.

8          CESAR BAHENA, GOVERNMENT'S WITNESS, SWORN,

9                    DIRECT EXAMINATION

10  BY MR. MACHICEK:

11  Q.   Good morning, Mr. Bahena.  How are you today?

12  A.   Very good.

13  Q.   Would you please state your name for the record?

14  A.   Yes, sir, Cesar Bahena.

15  Q.   And where is it that you work, Mr. Bahena?

16  A.   I work at First Cash Pawn.

17  Q.   And where is that located?

18  A.   On Gentry.

19  Q.   And what city is that in?

20  A.   Tyler.

21  Q.   Tyler, Texas?

22  A.   Yes, sir.

23  Q.   What kind of business is First Cash Pawn?

24  A.   It is a loan company.  We give loans on guns, gold, art,

25  goods, things like that.

1  Q.    In reference to the business practices relating to

2  firearms, is First Cash Pawn a federal firearms licensee?

3  A.    Yes, sir.

4  Q.    And during the course of your employment, are you

5  charged with assisting customers in the purchase of

6  firearms --

7  A.    No, sir.  We are not allowed to give them any

8  instructions towards anything.

9  Q.    But do you conduct firearms transactions on behalf of

10  First Cash Pawn?

11  A.    Yes, sir.

12  Q.    Okay.  When a customer comes in, what form do they fill

13  out?

14  A.    They fill out the 4473.

15  Q.    When they fill out that form -- and I think you have

16  supplied this answer, but I am going to ask the question --

17  A.    Yes, sir.

18          MR. YOO:  I am going to object to redundancy.

19          THE COURT:  Overruled.

20  BY MR. MACHICEK:

21  Q.    When a customer fills out the form, do you provide them

22  with the information to put in the form?

23  A.    No, sir, not at all.

24  Q.    How do they fill out that form?

25  A.    They do it on their own.  They just got to have a valid

1   ID, and then they do it all on their own.  We are not allowed

2   to tell them anything on that.

3   Q.   And you made a motions with your hands.  Is that form

4   filled out on a computer?

5   A.   Yes.

6   Q.   I want to refer you to the specific form that you

7   assisted a customer with.  It's Government's Exhibit No. 5,

8   Bate stamp 5014, and it has been popped up on the screen

9   there in front of you.

10         I want to ask you, are you familiar with an

11  individual by the name of Heon Jong Yoo?

12  A.   Yes, sir.

13  Q.   Is he seated in the courtroom here today?

14  A.   Yes, sir.

15  Q.   Would you please point at him and identify an article of

16  clothing that he is wearing?

17  A.   He is right there in the black suit.

18         MR. MACHICEK:  Okay.  Your Honor, I would ask that

19  the record reflect that the witness has identified the

20  Defendant in open court.

21         THE COURT:  The record will reflect that.

22  BY MR. MACHICEK:

23  Q.   Flipping to the next page of that form, we see a date.

24  Was that form completed on November 3rd, 2016?

25  A.   Yes, sir.

1    Q.   Okay.  And the form having been completed by the

2    Defendant, going back to the first page at the bottom of the

3    page, did the Defendant make any indications about his

4    country of citizenship?

5    A.   Yes, he did.

6    Q.   What country did he claim citizenship of?

7    A.   United States of America.

8    Q.   Did he indicate that he was a legal permanent resident

9    and provide an admission number?

10   A.   No.

11   Q.   Would that make a difference in the completion of the

12   form?

13   A.   Yes.

14   Q.   The next page we will return to the box there on Page 2

15   at the top.

16            Did the Defendant sign that section indicating his

17   certification that the answers provided are true, correct,

18   and complete?

19   A.   Yes, sir, he did.

20            MR. MACHICEK:   I will pass the witness, Your Honor.

21                          CROSS-EXAMINATION

22   BY MR. YOO:

23   Q.   All right.  Let's go back to Page 1, please.

24            MR. YOO:   Page 1.

25            Next page.  Page 1 of the 4473 form.

1         Okay.  Would you magnify on the first section

2 before reaching the Question 11 from Section Alfa, the

3 entirety of Section Alfa?  Yes.

4 BY MR. YOO:

5 Q.  So what is my name stated there?

6 A.  Yoo, last name?

7 Q.  Yes, sir.  And, to the best of your knowledge, that name

8 is correct and accurate; is that correct?

9 A.  Yes.

10 Q.  What is my --

11         MR. YOO:  Permission to address the Court from

12 podium?

13         THE COURT:  Okay.

14         MR. YOO:  My birthday is redacted, sir, and that

15 is -- that is actually information required to get.

16         THE COURT:  Well, it is redacted presumably --

17         Mr. Machicek, can you tell me why it was redacted?

18         MR. MACHICEK:  Your Honor, these are public

19 records, and it is the common practice and requirements under

20 federal law that we redact out personal identifiers such that

21 they cannot be fraudulently used by others.

22         THE COURT:  Okay.  Mr. Yoo?

23         MR. YOO:  All right.

24 BY MR. YOO:

25 Q.  To the best of your knowledge, is that current address

1    accurate?  Is that address accurate?

2    A.    I don't know.

3    Q.    When I walked into your shop, did I display a valid

4    Texas driver's license, to the best of your knowledge?

5    A.    That is what is required, yes.

6              MR. YOO:  I will pass on the witness.  Thank you.

7              THE COURT:  Anything further?

8              MR. MACHICEK:  No further questions for this

9    witness.  May he be finally excused?

10             THE COURT:  May he be excused, Mr. Yoo?

11             MR. YOO:  Yes, sir.

12             THE COURT:  You may step down.

13             THE WITNESS:  Thanks.

14             THE COURT:  Call your next witness.

15             MR. MACHICEK:  Your Honor, the Government calls

16   Phillip Olivares.

17             (Pause in proceedings.)

18             THE COURT:  You may proceed.

19         PHILLIP OLIVARES, GOVERNMENT'S WITNESS, SWORN,

20                      DIRECT EXAMINATION

21   BY MR. MACHICEK:

22   Q.    Good morning, Mr. Olivares.  How are you today?

23   A.    Doing good, sir.

24   Q.    Would you please state your full name for the record?

25   A.    Phillip Olivares.

1    Q.    And, Mr. Olivares, where is it you are employed?

2    A.    I am currently with First Cash Pawn at the Whitehouse,

3    Texas.

4    Q.    You said in Whitehouse Texas.  Is that located in Smith

5    County?

6    A.    Yes, sir.

7    Q.    Okay.  And what is your position at First Cash Pawn?

8    A.    Store manager.

9    Q.    Okay.  As a store manager, are you familiar with the

10   pawn store's practices as it relates to the sale of

11   firearms?

12   A.    Yes, sir.

13   Q.    Would you please describe for the jury how a

14   customer -- or what a customer is required to do at the time

15   that they express an interest in purchasing a firearm?

16   A.    Okay.  Well, at that moment we -- if they are going to

17   proceed with purchasing a gun, we just give them an ATF form,

18   which is the form that an individual has to fill out when

19   they purchase it from an FFL dealer.

20         So they present us their ID.  We make sure that

21   what they are giving us is all current, up to date.  So we

22   then have the customer fill out their section.

23         Once they are complete, we fill out our section,

24   and we either proceed with using if they present their CHL or

25   call it in for the NICS background check.

1  Q.   Let's unpack a little bit of that information.  You

2  indicated that you would have a customer fill out an ATF

3  form.  Are you referring to ATF Form 4473?

4  A.   4473, yes, sir.

5  Q.   And the mode of filling out that form at your store, how

6  does the customer fill that out?  By hand or how?

7  A.   It is either by hand or the e-form.

8  Q.   Okay.  The e-form would be on the computer terminal?

9  A.   Yes, sir.

10 Q.   Okay.  Let's talk a little bit about -- flash forward a

11 little bit I guess.  At the point that a sale is completed or

12 denied, what does your store do with the Form 4473?

13 A.   If it is a -- we file the form.  We -- if it is a

14 "denied," then we let the customer know that they have been

15 denied, and we can't proceed with the sale or purchase of the

16 firearm.

17 Q.   And if it is a "proceed," you go along with the sale of

18 the firearm?

19 A.   Yes, sir, if it is a "proceed."

20 Q.   In either circumstance if it is "denied" or "proceed,"

21 do you keep the Form 4473 in the records of the store?

22 A.   Yes, sir, we file the form.

23 Q.   I want to talk to you about a couple of specific forms.

24 We are going to go to Government's Exhibit No. 5, Bates 5024.

25 I want to talk about this form in particular, but first I

1    want to talk about the personal information contained at the

2    top.  Do you recognize the name Heon Jong, or Hank, Yoo?

3    A.   Yes, sir, I do.

4    Q.   And the person that you know by that name is he seated

5    in the courtroom today?

6    A.   Yes, he is.

7    Q.   Would you point him out and identify him by an article

8    of clothing he is wearing?

9    A.   This guy right here in the suit.

10              MR. MACHICEK:  Your Honor, I would ask the record

11   to reflect that the witness has identified the Defendant in

12   open court.

13              THE COURT:  The record will reflect that.

14   BY MR. MACHICEK:

15   Q.   Is that the individual who filled out this form?

16   A.   Yes, sir.

17   Q.   Was he assisted in any way, shape, or form in completing

18   this form with any information?

19   A.   No, sir.

20   Q.   Okay. I would like to go to the bottom of that first

21   page of the form, Box 14.  That goes to the citizenship

22   question.

23              What indication did the Defendant make at the time

24   of this transaction as to his citizenship?

25   A.   That he is a U.S. citizen.

1  Q.   I want to go to the next page, the top of the page.

2         Once a customer completes that first portion on the

3  first page of the form, the first thing on the second page

4  here, what is that?

5  A.   That is his signature certification and the date that

6  the form was filled out.

7  Q.   Okay.  And is it certifying that the answers given are

8  true, correct, and complete?

9  A.   Yes, sir.

10  Q.   Does it admonish the person who is filling out the form

11  as to the consequences of providing false information?

12  A.   Yes, sir.

13  Q.   I want to ask you about the section below that that

14  indicates the date that this transaction occurred.  What day

15  was this form filled out in your store?

16  A.   November 17th, 2016.

17  Q.   Okay.  So this Form 4473 was filled out by the Defendant

18  Hank Yoo on November 17th, 2016?

19  A.   Yes, sir.

20  Q.   Thank you.

21         MR. MACHICEK:  I will pass the witness.

22         THE COURT:  Cross-examination.

23         MR. YOO:  All right.  Will you display the form

24  again?

25         So let's magnify on -- oh, it's also redacted.

1        Okay.  Well, anyway, magnify on the name, the name

2   and the address section and date of birth.

3                        CROSS-EXAMINATION

4   BY MR. YOO:

5   Q.    To the -- so, Mr. Olivares --

6   A.    Yes, sir.

7   Q.    -- am I saying it right?

8   A.    Yes, sir.

9   Q.    Yes, sir.

10        To the best of your knowledge, did I display a

11  valid identification when I walked into your store?

12  A.    Yes, sir.

13  Q.    Did I give -- to the best of your -- to the best of your

14  knowledge, did I give you any false or fictitious or mistaken

15  name, age, or -- name, date of birth, or address?

16  A.    No, sir.

17            MR. YOO:  I will pass the witness.

18            MR. MACHICEK:  Redirect, Your Honor.

19                        REDIRECT EXAMINATION

20  BY MR. MACHICEK:

21  Q.    Mr. Olivares, with this information up on the overhead

22  in front of you, is there an indication as to a place of

23  birth there?

24  A.    Yes, there is.

25  Q.    And what did the Defendant put in the place of birth?

1    A.    On place of birth, he left it blank.

2            MR. YOO:  Objection.  Relevancy.

3            THE COURT:  Overruled.

4    BY MR. MACHICEK:

5    Q.    He left the U.S. city and state portion blank and there

6    is an "or" section that says foreign country; is that

7    correct?

8    A.    Yes, sir.

9    Q.    And what did the Defendant provide as far as the

10   information in that blank?

11   A.    North Korea.

12   Q.    I want to direct your attention to another Form 4473

13   that is completed by the Defendant at your shop, Exhibit 5

14   Bate Stamp 5030.

15           Was this form filled out by the Defendant in your

16   presence?

17   A.    Yes, sir.

18   Q.    Was it also filled out on November 17th, 2016?

19           MR. YOO:  Objection.  It is irrelevant to the case,

20   and it has potential to mislead the jury.

21           MR. MACHICEK:  Your Honor, this is one of the

22   charged counts in the Indictment.

23           THE COURT:  Overruled.

24   BY MR. MACHICEK:

25   Q.    Going to the top of the form with the personal

1   information, did he provide the name Heon Jong Yoo?

2   A.   Yes.

3   Q.   Did he provide his place of birth being a foreign

4   country, to wit:  South Korea?

5   A.   Yes.

6   Q.   Going down to the bottom of the form, Box 14, did he

7   give an indication as to his citizenship status?

8   A.   Yes, U.S. citizen.

9   Q.   Did he indicate that he was a United States citizen?

10  A.   Yes, he did.

11  Q.   Going to the top of the next page where the

12  certification and Mr. Yoo's signature is located, did he

13  indicate and certify by his signature that the answers he

14  provided were true, correct, and complete?

15  A.   Yes, sir.

16  Q.   Did this also occur on November 17th, 2016?

17  A.   Yes, sir.

18  Q.   So he filled out two separate forms on that same day; is

19  that correct?

20  A.   Yes.

21  Q.   And provided similar information in both?

22  A.   Yes, sir.

23       MR. MACHICEK:   Thank you.  I will pass the

24  witness.

25                    RECROSS-EXAMINATION

1   BY MR. YOO:

2   Q.   On any of those separate forms, to the best of your

3   knowledge, did I give false name, age, or -- name, date of

4   birth, or address?

5   A.   No, sir.

6   Q.   Also, let's talk about those two -- two separate forms.

7   Did both of those forms go through NICS background check, or

8   was it the same form, just a copy of -- like was the second

9   form on 2016-11-17 the exact copy of the first form on

10  2016-11-17?

11  A.   I can't recall exactly what happened with both of those

12  forms.

13  Q.   Thank you, sir.  I appreciate it.

14          MR. MACHICEK:  Redirect, Your Honor.

15                  FURTHER REDIRECT EXAMINATION

16  BY MR. MACHICEK:

17  Q.   Going to the first form Bates -- or Government's

18  Exhibit 5, Bates 5024, the second page of that form on 5025,

19  could we go down to the middle of the page where we see some

20  corrections that are made there.  Do you see those?  Were

21  those corrections that were made to some of the identifying

22  numbers that you were provided by NICS?

23  A.   Yes, sir.

24  Q.   Now, if we go to the second form from that same day,

25  November 17th, 2016, that would be Government's Exhibit 5,

1  Bates 5030, going to the same second page, we look in the

2  middle section where those same numbers recorded.  Are any

3  corrections made on that page?

4  A.    No, sir.

5  Q.    So they are, in fact, two separate forms?

6  A.    Yes.

7        MR. MACHICEK:  Thank you, I will pass the

8  witness.

9                    FURTHER RECROSS-EXAMINATION

10  BY MR. YOO:

11  Q.    So on those two -- on those two separate forms, did I

12  also exhibit my proper driver's license and --

13  A.    I recall your driver's license.

14  Q.    Yes, sir.  Thank you, sir.

15        MR. YOO:  I will pass the witness.

16        MR. MACHICEK:  One final question, Your Honor.

17                    FURTHER REDIRECT EXAMINATION

18  BY MR. MACHICEK:

19  Q.    Mr. Olivares, on each of those two forms a background

20  check was initiated.  What was the result of both of those

21  background checks for this Defendant?

22  A.    Denied.

23  Q.    Thank you.

24        MR. MACHICEK:  Pass the witness.

25                    FURTHER RECROSS-EXAMINATION

1    BY MR. YOO:

2    Q.   Do you have personal knowledge whether that denial

3    was -- was based on prohibiting factors or

4    misidentification?

5    A.   I don't have the answer to that.

6               MR. YOO:  Thank you, sir, I appreciate it.

7               MR. MACHICEK:  Your Honor, I have no further

8    questions for this witness.  May he finally be excused?

9               THE COURT:  May the witness be excused?

10              MR. YOO:  Yes, sir.

11              THE COURT:  You may step down.

12              Call your next witness.

13              MR. MACHICEK:  Your Honor, the Government calls

14   Michelle Threadgill.

15              (Pause in proceedings.)

16              MICHELLE THREADGILL, GOVERNMENT'S WITNESS, SWORN,

17                         DIRECT EXAMINATION

18   BY MR. MACHICEK:

19   Q.   Good morning, Ms. Threadgill.  How are you today?

20   A.   I'm very good.  Good morning.

21   Q.   Would you please state your full name for the record?

22   A.   Michelle Threadgill.

23   Q.   And where is it that you are employed?

24   A.   Academy Sports + Outdoors.

25   Q.   And where is Academy Sports + Outdoors located?

1  A.   South Broadway, four miles past the Loop.

2  Q.   South Broadway, four miles past the interior Loop of

3  Tyler, Texas?

4  A.   Correct.  About a half mile north of Loop 49.

5  Q.   Okay.  And what is your position at Academy Sports +

6  Outdoors in Tyler, Texas?

7  A.   I am the store director.

8  Q.   And what kind of store is Academy?

9  A.   Academy is a sports and outdoors store.

10  Q.   Included in the retail items that Academy Sports +

11  Outdoors provides for customers, do you sell firearms?

12  A.   Yes, we do.

13  Q.   Is Academy in Tyler, Texas an FFL?

14  A.   Yes.

15  Q.   Would you please walk the jury through your store's

16  policies and procedures as how to conduct a firearms

17  transaction?

18  A.   Absolutely.  So a customer would approach the gun bar,

19  and express an interest in purchasing a firearm.  At that

20  point the associate behind the gun bar would ask some

21  questions as to what is the intent of the gun purchase.  For

22  example, is it for home protection?  Is it for personal

23  protection?  So we can get the customer into the right gun.

24  Or is it a gift?  Multiple things we are asking and

25  interacting.

1    Customers are allowed to hold the firearms, so they

2    get to feel the firearms so we can make sure that the sale is

3    comfortable.

4    Once the customer has committed to buying a

5    firearm, we begin a process.  The first thing is ensuring

6    that the customer has a valid form of ID.  So we ask for

7    that, whether it's a driver's license, an ID form, or

8    commercial driver's license, or a conceal to carry or license

9    to carry.

10    So once we have that information, we have a

11    checklist that we put that information on, and we are also

12    qualifying the customer to make sure they are the appropriate

13    age to buy that firearm.  18 for a long gun -- or, excuse me,

14    a long gun, or 21 years old for a handgun.  We have to make

15    sure they are the right age to purchase that gun.

16    Throughout the course of these questions we are

17    also asking, you know, is a customer a resident, you know,

18    alien or are they a U.S. citizen?  What would be the status

19    of their citizenship?

20    At that point once we filled out that information,

21    the customer is given a tablet, which is a -- the Form 4473

22    is on the electronic tablet that the customer begins to fill

23    out.  The customer is instructed that we cannot assist them

24    once they started filling out that form.  The customer has to

25    fill out Section A completely on their own.  There are places

1    where if they have a question they can refer to on the tablet

2    that would give them answers, but we are not able to guide

3    them.

4         While the customer is filling out Section A on that

5    form, on our computer we are filling out Section B and

6    Section C of that form.

7         Once a customer is complete, the customer signs the

8    last line of Section A attesting that everything on the form

9    is correct.  At that point if the customer has presented a

10   driver's license and ID or a commercial driver's license, at

11   that point we are going to initiate a background check

12   through NICS to get the status of that.

13        If the customer has presented a license to carry or

14   conceal and carry, that bypasses the need to do a background

15   check, and we would log that information in Section B of the

16   form.

17        The last section of the form is where we are

18   filling out the gun information.  Again, we are qualifying

19   the information with the customer that they are buying X

20   model gun, X caliber, et cetera.  And then once that is

21   completed, the associate fills out -- or signs the form

22   attesting that everything to their knowledge is correct on

23   the form.

24        At that point leadership is asked to come over to

25   the gun bar, and we complete the sale.  That is done by (a)

1   confirming that everything on the ID that the customer

2   presented is correct.  We give the ID back to the customer.

3   And then we are going to confirm the information on the gun

4   is correct what they are buying; caliber, model, et cetera,

5   barrel length, et cetera.

6        And we are going to check the gun to make sure that

7   the firearm itself matches the paperwork we have.  And the

8   customer has the chance to look at the gun.  We are also

9   qualifying, for example, if it is a shotgun, if the gun is

10  put together, so they make sure that everything worked

11  correctly.

12       Once we have done that, we disposition the gun in

13  our electronic system and the gun is escorted to the register

14  with another associate to be checked out, and the customer

15  leaves.

16  Q.   Okay.  I want to unpack some of that information with

17  you and talk in a little bit more detail about some of it.

18  You indicated that Academy Sports + Outdoors as a store,

19  within its business practices, has an additional checklist;

20  is that correct?

21  A.   That is correct.

22  Q.   And those checklists are an internal process that stores

23  devise to assist sales associates in the sale of guns; is

24  that correct?

25  A.   Yes.

1    Q.    Okay.  Does the store maintain that record?

2    A.    Yes, it is maintained with the Form 4473.

3    Q.    Okay.  And as an FFL, is Academy Sports + Outdoors

4    required to also retain Form 4473?

5    A.    Yes, sir.

6    Q.    Are they required to retain that form regardless of

7    whether or not the sale is denied or actually completed?

8    A.    Yes, sir, we retain all forms.

9    Q.    You indicated that the customer uses a tablet computer

10   to fill out the Form 4473, and you said if they had any

11   questions, there were places on the tablet where they could

12   have the questions answered.

13          Could you explain sort of what that looks like for

14   the jury?  Are they like links to the instruction pages of

15   Form 4473?

16   A.    Essentially it is like a question mark box at the bottom

17   where they can tap it and a pop-up screen will come up with

18   the same explanations on the paper form of the Form 4473.  So

19   throughout qualifying questions or any of the questions, you

20   can refer to it if you have any questions or -- about what

21   the question is asking.

22   Q.    And with -- in reference to your retention practices of

23   all of these documents, do you retain the entire Form 4473 at

24   the completion of one of these transactions?

25   A.    Yes.

1  Q.   Do you take a pair of scissors or do you tear it up and

2  only keep portions of it?

3  A.   No, sir.

4  Q.   Do you keep it all?

5  A.   Absolutely.

6  Q.   Okay.  I want to draw your attention to the binders on

7  the table next to you.  I want you to flip to Tab No. 6 for

8  me.  And you will find inside that tab what has been marked

9  for identification purposes as Government's Exhibit 6.  Do

10 you recognize that?

11 A.   Yes, sir, I do.

12 Q.   And is that a business record of Academy Sports +

13 Outdoors in Tyler, Texas?

14 A.   Yes, it is.

15 Q.   And is that business record accompanied by a business

16 records affidavit signed by an appropriate custodian of

17 records at the Tyler Academy Sports + outdoors?

18 A.   Yes, it is.

19          MR. MACHICEK:  Your Honor, at this time we would

20 move to enter Exhibit No. 6 in its entirety.

21          THE COURT:  Any objection?

22          MR. YOO:  No objections.

23          THE COURT:  Very well.  It will be received.

24 BY MR. MACHICEK:

25 Q.   Now, the form that is contained in Government's Exhibit

1    No. 6, are you personally familiar with that transaction?

2    Did you observe that transaction or the individuals

3    involved?

4    A.    No, I did not.

5    Q.    However, as a director of operations for the store, you

6    are aware of these forms, and it is part of your duties to

7    retain these forms; is that correct?

8    A.    Yes.

9    Q.    Okay.

10              MR. MACHICEK:   Your Honor, at this time I will pass

11   the witness.

12                          CROSS-EXAMINATION

13   BY MR. YOO:

14   Q.    Do you have any past interactions with me?

15   A.    Me personally I have not.

16   Q.    Is your expertise your store policy or federal law?

17   A.    I am sorry, I don't understand the question.

18   Q.    Is your expertise your store policy or federal law and

19   federal codes?

20              MR. MACHICEK:   Your Honor, I am going to object at

21   this time.   I know it is a legal term of art, but using the

22   term "expert" is not appropriate under these circumstances.

23   This witness has not been qualified under 702.

24              THE COURT:   Can you rephrase the question, Mr. Yoo?

25              MR. YOO:   Yes, sir.   I would like to note it is

1  getting close to abuse of discretion how many times the

2  Prosecutor will object.  I will happily like to rephrase the

3  question.

4          THE COURT:  Thank you.

5  BY MR. YOO:

6  Q.   Is your extent -- do you have -- do you have extensive

7  knowledge on your store policy or federal law?

8  A.   I feel like I have extensive knowledge on our store

9  policies.  I guess I don't understand which federal laws you

10 would be referring to, so to say I am an expert, I would be

11 guessing.

12          MR. YOO:  I will pass the witness, Your Honor.

13          MR. MACHICEK:  I have no further questions for this

14 witness.  May she be finally excused?

15          THE COURT:  May the witness be excused, Mr. Yoo?

16          MR. YOO:  Yes, sir.

17          THE COURT:  Ma'am, you may step down.

18          Call your next witness.

19          MR. MACHICEK:  Your Honor, the Government calls

20 Michael Mayfield.

21          (Pause in proceedings.)

22      MICHAEL MAYFIELD, GOVERNMENT'S WITNESS, SWORN,

23                  DIRECT EXAMINATION

24 BY MR. MACHICEK:

25 Q.   Good morning, Mr. Mayfield.  How are you today?

1    A.   Doing good.  Thank you.

2    Q.   Would you please state your full name for the record?

3    A.   My name is Michael Curtis Mayfield.

4    Q.   And, Mr. Mayfield, where is it you are employed?

5    A.   I am employed at Academy Sports + Outdoors in Tyler,

6    Texas.

7    Q.   And what is your position at Academy Sports + Outdoors

8    in Tyler, Texas?

9    A.   I'm an outdoor enthusiast.  I work at the gun bar and

10   the field and stream department.

11   Q.   I want to focus our attention here for your testimony on

12   your duties as an associate in the firearms section of the

13   store.  Is that okay?

14   A.   Yes, sir.

15   Q.   Is Academy Sports + Outdoors in Tyler, Tyler a federal

16   firearms licensee?

17   A.   Yes.

18   Q.   For the purposes of the remainder of your testimony,

19   would you mind if I refer to that as an FFL?

20   A.   That is okay.

21   Q.   Okay.  Could you tell the jury what obligations you have

22   as a sales associate at the firearms counter when a customer

23   expresses an interest in purchasing a firearm?

24   A.   My job is to make sure that everything is done

25   appropriately and that as we proceed through the sale,

1   everything is okay, the forms are filled out correctly, and

2   that I do my job properly as stated through what my job is

3   supposed to be at Academy.

4   Q.   I want to refer your attention to the screen there on

5   the table, and up on there is going to pop an Exhibit labeled

6   Government's Exhibit No. 6, the first page of that Exhibit.

7           Moving on to 6003, I am going to ask you if you

8   recognize that document?

9   A.   Yes, sir, I do.

10  Q.   And I am going to zoom in on the identification section

11  at the top of that page.  There is a name listed there.

12  Would you please state that name for the record?

13  A.   Heon Jong Yoo.

14  Q.   And do you recognize that name is the individual you

15  know to go by that name seated in the courtroom?

16  A.   Yes.

17  Q.   Would you please point at that individual and identify

18  him by an article of clothing he is wearing?

19  A.   The gentleman in front of me in the blue tie.

20          MR. MACHICEK:   Your Honor, I ask the record to

21  reflect that the witness has identified the Defendant in open

22  court.

23          THE COURT:   The record will reflect that.

24  BY MR. MACHICEK:

25  Q.   Proceeding down that first page of the form towards the

1  bottom there is a box, Box 14, that asks a question regarding

2  citizenship.  What indication did the Defendant give when

3  filling out this Form 4473 as to his citizenship status?

4  A.    He marked the box stating United States of America.

5  Q.    Now, I want to ask you, did you observe the

6  Defendant -- did you -- were you involved in this specific

7  transaction with the Defendant, capable of knowing that he

8  was the one who provided these answers?

9  A.    Yes.

10  Q.    And the answers that he provided included the answer to

11  the citizenship question; is that correct?

12  A.    Yes.

13  Q.    I want to go to the top of the next page.  There is a

14  section there certifying that the information is true,

15  correct, and complete; is that right?

16  A.    Yes.

17  Q.    Who signed their name on that section?

18  A.    Hank Yoo.

19  Q.    The same person who is seated here, the Defendant in

20  this case?

21  A.    Yes, sir.

22  Q.    And what date was that certification -- what date was

23  this form filled out?

24  A.    11-18-2016.

25  Q.    So on November 18, 2016, the Defendant filled out this

1   form and gave these answers in Tyler at Academy Sports +

2   Outdoors; is that right?

3   A.   Yes, sir.

4   Q.   Did the Defendant provide any identification during the

5   course of the sale, any other identification cards or

6   anything like that?

7   A.   No, sir.

8   Q.   Did he provide a Texas Concealed License to Carry?

9   A.   Yes, sir, he did.

10  Q.   And is that information documented on this form?

11  A.   Yes, sir.

12  Q.   As far as your obligations as a sales associate, how

13  does that alter a gun transaction at Academy Sports +

14  Outdoors?

15  A.   The Texas concealed handgun license exempts --

16         MR. YOO:  I am going to object to relevancy, Your

17  Honor.  This might potentially mislead the jury.  The

18  question of the law is not in the validity of my Texas

19  handgun license or, as Mr. Machicek stated, that it is not a

20  intent to deceive.

21         THE COURT:  Mr. Machicek?

22         MR. MACHICEK:  Your Honor, we have heard testimony

23  from numerous individuals about Form 4473, the information

24  that Mr. Yoo provided on those forms, subsequent background

25  checks, and denials.  I intend to elicit testimony from this

1  witness that Mr. Yoo, subsequent to those denials provided

2  information that allowed him to bypass that NICS background

3  check, which would have resulted in a denial.

4          THE COURT:  The objection is overruled.

5          You may proceed.

6  BY MR. MACHICEK:

7  Q.  What is the effect of a customer providing a Concealed

8  Carry permit or a License to Carry permit from the State of

9  Texas?

10  A.  It would exempt the individual from a background

11  check.

12  Q.  And did Mr. Yoo present a Texas License to Carry a

13  Handgun permit in this transaction?

14  A.  Yes, he did.

15  Q.  And did that exempt him from a background check?

16  A.  Yes, it did.

17  Q.  And did that result in him completing the purchase for

18  the firearm?

19  A.  Yes, it did.

20  Q.  At the time that this information is provided, who was

21  giving you all of the information upon which you were relying

22  as a sales associate?

23  A.  The Defendant, Hank Yoo.

24  Q.  If an individual like Mr. Yoo or anyone else comes in

25  the store and provides you with fake information or with

1    false information or inaccurate information, is there any way

2    for you to know that at the time of the sale?

3    A.   Only if the customer says that it is false or fake

4    information.

5    Q.   So if they make representations to you about the

6    validity of the information that they provided you, you have

7    no other way to check that; is that correct?

8    A.   Yes, sir, that is correct.

9    Q.   Is that why it is important for them to give you

10   truthful information on these forms?

11   A.   Yes, sir.

12          MR. MACHICEK:  I'll pass the witness, Your Honor.

13                      CROSS-EXAMINATION

14   BY MR. YOO:

15   Q.   To the best of your knowledge, did I display a proper

16   Government identification?

17   A.   Yes, you did.

18   Q.   Was -- was -- to the best of your knowledge, was my

19   Concealed Handgun License expired or revoked?

20   A.   It would not have been, to my knowledge.

21   Q.   Okay.  To the best of your knowledge, did I give false,

22   fictitious, or mistaken name, date of birth, and address?

23          MR. MACHICEK:  Your Honor, at this point in time

24   I'm going to object to the question.  The Defendant is not

25   charged by Indictment with making such false statements.  He

1    is only charged with lying as to his U.S. citizenship.

2                THE COURT:  I think the question is asked and

3    answered, Mr. Yoo.

4                MR. YOO:  The Indictment itself is defective, Your

5    Honor, because it does not -- it is not accurate pursuant to

6    the federal code, and he just objected to it.  He just --

7                MR. MACHICEK:  Your Honor I am going to object to

8    the Defendant making legal arguments to the bench in the

9    presence of the jury.

10               MR. YOO:  Your Honor, I would like to object to

11   Prosecution making legal arguments to the -- to the bench in

12   presence of the jury.

13               THE COURT:  All right.  Let's confine our -- let's

14   confine our concern to the question before the witness.

15               MR. YOO:  Yes, sir.

16               THE COURT:  And the question before the witness is,

17   to the best of his knowledge, whether you, Mr. Yoo, gave

18   false, fictitious name, date of birth, and address.

19               Mr. Machicek, do you want to renew your objection

20   to that question?  And, if so, what is the basis?

21               MR. MACHICEK:  The basis of my objection is

22   Rule 401 of the Federal Rules of Evidence.  It is irrelevant.

23   The Defendant is not charged with making such false

24   statements.  It is not a fact question that the jury will be

25   asked to answer.

1          THE COURT:  And, Mr. Yoo?

2          MR. YOO:  Judge, Mr. Machicek clearly stated on

3   the -- on the during -- no, no, sorry, not stated, clearly

4   inquired during direct -- direct examination leading

5   the -- leading and coaching the witness to mislead -- mislead

6   the jury that I displayed CHL with the intent to deceive and

7   override the -- override the background checks and also

8   the -- all right.  Since the Prosecution made argument about

9   the Indictment, I am going to make an argument about the

10  Indictment.

11         THE COURT:  I want to hear legal argument about

12  things at the bench.  For the purposes of this witness, let's

13  go ahead and get his testimony completed, and I will let you

14  make whatever argument either side wants to make on this

15  point.

16         MR. YOO:  Yes, sir.

17         THE COURT:  I am going to give the witness an

18  opportunity to answer that question, and then let's move

19  on.

20         MR. YOO:  Yes, sir.

21         THE COURT:  Do you remember the question?

22         THE WITNESS:  If you will please restate the

23  question for me.

24         THE COURT:  I will.

25  BY MR. YOO:

1  Q.   To the best of your knowledge, did I give a false,

2  fictitious name, date of birth, or address?

3  A.   At the time that the CHL was presented to me, all

4  information was told to me to be valid and true.

5           MR. YOO:  I will pass on the witness.

6           MR. MACHICEK:  One follow-up question, Your Honor.

7                   REDIRECT EXAMINATION

8  BY MR. MACHICEK:

9  Q.   Who gave you all of that information?

10 A.   The Defendant Hank Yoo.

11          MR. MACHICEK:  Thank you.

12                  RECROSS-EXAMINATION

13 BY MR. YOO:

14 Q.   At the time, did you have any reasonable suspicions to

15 question my credibility when I gave you those information?

16          MR. MACHICEK:  I am going to object, Your Honor.

17 That invades the province of the jury.

18          THE COURT:  Sustained.

19          Next question.

20          MR. YOO:  I reserve my right to appeal.

21          THE COURT:  Of course.

22          MR. YOO:  That was my conclusive question.

23          THE COURT:  Okay.  Very well.

24          May this witness be excused?

25          MR. MACHICEK:  Yes, Your Honor.

1          THE COURT:  Mr. Yoo, may the witness be excused?

2          MR. YOO:  Yes.

3          THE COURT:  Do the parties need to raise anything

4    at the bench, or can we call the next witness?

5          MR. MACHICEK:  The Government is prepared to call

6    its next witness, Your Honor.

7          THE COURT:  Mr. Yoo, do you have anything that you

8    want to address right now?

9          MR. YOO:  No.

10         THE COURT:  Let's call the next witness.

11         MR. MACHICEK:  Government calls Johnny Foster.

12         (Pause in proceedings.)

13         JOHNNIE FOSTER, GOVERNMENT'S WITNESS, SWORN,

14                     DIRECT EXAMINATION

15   BY MR. MACHICEK:

16   Q.   Good morning, Mr. Foster.  How are you today?

17   A.   I am good.

18   Q.   I am over here.  A lot of folks in the courtroom and a

19   lot of microphones.

20         Could you please state your full name for the

21   record?

22   A.   Johnnie Raymond Foster.

23   Q.   Mr. Foster, where is it your employed?

24   A.   Cash America.

25   Q.   Where is Cash America located?

1   A.    Cash America on the Loop here in Tyler.

2   Q.    What type of business is Cash America?

3   A.    It is a pawn shop.

4   Q.    As a pawn shop, does cash America sell firearms?

5   A.    Yes.

6   Q.    Is Cash America a federal firearms licensee?

7   A.    Yes, sir.

8   Q.    As far as the business practices of Cash America and

9   their obligations under federal law, would you please walk

10  the jury through how your store addresses a customer who

11  wishes to purchase a firearm?

12  A.    When they want to buy a firearm, we secure an ID from

13  them, and then have them fill out a 4473.  Once they fill it

14  out, sign, and date it, then we call it in or do an

15  electronic check and wait for the response.

16  Q.    Okay.  And how does the customer go about filling out

17  that Form 4473?

18  A.    We have an iPad that has the form pre-built in.

19  Q.    And at the time a customer fills out the form on the

20  iPad, do you stand by and tell them which answers to give in

21  each of the blanks?

22  A.    No, sir.

23  Q.    Do you instruct them to fill it out on their own?

24  A.    Yes, sir.

25  Q.    And do they do so?

1  A.  Yes.

2  Q.  Once a firearms transaction is completed, whether it is

3  denied or the sale is actually approved and goes through,

4  what do you do with the Form 4473?

5  A.  We file it.

6  Q.  And when you say "file it," do you mean do you retain it

7  in the records of the store?

8  A.  We retain it indefinitely.

9  Q.  And are you required to do so?

10  A.  Yes.

11  Q.  I want to draw your attention to the binder that is on

12  the table in front of you.  I ask you to flip to Tab 7.  It

13  is marked for identification purposes as Government's

14  Exhibit 7.  I ask you, do you recognize those documents?

15  A.  Yes, sir.

16  Q.  Are those business records documents relating to

17  firearms transaction records Form 4473 from Cash America

18  Pawn?

19  A.  Yes, sir.

20  Q.  And are they accompanied by an affidavit certifying that

21  they are fair and accurate business records of Cash

22  America?

23  A.  Yes, sir.

24          MR. MACHICEK:  Your Honor, at this time we would

25  move to admit Exhibit 7 in its entirety for all purposes.

1          THE COURT:  Any objection?

2          MR. YOO:  No objections.

3          THE COURT:  Very well.  It will be received.

4  BY MR. MACHICEK:

5  Q.   I want to draw your attention to the first of those

6  forms, page -- it is going to be 7003, the top section of

7  that form giving identification information.

8          The name that is provided there under Section A1,

9  do you recognize that name.

10  A.   Yes.

11  Q.   The person that you know has that name or uses that

12  name, is that person seated in the courtroom?

13  A.   Yes.

14  Q.   Would you please point at that person and identify him

15  by an article of clothing he is wearing?

16  A.   Standing.

17          MR. YOO:  Your Honor, objection, because, to the

18  best of my knowledge, this is not the individual who made the

19  transaction.

20          THE COURT:  Mr. Yoo, you will have an opportunity

21  to cross-examine the witness.

22          The record will reflect that the witness identified

23  the Defendant.

24  BY MR. MACHICEK:

25  Q.   How do you know the Defendant to be Heon Jong Yoo, a/k/a

1    Hank Yoo?

2    A.    A customer.

3    Q.    And you have had interactions with Mr. Yoo, the

4    Defendant, as a customer before?

5    A.    Very little, but yes.

6    Q.    Enough to recognize him?

7    A.    Correct, yes.

8    Q.    Is it enough to recognize his name on this form?

9    A.    Yes.

10   Q.    I would like to ask you some questions about the form

11   itself as it relates to the business practices at Cash

12   America Pawn.  At Cash America do sales associates check IDs

13   of individuals filling out Form 4473?

14   A.    Yes.

15   Q.    Why do they do that?

16   A.    To ensure that that is the person getting the gun.

17   Q.    Okay.  And the IDs provided, are those IDs matched

18   against the identification information contained in Section A

19   to make that verification?

20   A.    Yes.

21   Q.    And is that a common practice of the store and the store

22   policy that all employees are expected to follow?

23   A.    Yes.

24   Q.    All right.  As far as filling out the remainder of

25   Form 4473, is it store policy that the customer fills out all

1   that form?

2   A.   No.  The customer fills out Section A only.

3   Q.   Okay.  And the Section B and C, those pertain to

4   information that the FFL is required to provide on the

5   form?

6   A.   Correct, yes.

7   Q.   As far as Section A goes, are your employees trained by

8   way of the store policy to assist in any way, shape, or form

9   with providing the information in that section?

10  A.   No, they are prohibited from doing so.

11  Q.   Let's take a look at first Form 4473 as we scroll down

12  to the bottom of that page.  And we are going to be looking

13  at a box there.  It is going to be Box 12A, country of

14  citizenship.  Is there an indication that is made as to the

15  country of citizenship here?

16  A.   United States.

17  Q.   Okay.  And let's flip to the second page.  The top of

18  the page contains a certification and a signature.  The

19  person who signs in that blank, what are they certifying?

20  A.   That everything that they said in Section A is true and

21  correct.

22  Q.   Okay.  And by signing that, are they also acknowledging

23  that they have been admonished as to the criminal

24  consequences of providing false information on the form?

25  A.   Yes.

1  Q.   This form in particular next to the signature line has a

2  date on it.  What is that date?

3  A.   November 6th of 2017.

4  Q.   We are going to flip ahead in Government's Exhibit No. 7

5  to the next form that is contained in there.  And that is

6  going to be 70 -- 7009, I believe.  There we go.

7          Is there an indication as to the individual who

8  filled out this form?

9  A.   Yes.

10  Q.   And who is that individual?

11  A.   The same individual.

12  Q.   The Defendant in this case?

13  A.   Yes.

14  Q.   Okay.  As we scroll down that first page down to the

15  bottom, Section 12A.  As far as the citizenship question,

16  what indications did the Defendant make on this form?

17  A.   That they are a United States citizen.

18  Q.   If we scroll to the next page at the certification, did

19  the Defendant sign this form certifying that the answers

20  provided are true, correct, and complete?

21  A.   Yes.

22  Q.   On what day was this form completed?

23  A.   It appears November 7th of 2017.

24          MR. MACHICEK:  Your Honor, I will pass the

25  witness.

```
 1                        CROSS-EXAMINATION
 2   BY MR. YOO:
 3   Q.   Good morning, sir.
 4   A.   Good morning.
 5   Q.   So -- so I am guessing -- guessing your claim that
 6   your -- your extensive knowledge on this matter is on your
 7   store policy rather than federal law; am I correct?
 8   A.   Correct.
 9   Q.   Thank you, sir.
10           MR. YOO:  I will pass the witness.
11           MR. MACHICEK:  Brief redirect, Your Honor.
12                     REDIRECT EXAMINATION
13   BY MR. MACHICEK:
14   Q.   Mr. Foster, I want to redirect your attention to
15   Government's Exhibit No. 7, Page 7003.  That would be
16   Section A at the top of the page.  We are going to zoom in.
17   One of the items that is required to be listed there is the
18   place of birth, U.S. city and state?
19           MR. YOO:  Objection, Your Honor.  The accused is
20   not charged with false information to a place of birth, nor
21   is it regarding pursuant to 922(b)(5).
22           THE COURT:  Mr. Machicek.
23           MR. MACHICEK:  Your Honor, the Defendant is charged
24   with providing false information relative to that effect.  It
25   is also admissible under Rule 404(b) under the Federal Rules
```

1  of Evidence under other crimes or bad acts.

2          THE COURT:  I will overrule the objection.  You may

3  proceed.

4  BY MR. MACHICEK:

5  Q.  Where did the Defendant indicate his place of birth to

6  be on that form?

7  A.  Fort Worth, Texas.

8  Q.  Does it say anything in the foreign country section?

9  A.  No, sir.

10  Q.  Did the Defendant indicate he was born in South Korea?

11  A.  No, sir.

12          MR. MACHICEK:  Pass the witness.

13          MR. YOO:  I reserve my right to appeal.

14          THE COURT:  Any questions for this witness?

15                          RECROSS-EXAMINATION

16  BY MR. YOO:

17  Q.  To the best of your knowledge, did I display any

18  fictitious identification or did I give you any false

19  name -- name, address, or date of birth?

20          MR. MACHICEK:  Your Honor, I'm going to object to

21  the question.  It improperly bolsters the credibility of the

22  person asking the question, the Defendant in this case.

23          THE COURT:  I'm going to overrule the objection and

24  let the witness answer.

25  A.  Can you repeat the question?

1  BY MR. YOO:

2  Q.   To the best of your knowledge, did I give false,

3  fictitious, mistaken name or date of birth?

4  A.   Not to my knowledge.

5  Q.   I thank you.

6           MR. YOO:  I pass the witness.

7           MR. MACHICEK:  Government has no further questions.

8           THE COURT:  May the witness be excused?

9           MR. YOO:  Yes.

10          THE COURT:  All right.  You may step down.

11          Ladies and Gentlemen of the Jury, we are a little

12  late taking our morning break, and for that, I apologize.  We

13  are going to recess for 15 or 20 minutes.

14          We do have lunch provided for you, but it won't be

15  here until a little later, so we will hold off eating our

16  lunch until sometime after 12:00.  When we come back, we will

17  probably go another hour and break for lunch.

18          So we will be in recess for 15 or 20 minutes.

19          COURT SECURITY OFFICER:  All rise for the jury.

20          (Recess taken.)

21          (Jury out.)

22          THE COURT:  All right.  Let's have the jury brought

23  in.

24          MR. COAN:  Your Honor, if I could have two

25  housekeeping things.

1        The next witness the United States will call is an

2    individual by the name of Aaron Lee.  And my apologies, the

3    order switched, unbeknownst to me, on the witnesses.

4        So Mr. Lee will offer testimony, and then

5    Mr. Barker from NICS will be testifying.  And if the Court

6    will recall from the Pretrial Conference our discussion

7    regarding the 404(b) notice, Mr. Barker's testimony is

8    expected to include testimony about a January 19th of 2016

9    denial of a firearms purchase regarding Mr. Yoo and then a

10   subsequent appeal of that denial by Mr. Yoo.

11       So the testimony and the documents related to that

12   denial have been included in the Government's Exhibit, I

13   believe it is 32.  Those documents are also identified on the

14   Defendant's Exhibit list, and so I am just -- I am providing

15   additional notice for the Court and the Defendant about that

16   component of Mr. Barker's testimony.

17       THE COURT:  Very well.

18       MR. COAN:  The additional item is that after

19   Mr. Barker, Dr. Larsen from Rutgers University Behavioral

20   Health Care will be testifying.  And she has prepared a

21   demonstrative exhibit that has been exchanged with the

22   Defendant.  We have a copy for the Court.  It will marked for

23   identification purposes as Government's Exhibit 36.  It will

24   not be introduced as substantive evidence.

25       THE COURT:  All right.  Is there any objection to

1    the demonstrative?

2          MR. YOO:  No objection to that exhibits, but may I

3    submit my own exhibits?

4          THE COURT:  Yeah, I mean, you don't have to submit

5    it at this time, but if you have got a demonstrative or

6    something of that nature, it is helpful for us to have that

7    conversation now.

8          MR. YOO:  Yes, sir.

9          THE COURT:  That's why Mr. Coan is --

10          MR. YOO:  All right.  So from 1 through --

11    Exhibit 1 through 8 would be -- would be the codes.  Exhibit

12    1 through 7 are the --

13          THE COURT:  Well, Mr. Yoo, when we get into your

14    case, when we get into your presentation of the case, you can

15    certainly move for admission into evidence whatever you want

16    to as long as it is -- you know, meets the requirements of

17    the Federal Rules of Evidence, and we will deal with that at

18    that time.  So right now is not the time to move into

19    evidence your exhibits.

20          MR. YOO:  Yes, sir, but I do have an exhibit

21    contesting Dr. Larsen.

22          THE COURT:  That's fine.  We can address that

23    during Dr. Larsen's testimony.

24          MR. YOO:  Roger that, sir.

25          THE COURT:  I'm sorry.

1        MR. YOO:  Roger that, sir.

2        THE COURT:  Okay.  Very well.

3        Let's have the jury brought in.

4        COURT SECURITY OFFICER:  All rise for the jury.

5        (Jury in.)

6        THE COURT:  Please be seated.

7        Government may call its next witness.

8        MR. MACHICEK:  Your Honor, the Government calls

9   Aaron Lee.

10        AARON LEE, GOVERNMENT'S WITNESS, SWORN,

11                    DIRECT EXAMINATION

12   BY MR. MACHICEK:

13   Q.   Good morning, Mr. Lee.  How are you today?

14   A.   Doing very well.  Thank you.

15   Q.   Would you please state your full name for the record?

16   A.   Aaron David Lee.

17   Q.   And, Mr. Lee, where is it that you are employed?

18   A.   Cash America.

19   Q.   Where is Cash America located?

20   A.   The one on the Loop next to Cavender's Boot City.

21   Q.   And on the Loop next to Cavender's in what city?

22   A.   Oh, in Tyler, Texas.  I apologize.

23   Q.   That's okay.  What kind of a store is Cash America?

24   A.   It is a pawn shop dealing in preowned merchandise, you

25   know, guns, jewelry, and everything.

1  Q.   You mentioned guns, does the pawn shop, in fact, offer

2  for sale, firearms?

3  A.   That's correct.

4  Q.   And is Cash America a federal firearms licensee?

5  A.   That's correct.

6  Q.   Would you mind if I refer to a federal firearms licensee

7  as an FFL?

8  A.   That would be fine, yes.

9  Q.   As an FFL, are there certain requirements that sales

10  associates or pawn brokers within the business at Cash

11  America are required -- are asked to follow during the sale

12  of firearms?

13  A.   That is correct.

14  Q.   Is one of those requirements the completion of an ATF

15  Form 4473?

16  A.   Yes.

17  Q.   Okay.  Can you tell me a little bit about how the

18  completion of that form and the obligation to complete and

19  retain that form affects your job as a sales associate when a

20  customer comes in to purchase a firearm?

21  A.   Yes.  We, of course, secure the ID and make sure the ID

22  matches the person that is, in fact, trying to purchase the

23  firearm and then actually give them the form to complete on

24  their own.  And then we either -- if it is a CHL, we don't do

25  the NICS check.  We make sure the information is correct on

1  the form.  Or if it is not, we submit that to the NICS

2  E-Check system.

3  Q.   I want to refer your attention to a specific exhibit

4  that has already been admitted into evidence.  It is

5  Government's Exhibit No. 7, Page 7003.  I ask you if you

6  recognize that document?

7  A.   Yes.

8  Q.   Is that a Form 4473 that was filled out at Cash America

9  Pawn that you observed?

10  A.   That is.

11  Q.   And who did you observe, personally, fill out that

12  firm?

13  A.   Mr. Yoo.

14  Q.   And you made an indication with your hand.  Is Mr. Yoo

15  seated in the courtroom here today?

16  A.   Yes, right there.

17  Q.   Would you point at him and identify him by an article of

18  clothing he is wearing?

19  A.   Mr. Yoo, the guy in the jacket right there.

20           MR. MACHICEK:  Your Honor, I would ask the record

21  to reflect that the witness has identified the Defendant in

22  open court.

23           THE COURT:  The record will so reflect.

24  BY MR. MACHICEK:

25  Q.   At the time that Mr. Yoo filled out this particular

1   Form 4473, was he asked to fill it out himself?

2   A.   That's correct.

3   Q.   Did you provide him with any of the information that he

4   gave in Section A of 4473?

5   A.   No, no, I did not.

6   Q.   Scrolling down the page to Section 12A, the citizenship

7   question, who gave the answer to 12A?

8   A.   It would have to be the person filling out the form.

9   Q.   And who was that person?

10   A.   Mr. Yoo.

11   Q.   And what answer did he indicate in Section 12A?

12   A.   United States of America as his citizenship.

13   Q.   Okay.  Going to the second page of that form.  At the

14   top of the second page there is a signature and a

15   certification.  What is that certification all about?

16   A.   I'm sorry, could you say that again?

17   Q.   What does a person signing that section certify?

18   A.   Oh, that all of the answers on the first page are

19   correct, and they are not lying about anything, basically.

20   Q.   Okay.  And next to the signature there, who signed?

21   A.   Actually I can't tell.  I mean -- well, it would have to

22   have been the person filling out the 4473.

23   Q.   That would have been who?

24   A.   Mr. Yoo.

25   Q.   And what day was that signed?

1   A.   It looks like November 6th of 2017.

2   Q.   Okay.  I am going to show you another Exhibit.  It is

3   Government's Exhibit 7, Page 7009?

4         Is this another 4473 that you are familiar with.

5   A.   Yes.

6   Q.   And the first part of Section A with the identifying

7   information, who filled out that form?

8   A.   Looks like Mr. Yoo filled that out.

9   Q.   Okay.  And Mr. Yoo being the Defendant in this case?

10  A.   Correct.

11  Q.   If we scroll down to Section 12A.  As far as the country

12  of citizenship, what country of citizenship indication did

13  Mr. Yoo give at the time he filled out this form?

14  A.   United States of America.

15  Q.   Okay.  If we scroll down to Page 2 at the top of the

16  page with the signed certification, did Mr. Yoo sign this

17  form certifying that the answers provided are true, correct,

18  and complete?

19  A.   That's correct.

20  Q.   And did he do so on November 7th, 2017?

21  A.   Yes.

22  Q.   Thank you, Mr. Lee.

23         MR. MACHICEK:  I will pass the witness, Your Honor.

24                    CROSS-EXAMINATION

25  BY MR. YOO:

1  Q.   Good morning, Mr. Lee.

2  A.   Good morning.

3  Q.   I would like to ask you just a couple of, like, very

4  short, straightforward questions.  So -- so, to the best of

5  your knowledge, did I give false, fictitious, or mistaken

6  name, age or -- name, date of birth, or address?

7  A.   I can't say on that.

8  Q.   Have you ever sold a gun to a permanent resident?

9  A.   No, I have not.

10 Q.   Oh.  What is -- so do you have any personal knowledge,

11 like what basic informations are required to run a NICS

12 background check?

13 A.   I'm sorry, could you clarify that for me?

14 Q.   Do you have a -- do you have a personal knowledge -- or

15 sorry, personal knowledge of what informations are required

16 to run a -- sorry, required to identify an individual to run

17 a NICS background check?

18 A.   I know what is required on the form itself.  And then

19 after it is submitted, I don't make any determination on

20 that.

21 Q.   Thank you, sir.

22          MR. YOO:  I will pass the witness.

23          MR. MACHICEK:  Brief redirect, Your Honor.

24                    REDIRECT EXAMINATION

25 BY MR. MACHICEK:

```
1   Q.   Mr. Lee, I am going to refer your attention to

2   Government's Exhibit 7, Page 7003, Section A, the personal

3   identifying information provided by Mr. Yoo.  He asked you a

4   question about whether or not he gave truthful information.

5   The information is provided by the customer; is that

6   correct?

7   A.   That is correct.

8   Q.   You don't have any way of verifying the truthfulness of

9   that information other than by the information provided to

10  you by the customer; is that right?

11  A.   That's correct, by the identification that is

12  provided.

13  Q.   I want to direct your attention to Section 3 of --

14  Subsection 3 of Section A?

15            MR. YOO:  Objection, Your Honor.  The accused is

16  not charged with providing false place of birth.  That is not

17  in -- that is neither in the Indictment or federal code.

18            MR. MACHICEK:  And --

19            THE COURT:  Hold on just a moment.

20            I think you opened the door on this, Mr. Yoo.

21  Didn't you ask the witness on cross-examination whether you

22  gave false or fictitious name, age, date of birth, or

23  address.

24            MR. YOO:  Well, name, date of birth, and the

25  address.  But place of birth is neither -- neither on the
```

1    Indictment nor required by federal codes.

2         THE COURT:  I am going to overrule the objection.

3         You may answer.

4    Q.   Under Section A, Subsection 3 asks the customer to

5    provide their place of birth.  What place of birth did

6    Mr. Yoo provide on the Form 4473 that you observed him

7    complete?

8    A.   Fort Worth, Texas.

9    Q.   Thank you.

10        MR. MACHICEK:  I will pass the witness.

11                       RECROSS-EXAMINATION

12   BY MR. YOO:

13   Q.   To your experience, did you have any difficulty running

14   a background check for a false place of birth, or is it a --

15   just a -- is it an information just on the 4473 form?

16   A.   I take the information from the 4473 and process it

17   through the NICS E-Check system.

18   Q.   So -- so you do not personally have extensive knowledge

19   on what happens, like what -- what goes on once you submit

20   those information, correct?

21   A.   No.

22   Q.   Thank you, sir, appreciate it.

23        MR. MACHICEK:  Briefly, Your Honor.

24                  FURTHER REDIRECT EXAMINATION

25   BY MR. MACHICEK:

1  Q.   I'm going to direct your attention to Government's

2  Exhibit 7, Page 7010.  At the top of that page there is a

3  statement followed by a signature.  Halfway through that

4  certification statement there is an acknowledgment made by

5  the signatory after the number and letter, 18C.  Do you see

6  where I am referring to?

7  A.   Yes.

8  Q.   Would you please read aloud that statement contained in

9  the certification?

10 A.   I also understand that making any false oral or written

11 statement or exhibiting any false misrepresented

12 identification with respect to this transaction is a crime

13 punishable as a felony under federal law.

14 Q.   Thank you.

15        MR. MACHICEK:  I will pass the witness.

16        MR. YOO:  Objection actually.  Would you identify

17 the federal code in relation to that?

18        MR. MACHICEK:  I am going to object as to relevance

19 as to the propriety and form of that question.

20        THE COURT:  Mr. Yoo, if you have additional

21 questions for this witness on cross-examination, please

22 proceed.

23        MR. YOO:  I will pass on the witness.

24        MR. MACHICEK:  Government has no further questions

25 for this witness.

1        We'd ask that he be finally excused.

2        THE COURT:  May he be excused, Mr. Yoo?

3        MR. YOO:  Yes, sir.

4        THE COURT:  All right.  You may stand down, sir.

5        The Government may call its next witness.

6        MR. COAN:  Thank you, Your Honor.  The United

7   States calls Mr. Brian Barker.

8        BRIAN BARKER, GOVERNMENT'S WITNESS, SWORN,

9                    DIRECT EXAMINATION

10  BY MR. COAN:

11  Q.   Good morning.

12  A.   Good morning.

13  Q.   Would you state your name for the record, please?

14  A.   Yes.  My name is Brian Barker.

15  Q.   And how are you currently employed?

16  A.   I am currently employed with the FBI, since 1997.

17  Q.   And what is your current position?

18  A.   I currently have the position of legal administrative

19  specialist.

20  Q.   If you would, tell the members of the jury, just

21  briefly, what a legal administrative specialist does?

22  A.   Part of my core responsibilities are we provide support

23  to all NICS users, whether that is internally examiners or

24  external point of contact states.

25        And what we do is more complex issues, we provide

1   guidance to assist them in processing their transactions.  We

2   also provide some support to the office of general counsel

3   when handling their matter.  We serve as kind of a paralegal

4   to that office, and I do some research and analysis for them.

5         Also, I have been designated as the custodian of

6   records for the NICS section.  This delegation allows me to

7   review the accuracy and timeliness of the NICS section's

8   records.

9         And when I am not performing a lot of my core

10  responsibilities, I serve as an instructor for a lot of our

11  new examiners.  I train the new examiners on how to apply

12  state and federal prohibitions, how to perform online

13  research on such cites as Westlaw, just to get them

14  comfortable with performing a basic search.

15        Those are the core responsibilities I have at the

16  position.

17        Also, in addition to those, we maintain internal

18  state reference materials.  Those are materials that include

19  state-specific information.  Like I have a set of states, for

20  example, those states include Delaware, Maryland, and New

21  Jersey.

22        It is my responsibility to validate those pages

23  through the state attorney general's offices and ATF division

24  counsel to make sure that our users have the most current and

25  accurate information that is available.

1   Q.   Thank you.

2          Where did you go to school?

3   A.   I am a graduate of West Virginia Wesleyan College.   I

4   have a Bachelor of Arts in Political Science.

5   Q.   Thank you.

6          In your work with the FBI, have you gained

7   familiarity with the National Instant Criminal Background

8   Check System?

9   A.   Yes, I am currently assigned to the NICS section.

10   Q.   Would it okay for the remainder of your testimony if we

11   refer to that mouthful of words as NICS?

12   A.   Yes.

13   Q.   Okay.   Thank you.

14          Now, I will represent to you the jury has heard

15   some information about the NICS background check; but, if you

16   would, explain what the general purpose of the NICS

17   background check is?

18   A.   Yes.   The general purpose of the NICS is that it is a

19   national computerized criminal background check system that

20   FFLs utilize to determine if a prospective buyer is eligible

21   to buy a firearm.

22   Q.   And are the guidelines regarding the establishment of

23   NICS set forth in federal regulations?

24   A.   Yes, sir.

25   Q.   How about the rules regarding the maintenance of NICS,

1  are those set forth in federal regulations?

2  A.   Yes.

3  Q.   How about the use of NICS, is that defined in federal

4  regulations?

5  A.   Yes.

6  Q.   When approximately did NICS become operational?

7  A.   We became operational on November 30th, of 1998.

8  Q.   The Criminal Justice Information Services Division which

9  oversees NICS is located where?

10  A.   That is located in Clarksburg, West Virginia.

11  Q.   Okay.  So who submits the data that is used for the

12  background checks?

13  A.   The NICS Indices or the NICS data is submitted by state,

14  local, tribal, and federal agencies.

15  Q.   And who is responsible for the accuracy of the

16  information that is submitted to the NICS Indices?

17  A.   I have a contributing agency that is responsible for the

18  accuracy of that information.

19  Q.   All right.  How does a -- well let me ask you this:  I

20  am going to refer to a term, a federal firearms licensee, and

21  I just ask if we can refer to that as FFL?

22  A.   Yes, sir.

23  Q.   Okay.  How does an FFL become eligible to participate in

24  the NICS Background Check System?

25  A.   It is a three-tiered process for an FFL.  First, they

1    have to have a valid issued license from ATF.  Second, they

2    have to be enrolled or registered with the NICS section to

3    perform background checks.  And, third, they must have a

4    unique code word that has been provided by the NICS section

5    or they can choose themselves.

6            That license validation is electronically conducted

7    by the ATF Federal Firearms and Explosives Licensing Center

8    which is located in Martinsburg, West Virginia.  If they

9    discover later on that that FFL is no longer valid, they

10   notify the NICS section, the records are updated, and at that

11   point in time the FFL is unable to initiate any further

12   background checks.

13   Q.   Let's talk about the mechanics of the background check.

14   So when is a NICS background check performed?

15   A.   A NICS background check will be performed prior to the

16   transfer of any firearm, with one exception.  If there is a

17   state firearms permit that has been recognized by ATF as an

18   alternate permit, then a NICS background check is not

19   necessary.

20           Upon implementation of NICS, there were certain

21   states that had permits, such as carrying concealed weapons

22   permits, permits to purchase, that ATF qualified, the act in

23   lieu of permits.  Those permits are designated for a certain

24   time frame by state law.

25           And as long as those permits are active, if the

1    individual presents that to the FFL, a background check is no
2    longer required.

3           For example, the carry permits in Texas, ATF has
4    currently recognized those as an alternate permit to a NICS
5    check; therefore, a background check would not be required.
6    Q.    So who actually conducts the NICS background check?
7    A.    The actual NICS check is either conducted by the NICS
8    section or an intermediary between the FFL and the FBI, which
9    is known as a state point of contact.

10          In Texas, FFLs that transfer to a non-licensee for
11   a long gun or a handgun background check must contact the
12   NICS section directly.  However, if the individual does have
13   an alternate permit, that background check is not
14   necessary.
15   Q.    How does an FFL initiate a request for a background
16   check?
17   A.    If the FFL initiates a background check by telephone or
18   via the Internet through the NICS E-Check, at that point in
19   time ATF does not authorize the FFL to initiate check unless
20   the individual has completed Section A of the 4473.  Not only
21   do they need to complete that section of the 4473, they need
22   to sign and date that as well.  That certifies they are
23   attempting the purchase on that particular date.

24          Once they have obtained all of that information,
25   they contact the NICS section and provide them with all of

1    the identifying information.  This includes name, date of

2    birth, sex, race, country of citizenship.

3         If the individual lists a non-U.S. citizenship,

4    they must provide their U.S.-issued alien or admissions

5    number and answer whether or not they are a non-immigrant.

6         The final thing the NICS section has to have before

7    a background check is conducted, is, first, we have to know,

8    is the transaction pertaining to a long gun, handgun, or

9    other type of fire -- or other type of transaction.  And,

10   finally, is this for a sale or a pawn redemption?

11   Q.   Does it matter, for the purposes of conducting the NICS

12   background check, whether it is a sale of a firearm or a

13   pawn-type transaction?

14   A.   No, the application law does not change.

15   Q.   Okay.  So we have initiated the background check

16   request.  We have -- the FFL has transferred the identifying

17   information to NICS.  How does NICS do what it does?  How

18   does it do the search?  What is it searching?

19   A.   Once the background check is initiated, the NICS

20   initially searches three databases.  That is the Interstate

21   Identification Index, which is more commonly referred as to

22   "Triple I."  That contains over 74 million criminal history

23   records.

24        We also check the National Crime Information

25   Center, which is NCIC.  That has about 6.4 million records of

1  protection orders, warrants, deportable felons, and other

2  matters.

3         And, finally, we search the NICS Indices, which

4  contains various state and federal prohibitions.  And that

5  currently has about 18 million records.

6         If the individual lists a non-U.S. citizenship,

7  there is an automatic electronic submission to check the U.S.

8  Customs records.  And those ICE records are searched just to

9  try to determine if the individual is an illegal or unlawful

10  alien or if they are a non-immigrant who is prohibited from

11  possessing or receiving a firearm pursuant to Title 18, USC,

12  Section 922(g)(5).

13  Q.   Okay.  So there are three databases that NICS searches

14  as part of its background check; is that right?

15  A.   Correct.

16  Q.   But if the prospective buyer is a non-U.S. citizen,

17  there is an extra step that is required; is that right?

18  A.   Correct.  There would be a search of ICE database.

19  Q.   What is it that the NICS background check is looking

20  for?

21  A.   The NICS background check is looking for any state or

22  federal prohibitions that are defined by state law or federal

23  law.

24  Q.   Okay.  Is one of those prohibitions under federal law a

25  person adjudicated mentally defective or involuntarily

1  committed to a mental institution?

2  A.  Yes, sir, unless that individual has received a state

3  relief.  There are some states that have a state relief

4  program.  If it has been implemented in accordance with

5  federal law, this permits the individual to go back to the

6  agency who issued -- the state of the agency of the

7  commitment and seek that relief.  If the relief is granted,

8  that removes the 922(g)(4) prohibition.

9  Q.  Okay.  So one of the federal prohibited person

10  categories is this committed to a mental institution; is that

11  right?

12  A.  Correct.

13  Q.  And normally that would work as a lifetime prohibition

14  from possession of a firearm; is that correct?

15  A.  Correct, unless I previously stated regarding the

16  relief.

17  Q.  And are you familiar with whether the state of

18  New Jersey has one of these relief from disability

19  programs?

20  A.  Yes, the State of New Jersey does have a relief

21  program.

22  Q.  Okay.  And it has been implemented in accordance with

23  federal law?

24  A.  Correct, in January of 2010.

25  Q.  Okay.  FFL has initiated the request, NICS has done its

1  searches.  What are the results or responses that come back

2  and are communicated to the FFL?

3  A.  Once the check is initiated, if there is no hit against

4  any of the databases, the FFL will be provided with a

5  "proceed" response, which is known in terms as an immediate

6  proceed.  It means there were no hits to any of the

7  databases.

8        If there was a hit, that transaction is immediately

9  given a cursory review by the NICS section.  And if the NICS

10  section is able to determine that it was non-identical or

11  there were no state or federal prohibitions, the FFL is

12  advised that the transaction can proceed.

13        If there is prohibiting information that is on the

14  record, the FFL is advised that the transaction is now in

15  "denied" status.

16        If the transaction cannot be resolved during

17  cursory review, it is placed into "delayed" status and

18  eventually pulled by a NICS examiner to process.

19        At that point in time the NICS examiner will start

20  the research on that transaction.  If three business days

21  have expired and the FFL has not received a response from the

22  NICS section, legally they can transfer that firearm.

23        If the response has not been received, it goes into

24  an open status, and the open status will remain on our system

25  up to 90 days.

1  Q.    If a firearms transaction is denied by the FFL based

2  upon the NICS background check, does that prospective buyer

3  have a right to appeal the denial?

4  A.    Yes.  There is currently an appeal process that is

5  defined in the federal regulation.

6  Q.    All right.  So, as part of this whole process, does NICS

7  create any type of records in the ordinary course of its

8  business?

9  A.    Yeah.  The federal regulation requires NICS to maintain

10  an audit log of any incoming and outgoing transactions.  That

11  includes the NTN number, the identifying information, the

12  date and creation time of that transaction, and that

13  information is used to measure the performance of the NICS,

14  as well as to identify any misuse of the system.

15  Q.    All right.  You used an acronym there I don't know if we

16  have defined yet, NTN number.  If you would, just explain

17  that to the Members of the Jury.

18  A.    Yeah, what an NTN number is, is a NICS transaction

19  number.  When the FFL calls the background check in and the

20  check goes through, that is the first thing that is

21  generated, and they read that back to the FFL, that actual

22  transaction number, and that is used throughout the course of

23  the transaction as long as it remains on the audit log.

24  Q.    So this NICS audit log is required by law; is that

25  right?

1    A.    Correct.

2    Q.    And it is subject to auditing; is that right?

3    A.    Correct.

4    Q.    And is it created and maintained in the ordinary course

5    of business?

6    A.    Yes.

7    Q.    And is it a compilation of records of a Government

8    agency?

9    A.    Yes.

10   Q.    And does it set forth the activities of the Government

11   agency?

12   A.    Yes.

13   Q.    Have you -- in connection with your work on this case,

14   have you reviewed documents created and maintained in the

15   ordinary course of business regarding an individual by the

16   name of Heon Jong Yoo?

17   A.    Yes.

18   Q.    I am going to ask you to turn your attention to what has

19   been marked as Exhibit 32.  It is in the notebook there.

20   A.    (Witness complies.)

21   Q.    All right.  I would ask if you recognize the document

22   that has been identified as Government's Exhibit 32?

23   A.    Yes, yes, sir.

24   Q.    And what is that document?

25   A.    That is an affidavit I prepared as a custodian of

1    records for the NICS section.

2    Q.   Does the affidavit discuss your review of the NICS audit

3    log regarding an individual by the name of Heon Jong Yoo?

4    A.   Yes, sir.

5    Q.   And then attached to the affidavit are there records

6    that were created and maintained in the ordinary course of

7    business by the NICS section?

8    A.   Yes.

9           MR. COAN:   Your Honor, at this time the United

10   States would move to admit Government's Exhibit No. 32.

11          THE COURT:   Any objection?

12          MR. YOO:   No objections, Your Honor.

13          THE COURT:   Very well.   It will be received.

14          MR. COAN:   Thank you, Your Honor.

15   BY MR. COAN:

16   Q.   Let's talk about the audit log for Heon Jong Yoo.  And,

17   if you would, just walk us through -- well, let me ask you

18   this:  Is there an entry on January 19th of 2016?

19   A.   Yes, sir.

20   Q.   All right.  And, if you would, walk the Members of the

21   Jury through that entry?

22          Yeah.  On that particular data, a transaction was

23   created on Mr. Yoo by the FFL.  The NICS examiner reviewed

24   the criminal history records and the databases and determined

25   that there was a match to the NICS Indice -- actually two

1  matches to the NICS Indice -- Indices entries that matched

2  Mr. Yoo.

3        Based upon that match, they advised the FFL that

4  the transaction was in "denial" status.

5  Q.   And the two entries in the NICS Indices that matched

6  with the information belonging to Heon Jong Yoo consisted of

7  what?

8  A.   Consisted of an individual who had been adjudicated as a

9  mental defective.

10  Q.   And what agency, state, local, tribal, or federal agency

11  had entered that information into the NICS Indice?

12  A.   Yeah, the Middlesex County Adjuster's office in New

13  Brunswick, New Jersey had made those entries.

14  Q.   And do those entries, do they receive some type of

15  identifiers?

16  A.   The only information in the entries are the identifying

17  information of the individual, which is the name and any

18  other thing that is available, as well was the prohibiting

19  code that the entry was made under.

20  Q.   Okay.  So there is a code for adjudicated mental

21  defective or committed to a mental institution?

22  A.   Correct.

23  Q.   And any additional information, any documents associated

24  with those entries?

25  A.   No, there is no supporting documentation of that

1    entry.

2    Q.    Okay.  So Middlesex Adjuster in New Brunswick, New

3    Jersey enters codes that correspond with adjudicated mental

4    defective committed to a mental institution; is that right?

5    A.    Correct.

6    Q.    And I think you mentioned to us that there are two

7    entries; is that correct?

8    A.    Correct, there are two entries.

9    Q.    What are the dates of those entries?

10   A.    The date of those entries was April 19th of 2013 and

11   September 25th of 2015.

12   Q.    Okay.  And so based on those matches with the NICS

13   Indices entries indicating that Heon Jong Yoo was a

14   prohibited person, what response was communicated by NICS to

15   the FFL?

16   A.    The FFL was provided with a deny status based upon the

17   match.

18   Q.    Okay.  Subsequent to the "denial" response, did FBI

19   receive communication from an individual identifying

20   themselves as Heon Jong Yoo?

21   A.    Yes.  Mr. Yoo submitted two emails requesting his reason

22   for denial, on January 19th of 2016.

23   Q.    And in response to that inquiry, did the FBI send a

24   letter to Mr. Yoo?

25   A.    Yes.  The NICS section responded with a letter on

1  January 26th advising that they matched one of the federal

2  prohibitive categories under 18 USC 921 and 922.

3            MR. COAN:  All right.  If we could pull up Exhibit

4  32, Page 32010?

5  BY MR. COAN:

6  Q.   Okay.  It is there on the screen too, if that is easier.

7            Does that appear to be the letter that was sent by

8  FBI to Mr. Heon Jong Yoo on or about January 26th of 2016?

9  A.   Yes, this is the letter.

10  Q.   Okay.  And I think you testified for us here.  The

11  stated reason for the denial in the letter in response to

12  Mr. Yoo's request for some information was what, according to

13  FBI?

14  A.   According to the records the reason for denial was for

15  persons adjudicated as mental defectives or have been

16  committed to a mental institution.

17  Q.   Okay.  And does the NICS audit log contain additional

18  entries regarding Heon Jong Yoo?

19  A.   Yes.

20  Q.   All right.  Let's talk about an entry from September

21  13th of 2016.  And again, just to clarify, each of the

22  entries in the NICS log receive this unique identifier, this

23  NTN number that you defined for us earlier; is that right?

24  A.   Correct, these are assigned to all transactions

25  incoming.

1    Q.   And, if you would, so walk us through what the audit log

2    tells you about the September 13th, 2016, transaction?

3    A.   The audit log shows a transaction was created on

4    September 13th at 4:27 Eastern Time.  And it was placed into

5    denied status, and the FFL had retrieved -- based upon that

6    match to the NICS Indices, and the FFL had retrieved that

7    "denial" status at 4:43 Eastern Time.

8    Q.   And based on the audit log, what was the reason for the

9    denial?

10   A.   Based upon the audit log, the reason was the descriptive

11   match to those two NICS Indices entries.

12   Q.   That we talked about earlier from Middlesex County, New

13   Jersey?

14   A.   Correct.

15   Q.   All right.  Let's talk about -- well, let me ask you

16   this:  Is there another -- are there other entries in the

17   audit log regarding this individual Heon Jong Yoo?

18   A.   Yes, there are entries, correct.

19   Q.   If you walk us through to the next one after the

20   September 2016.

21   A.   Yeah, after the September 2016 there is an entry that

22   was created on 11-17-2016 at 5:07 p.m. Eastern Time.  This

23   was also placed into "denied" status based upon the match to

24   the NICS Indices entries by the entries by the Middlesex

25   County Adjuster.  And the FFL picked the "denied" status up

1    immediately at 5:07 Eastern Time as well.

2    Q.   Any additional entries in the NICS audit log regarding

3    Heon Jong Yoo?

4    A.   Yeah.   There was a subsequent entry on the same day at

5    5:32 p.m. Eastern Time.   And FFL retrieved the status at

6    5:36, and it was also based upon the descriptive match to the

7    NICS Indices entries.

8                 MR. COAN:   Your Honor, I will pass the witness.

9                 THE COURT:   Cross-examination?

10                        CROSS-EXAMINATION

11   BY MR. YOO:

12   Q.   All right.   So I have got to bring the binder.   I

13   believe the NICS -- his affidavit was Exhibit --

14                 THE COURT:   32, I think.

15                 MR. YOO:   32, yes, sir.   I would like to skip

16   the -- sorry.   I would like to display the exhibit,

17   Government Exhibit 32 on the screen, please.

18   BY MR. YOO:

19   Q.   So I believe your title is Special Agent Barker, right?

20   A.   No, it is legal administrative specialist.

21   Q.   Okay.   Specialist --

22   A.   Legal administrative specialist.

23   Q.   Okay.   I will say LAS --

24   A.   That's fine.

25   Q.   -- Barker.   So LAS Barker, so, according to the NICS

1    entry, I have been labeled adjudicated mentally defective

2    committed to a mental institution, correct?

3    A.   Correct, that is what the entry was based upon.

4    Q.   And we just read on September 13th my background check

5    was denied because of those two -- two factors?

6    A.   The September 13th background check was denied upon the

7    hit to the entry -- NICS Indices entry.

8    Q.   So -- so all of the denial here September 13th from

9    Superior and the November 17th from First Cash Pawn, they

10   all -- following "denial" they are all because of that record

11   adjudicated mentally defective committed to a mental

12   institution?

13   A.   They were based on the descriptive match of the NICS

14   Indices entries, correct.

15   Q.   So are you aware that I answered on the question of

16   citizenship as United States citizen?

17   A.   I am not aware.

18   Q.   So is a -- so is a country of citizenship, according to

19   this record, you know, required to run a -- absolutely

20   necessary to run a background check and identify the

21   individual?

22   A.   That is an ATF form that requires submission of the

23   forms.  I would have to defer to ATF on that.

24   Q.   So in terms of NICS, even -- even though I did not

25   disclose my -- my permanent residency status, these NICS

```
 1    audit log, the background check log is registered under
 2    the -- on to the record; is that correct?
 3    A.   Well, the NICS check does require -- the FBI requires
 4    the FFL to provide the country of citizenship for the NICS
 5    check to ultimately go through?
 6    Q.   Yes, sir.
 7              All right.  So I appealed -- I filed inquiry/appeal
 8    from 2016-01-19 to 2016-03-18; is that correct?
 9    A.   Could you please repeat that?
10    Q.   So I filed inquiry/appeal following a denial of
11    2016-01-19 -- from the date 2016-01-19 to 2016-03-18; is that
12    correct?
13    A.   I am having a hard time following your dates --
14              THE COURT:  Hold on just a moment.
15              What is -- what is the objection?
16              MR. COAN:  Your Honor, that misstates the testimony
17    offered on direct about the appeal.  The appeal is not in
18    September of 2016.
19              MR. YOO:  I didn't say September.  I said
20    2016-03-18.  If you are not familiar with military date
21    format, it is not my fault, sir.
22              THE COURT:  Mr. Yoo, go ahead and ask the
23    question.
24    BY MR. YOO:
25    Q.   Yes.  So 2016-01-19 -- sorry.  Let me first ask this
```

1   question:  Are you familiar with military date format?

2   A.   No.

3   Q.   Okay.  Then I will just use civilian date format.

4         January 19th, 2016, you know, following that -- that

5   denial, did I -- did I file inquiry/appeal?

6   A.   Correct, we received two emails on that date.

7   Q.   Yes.  Did I ask a specific reason, according to this

8   record, no?

9   A.   Yes, you asked a reason for denial.

10  Q.   Specific reason pertaining to me, right; is that

11  correct?

12  A.   Yes, your specific reason for denial.  Why was I denied

13  a transfer of a firearm?

14         MR. YOO:  Let's scroll down please.  Scroll down

15  more to the -- to the -- past his affidavit.  Department of

16  Justice, Federal Bureau of Investigation.  Yeah.  More.  One

17  more page.

18  BY MR. YOO:

19  Q.   So over here, applicant questions and concerns.  That is

20  my email; is that --

21  A.   Correct, that is the email we received.

22  Q.   -- correct?

23         MR. YOO:  All right.  Scroll down, please.

24  BY MR. YOO:

25  Q.   So that is the email that you sent back to me; is that

1    correct?

2    A.    That's the letter that was mailed back.

3    Q.    So did you give me a general category of people who

4    are -- who are prohibited from purchasing a firearm, or did

5    you give me a specific reason referring to me why I was

6    denied?

7    A.    A specific reason was not provided in the letter.

8    Q.    A specific reason was not provided for the letter; is

9    that correct?

10   A.    Right.

11   Q.    Okay.  So -- so -- so it is very possible that I might

12   have been completely unaware of this entry; is that

13   correct?

14            MR. COAN:  Your Honor, I'm going to object.

15            THE COURT:  Can you rephrase the question, Mr. Yoo?

16   BY MR. YOO:

17   Q.    Do you have any personal knowledge that I was aware of

18   this entry, or you have provided -- you have informed me of

19   this entry?

20   A.    I have no knowledge of that, no.

21   Q.    Okay.  Let's -- all right.  So I believe that I have

22   also submitted a cognitive assessment form; is that

23   correct?

24   A.    That's correct.

25            MR. YOO:  Let's turn on the projector, please.

1        MR. COAN:  Your Honor, I am going to object.

2   Before publication to the jury, we are going to need --

3        THE COURT:  If we need to discuss that document and

4   rule on its use with this witness, let's do -- let's have

5   that discussion before we publish it to the jury, Mr. Yoo.

6        MR. YOO:  Okay.  Your Honor, may I -- permission to

7   submit that cognitive assessment form that I have submitted

8   to the record custodian.

9        THE COURT:  Maybe you all should approach.

10       (Bench conference held.)

11       THE COURT:  All right.  Let me see.

12       MR. YOO:  That is redacted from the FBI.  It is

13  actually a legit form that came with the ATF record.

14       THE COURT:  Okay.  And has this witness reviewed

15  this document?

16       MR. YOO:  Yes, sir, he just said it.

17       THE COURT:  He said that he had?

18       MR. YOO:  He said that he has received cognitive

19  assessment.

20       THE COURT:  Okay.

21       MR. YOO:  Which is referring to this.

22       THE COURT:  I mean, related to you?

23       MR. YOO:  Yes.

24       THE COURT:  So here is the way to do this:  I

25  will -- you approach -- after we break, you approach and give

1    him a copy of this and ask him whether he has reviewed it or

2    not.  If he says that he has, then I will allow you to ask

3    questions subject to further objections by the Government.

4           MR. COAN:  I will be objecting.

5           THE COURT:  Okay.  Is that something we can deal

6    with now or --

7           MR. COAN:  Probably at least to preview it.

8           THE COURT:  Okay.

9           MR. COAN:  This is not contained in Exhibit 32.  I

10   am sure he will try to establish appropriate foundation, as

11   instructed by the Court.

12          We would object, primarily on 403 grounds,

13   misleading, confusing to the jury.  He wants to argue that he

14   submitted this cognitive assessment as part of his appeal as

15   part of an argument contesting his prohibited status.  That

16   is not the inquiry.  And NICS doesn't perform that inquiry.

17          So he is trying to put this evidence on his behalf

18   in front of the jury, when that is not a factual issue in

19   dispute, what his cognitive status was on the date of the

20   report.

21          THE COURT:  Okay.

22          MR. YOO:  This is a factual issue because it just

23   demonstrates their complete disregard for my -- my

24   inquiry/appeal.  And on the ATF audit log -- ATF audit log

25   and the report it specifically states disregard.

1          So I would like to submit this to the jury to show

2     their gross incompetence, and Mr. Coan is actually trying to

3     mislead the jury by selectively submitting the evidences.

4          And also on top of that, I did list this out as a

5     part of exhibit during the Pretrial Conference through

6     that --

7          THE COURT:  Yeah, but that doesn't make it

8     admissible.  So what you have to do is you have to lay a

9     foundation for that.  We will see what the witness's

10    testimony is, and we will see where it develops.  But I

11    appreciate the preview of it.  And we will see where we go.

12         MR. YOO:  Yes, sir.

13         (Bench conference concluded.)

14         MR. YOO:  Judge, permission to approach the

15    witness.

16         THE COURT:  Very well.

17    BY MR. YOO:

18    Q.   Is this the Exhibit that you have received, the

19    cognitive assessment report?

20    A.   Yes, this was received in the NICS audit log.

21         MR. YOO:  Judge, permission to present it?

22         THE COURT:  Well, you have got to lay a foundation.

23    I mean, that doesn't make the document itself admissible.

24    Ask him what he used it for, did he rely upon it, those types

25    of information to lay a foundation for it.

1    BY MR. YOO:

2    Q.   Have you relied upon it or disregarded it?

3    A.   No, the NICS examiner reviewed the document and deemed

4    it insufficient to overturn the denial.

5    Q.   Okay.  So let's proceed with the meaning of the terms.

6    Are you aware of the meaning of adjudicated mentally

7    defective and committed to a mental institution?

8    A.   It is defined in the ATF regulation.

9    Q.   ATF regulation.  Are you aware of the federal code that

10   defines those --

11   A.   27 CFR 478.11.

12   Q.   Okay.  Let's take a look at 27 CFR 478.11.  Is this the

13   accurate copy of 27 CFR 478.11?

14            MR. COAN:  Your Honor, again, similar to previous

15   cross-examination questions, the witness is not here to

16   testify about the accuracy of a printout from the

17   Defendant.

18            THE COURT:  Right.

19            So, again, Mr. Yoo, why don't you provide the

20   witness with a copy of it, and let's let him review it and

21   see if he is familiar with it, and see if you can lay a

22   foundation for his use of it or whether he can testify to its

23   accuracy as to, you know, what the regulation is.  And you

24   have got to develop the testimony.

25   BY MR. YOO:

1  Q.   Is that an accurate copy of 27 CFR 478.11?

2          THE COURT:  Mr. Yoo, you have to give him a minute

3  to read it.

4          (Pause in proceedings.)

5  A.   This appears to be an accurate copy.

6  BY MR. YOO:

7  Q.   Yes, sir.

8          MR. YOO:  So may I present it?

9          THE COURT:  You can ask him questions based upon

10  it.

11          MR. YOO:  Yes, sir.

12  BY MR. YOO:

13  Q.   So what is the -- what is the definition of a committed

14  to a mental institution pursuant to 27 478 CFR 11 (sic) since

15  that is your field of expertise?

16          MR. COAN:  Number one, that misstates his

17  testimony.  He did not testify that he is an expert in the

18  definition of the prohibited categories defined by the United

19  States Congress.

20          Number two, again, similar to the line of

21  questioning with other witnesses, this witness has not been

22  offered to testify about what the federal regulations state.

23          THE COURT:  All right.  I am going to -- it is

24  cross-examination, Mr. Coan, I am going to give him a little

25  bit of latitude.

1          I need you to rephrase your question though,

2   Mr. Yoo.

3   BY MR. YOO:

4   Q.    What is the important factor of a committed -- to label

5   someone as committed to a mental institution?

6   A.    Based upon the federal reg, it is a determination by a

7   court, board, commission or other lawful authority that a

8   person, as a result of marked subnormal intelligence or

9   mental illness, incompetency, condition, or disease is a

10  danger to himself or others, lacks the mental capacity to

11  contract or manage his own affairs.  And then there is a list

12  of criminal dispositions that apply as well.

13  Q.    That is, no -- for the -- committed for the -- committed

14  to a mental institution.  That is adjudicated mentally

15  defective.

16          Are you suffering from temporary amnesia, or are

17  you ignorant of the regulations that you are paid to

18  enforce?

19          THE COURT:  Mr. Yoo, don't argue with the witness.

20  Ask questions, please.

21  BY MR. YOO:

22  Q.    Committed -- would you please turn to committed -- to

23  the term committed -- phrase committed to a mental

24  institution on that paper?  What does the Federal Government

25  define as committed to a mental institution?

1  A.   The committed portion is a formal commitment of a person

2  to a mental institution by a court, board, commission, or

3  other lawful authority.  The term includes a commitment to a

4  mental institution involuntarily.  The term includes

5  commitment for mental defectiveness or mental illness.  It

6  also includes commitments for other reasons such as for drug

7  use.  The term does not include a person in a mental

8  institution for observation or voluntary admission to a

9  mental institution.

10 Q.   So in -- so either voluntary admission or -- or in,

11 therefore, an observation period is not a commitment -- a

12 person -- is that correct?

13          MR. COAN:  Your Honor, we object.  The regulation

14 says what the regulation says.  This witness says --

15          THE COURT:  I will give him a little bit of

16 latitude here.

17 BY MR. YOO:

18 Q.   Is that correct?

19 A.   I can only speak to what the federal regulation

20 states.

21 Q.   Okay.

22          MR. YOO:  May I have permission to approach the

23 witness?

24          THE COURT:  Yes.

25 BY MR. YOO:

1    Q.   Are you familiar with the NICS Improvement Amendments
2    Act of 2007?
3    A.   Yes.
4    Q.   Is that the -- is that the correct copy of NICS
5    Improvement Amendments Act of 2007?
6    A.   This appears to -- to be a correct copy.
7    Q.   What does the Section 101 Charlie state?
8    A.   101 Charlie states:  A standard for adjudication is a
9    commitment related to mental health.
10   Q.   What is the -- what is the standard for commitment and
11   adjudication according to that federal law as stated in
12   Charlie 1 Charlie?
13           And I know that Mr. Coan is going to object and try
14   to mislead the jury.
15           MR. COAN:  First, I am going to object the
16   commentary.
17           THE COURT:  Mr. Yoo, just let Mr. Coan get his
18   objection out, and I will deal with it in due course.  But
19   let's don't make speeches.  Okay?
20           MR. YOO:  Yes, sir.
21           MR. COAN:  Second, I am going to object because if
22   we are going to be reading from legislation, we should at
23   least get it correct.  He has mischaracterized what the
24   statute says, what the legislation says.  It does not set
25   forth the definition of committed under a mental institution.

1   It sets forth the requirements of reporting by federal

2   departments and agencies to NICS.

3           THE COURT:  All right.

4           MR. YOO:  That is the -- yes, Your Honor, that is

5   the standard for commitment and -- and the adjudication

6   federal standards.

7           THE COURT:  Go ahead and rephrase your question and

8   proceed.

9           Mr. Coan you, will have an opportunity to the

10  redirect the witness.

11  BY MR. YOO:

12  Q.   In that -- so -- so according to the NICS Improvement

13  Amendments Act of 2007, the standards for -- for adjudication

14  or commitment, right, it does state that if it is solely a

15  medical finding and if the patient had no opportunity for a

16  hearing, adversary procedure, or any formal due process, if

17  it just was strictly medical ex parte communication with the

18  psychiatrist and the court, that person has not been

19  committed or adjudicated.  Is that correct?

20          MR. COAN:  I would object.  Same objection.

21  Mischaracterizes what the statute says, misstates the law.

22  Asking questions that are more appropriate for the Judge and

23  not the province for the jury.

24          MR. YOO:  Your Honor, if what Mr. Coan is saying is

25  true, I would like to -- for you to compel Mr. Coan to make a

1    judicial notice of the fact.

2            THE COURT:  Mr. Yoo, let me ask you to rephrase

3    your question, and let's break it up.  Let's take it

4    individually piece by piece.  Okay?

5            MR. YOO:  Yes.

6            THE COURT:  I think that is -- part of the concern

7    is that the question you asked has multiple parts to it, so

8    let's just try to rephrase it to contain one fact.

9    BY MR. YOO:

10   Q.    Do you have any personal knowledge of me going to a

11   court hearing and getting committed?

12   A.    I have no knowledge of that.

13   Q.    So what is your legal basis of labeling me adjudicated

14   mentally defective and committed to a mental institution?

15   A.    The NICS section did not make those entries.

16   Q.    The NICS receives documents from the state and -- state

17   local and the federal Governments; is that correct?

18   A.    Correct.

19   Q.    Has the NICS ever received a formal order from the court

20   following a hearing, that I had been committed or

21   adjudicated?

22   A.    The NICS section has not personally.  They are based

23   upon those entries, as I referred to, from the Middlesex

24   County Adjuster.

25   Q.    Do those -- so did those -- I'm sorry, are you ignorant

1   of my question or are you evading my question?

2           MR. COAN:  Your Honor --

3           THE COURT:  Mr. Yoo, just ask the question, okay?

4   Let's leave the personal out of it.  All right?

5   BY MR. YOO:

6   Q.   Did those records -- did those records indicate that

7   I -- I -- I was committed or adjudicated pursuant to a proper

8   due process and hearing?

9   A.   I have no knowledge of those records.

10  Q.   Okay.  So going back to 27 CFR 478.11, you have -- you

11  have read that -- you have read that -- in there for -- for

12  temporarily confined for observational period is not a

13  commitment; is that correct?

14  A.   I have read the definition previously word for word from

15  the reg.

16  Q.   So why was NICS Improvement Amendments Act of 2007

17  enacted?

18  A.   To allow an opportunity for an individual to seek

19  relief.

20  Q.   And I do believe that --

21  A.   For also reporting to agencies -- for reporting as well

22  to the --

23  Q.   It also sets standards for commitment and adjudication;

24  is that correct?

25  A.   It doesn't change the definition in the federal reg,

1  NIAA doesn't.

2  Q.   Yes.  But it sets the standards, is that correct, or are

3  you not comprehending my question?  Do you want me to

4  rephrase the question?

5         THE COURT:  Give him a chance to rephrase the

6  question.

7         MR. COAN:  The argument -- the arguing with the

8  witness is enough.

9         THE COURT:  All right.  Let's don't argue with the

10  witness, Mr. Yoo.  Just rephrase the question simply stated

11  without any argument in it, please.

12  BY MR. YOO:

13  Q.   According to that form, it does say standards for

14  adjudication and commitment; is that correct?

15  A.   As I referenced, the NIA, the NICS Improvements

16  Amendments Act, did not change the federal definition for

17  adjudicated as mentally defective.

18         MR. YOO:  Your Honor, would you please compel the

19  witness to answer the question properly?

20         THE COURT:  You can ask -- you can ask a follow-up

21  question, Mr. Yoo.

22  BY MR. YOO:

23  Q.   Did I ask for a definition, or did I ask for

24  standards?

25  A.   Your question was regarding standards.

1  Q.   What are the -- so what are the -- will you please

2  answer what are the standards pursuant to the act?

3  A.   We went over the standards previously that is defined in

4  the regulation.

5  Q.   Would you state it?

6          MR. COAN:  Your Honor, asked and answered.

7  Argumentative.

8          THE COURT:  Sustained.

9          Move along, Mr. Yoo.

10          MR. YOO:  Are you objecting on behalf of the

11  Prosecution, Your Honor?

12          THE COURT:  I'm sorry?

13          MR. YOO:  Are you objecting on behalf of the

14  Prosecution, Your Honor?

15          THE COURT:  Mr. Yoo, move along, please.

16  BY MR. YOO:

17  Q.   Okay.  So have I been committed to a mental institution

18  pursuant to federal standards if I have never been to a

19  hearing?

20          MR. COAN:  Your Honor --

21  A.   I have no knowledge of any of your past.

22  Q.   So are you admitting your ignorance to the laws that you

23  are paid to enforce?

24          MR. COAN:  Your Honor, I object.  Argumentative.

25  Repetitive.

1      THE COURT:  Mr. Yoo, how about rephrasing the

2  question without the argument in it.  All right?  Just ask

3  the question simply.

4  BY MR. YOO:

5  Q.  How long have you worked for NICS?

6  A.  Since September of 1998.

7  Q.  1998.

8      MR. YOO:  So, Your Honor, motion to strike the

9  witness.

10      THE COURT:  Mr. Yoo, just ask the follow-up

11  questions.  Ask him -- just rephrase the question.

12  BY MR. YOO:

13  Q.  All right.  So there -- there is a set standards for

14  commitment and adjudication; is that correct?

15  A.  I believe you previously asked that regarding standards.

16  Q.  Yes.

17  A.  Correct.

18  Q.  So you received -- so let me just clarify.  Okay?  You

19  received no documents, no information pertaining that I have

20  been through a court hearing and received a formal order; is

21  that correct?

22  A.  Correct.  The contributing agency to the NICS Indices is

23  responsible for that accuracy and validity of that

24  information.  We have no supporting documentation.

25  Q.  So you are not responsible for --

1  A.   Not for the NICS Indices entries.  They are the

2  responsibility of the submitting agency.

3  Q.   Are you aware of remedy for erroneous denial of firearm

4  transaction?

5  A.   That is the NICS appeal process.

6  Q.   So did my appeal -- did my appeal get processed

7  properly?

8  A.   Yes.

9  Q.   What is the legal basis for it saying -- for proper

10  appeal process?

11  A.   It is defined in the federal regulation.

12  Q.   Would you turn to -- on that packet would you turn to

13  Section Charlie 3?

14  A.   Of which piece of documentation?

15  Q.   NICS Improvement Amendments Act, Charlie 3?

16  A.   (Witness complies.)

17       Are you talking about Section 102?

18  Q.   Section 101, Charlie 3.

19  A.   I'm not seeing a Charlie 3 in this document.

20       MR. YOO:  Permission to approach the witness?

21       THE COURT:  Yes.

22  BY MR. YOO:

23  Q.   3.  According to NICS Improvements Amendments Act

24  Section Charlie 3 at --

25  A.   Would you please point -- the one you showed me was

1    under (b)(3).

2    Q.   3.

3    A.   Yeah, you mentioned C, Charlie 3.  That is under

4    (b)(3).

5    Q.   Oh, Bravo 3.

6    A.   Bravo 3?

7    Q.   Bravo 3.  Yes.

8             MR. YOO:  Correction, Your Honor.  It is

9    Section 101 Bravo 3, not Charlie 3?

10            THE COURT:  Okay.

11   BY MR. YOO:

12   Q.   So according to Bravo 3, it is stated it is --

13            MR. YOO:  This is a question, Your Honor.  This is

14   not testimony.

15   BY MR. YOO:

16   Q.   Is it -- it is stated that when -- when the NICS goes --

17   goes through labeling a person as 922(g)(4) factor, that they

18   have to notify the individual as the proceeding goes on; is

19   that correct?

20            MR. COAN:  Your Honor, I am going to object to this

21   question and this whole line of questions.  If the Defendant

22   had accurately represented what Section 101 is, it, in fact,

23   relates to recordkeeping and reporting by the Federal

24   Government when the Federal Government has involuntarily

25   committed an individual.  That is not what occurred here.  He

1  was committed by a state agency under state law.

2      MR. YOO:  Objection, Your Honor.  Misleading the

3  jury.  This is a basic --

4      THE COURT:  Mr. Yoo, let Mr. Coan finish.

5      MR. COAN:  The Section 101 is entitled:

6  Enhancement of requirements that federal departments and

7  agencies provide relevant information to the National Instant

8  Criminal Background Check System.  None of this has anything

9  to do with the commitments of Mr. Yoo under New Jersey state

10  law.

11      THE COURT:  Thank you, Mr. Coan.

12      What, Mr. Yoo --

13      MR. YOO:  Objection, Your Honor.  Mr. Coan is

14  severely misleading the jury.  It's actually both -- it sets

15  the regular standards for -- for commitment.  Also -- also,

16  according to the Fifth Amendment of our Constitution, the

17  individual must not be deprived of liberty, property, and

18  life without the proper due process of the law.

19      So the -- so the Section C -- sorry.  Section 101

20  Charlie 1 Charlie actually sets -- so I can't explain to you

21  why NICS Improvement Amendment Act was enacted, but -- but

22  that is a legal argument that I will save for -- for the --

23      THE COURT:  That will be fine.

24      MR. YOO:  -- the appropriate time.

25      THE COURT:  All right.

1    MR. YOO:  But, yes, Section 101 Charlie 1

2  Charlie -- no, Section 101 Charlie 1 defines all of the

3  standards for when -- when the NICS can provide the attorney

4  general of the adjudication or commitment record.  It does

5  not specifically define whether by the Federal Government or

6  the State Government.

7    Mr. Coan is known to mislead and misinterpret the

8  law, so I understand what he is getting it, but it

9  specifically said to provide to the attorney general for

10  NICS -- record to provide to the attorney general.

11    And also we are talking about federal law here.

12  This is a federal court, Your Honor.  This is not the state

13  court.  I believe -- I believe Mr. Machicek is the one who

14  has told me during the Pretrial Conference that any

15  collateral attacks should be taken up with the state court of

16  New Jersey.  This is a federal court --

17    THE COURT:  Hold on, Mr. Yoo.

18    Mr. Coan, anything further?

19    MR. COAN:  I'm sorry, Your Honor.  I lost track.

20  Was there a question?

21    THE COURT:  Let's just -- go ahead and rephrase

22  your question, Mr. Yoo, and let's see if we can move this

23  along.

24    MR. YOO:  Yes, sir.

25  BY MR. YOO:

```
1   Q.   So was I properly -- sorry.  When did my -- my
2   NICS -- NICS entry -- sorry.  When did the -- what was the
3   date that I was entered as adjudicated mentally defective
4   committed to a mental institution?
5   A.   There were multiple entries by Middlesex County Adjuster
6   on 4-19 of '13 and September 25th of 2015.
7   Q.   Was I notified of those proceedings personally?
8   A.   I have no knowledge of the notification.
9   Q.   Does the law -- law require me -- me to be notified?
10  A.   You were notified upon your --
11          MR. COAN:  Your Honor, what -- I'm going to object
12  as to vagueness.  What law are we talking about now?
13          THE COURT:  Why don't you rephrase your question,
14  Mr. Yoo.  Which law are you referring to in your question
15  regarding whether the law requires you to be notified.
16          MR. YOO:  I'm sorry.
17          Mr. Coan, isn't NICS Improvement Amendments Act a
18  federal law.
19          THE COURT:  Mr. Yoo?
20          MR. YOO:  Yes.
21          THE COURT:  Can you answer my question, sir?
22          MR. YOO:  Yes, sir.
23          THE COURT:  Are we talking state law, or are we
24  talking about federal law?
25  BY MR. YOO:
```

1    Q.   According to NICS Improvements Amendments Acts of 2007,

2    are the individuals required to be notified?

3    A.   The NICS Amendments Improvements Act (sic) relates to

4    the reporting of the information from the agencies and the

5    relief.  To my knowledge, no.

6              MR. YOO:  May I put the current copy of the NICS

7    Improvement Amendments Act on display, Your Honor?

8              THE COURT:  Mr. Coan, any objection?

9              MR. COAN:  No objection, Your Honor.

10             THE COURT:  Thank you.

11             MR. YOO:  Okay.

12   BY MR. YOO:

13   Q.   Okay.  So was this the section for the standard that we

14   were looking at before?  Was this the correct section?

15   A.   Regarding the standards, correct.

16   Q.   Yes, sir.

17             So from what I am seeing, Section Charlie 1 Charlie

18   states that adjudication -- may respectively -- is based

19   solely on medical finding of disability without an

20   opportunity for a hearing.

21             And then this section says:  No department or

22   agency --

23             THE COURT:  Mr. Yoo?

24             MR. YOO:  -- of the Federal Government --

25             THE COURT:  Mr. Yoo?

1          MR. YOO:  -- may for --

2          THE COURT:  Mr. Yoo?  Let's just -- let's have a

3    simple question and let the witness answer, and then you can

4    move on to your next question.

5          MR. YOO:  Yes, sir.

6    BY MR. YOO:

7    Q.   So 2 Bravo -- yeah -- 2 -- sorry.  2 Bravo 3, that

8    describes the notice -- notice requirement; is that

9    correct?

10   A.   That is the notice requirement effective 30 days after

11   the date of enactment of this act.

12   Q.   And it states that:  Shall provide both oral and written

13   notice to the individual at the commencement of adjudication

14   process -- process including?

15   A.   That's what is stated.

16   Q.   So was I notified when -- when there was a -- when --

17   when, sorry.  Let me rephrase that question.

18          Was I notified at the commencement of adjudication

19   or commitment label proceeding?

20   A.   Once again, the NICS section has no knowledge of the

21   supporting documentation.

22          MR. YOO:  Okay.  I will pass the witness, Your

23   Honor.

24          MR. COAN:  You can leave the exhibit.  Thank

25   you.  You can leave the exhibit.

1            MR. YOO:  All right.  I will take these.

2            MR. COAN:  Your NICS things, please.

3                    REDIRECT EXAMINATION

4    BY MR. COAN:

5    Q.   Well, we talked a lot about the NICS Improvement

6    Amendments Act of 2007, so -- and I think you were asked some

7    questions about why the NICS Improvement Amendments Act was

8    enacted.  Does the legislation include a statement by

9    Congress as to the reasons underlying passage of the act?

10   A.   Yes.

11           MR. YOO:  Your Honor, I will object to relevancy.

12   We are not talking about the history of NICS Improvements

13   Act.

14           MR. COAN:  Your Honor, he opened the door.  He

15   asked repeatedly about what the purpose of the NICS

16   Improvement Amendments Act --

17           THE COURT:  Overruled.

18           MR. YOO:  Your Honor, I actually saved the history

19   lesson for -- for appropriate time later day.  This is an

20   unnecessary delay.

21           THE COURT:  Overruled, Mr. Yoo.

22           You may proceed.

23   BY MR. COAN:

24   Q.   If you would, familiarize yourself with the stated

25   legislative history here.  Actually the NICS Improvement

1    Amendments Act of 2007 was passed almost immediately in the

2    wake of what tragedy in the United States?

3    A.    The Virginia Tech tragedy.

4    Q.    Okay.  And what are the circumstances of that occurrence

5    that are stated in the legislation there?

6    A.    It states that in spite of the proven history of mental

7    illness, the shooter was able to purchase two firearms

8    utilized in the shooting.  And this is an act to improve the

9    coordination between state and federal authorities that could

10   have ensured that the shooter's disqualifying mental health

11   information was available to the NICS.

12   Q.    All right.  Let me give you an opportunity to review.

13   So the legislative history, the findings there which is

14   Section 2 of the act -- do you have the copy of the act still

15   there?

16   A.    Not --

17   Q.    Well, we will move on.

18          Let's go to definitions.  You were asked a lot

19   about what things mean and who is supposed to do what.

20          All right.  Who -- let me ask you this:  Does the

21   Federal Bureau of Investigation define who a prohibited

22   person is under federal law.

23   A.    It is defined by Congress in 18, 922.

24   Q.    Okay.  The United States Congress does that; is that

25   right?

1    A.   Correct.

2    Q.   But there is reference to -- well, let me back up.

3         We are talking about specifically Title 18, United

4    States Code, Section 922 with respect to prohibited persons

5    under federal law; is that right?

6    A.   Yes.

7    Q.   Okay.  And what we have been talking here in your

8    testimony is 922(g)(4), that is, this adjudicated as mental

9    defective or committed to a mental institution; is that

10   right?

11   A.   Correct.

12   Q.   Okay.  You talked a lot about some definitions that are

13   contained in the NICS Improvement Amendments Act of 2007.  If

14   you would, let me direct your attention here to the

15   definition section, which is Section 3.  And are mental

16   health terms defined by this legislation?

17   A.   No, the definition does not change from the ATF

18   regulation.

19   Q.   Okay.  So wait.  So the definition that you read into

20   the record was not changed by the NICS Improvement Amendments

21   Act of 2007?

22   A.   Correct.

23         MR. YOO:  Objection, Your Honor.  The accused was

24   not contesting the definition defined by 27 CFR 478.11.  The

25   accused was actually defining the standards for that -- that

1  definition and consideration.  Coan is just taking

2  unnecessary delay, I believe.

3         THE COURT:  Mr. Yoo, I will give you an opportunity

4  to recross the witness.

5  BY MR. COAN:

6  Q.   Okay.  Immediately under the definition section is this

7  Title I, Section 101.  You were asked a series of questions

8  about those provisions within that section.

9         So, first of all, what is Title I?  What is that

10  all about?  What is the title of Title I here, according to

11  the act?

12  A.   According to the act, it is the enhancement of

13  requirements of federal departments and agencies that provide

14  relevant information to the National Instant Criminal

15  Background Check System.

16  Q.   Okay.  And this entire title, Title I is about -- let me

17  ask you, it states transmittal of records.  What is your

18  understanding of that term?

19  A.   It means those agencies that have prohibiting

20  information will make those records available to the NICS

21  section.

22  Q.   Okay.  And so with respect to transmittal requirements

23  that are imposed on reporting agencies, what is your

24  understanding of who that applies to in Section 101?

25  A.   It refers to federal departments and agencies.

1    Q.    Okay.  So if an individual is involuntarily committed or

2    adjudicated as a mental defective by a federal department or

3    a federal agency, then the transmittal of records by that

4    federal department or federal agency would then be governed

5    by Section 101; is that right?

6    A.    Correct.

7              MR. YOO:  Objection, Your Honor.  I would like to

8    request Mr. Coan to point out where it specifically states

9    that -- that the standards for -- for adjudication and

10   commitment for -- for Federal Government and the State

11   Government are different in regards to the federal law.

12             THE COURT:  Mr. Coan, please proceed.

13             MR. COAN:  Do I need to read the title of the

14   section.

15             THE COURT:  You can proceed however you think is

16   necessary.

17             Mr. Yoo, you will have an opportunity to ask any

18   follow-up questions you want.

19   BY MR. COAN:

20   Q.    Now, the legislation does speak to record reporting

21   requirements imposed upon states; is that right?

22   A.    I believe so, yes.

23             MR. YOO:  Objection.  Your Honor, he moved -- he

24   moved display.  That can mislead the jury.

25   BY MR. COAN:

1  Q.   Okay.  This is Section 102 of the act.  And I am going

2  to refer you to Subsection (c) and just ask you, what is the

3  title of that?

4  A.   That is the eligibility of state records for submission

5  to the National Instant Criminal Background Check System.

6  Q.   Okay.  So Section 102(c), not 101 Charlie, that is what

7  talks about state reporting; is that right?

8  A.   Correct.

9  Q.   And based on the NICS Indices in the audit log for

10  Mr. Yoo, who reported the prohibiting characteristic as

11  adjudicated mental defective or committed to a mental

12  institution?

13          MR. YOO:  Objection, Your Honor.  I was never

14  contesting the state -- state authority to -- to report to

15  the -- to the Federal Government.  I was -- I was contesting

16  the standards, the federal standards --

17          THE COURT:  Mr. Yoo, Mr. Yoo.  If you have an

18  objection, please precisely state your objection.  This is

19  not the time to testify.

20          MR. YOO:  Objection.  It is misleading the jury.

21          THE COURT:  Overruled.

22          MR. COAN:  Ms. McCullars, if you would, please, if

23  you would pull up Page 32, Page 10, please.

24  BY MR. COAN:

25  Q.   All right.  You were questioned about whether FBI

1  notified Mr. Yoo about his prohibited status.  Did that take

2  place?

3  A.  Yes, he was notified of his reason for denial under one

4  of the following prohibited categories.

5  Q.  So Exhibit 32, this letter January 26th, 2016, advises

6  the Defendant that he was a prohibited person under federal

7  law, prohibited from possessing a firearm; is that correct?

8  A.  That's correct --

9       MR. YOO:  Objection, Your Honor.  Misleading the

10  jury.  It does not state --

11       THE COURT:  Overruled.

12                RECROSS-EXAMINATION

13  BY MR. YOO:

14  Q.  Does this exhibit stately -- no, no, no.  Sorry.

15       Does this exhibit exclusively refer to my specific

16  case of denial or just general category of denial?

17  A.  It provides the general categories under the federal

18  prohibitions.

19       MR. YOO:  Your Honor, the witness committed perjury

20  on -- on two occasions.  Pertaining to NICS Improvement

21  Amendments Act he said that -- he said that the FBI does not

22  have to inform the individual.

23       THE COURT:  Mr. Yoo, Mr. Yoo, this is not proper

24  impeachment.  If you wish to impeach this witness with some

25  other document or some prior statement of his that you think

1  is inconsistent, you may do so.

2       MR. YOO:  Yes, sir.  Motion to strike the -- motion

3  to strike the witness based on fraudulent -- fraudulent

4  testimony because he clearly stated that -- that it

5  doesn't -- the -- the FBI does not have to inform the

6  individual --

7       THE COURT:  Well, Mr. Yoo -- Mr. Yoo, that may go

8  to the witness's credibility as a witness, but it doesn't

9  mean he has perjured himself.

10       MR. YOO:  Motion to strike the -- strike the

11  witness based on his credibility.

12       THE COURT:  That's denied.

13       MR. YOO:  I would like to object and reserve my

14  right to appeal.

15       THE COURT:  You may do that.

16       Do you have any further questions?

17       MR. YOO:  Yes, sir.

18  BY MR. YOO:

19  Q.  So when Mr. Coan was talking about, let's see, the

20  eligibility of the state records for submission, does it

21  really talk about the standards?

22  A.  I would need to see a copy of the act.

23  Q.  All right.

24       MR. YOO:  Well, can we please -- please pull up the

25  record of -- I mean, the projection?

1      Permission to address the jury based on -- I mean,

2   just inquiring on the visibility.

3        THE COURT:  I think it is -- they can read it.

4   BY MR. YOO:

5   Q.   All right.  So does this actually state the standards

6   for adjudication and commitment?

7   A.   Not in this particular section.

8   Q.   Okay.  Let's go back to the Section 101 Charlie.

9   Charlie 1, Section 101.

10       Does it -- does it specifically define that this

11  only pertains to the federal adjudication or mental health

12  record, or does it say requirement for the federal

13  departments to provide relevant information to the NICS

14  Instant Criminal Background Check System?

15  A.   This section pertains to the record reporting of the

16  federal agencies.

17  Q.   Okay.  So 922(g) is a federal prohibition -- prohibition

18  factor; is that correct?  It is not a state pro -- it is not

19  a state factor?

20  A.   Correct.

21  Q.   So this over here, you know, that -- this is the federal

22  standards for -- for providing this records to the attorney

23  general; is that correct?

24       MR. COAN:  Your Honor, I am going to object.  401,

25  403, asked and answered.  Repetitive.

| | |
|---|---|
| 1 | THE COURT:  What is new here, Mr. Yoo?  What is |
| 2 | new? |
| 3 | MR. YOO:  I am trying to prove that Mr. Coan was |
| 4 | trying to mislead the jury. |
| 5 | THE COURT:  Okay.  I am going to give you just a |
| 6 | little latitude about this, but I think this is ground that |
| 7 | has been well trod. |
| 8 | MR. YOO:  Yes, sir. |
| 9 | BY MR. YOO: |
| 10 | Q.  Okay.  So this is the standards for -- over here |
| 11 | stated -- for a Federal Government may provide to the |
| 12 | attorney general any record of adjudication related to mental |
| 13 | health.  So basically it is the standard; is that correct? |
| 14 | A.  What was that again? |
| 15 | Q.  This is the standard for adjudication and commitment |
| 16 | for -- |
| 17 | A.  As I have mentioned previously, the standard for |
| 18 | adjudication did not change. |
| 19 | Q.  Did I ask whether it has changed or whether it has been |
| 20 | further defined as the standard? |
| 21 | A.  It has not been further defined. |
| 22 | Q.  Are you saying that is not further -- |
| 23 | MR. COAN:  Your Honor, argumentative. |
| 24 | Repetitive. |
| 25 | THE COURT:  Sustained. |

1          Mr. Yoo, let's move along, please.

2          MR. YOO:  I will pass on the witness, Your Honor.

3          THE COURT:  Mr. Coan?

4          MR. COAN:  I don't have any additional questions,

5   Your Honor.  May this witness be finally excused?

6          THE COURT:  May the witness be excused?

7          MR. YOO:  Oh, wait.

8          THE COURT:  No, you have passed the witness, Mr.

9   Yoo.

10          MR. YOO:  May I re-call the witness?

11          THE COURT:  No, you may not.  The witness -- you

12  have passed on the witness.  May he be excused?

13          MR. YOO:  Yes, sir, no objections.

14          THE COURT:  You may step down.

15          Ladies and Gentlemen of the Jury, we are going to

16  take our lunch recess at this time.  Given the hour, we will

17  resume at 2:00 o'clock.

18          COURT SECURITY OFFICER:  All rise for the jury.

19          (Jury out.)

20          THE COURT:  Counsel, please approach.

21          (Bench conference held.)

22          THE COURT:  Mr. Yoo, I want to protect your right

23  to a fair and impartial trial, and I want to protect your

24  right to represent yourself.  But what I just saw really

25  bordered on abusive conduct.  I am not sure I have ever seen

1    a witness treated quite that way by anyone in any of the

2    nearly 30 trials I have presided over.

3          I admonished you and warned you on Friday at the

4    Pretrial Conference that if I observed conduct during the

5    course of the trial that could fairly be viewed as

6    obstructionist or disruptive, that I would consider that

7    behavior as a waiver of your right to represent yourself.

8    And that conduct that I just observed in your

9    cross-examination of the witness really borders on that.

10          I am incredibly reluctant to require you to step

11   aside in your representation of yourself -- because I know

12   that is something that you want to do -- and to require

13   Mr. Haas to take over your representation; but if the

14   behavior that I witnessed with that witness continues with

15   any further witnesses, I will not hesitate to do that.

16          MR. YOO:  Your Honor, may I -- may I respond?

17          THE COURT:  You may.

18          MR. YOO:  Okay.  Thank you for -- for -- thank you

19   for -- thank you for preserving my constitutional right,

20   however, the witness has displayed inconsistencies in his

21   testimony and the lack of knowledge of the law that he

22   should -- he should well -- be well aware of if he had worked

23   for FBI NICS for more than 20 years by now.  That is not

24   excusable, sir.

25          MR. HAAS:  May I have the opportunity to visit with

1  Mr. Yoo?

2         THE COURT:  You may.

3         MR. YOO:  But -- wait.

4         MR. HAAS:  No.

5         MR. YOO:  But I do acknowledge what you are warning

6  me about and then --

7         THE COURT:  And I appreciate your recognition of

8  that.  What I will not permit is abusive treatment of

9  witnesses.

10         Now, if you think a witness has testified to

11  something he or she should not have or you think that the

12  witness has testified falsely or you think you have got

13  grounds to impeach the witness's credibility, believe me, I

14  am in your corner, and I will permit you to do it.  But I

15  will not permit you to abuse the witness as I saw that

16  witness abused.

17         MR. YOO:  That is clear, Your Honor.

18         THE COURT:  Okay.  So do we have an agreement on

19  that, that is not going to happen with another witness?

20         MR. YOO:  Yes, sir.  But I would also like you to

21  require Mr. Coan from -- from misciting the law and

22  prevent --

23         THE COURT:  Well --

24         MR. YOO:  -- prevent Mr. Coan from misleading the

25  jury since he is supposed to be a professional.

1        THE COURT:  Mr. Yoo, we are really here to discuss

2   what I observed of your conduct in that last witness's

3   testimony.  So you are more than welcome to object to

4   anything Mr. Coan does and has done or does in the future in

5   this case, and we will take that up in due course.

6        MR. YOO:  Yes, sir.

7        THE COURT:  But it is your conduct that I am

8   concerned about at this point.  I know that you want to

9   represent yourself, and I respect that, and I am going to do

10  everything I can to honor that.

11       But I am -- what I am telling you now is that if

12  you can't treat people with civility and respect, I am going

13  to consider that as a waiver of your right to represent

14  yourself, and I am going to require Mr. Haas to step in on

15  your behalf.

16       MR. YOO:  Yes, sir.  That's clear.

17       THE COURT:  Is that fair enough?

18       MR. YOO:  Yes.  Thank you.

19       (Recess was taken at this time.)

20       (Jury out.)

21       COURT SECURITY OFFICER:  All rise.

22       THE COURT:  Please have the jury brought in.

23       COURT SECURITY OFFICER:  Yes, sir.

24       (Jury in.)

25       MR. YOO:  Permission to approach the bench.

1          THE COURT:  Okay.

2          You all may be seated.

3          (Bench conference held.)

4          MR. YOO:  I thought we were going to discuss jury

5    instructions.

6          THE COURT:  No.  We were not discussing jury

7    instructions now.  We are just discussing the jury

8    instructions at the end of the day or first thing in the

9    morning after you have had an opportunity to review what the

10   Government has submitted.

11         And, likewise, I gave you an opportunity to submit

12   proposed jury instructions to the Government.  I have not

13   received any from you.  I have received the Government's.

14         MR. HAAS:  Judge, and I am sorry.  I talked to

15   Lucas.  I was going to do that over lunch.  I have left them

16   here.  I think Lucas is going to get some copies made.

17         THE COURT:  Okay.

18         MR. MACHICEK:  Yes, sir.

19         THE COURT:  Fair enough.

20         MR. HAAS:  I had that conversation with him like

21   five minutes ago.

22         THE COURT:  That's fine.

23         Okay.  Let's proceed.

24         (Bench conference concluded.)

25         THE COURT:  Government may call its next witness.

```
 1              MR. COAN:   Thank you, Your Honor.  The United
 2     States calls Dr. Victoria Larsen to the stand.
 3              THE WITNESS:  Hi.
 4       DR. MARY VICTORIA LARSEN, GOVERNMENT'S WITNESS, SWORN,
 5                        DIRECT EXAMINATION
 6     BY MR. COAN:
 7     Q.   Good afternoon.
 8     A.   Good afternoon.
 9     Q.   Would you state your name for the record, please?
10     A.   It's Mary Victoria Larsen.
11     Q.   Okay.  Could you pull the microphone just a little bit
12     closer?
13     A.   Sure.
14     Q.   Thank you.  How are you currently employed?
15     A.   I am employed by Rutgers University Behavioral Health
16     Care.
17     Q.   And where is that located?
18     A.   Piscataway, New Jersey.
19     Q.   And how long have you been at Rutgers University
20     Behavioral Health Care?
21     A.   Since 1986.
22     Q.   All right.  What is your current position there?
23     A.   I am director of acute emergency services.
24     Q.   And how long have you been in that particular
25     position?
```

1    A.   Since 2013.

2    Q.   All right.  And, if you would, tell the Members of the

3    Jury just briefly what it is you do in that position?

4    A.   I oversee two screening services and intensive

5    outpatient services with some case management.

6    Q.   Would you tell the Members of the Jury a little bit

7    about your educational background?

8    A.   Yeah.  I have a Doctorate from Rutgers University in

9    Counseling Psychology.  I am licensed as a psychologist in

10   the State of New Jersey, and I am a certified screener.

11   Q.   All right.  Dr. Larsen, have you ever had any types of

12   presentations regarding mental health law or procedures for

13   involuntary commitment --

14   A.   Yes.

15   Q.   -- under New Jersey state law?

16   A.   Yes, I have made multiple presentations to medical

17   students, to psychiatry residents, to New Jersey Hospital

18   Association.  We've presented to the Secret Service and any

19   other community groups who had a particular interest in

20   screening.

21   Q.   Are you a member of any professional organizations

22   regarding mental health?

23   A.   Yes.  New Jersey Psychological Association, American

24   Psychological Association.

25   Q.   Have you ever testified in Court before?

1   A.   Yes.

2   Q.   All right.  And what was the nature of your testimony,

3 just generally?

4   A.   Okay.  I testified about someone I had evaluated.

5   Q.   And was that a criminal or a civil case?

6   A.   Criminal.

7   Q.   Okay.  So you were testifying in your capacity as a

8 treater?

9   A.   Yes.  And I was declared an expert witness.

10   Q.   Okay.  Now, you were asked by the Government to appear

11 today; is that correct?

12   A.   Yes, yes.

13   Q.   You weren't subpoenaed; is that right?

14   A.   That's correct.

15   Q.   Okay.  And you are being compensated for the time that

16 you are away from your real job; is that right?

17   A.   That's correct.

18   Q.   As well as your travel expenses; is that correct?

19   A.   Yes.

20   Q.   So what were you asked to do in connection with this

21 particular case?

22   A.   I was asked to review the documents, confirm that it

23 conformed to the screening law, and I was asked to present as

24 -- to prepare information about the screening law to explain

25 to the jury and how that works in New Jersey.

1   Q.   All right.  And have you done those things?

2   A.   Yes.

3   Q.   Okay.  You mentioned preparation of some information in

4   connection with your testimony today.  I am going to direct

5   your attention to what has been marked for identification

6   purposes as Exhibit 36.  I believe you have it there on the

7   stand in front of you.  Is that a presentation that you

8   prepared in connection with your testimony?

9   A.   On the screen?

10  Q.   Is it there -- do you have something there on the table

11  in front of you?

12  A.   I have it, yes.

13  Q.   Okay.  Is that the presentation that you prepared?

14  A.   Yes.

15  Q.   All right.  Did you prepare it for the purpose of

16  assisting the jury to understand your testimony today?

17  A.   Yes.

18  Q.   All right.  And do you believe that it will assist the

19  jury in better understanding your testimony today?

20  A.   I hope so.

21          MR. COAN:  Okay.  Your Honor, I would ask

22  permission for Exhibit 36 to be published.  It will be used

23  for demonstrative purposes only and not entered as

24  substantive evidence.

25          THE COURT:  Objection?  Any objection?

| | |
|---|---|
| 1 | MR. YOO:  Would you please repeat the question?  I |
| 2 | mean -- |
| 3 | THE COURT:  Is there any objection to publishing of |
| 4 | the Demonstrative Exhibit 36? |
| 5 | MR. YOO:  Negative, sir. |
| 6 | THE COURT:  All right.  Very well.  It will be |
| 7 | received. |
| 8 | MR. COAN:  Thank you, Your Honor. |
| 9 | BY MR. COAN: |
| 10 | Q.  All right. |
| 11 | MR. YOO:  Actually -- actually, I didn't know |
| 12 | what -- what Mr. Coan was -- was referring to, but it is New |
| 13 | Jersey's screening law, and I object to it.  We are strictly |
| 14 | talking about federal standards -- |
| 15 | THE COURT:  Mr. Yoo, I don't need a legal argument |
| 16 | right now about that.  Is there an objection to the slide? |
| 17 | MR. YOO:  Yes, sir. |
| 18 | THE COURT:  If so, would you please state it |
| 19 | simply. |
| 20 | MR. YOO:  I object to relevancy because it only |
| 21 | pertains to New Jersey law and not federal law. |
| 22 | THE COURT:  Overruled. |
| 23 | MR. YOO:  I reserve my right to appeal, sir. |
| 24 | BY MR. COAN: |
| 25 | Q.  All right.  Dr. Larsen, if you would, let's walk through |

1  your first slide here with respect to New Jersey procedures

2  for involuntary commitments.

3  A.   All right.  This is New Jersey screening law.  It was

4  signed into law in 1987.  It is the commitment law in the

5  State of New Jersey.  It created the screening route of

6  commitment which requires an evaluation by a screener prior

7  to an evaluation by a board certified psychiatrist who must

8  be affiliated with the screening service.

9       It created screening services.  There has to be one

10  screening service in every county in New Jersey.  We have 21

11  counties.  So a minimum of one.  Some counties have more than

12  one.  It enables screeners also to outreach individuals in

13  the community who present as -- you know, as appearing to

14  suffer from a mental illness, which is something we were not

15  able to do before the screening law was passed.

16  Q.   All right  And let me stop you right there.  What county

17  does Rutgers University sit within in the State of New

18  Jersey?

19  A.   Middlesex County.

20  Q.   All right.  And what is the designated screening service

21  for Middlesex County, New Jersey?

22  A.   Acute Psychiatric Service.

23  Q.   Okay.  All right.  So this screening service is

24  established for each county, and then there is some outreach

25  that is -- that is set forth by the rules that allows

1   interaction with individuals in the community; is that

2   correct?

3   A.   That's correct.

4   Q.   All right.  Could we go to the next slide, please?

5        All right.  If you would, just explain to the

6   Members of the Jury this outreach exercise that occurs by

7   certified screeners?

8   A.   Okay.  Well, there is basically two routes.  A screener

9   can go into the community, evaluate someone, complete what we

10  call a transport form, and that mandates law enforcement to

11  arrange for the transport of that person to the screening

12  service.

13       In addition, a police officer on the basis of their

14  own observation can make a decision that they feel that the

15  person needs evaluation, and they can transport the person to

16  the screening service.

17  Q.   Is voluntary transport of an individual permitted by New

18  Jersey law?

19  A.   Yes.

20  Q.   What is the effect of voluntary transport of an

21  individual to a screening center?

22  A.   It is -- in the end when the person is evaluated, we are

23  going to make the determination whether they meet criteria

24  for commitment.

25  Q.   So if a person is transported voluntarily to a screening

1  center, does that preclude them -- subject to the other

2  requirements, does that preclude them from being

3  involuntarily committed to a mental institution?

4  A.  No.

5  Q.  And, in fact, do you have personal experience with

6  that --

7  A.  Yes.

8  Q.  -- with individuals who have been voluntarily

9  transported?

10  A.  Yes.

11  Q.  All right.  What would an example of that be?

12  A.  Actually, the previous trial where I testified, that

13  person did come in voluntarily.  He asked police to bring him

14  in.  But once we evaluated him, he was committed.

15  Q.  All right.  So outreach is permissible?

16  A.  Uh-huh.

17        MR. COAN:  And if we can go to the next slide,

18  please.

19  BY MR. COAN:

20  Q.  Outreach is available.  And what is the criteria that is

21  imposed on these screeners when they are evaluating the

22  individuals?

23  A.  They must determine that the person meets the definition

24  of mental illness as specified in the screening law, and they

25  must meet criteria for dangerous to self, others, or

1  property.

2         MR. COAN:  Okay.  And if we can go to the next

3  slide, please.

4  BY MR. COAN:

5  Q.  All right.  What is the definition of mental illness

6  under New Jersey law?

7  A.  Okay.  It is a current, substantial disturbance of

8  thought, mood, perception, or orientation which significantly

9  impairs judgment, capacity to control behavior, or capacity

10  to recognize reality.  Does not include simple alcohol

11  intoxication, transitory reaction to drug ingestion, organic

12  brain syndrome, or developmental disability unless it results

13  -- it results in the severity of impairment as described in

14  this definition.  The term "mental illness" is not limited to

15  psychosis or active psychosis, but shall include all

16  conditions that result in the severity of impairment as

17  described in the definition.

18  Q.  Okay.  So under the evaluation criteria, step 1 is:

19  Does the individual meet the definition of mental illness; is

20  that correct?

21  A.  That's correct.

22  Q.  Step 2 is:  Does the individual meet criteria for being

23  dangerous to themselves, others, or property; is that

24  correct?

25  A.  That's correct.

1        MR. COAN:  All right.  Next slide, please.

2    BY MR. COAN:

3    Q.   All right.  If you would just briefly explain how

4    dangerous to others or property is used in evaluating

5    individuals who have met this criteria for mental illness?

6    A.   It means that by reason of mental illness there is a

7    substantial likelihood the person in the foreseeable future

8    will act on behavior that would harm someone else or harm

9    property.

10        And we take into account the person's history,

11    their recent behavior, and a recent act or threat.  Dangerous

12    to self includes suicidal threats or behavior or failure to

13    take care of oneself.

14    Q.   All right.  Subject to the transport of the individual

15    to the screening center, what is next in the process?

16    A.   The screener will do an evaluation to determine whether

17    that person meets commitment criteria.

18        MR. COAN:  Okay.  If we can go to the next slide,

19    please.

20    BY MR. COAN:

21    Q.   And if that screener who conducts an evaluation at the

22    screening service determines that the individual meets

23    commitment criteria, what happens?

24    A.   If they do, then they would complete a screening

25    document, where the screener has to document how the person

1    meets the criteria for mentally ill, how the person meets

2    criteria for danger to self, others, and/or property, and

3    also has to show that the person cannot be treated in a less

4    restrictive environment.

5    Q.   All right.  And if the screener makes that determination

6    and completes the screening document, then what is the next

7    step?

8    A.   Then once that screening document is completed, it

9    must -- a board certified physician who is affiliated with

10   the screening service must evaluate the person.

11             MR. COAN:  All right.  Next slide, please.

12   BY MR. COAN:

13   Q.   So we have had outreach, we have had transport, we have

14   had evaluation by certified screener at screening service, we

15   have had screening document completed with the determination

16   as you just set forth.

17             What is the next step in the process?

18   A.   So the physician would evaluate the person and also make

19   the same determination whether the person is mentally ill and

20   whether the person is dangerous to self, others, and/or

21   property.

22             If the physician decides that that is the case,

23   that those criteria are met, then they complete a screening

24   certificate, which is a clinical certificate.

25   Q.   And what is the effect of that screening certificate by

1  the medical doctor?

2  A.    Once there is a screening document and a screening

3  certificate, the person is admitted to an involuntary

4  psychiatric unit.  That has to -- once that screening

5  certificate is completed, that person must be evaluated by

6  the inpatient psychiatrist within 72 hours.

7  Q.    The evaluation that must take place within 72 hours of

8  admission, the involuntary admission to the inpatient

9  treatment facility --

10 A.    Excuse me -- that evaluation on the inpatient unit must

11 happen within 72 hours of the completion of the screening

12 certificate.

13         So, for example, if at 2:00 o'clock on a Tuesday

14 the screening certificate is completed by -- go -- the 72

15 hours, that would be Friday -- by 2:00 o'clock on Friday,

16 that psychiatrist has to have done the evaluation, so it is

17 not just from admission to the inpatient unit.

18 Q.    Okay.  And then what is the criteria that is used for

19 the evaluation by the psychiatrist at the inpatient

20 facility?

21 A.    It is the same criteria.  The person must meet the

22 definition of being mentally ill and also a danger to self,

23 others, and property -- or property.

24 Q.    All right.  How is -- so we've got into the screening

25 document, we got transport, we have got screening document,

1  we have got screening certificate and clinical certificate.

2  Are there any other steps required for an individual to be

3  involuntarily committed --

4  A.   Yes.

5  Q.   -- in New Jersey?

6  A.   Yes.  So then the three documents, the screening

7  document, the screening certificate, and the clinical

8  certificate are reviewed by a judge.  If the judge determines

9  that all of this is in order, the judge will issue a

10  temporary order of commitment which involuntarily

11  hospitalizes the individual for 21 days.

12          MR. COAN:  All right.  If we can go to the next

13  slide, please.

14  BY MR. COAN:

15  Q.   All right.  And I think that that --

16  A.   That is a summary.

17  Q.   I want to make sure -- so, anything we left out of the

18  process here?  We have outreach, correct?

19  A.   Uh-huh.

20  Q.   Is that a "yes"?

21  A.   Yes.

22  Q.   And then transport to a screening center; is that

23  correct?

24  A.   Yes.

25  Q.   Evaluation by a certified screener at the screening

1    service; is that right?

2    A.    Uh-huh.

3    Q.    Is that a "yes"?

4    A.    Yes.

5    Q.    Screening document completed by the certified

6    screener?

7    A.    Yes.

8    Q.    Okay.  And then the certificates that you mentioned; is

9    that correct?

10   A.    Yes.

11   Q.    And then presentation of all of those papers, the

12   screening documents, screening certificate, and clinical

13   certificate to a Court for consideration of involuntary

14   commitment; is that correct?

15   A.    Yes, uh-huh.

16   Q.    The inpatient facility that you are familiar with that

17   you use through Rutgers is what hospital?

18   A.    I mean, we use more than one hospital.  We can use a

19   private hospital like Carrier or we would transport people to

20   what we call short-term care units, and those are in various

21   hospitals.

22   Q.    The private hospital that you mentioned Carrier, so is

23   it Carrier Hospital?

24   A.    Carrier Clinic.

25   Q.    Okay.  And that's an inpatient --

1  A.  Yes.

2  Q.  -- psychiatric facility?

3  A.  Yes.

4  Q.  Okay.  And do you know what county that that is located

5  in?

6  A.  Somerset, County.

7  Q.  Somerset, County.  Okay.  So Rutgers and the Rutgers

8  Behavioral Health Hospital are located within Middlesex --

9  A.  Yes.

10  Q.  -- and then the inpatient facility is located in

11  Somerset --

12  A.  Yes.

13  Q.  -- is that correct?

14  A.  Yes.

15  Q.  Who actually presents the application to the Court in

16  connection with this involuntary commitment process?  Is that

17  the hospital?

18  A.  I believe they arrange for the paperwork to be

19  transported to the court.

20  Q.  Okay.  Is there any type of governmental agency --

21  A.  County adjuster.

22  Q.  I'm sorry?

23  A.  I believe it is the county adjuster.

24  Q.  So is there a county adjuster for Middlesex County, New

25  Jersey?

1  A.   Yes.

2  Q.   Okay.  Have you -- let me direct your attention to that

3  big notebook there on the table in front of you.

4  A.   Uh-huh.

5  Q.   And I ask you to turn to Tab No. 9.

6  A.   Okay.

7  Q.   Were you asked to review documents in connection with

8  your work in this case?

9  A.   Yes.

10 Q.   Can you identify the documents that are marked as

11 Exhibit 9?

12 A.   Yes.

13 Q.   All right.  And what do those documents appear to be?

14 A.   This is the documentation related to the two commitments

15 in 2013 and 2015.

16 Q.   Okay.  And are these documents from Middlesex County

17 Adjusters Office?

18 A.   I believe so, yes.

19 Q.   And does Exhibit 9 contain a records custodian affidavit

20 on Pages 2 and 3, certifying that these are business records

21 created and maintained in the ordinary course of business by

22 the Middlesex County, New Jersey Adjuster?

23 A.   Yes.

24       MR. COAN:  Your Honor, at this time we would move

25 to admit Government's Exhibit No. 9.

1           THE COURT:  Any objection?

2           MR. YOO:  No objection, Your Honor.

3           THE COURT:  Very well.  They will be received.

4    BY MR. COAN:

5    Q.   Are these documents that you reviewed, do they concern

6    an individual by the name of Heon Jong Yoo?

7    A.   Yes.

8    Q.   Now, did you personally treat Mr. Yoo?

9    A.   No.

10   Q.   Were you involved with his involuntary commitment?

11   A.   No.

12   Q.   Okay.  All right.  So I think you mentioned there are

13   two sets of documents, groups of documents within this

14   Exhibit No. 9.  One set is from 2013; is that right?

15   A.   Yes.

16   Q.   And another set is from what year?

17   A.   2015.

18   Q.   Okay.  Well, let's talk about 2013 first.  And let me

19   ask you this:  So was a screening document completed by a

20   mental health screener?

21   A.   Yes.

22   Q.   And -- for Mr. Yoo?

23   A.   Yes.

24   Q.   And was the determination made, as you mentioned

25   earlier, about the required criteria for mental health --

1   mental illness and dangerousness?

2   A.   Yes.

3   Q.   All right.  Was a screening certificate completed by a

4   psychiatrist affiliated or associated with the screening

5   center?

6   A.   Yes.

7   Q.   All right.  If we could, if we could bring up

8   Page No. 9021.

9   A.   Yes.

10  Q.   All right.  And is this part of the screening

11  certificate that was completed?

12  A.   Yes.

13          MR. COAN:  All right.  And if we could highlight

14  No. 5 there.

15  BY MR. COAN:

16  Q.   So I think you mentioned for us earlier that the

17  evaluating psychiatrist has to make a determination as to the

18  patient; is that right?

19  A.   That's correct.

20  Q.   What does this finding contained in No. 5 confirm with

21  respect to the psychiatrist who conducted the examination for

22  this screening certificate?

23  A.   Repetitive -- this handwriting is not great.

24  Q.   If you look on the screen there, we are at No. 5.  I'm

25  sorry.

1  A.  Okay.  I'm sorry.  I am looking at a different part.

2       Personally examined this patient.  This patient

3  suffers from a mental illness as defined in Section I of this

4  form.  This patient, if not committed, would be a danger to

5  self or others or property by reason of such mental illness

6  in the foreseeable future.  This patient is unwilling to be

7  admitted to the recommended treatment program or facility

8  voluntarily for care.

9  Q.  All right.  As part of this group of documents related

10  to April of 2013, was a clinical certificate created by a

11  psychiatrist who was associated or affiliated with the

12  inpatient treatment facility?

13  A.  Yes.

14  Q.  And what was that inpatient treatment facility?

15  A.  Carrier Clinic.

16       MR. COAN:  And I could -- if we could pull up

17  Page 9031.

18       Again, highlight No. 5, please.

19  BY MR. COAN:

20  Q.  So this is a separate evaluation by a psychiatrist at

21  another hospital, correct?

22  A.  Correct.

23  Q.  Okay.  And, again, this is April 2013; is that right?

24  A.  Yes.

25  Q.  What was the finding of this other psychiatrist?

1   A.   Okay.   Again, I am aware of the standard for involuntary

2   commitment as defined in Section 1 above.   The following

3   checked statements are true.   I personally examined this

4   patient.   This patient suffers from mental illness as defined

5   in Section I of this form.   This patient, if not committed,

6   would be a danger to self or others or property for reason of

7   such mental illness in the foreseeable future.   This patient

8   is unwilling to be admitted to the recommended treatment

9   program or facility voluntarily for care.

10  Q.   All right.   And based on your review of the documents

11  from the adjuster for Middlesex County, did you see whether

12  there was an application to the court for Somerset, County

13  for an order of involuntary commitment?

14  A.   Yes.

15  Q.   Okay.   And was there a determination made based on that

16  application?

17  A.   Yes.   The judge issued a temporary order of

18  commitment.

19           MR. COAN:   Okay.   If we could bring up No. 9033.

20           All right.   If we could blow it up just a little

21  bit, please?

22  BY MR. COAN:

23  Q.   All right.   Is this the -- is this the commitment

24  order --

25  A.   Yes.

1  Q.   -- that you spoke of?

2  A.   Yes.

3  Q.   All right.  And what is the date of this commitment

4  order?

5  A.   8th day of April, 2013.

6  Q.   Okay.

7          MR. COAN:  And then if we could -- if we could

8  highlight the third paragraph there, please.  I'm sorry not

9  the numbered paragraph, the third paragraph from the top.

10 There you go.

11 BY MR. COAN:

12 Q.   So the Court is asked to make a determination based upon

13 submission of the certificates and screening document that

14 you described for us earlier; is that correct?

15 A.   Yes.

16 Q.   And what does the Court have to find to enter this order

17 for involuntary commitment?

18 A.   The Court upon review of the documents received, finding

19 there to be probable cause to believe that the above-named

20 patient is in need of involuntary commitment to treatment in

21 accordance with the standards set forth in N.J.S.A.

22 30:4-27 -- I'm sorry.  Let me get my glasses.

23 Q.   Okay.  Now, further down there it talks about a court

24 hearing scheduled for some day; is that correct?

25 A.   Yes.

1  Q.   Can the temporary order -- I think you told us earlier

2  that the temporary order for involuntary commitment of an

3  adult of the type that is Exhibit 9033, it is good for a

4  certain period of time; is that right?

5  A.   21 days.

6  Q.   Okay.  And so to extend the involuntary commitment of an

7  individual beyond the 21 days, is additional process

8  required?

9  A.   Yes.

10 Q.   Okay.  Is that what is being referenced there by the

11 setting of a Court hearing?

12 A.   Yes.

13 Q.   All right.  There was a -- was there a set of documents

14 included in Exhibit 9 concerning an involuntary commitment in

15 2015?

16 A.   Yes.

17 Q.   Okay.  And you reviewed all of those documents,

18 correct?

19 A.   Yes.

20 Q.   And these concern an individual by the name of Heon Jong

21 Yoo; is that right?

22 A.   Yes.

23 Q.   Okay.  And was a screening document completed by a

24 mental health screener in September of 2015 concerning Heon

25 Jong Yoo?

1   A.   Yes.

2   Q.   Was a screening certificate completed by a psychiatrist

3   affiliated or associated with the screening center?

4   A.   Yes.

5            MR. COAN:  All right.  If we could pull up

6   Page 9056, please.

7   BY MR. COAN:

8   Q.   And what does this appear to be?

9   A.   Can we enlarge it a little bit?

10            All righty.  This is the screening certificate.

11            MR. COAN:  All right.  And if we could highlight

12   No. 5, there.

13            All right.  Could we enlarge it just a little bit?

14   I'm sorry.

15            Okay.  Thank you.

16   BY MR. COAN:

17   Q.   So does this appear to be the same findings that were

18   required in terms of what is being asked of the evaluating

19   psychiatrist that you described earlier as part of the

20   process under New Jersey law?

21   A.   Yes.

22   Q.   Okay.  What was the finding with respect to this

23   screening certificate related to Heon Jong Yoo?

24   A.   Okay.  I am aware of the standards for involuntary

25   commitment as defined in Section I above.  The following

1  checked statements are true.  I personally examined this

2  patient.  This patient suffers from mental illness as defined

3  in Section I of this form.  This patient, if not committed,

4  would be a danger to self or others or property by reason of

5  such mental illness in the foreseeable future.  This patient

6  is unwilling to be admitted to the recommended treatment

7  program or facility voluntarily for care.

8         MR. COAN:  All right.  If we would pull up Page

9  9070, please.  If we could enlarge that.

10 BY MR. COAN:

11 Q.  Do you recognize this document?

12 A.  Yes.

13 Q.  What does this appear to be?

14 A.  This is -- this is a clinical certificate.

15 Q.  All right.

16        MR. COAN:  And the bottom of the page there, if we

17 could highlight that, No. 5.

18 A.  That is going to the next page.

19 BY MR. COAN:

20 Q.  Okay.  Again, similar finding required --

21 A.  Uh-huh.

22 Q.  -- of the --

23 A.  Same language.

24 Q.  -- of the --

25 A.  Yes.

1  Q.   -- evaluating psychiatrist?

2  A.   Yes.

3  Q.   So this is the psychiatrist -- just to be clear, so this

4  clinical certificate is completed by a psychiatrist at the

5  inpatient psychiatric facility; is that right?

6  A.   Yes.

7  Q.   And in 2015, September of 2015, that physician was

8  associated or affiliated with what inpatient psychiatric

9  facility?

10  A.   Carrier Clinic.

11  Q.   Okay.

12         MR. COAN:  And if we could go to 9071, please.  If

13  we could highlight the top there before the Roman Numeral.

14  BY MR. COAN:

15  Q.   All right.  And what were the findings made by this

16  psychiatrist in connection with the evaluation of Mr. Heon

17  Jong Yoo?

18  A.   I personally examined this patient.  This patient

19  suffers from a mental illness as defined in Section I of this

20  form.  This patient, if not committed, would be a danger to

21  self and/or others or property by reason of mental illness in

22  the foreseeable future.  This patient is unwilling to be

23  admitted to the required treatment program or facility

24  voluntarily for care.

25  Q.   In the documents that you reviewed that are contained in

1    Government's Exhibit 9, that group of documents related to a

2    September 2015 commitment.  Did you see an application that

3    was made to the court of Somerset County for an order of

4    involuntary commitment?

5    A.    Yes.

6    Q.    And was it submitted by the adjuster for Middlesex

7    County, New Jersey?

8    A.    Yes.

9    Q.    And what was the Court's determination based on a

10   submission of that application?

11   A.    The judge issued a temporary order of commitment.

12            MR. COAN:  All right.  If we could pull up 9036,

13   please.  All right.  If we could enlarge it just a little

14   bit.

15   BY MR. COAN:

16   Q.    Okay.  Do you recognize that document?

17   A.    Yes.

18   Q.    Okay.  What is it?

19   A.    This is a temporary order of commitment.

20   Q.    All right.  And the date on that temporary order for the

21   involuntary commitment of an adult -- well, first off, who is

22   this -- in the matter of what individual?

23   A.    Heon Jong Yoo.

24   Q.    Okay.  And the date of this order is what?

25   A.    24th day of September, 2015.

1      MR. COAN:  And if we could go down to the third

2    paragraph there.

3    BY MR. COAN:

4    Q.   All right.  What was the determination that was made by

5    the Court based upon the submission of the screening

6    document, clinical certificate, and screening certificate

7    that you have just described for the jury?

8    A.   The Court, upon review of the documents received finding

9    there to be probable cause to believe that the above-named

10   patient is in need of involuntary commitment to treatment in

11   correspondence with the standards set forth in N.J.S.A.

12   30:4-27(m).

13   Q.   All right.  And as with the -- thank you -- April 2013

14   commitment, this order of involuntary commitment that is

15   entered by the Superior Court for Somerset County, New Jersey

16   is in effect for what period of time?

17   A.   21 days.

18   Q.   And for there to be involuntary commitment beyond that

19   period, there would need to be some additional procedures and

20   applications; is that correct?

21   A.   That's correct.

22      MR. COAN:  All right.  Your Honor, I will pass the

23   witness.

24      THE COURT:  Cross-examination?

25                  CROSS-EXAMINATION

```
1    BY MR. YOO:

2    Q.   Good afternoon, Dr. Larsen -- right?

3    A.   Yes.

4    Q.   So -- so you are familiar with -- with -- with

5    university state law, correct?

6    A.   Yes.

7    Q.   In terms of involuntary -- in terms of mental health?

8    A.   Screening law, yes.

9    Q.   Are you familiar with the federal NICS background check

10   law?

11   A.   No.

12   Q.   And the federal standards for what should be adjudicated

13   mentally defective or committed to a mental institution?

14   A.   No.

15   Q.   Are you familiar with the federal gun law?

16   A.   No.

17   Q.   Okay.  Thank you for your honesty.  So let's -- let's

18   examine this document.

19           MR. YOO:  Permission to approach -- approach the

20   witness?

21           THE COURT:  All right.  Yes.  Can you identify what

22   the document is?

23           MR. YOO:  This is the code -- code about New

24   Jersey -- New Jersey mental health code.

25           THE COURT:  Okay.
```

1           MR. YOO:  This is also a booklet about New Jersey

2   mental health.  Permission to approach the witness?

3           THE COURT:  Why don't you do it one at a time.

4           MR. YOO:  Yes.

5   BY MR. YOO:

6   Q.   Is that correct code so far?

7   A.   Yes, this is the screening law.

8   Q.   Yes, sir -- yes, ma'am.

9           MR. YOO:  So let's pull up the temporary commitment

10  order please on the screen.

11          MR. COAN:  Your Honor, there are two commitment

12  orders.

13          THE COURT:  Which order are you talking about?

14          MR. YOO:  2013.

15  BY MR. YOO:

16  Q.   Okay.  So for 2013 -- 2013.  So which date did I -- did

17  the hospital receive this order?

18  A.   I'm really not clear what your question is.

19  Q.   So on which date -- which day of April was this order

20  issued?

21  A.   According to this order, it was effective, I believe,

22  the 8th day of April.

23  Q.   Which date was the hearing, scheduled court hearing?

24  A.   It would help if this can be enlarged a little bit.

25          THE COURT:  That might help all of us.

1  A.   Yeah, okay.  Okay.  So the hearing referred to here is

2  scheduled for 10:00 a.m. on the 23rd day of April 2013 at

3  Carrier Clinic.

4         MR. YOO:  Okay.  I would like for the jury to take

5  the notice of those dates.

6         THE COURT:  Well, the jury is looking at the

7  document just like we all are, Mr. Yoo.

8         MR. YOO:  I would like to request the jury to take

9  notes of those exact dates.

10        THE COURT:  Mr. Yoo, you know I instructed the jury

11 at the beginning of this trial they could take notes if they

12 wished to.

13        MR. YOO:  Yes, sir.

14 BY MR. YOO:

15 Q.   All right.  So for 2013 supposed commitment, do you

16 know -- do you know which facility I was, quote, unquote,

17 committed at?

18 A.   You were committed to the involuntary bed at Carrier

19 Clinic.

20 Q.   Oh, sorry.  First let me ask you this:  Was I admitted

21 or committed?

22 A.   Say that again, please.

23 Q.   Was I temporarily detained, or was I formally committed?

24 Those two are complete different things.

25 A.   A temporary order means an involuntary

1  hospitalization.

2  Q.   Involuntary hospitalization, okay.  Which date was I

3  discharged from Carrier Clinic for 2013?

4  A.   I have no idea.

5  Q.   Okay.  Okay.  Let's skip to exhibit for the 2013

6  Carrier.  It is Exhibit 10.  And let's look at discharge

7  date.

8          THE COURT:  Mr. Yoo, I don't think the Government

9  has a copy of that, so you will have to provide one for the

10  witness.

11          MR. COAN:  It is not in evidence.

12          MR. YOO:  There is actually a copy of it.

13          THE COURT:  Well, I don't have a copy, and Mr. Coan

14  says the Government doesn't have a copy, and I am pretty sure

15  the witness doesn't have a copy.

16          MR. YOO:  No, it is actually Government's

17  exhibit.

18          THE COURT:  Oh, the Government's exhibit.

19          MR. COAN:  What I am saying is we haven't

20  introduced it into evidence.

21          THE COURT:  Okay.

22          MR. YOO:  No, but this is a -- this is not a

23  collateral attack, Your Honor.  This is a direct attack.

24          THE COURT:  Well, Mr. Coan, do you have any

25  objection to Mr. Yoo seeking to have this exhibit admitted

1    himself?

2           MR. COAN:  I would ask for him to lay a proper

3    foundation.

4           THE COURT:  All right.  Mr. Yoo, let's see if you

5    can lay the foundation for this exhibit before you move

6    for --

7           MR. YOO:  I am.

8           THE COURT:  -- its admission.

9           MR. YOO:  Sorry, sir.  I didn't mean to interrupt.

10   I meant to establish the grounds that I was discharged before

11   going to the scheduled court hearing, and that is why I need

12   to prove the date which I was discharged.  I know the date on

13   top of my head, but I need an evidence to prove.

14          THE COURT:  I understand.  You need to lay the

15   foundation for the exhibit if you are going to move its

16   admission though.

17          MR. YOO:  Yes, sir.  Basically I --

18          THE COURT:  I am not sure this is the witness to do

19   that with.  But this is your cross-examination.

20          MR. YOO:  Yes, sir.  I am trying to say that -- all

21   right.  Was there a final adjudication -- all right.  Then

22   let me establish grounds by asking her a question first.

23          THE COURT:  That's a good way to do it.

24   BY MR. YOO:

25   Q.   Was there a final adjudication, means both sides could

1   be heard?

2   A.   What do you mean by a final adjudication?

3   Q.   Adversary proceeding at the court with an examination of

4   evidences, you know, proper representation, and then a

5   adversary hearing before a legal authority like a judge?

6   A.   I don't know.

7   Q.   Okay.  Okay.  Was -- so -- was -- was this commitment --

8   supposed temporary order established strictly based on

9   ex parte communication with the -- the screener and the

10  court?

11  A.   I really don't understand your question.

12  Q.   Did I participate in the procedure of issuance of this

13  commitment -- temporary detention order?

14  A.   I don't know.  I know the documentation that is

15  necessary for the temporary order of commitment was completed

16  and reviewed by the judge.

17  Q.   So -- so I am just clarifying.  You do not know whether

18  I had -- have -- sorry.  Let me ask you -- wrong question.

19          Are you -- are you familiar with the term

20  "ex parte"?

21  A.   No.

22  Q.   Okay.  Ex --

23          MR. YOO:  Your Honor, permission to explain.

24          THE COURT:  How about you rephrase the question.

25          MR. YOO:  Okay.

1  BY MR. YOO:

2  Q.   Did I actively participate before the court in terms of

3  this procedure, communication between -- between the screener

4  and the court --

5  A.   I don't know.

6  Q.   -- in terms of issuing the --

7  A.   Again, I don't know.

8  Q.   So you have --

9  A.   I have no information about that.

10  Q.   -- no personal knowledge?

11  A.   No.

12  Q.   Okay.  All right.  Do you -- are you familiar with --

13  with my discharge date?

14  A.   No.

15  Q.   Okay.  Have I ever been to a hearing?

16  A.   I don't know.

17       MR. YOO:  All right.  The ground has been

18  established?

19       THE COURT:  I don't see how.  I don't see how they

20  have been established, Mr. Yoo.  In fact, I think you haven't

21  established it at all.

22  BY MR. YOO:

23  Q.   If I get discharged prior to hearing, do I need to go

24  through a hearing, court hearing?

25  A.   I assume not.

1          MR. YOO:  Okay.  Now -- now -- now, can we

2    please -- I would like to admit Exhibit No. 10, Government's

3    Exhibit No. 10 to the -- to the evidence log.  It actually

4    prove that -- excuse me for a second.

5          (Attorney conference off the record.)

6          MR. YOO:  Actually, may I -- permission to direct

7    the witness to flip to Government's Exhibit No. 10.

8          THE COURT:  The Government's Exhibit No. 10, yes,

9    she can review that.

10   A.   Okay.

11   BY MR. YOO:

12   Q.   Is that -- is that record -- is that correct and true

13   record kept by Carrier Clinic?

14   A.   I don't know.  I have no way to verify this.

15   Q.   Okay.  Would you flip to the Page 010 -- 0100 -- 01 --

16   010008.  Oh, wait that is 2015.  I apologize.  We were just

17   talking about 2013.

18         MR. YOO:  May I get the -- the temporary detention

19   order on the screen again, please, for 2013?

20         THE COURT:  Which one?

21         MR. COAN:  Which order?

22         MR. YOO:  Temporary detention order for 2013.

23   Actually, no, temporary detention order for 2015.  Let's go

24   to 2015 first since we already flipped to 0100008.

25         Okay.  No.  The temporary detention order.

1      MR. COAN:  Your Honor, first of all, it is not a

2  temporary detention order.  There is a temporary order of

3  involuntary commitment.  There are two of them.  So our

4  litigation support specialist, who is trying her best to

5  assist the Defendant, if he could be more specific at a

6  minimum what the document is.  And if he could identify the

7  page number, that would be even better.

8      THE COURT:  Okay.  So is it 2015 you are asking for

9  Mr. Yoo; is that correct?

10     MR. YOO:  Yes, sir.  2015.  The order from, I

11  believe, Middlesex Superior Court or -- no, Somerset Superior

12  Court, I believe, by Kevin Shanahan.

13     THE COURT:  Okay.

14     MR. YOO:  Would you magnify on the items 1,

15  2 and -- no.  It is on this date 24th.

16  BY MR. YOO:

17  Q.  Okay.  So you have the Government's Exhibit 0100008 open

18  correct?

19  A.  Uh-huh.

20  Q.  Dr. Larsen?

21  A.  Yes.

22  Q.  At the right -- at the quadrant one of that page, there

23  is a discharge date.  Would you please read the discharge

24  date out for me?

25     MR. COAN:  Hold on.  Hold on, Your Honor.

1          THE COURT:  Yes.

2          MR. COAN:  Now we are asking the witness to read

3    from documents that have not been introduced into evidence.

4          THE COURT:  Right.

5          MR. YOO:  Your Honor, this is relevant because it

6    has to do with -- with either the supposed commitment

7    that -- that the Prosecution is -- is formal commitment

8    pursuant to the federal law, NICS Improvement Amendments Act

9    of 2007 or just a -- as -- a -- actually a temporary

10   detention or retention just -- just following an ex parte

11   proceeding, which is a severe violation of -- of Fifth

12   Amendment rights.

13         MR. COAN:  What is the foundation?

14         THE COURT:  Can you help me understand how the

15   discharge date is relevant to any of those things?

16         MR. YOO:  Yes, sir.

17         THE COURT:  And could I ask -- go ahead.

18         MR. YOO:  Yes, sir.  Because if I was -- if I was

19   discharged prior to a hearing that -- I have never been to a

20   hearing because Dr. Larsen admitted if I was -- if I am

21   discharged prior to a hearing, I did not have to go to a

22   hearing.

23         THE COURT:  Let me ask this, Mr. Coan, can we maybe

24   stipulate to what the discharge date was?

25         MR. COAN:  Your Honor, we can stipulate.  If we

```
 1   would look within Exhibit 9.

 2            THE COURT:  Okay.  Why don't we use Exhibit 9 --

 3            MR. COAN:  Which has been introduced in evidence.

 4            THE COURT:  -- which is an Exhibit that has been

 5   introduced into evidence.

 6            MR. YOO:  Oh, yeah.  There is discharge date in

 7   Exhibit 9.  I apologize.  I didn't -- okay.

 8   BY MR. YOO:

 9   Q.   Okay.  So would you turn to section -- 0090 --

10   Dr. Larsen, would you turn to 009004.

11            MR. YOO:  May I please get that on the display?

12            I apologize to the jury for unnecessary delay.

13   BY MR. YOO:

14   Q.   Okay.  So according to this document, which date was I

15   discharged from the Carrier Clinic?

16   A.   April 19th.

17   Q.   April 19th.

18            MR. YOO:  Okay.  Let's go to the temporary

19   detention order, which is --

20            MR. COAN:  Your Honor --

21            MR. YOO:  Temporary detention order --

22            MR. COAN:  Your Honor --

23            MR. YOO:  -- of 2013, please.

24            MR. COAN:  Your Honor, I am going to object --

25            THE COURT:  Let's --
```

1    MR. COAN:  -- to the mischaracterization.

2    THE COURT:  I will sustain the objection.  Let's

3    just refer to it as the document -- whatever the document

4    number is.

5    MR. YOO:  Document number.

6    THE COURT:  Which exhibit is it?

7    MR. YOO:  00 -- 009033.

8    THE COURT:  And that is part of Exhibit 9.

9    MR. YOO:  Yes, sir.

10    THE COURT:  Okay.

11    BY MR. YOO:

12    Q.  Okay.  Let's -- let's look at the -- the -- the date

13    there.

14    MR. YOO:  Can we magnify -- there it is.  Thank

15    you.  I appreciate it.

16    BY MR. YOO:

17    Q.  All right.  So the court hearing was scheduled for

18    2013 -- 2013-04-23, 1000 hours; is that correct?

19    A.  I don't understand the way you are expressing this.

20    Q.  Oh, you are not familiar with military date format or

21    time?

22    A.  No.

23    Q.  Okay.  April 23rd of 2013, 10:00 a.m., that is hearing,

24    correct?

25    A.  Correct.

1   Q.   So there is no -- no possibility that I have actually

2   been to a court hearing, so -- so, in order for a person to

3   be formally committed, a person has to go through a proper

4   due process and a hearing because that is deprivation of a

5   person's liberty; is that correct?

6            MR. COAN:  Objection, Your Honor.

7            THE COURT:  Can you rephrase the question in a way

8   that, perhaps, the witness can answer?

9   BY MR. YOO:

10  Q.   Are you aware of the -- sorry.  Are you aware of the

11  difference between a temporary order and a formal -- formal

12  order?

13  A.   No.

14  Q.   Okay.  All right.  So -- and, again, before we move on

15  to 2015, so you have no personal knowledge that I have

16  ever -- ever been to a hearing on 2013; is that correct?

17  A.   Yes.

18  Q.   Okay.  So you have no personal knowledge?

19  A.   That's correct.

20  Q.   Okay.  All right.  So let's go to -- let's go to --

21  where is the 2015 one?  Let's go to Exhibit 009035.  So what

22  is the -- this is the correct certificate of discharge from

23  Carrier Clinic; is that correct?

24  A.   I would have no way of knowing that.

25  Q.   Okay.  So -- but what you are looking at, it says

1  certificate of discharge of Carrier Clinic, correct?

2  A.  Yes.

3  Q.  And the -- it says the patient was discharged on

4  September 30th of 2015; is that correct?

5  A.  Yes.

6  Q.  And -- and was it received by the Court?

7  A.  I don't know.

8  Q.  Would you please take a look at the -- right in the

9  middle of the page is there a stamp?

10  A.  Yes.

11  Q.  Okay.  Is there a court stamp?

12  A.  I honestly don't know.

13  Q.  Okay.  Let's flip one page and move to 009036.

14          Okay.  So September 30th was the date, according to

15  my memory, when I was discharged.

16          MR. YOO:  Can we magnify on -- it is from then and

17  on?

18  BY MR. YOO:

19  Q.  And -- okay.  So the Court hearing was scheduled on

20  which date?

21  A.  You want me to read this?

22  Q.  Yes.

23  A.  6th day of October, 2015.

24  Q.  Okay.  Is that prior or -- is that prior to or after

25  September the 30th of 2015?

1  A.   After.

2  Q.   After.  So I was discharged before I ever -- I've ever

3  had opportunity to -- to be heard at an open court; is that

4  correct?

5          MR. COAN:  Objection.

6  BY MR. YOO:

7  Q.   On both counts?

8          THE COURT:  Hold on, Mr. Yoo.  What is the

9  objection?

10          MR. COAN:  He is testifying from the podium.

11          THE COURT:  Yeah.

12          Mr. Yoo, confine your questions to questions of the

13  witness.  Okay?

14          MR. YOO:  Sir, that was a --

15          THE COURT:  You will have an opportunity to testify

16  if you want to.

17          MR. YOO:  Sir, I believe that was -- I mean, I

18  believe that -- that was in the form of a question.

19          THE COURT:  Well, just proceed and just try not to

20  testify, Mr. Yoo.

21          MR. YOO:  Okay.

22  BY MR. YOO:

23  Q.   Did I have any opportunity to be heard on both counts in

24  open court?

25  A.   I don't know.

1  Q.   All right.  So -- so on the -- on the screen documents

2  on both times the psychiatrist established the grounds that I

3  am a danger to myself or others; is that correct?

4  A.   At the time of that evaluation, yes.

5  Q.   Did they have any factual evidentiary basis or personal

6  knowledge to base that decision?

7           MR. COAN:  Your Honor, objection.

8           THE COURT:  I sustain the objection.  Move along.

9           MR. YOO:  Okay.

10  BY MR. YOO:

11  Q.   So -- so do you have any -- do you have any personal

12  knowledge that I was a danger to myself or others?

13  A.   I have no personal knowledge of your actual evaluation.

14  I was not involved with it.

15  Q.   Okay.  Is it impossible for, quote, unquote, medical

16  professional to lie?  Is it impossible?

17           THE COURT:  I'm going to permit him to ask it.

18           THE WITNESS:  Okay.  I am supposed to answer that?

19           THE COURT:  Yes.

20  A.   Is it possible for a medical professional to lie?

21  BY MR. YOO:

22  Q.   Is it physically impossible, yes.

23  A.   Impossible?  Anyone can lie.

24  Q.   Is it possible for a medical professional to be biased

25  based on their political opinion?

1          MR. COAN:  Your Honor, argumentative.

2          THE COURT:  I will let him ask it.

3          You can answer the question.

4   A.   Is it possible for them to be biased based on their

5   political opinion?

6   BY MR. YOO:

7   Q.   Yes.

8   A.   I would say it is unlikely, very unlikely.

9   Q.   But is it possible at all?

10  A.   Anything is possible.

11         MR. YOO:  All right.  I will pass on the witness,

12  Your Honor.  Actually -- I will pass on the witness, Your

13  Honor.

14                 REDIRECT EXAMINATION

15  BY MR. COAN:

16  Q.   Dr. Larsen, you described for us the process under

17  New Jersey law for involuntary commitment of an individual

18  for mental health treatment; is that correct?

19  A.   That's correct.

20  Q.   Okay.  You identified for us multiple stages of

21  evaluation that are required before that can occur; is that

22  right?

23  A.   That's right.

24  Q.   Is each one of those evaluations independent from the

25  other?

1   A.   Yes.

2   Q.   Is some type of court action required in New Jersey

3   before somebody can be involuntarily committed?

4   A.   The judge must review the documentation, the screening

5   document, the screening certificate, and the clinical

6   certificate.  And if that review is satisfactory, the judge

7   can issue the temporary order of commitment.

8   Q.   Okay.

9        MR. COAN:  And, if we could, if we could bring up

10  9033, please.

11  BY MR. COAN:

12  Q.   Okay.  And, again, this is the temporary order of

13  commitment, involuntary commitment for Heon Jong Yoo; is that

14  correct?

15  A.   That's correct.

16  Q.   And this is dated April 8th of 2013; is that correct?

17  A.   Yes.

18  Q.   Okay.  Just to be clear, is this called a temporary

19  confinement order?

20  A.   No, it is called a temporary order for the involuntary

21  commitment of an adult.

22  Q.   Is it called a temporary detention order?

23  A.   No.

24  Q.   Does this order commit an individual merely for

25  observation?

1    A.    No.

2    Q.    What is the purpose of this order?

3    A.    Treatment.

4          MR. COAN:  And, if we could, if we could go to

5    9036, please.

6    BY MR. COAN:

7    Q.    And this is the temporary order for involuntary

8    commitment regarding Heon Jong Yoo from September 2015; is

9    that right?

10   A.    Yes.

11   Q.    And what is the date of that order?

12   A.    24th day of September, 2015.

13   Q.    Okay.  And, again, is this called a temporary

14   confinement order?

15   A.    No.  It is called a temporary order for the involuntary

16   commitment of an adult.

17   Q.    Okay.  And is this order different from the 2013 order.

18   By that, I mean, does this one commit Mr. Yoo merely for

19   observation?

20   A.    It is the same as the 2013 order.  It is for

21   treatment.

22   Q.    Dr. Larsen, was Heon Jong Yoo involuntarily committed to

23   a mental institution in April of 2013?

24   A.    Yes.

25   Q.    Was Heon Jong Yoo involuntary committed to a mental

1    institution in September of 2015?

2    A.   Yes.

3    Q.   All right.  Thank you.

4            MR. COAN:  I will pass the witness.

5            MR. YOO:  Your Honor, I would like to bring up one

6    of my past -- past exhibits of the federal code.  Any

7    objections?

8            THE COURT:  Has it been -- which one is it, Mr.

9    Yoo?  Help me.

10           MR. YOO:  Public law 110, 180.

11           THE COURT:  Okay.  Can you tell me what it's --

12           MR. YOO:  Standard for adjudication and commitment

13   related to mental health.

14           THE COURT:  Mr. Coan?

15           MR. COAN:  Several things.  One, the same relevance

16   objections that we had with the previous witness.  And I

17   would also add that this witness has also testified to lack

18   of personal knowledge and familiarity with federal law.

19           THE COURT:  Okay.  Mr. Yoo, do you understand what

20   Mr. Coan's objection is?

21           MR. YOO:  Yes, sir.

22           THE COURT:  Help me understand how it is

23   relevant.

24           MR. YOO:  Because that means that exhibit --

25   Your Honor, may I ask you one question?

1          THE COURT:  Yes.

2          MR. YOO:  Is this -- are we -- am I getting charged

3    with a federal law or state law?

4          THE COURT:  Well, the Indictment is a Federal

5    Indictment.

6          MR. YOO:  Yes, sir.  Then federal law -- I do

7    believe that the federal law is more pertinent than the state

8    law in terms of Federal Indictment.

9          THE COURT:  I am going to give you a little bit of

10   latitude, Mr. Yoo.  Let's see what the witness's knowledge

11   is.

12         MR. YOO:  Yes, sir.

13         Can we get the projector?

14         THE COURT:  Yeah.  You will need to use the ELMO.

15         MR. YOO:  So -- all right.

16                    RECROSS-EXAMINATION

17   BY MR. YOO:

18   Q.   Well, first of all, Dr. Larsen, this is something called

19   the NICS Improvement Amendments Act of 2007.  It was enacted

20   January 8th.  Are you familiar with this law?

21   A.   No.

22   Q.   All right.  Mind if I show you a section of this law?

23         THE COURT:  I am not sure where we are going,

24   Mr. Yoo.  Maybe you could give me a roadmap.

25         MR. YOO:  I would say, by this definition, was I

1   committed?

2           MR. COAN:  Several things, Your Honor.  First, this

3   does not set forth the definition of committed to a mental

4   institution under federal law, and it certainly does not set

5   forth the definition under New Jersey state law.

6           MR. YOO:  Objection, Your Honor.  Misleading the

7   jury.

8           MR. COAN:  Second.  The witness has testified to a

9   lack of personal knowledge, so this is improper.

10          THE COURT:  She doesn't have any knowledge about

11  your treatment or commitment, Mr. Yoo, so I am not

12  particularly sure how it is relevant.  I will allow you to

13  present the witness with the document and ask her if she is

14  familiar with the definition.

15          MR. YOO:  Yes, sir.

16          THE COURT:  If she is, I will permit you to ask any

17  follow-up questions that are appropriate.

18          MR. YOO:  Yes, sir.

19          THE COURT:  If she is not, we are going to move on.

20          MR. YOO:  Yes, sir.

21  BY MR. YOO:

22  Q.   So you are familiar with the state law and what that

23  order is about, basically?

24  A.   Yes.

25  Q.   The temporary order for involuntary commitment?

1    A.    Under state law, yes.

2    Q.    All right.  So let me show you an Exhibit about a

3    federal law.

4            THE COURT:  Mr. Yoo, you are going to have to hand

5    the document to the witness.

6            MR. YOO:  Okay.

7    BY MR. YOO:

8    Q.    Would you mind reading that code for me?

9    A.    Which part do you want me to read?

10   Q.    (1)(c) and (C) please.  I mean (1) --

11   A.    Okay.  (c) standard for adjudications and commitments

12   related to mental health.

13           THE COURT:  Dr. Larsen, not into the record.  Just

14   read it to yourself.

15   A.    Oh.  (Witness complies.)

16   Q.    Are you done yet?

17   A.    I am finished, yes.

18   Q.    So do you understand what that code says?

19   A.    I think so.

20   Q.    So was I -- was I committed if we -- pursuant to that

21   standard?

22           MR. COAN:  Your Honor?

23           THE COURT:  Yes.

24           MR. COAN:  Objection.  Calls for legal conclusion

25   and invades the province of the Court, and it is beyond her

1  personal knowledge.

2          MR. YOO:  Objection, Your Honor.  I am just trying

3  to -- I am just trying to make her testify on her

4  interpretation of that law and on her comprehension of that

5  law.

6          MR. COAN:  It calls for speculation.

7          THE COURT:  Counsel approach.

8          (Bench conference held.)

9          THE COURT:  I am a little concerned, frankly,

10  because I am not sure what capacity this witness is

11  testifying in.  You all filed a notice that she was going to

12  be testifying as an expert in some regard, and that you all

13  thought some of the opinions she was going to be rendering

14  were appropriate opinion testimony from a lay witness.

15          You didn't -- you didn't ask that she be, you know,

16  declared an expert witness.  You didn't describe her as that.

17  So I am not quite sure whether she testified as an expert or

18  not.

19          If she testified as an expert, then I think this is

20  an appropriate, you know, appropriate grounds for

21  cross-examination.

22          So can you tell me, Mr. Coan, how is this witness

23  appearing today?

24          MR. COAN:  Your Honor, as she was disclosed, she is

25  testifying as an expert.  I didn't formally tender her as an

expert because in some instances that can draw an objection
as bolstering.

I believe that she was qualified in the initial
colloquy as part of her direct examination to testify about
what the procedure is for involuntary commitments under
New Jersey law.

She then defined what the procedure is under
New Jersey state law; and then, based on her review of the
documents relating to the Defendant, testified that that
procedure complied with New Jersey state law.  That was the
extent of her testimony.

The concern that I have and that I have with the
previous witness is that Mr. Yoo is trying to use legislation
to define terms that are going to be subject to the Court's
instruction to the jury.

And he is using the wrong portion of that law.  He
keeps acting as if the record reporting requirements by the
Federal Government when the Federal Government involuntarily
commits someone such as a veteran by the VA hospital, what
records --

MR. YOO:  I am going to object.

MR. COAN:  -- and information are they required to
report to NICS.  The definition of committed to a mental
institution, as set forth in 922(g)(4), is not further
defined, elaborated on, or changed in any way by the

 1    legislation that Mr. Yoo wants to use to cross-examine the

 2    witnesses.

 3              THE COURT:  Mr. Yoo, I want you to tell me very

 4    succinctly why that is wrong.

 5              MR. YOO:  That is completely false, Your Honor.  It

 6    clearly states word by word on the NICS Improvement

 7    Amendments Act of 2007, which is a public law 180-110 Charlie

 8    is for -- Charlie 1 is for standards of NICS commitment.

 9              Charlie 1 is I believe for standards of commitment.

10    And --

11              THE COURT:  Mr. Yoo, I need you to really focus

12    here.

13              MR. YOO:  It defines --

14              THE COURT:  What Mr. Coan has just told me is that

15    the definition and the law that you are trying to get this

16    witness to review --

17              MR. YOO:  Yes.

18              THE COURT:  -- is related to the definition of

19    mental incompetency in a completely different area.

20              MR. YOO:  Negative, sir.

21              THE COURT:  Okay.  Then you need to explain very

22    succinctly why he is wrong.  Let's stop the military lingo.

23              MR. YOO:  Let me bring the book --

24              THE COURT:  Okay.  Bring it up.

25              (Pause in proceedings.)

1          (Showing document to Court.)

2          MR. YOO:  And then it states standards for

3    adjudication.

4          THE COURT:  All right.  Let me look at this.

5          (Pause in proceedings.)

6          THE COURT:  All right.  Mr. Yoo, where is the

7    definition of commitment, though, that you are wanting to

8    cross-examine the witness with?

9          MR. YOO:  (Indicating.)

10         THE COURT:  That is not a definition of

11   commitment.

12         MR. YOO:  I understand, but this -- this basically

13   says, what is admissible as commitment in terms of federal

14   gun laws?

15         THE COURT:  No.

16         MR. COAN:  No.

17         MR. YOO:  Yes, it does.

18         THE COURT:  Sorry.  Move along.

19         MR. YOO:  To NICS --

20         THE COURT:  The objection is sustained.

21         MR. YOO:  Sir?  Sir?

22         THE COURT:  The objection is sustained, Mr. Yoo.

23   Move along.

24         (Bench conference concluded.)

25   BY MR. YOO:

1  Q.   Okay.  Are you familiar with the case United States vs.

2  Rehlander?

3  A.   No.

4          MR. YOO:  I will pass on the witness.

5                  FURTHER REDIRECT EXAMINATION

6  BY MR. COAN:

7  Q.   Dr. Larsen, thank you.  Just to clarify, the court

8  hearing that is referenced in the commitment orders,

9  involuntary commitment orders, the purpose of those hearings

10  is to what?

11  A.   It is to determine whether continued commitment is

12  necessary.

13  Q.   Okay.  Thank you.

14          MR. COAN:  I pass the witness, Your Honor.

15          THE COURT:  Mr. Yoo.

16                  FURTHER RECROSS-EXAMINATION

17  BY MR. YOO:

18  Q.   To the best of your knowledge, was I required to go

19  through any more treatment after discharge by the court?

20  A.   I don't know.

21          MR. YOO:  I will pass on the witness.

22          MR. COAN:  No additional questions.  May this

23  witness be finally excused?

24          THE COURT:  May the witness be excused, Mr. Yoo?

25          MR. YOO:  Yes.

1      THE COURT:  You may step down, Dr. Larsen.

2      Government may call its next witness.

3      MR. COAN:  United States calls Special Agent James

4  Reed.

5      THE COURT:  Mr. Reed, have you not been sworn?

6      THE WITNESS:  I have not been sworn.

7      (Witness sworn.)

8      JAMES REED, GOVERNMENT'S WITNESS, SWORN,

9                  DIRECT EXAMINATION

10  BY MR. COAN:

11  Q.   Good afternoon.

12  A.   Good afternoon.

13  Q.   Would you state your name for the record, please?

14  A.   James Reed.

15  Q.   And how are you currently employed?

16  A.   Special Agent with the ATF out of Tyler, Texas.

17  Q.   And tell us a little bit about what you do with ATF?

18  A.   My main job with ATF is to investigate federal firearms

19  and explosives and arson laws.  I am out of the Tyler, Texas

20  field office, so we primarily investigate crimes occurring in

21  the Eastern District of Texas.

22  Q.   Would you tell the jury a little bit about your

23  educational background?

24  A.   Got my undergrad at Texas A&M University in Political

25  Science.  My Master's is also from Texas A&M University at

1   the Bush School of Public Administration.  That is my

2   educational background, sir.

3   Q.   Any military service?

4   A.   No, sir.

5   Q.   Any prior law enforcement experience?

6   A.   No, sir.

7   Q.   In the course and scope of your employment with ATF, did

8   you become involved in an investigation of an individual by

9   the name of Heon Jong Yoo?

10  A.   Yes, I did.

11  Q.   And was the nature of that investigation potential

12  federal firearms violations?

13  A.   Yes, sir, that was the nature of the investigation.

14  Q.   Did your investigation reveal a number of firearms

15  transactions where Mr. Yoo represented that he was a United

16  States citizen?

17  A.   Yes, sir.  There were multiple 4473 forms where Mr. Yoo

18  had indicated he was a United States citizen.

19  Q.   Do you recall how many?

20  A.   Seven, sir.

21  Q.   And where did those -- where were those 4473s

22  completed?

23  A.   They were all completed within the Eastern District of

24  Texas.

25  Q.   Okay.  Did your investigation reveal any

1   transactions -- well, let me back up.

2           What was the time period of these transactions?

3   A.   They occurred throughout 2016, 2017.

4   Q.   Okay.  Did your investigation reveal any transactions

5   during the same time period in which the Defendant stated in

6   ATF Form 4473 that he was not a United States citizen?

7   A.   Yes, sir.

8   Q.   All right.  If we could, I am going to refer you to

9   Tab 5 there.  This is an exhibit that has been previously

10  admitted into evidence.  I'm going to direct your attention

11  to --

12          MR. COAN:  If we could pull up 5003.

13  BY MR. COAN:

14  Q.   Okay.  And what does this appear to be?

15  A.   This is an ATF Form 4473 firearms transaction record

16  filled out by Heon Jong Yoo.

17          MR. COAN:  Okay.  And, if we could, if we could go

18  down to Question No. 14.

19  BY MR. COAN:

20  Q.   All right.  And this question asks for country of

21  citizenship; is that correct?

22  A.   Yes, sir.

23  Q.   All right.  And what is indicated there on the form?

24  A.   That says other specify, and the information provided

25  was South Korea.

1          MR. COAN:  And if we could slide over to 15 there

2    right next to it.

3    BY MR. COAN:

4    Q.   Okay.  Is an A number, an alien number provided in that

5    space?

6    A.   Yes, sir, it is.

7    Q.   All right.  And if we could go to Page 500 --

8          MR. YOO:  Objection, Your Honor.  How come my date

9    of birth is redacted, but my A number is not redacted?

10          THE COURT:  Your what?  I'm sorry, Mr. Yoo?

11          MR. YOO:  How come my date of birth is redacted,

12   but my A number is not redacted?  Because I do believe that

13   U.S. admission number is actually more of a private --

14          THE COURT:  Mr. Yoo, I will give you an opportunity

15   to cross-examine the witness, and you can ask him that.

16          MR. COAN:  If we can go to Page 5004, please.

17   BY MR. COAN:

18   Q.   And is the certification for this Form 4473 completed?

19   A.   Yes, sir, it is signed and dated, the date being

20   12-21-2016.

21   Q.   Okay.  And where did this transaction take place?

22   A.   First Cash Pawn No. 88.

23   Q.   All right.  And that is here in the Eastern District of

24   Texas; is that correct?

25   A.   Yes, sir, in Tyler, Texas.

1   Q.   Was -- did the transaction go through?  Was the transfer

2   of firearms, did that take place?

3   A.   According to this form, the transaction went through.

4   It shows that no NICS check was required because the buyer

5   had a valid permit from the state where the transfers had

6   taken place, which was the Texas License to Carry.

7         MR. COAN:  All right.  If we could pull up 5009,

8   please.

9   BY MR. COAN:

10  Q.   All right.  What does this appear to be?

11  A.   This is another ATF Form 4473, again filled out by an

12  individual listed as Heon Jong Yoo.

13  Q.   All right.

14        MR. COAN:  And if we could go down to Question 14.

15  BY MR. COAN:

16  Q.   All right.  And in the -- for the country of

17  citizenship, what is indicated there?

18  A.   The box "other" is checked, and the information filled

19  out is South Korea.

20  Q.   And is an alien number provided in Box No. 15?

21  A.   Yes, sir.

22  Q.   And on Page 5004, at the top of the page there, is the

23  buyer's certification executed --

24  A.   4 or 10, sir?

25  Q.   I'm sorry?

1   A.   Are we going back to the other --

2   Q.   I'm sorry.   5010.   I'm sorry.

3   A.   Yes, sir.   On that form the buyer's signature and

4   another certification date are listed as 12-21-2016.

5   Q.   Signed by Mr. Yoo attesting to the accuracy and truth of

6   the answers provided; is that correct?

7   A.   There is a signature on the page, yes, sir.

8   Q.   And who is the FFL?

9   A.   First Cash Pawn No. 88 in Tyler, Texas.

10   Q.   All right.   Was a NICS check performed in connection

11   with this transaction?

12   A.   The box is marked no NICS check required because of the

13   Texas License to Carry.

14   Q.   And was the transaction completed, meaning was the

15   transfer -- did a transfer of firearm take place?

16   A.   According to the form.

17          MR. COAN:   If we could go to 5019, please.

18   BY MR. COAN:

19   Q.   All right.   What is this?

20   A.   This is another ATF Form 4473, again filled out by Heon

21   Jong Yoo.

22   Q.   All right.

23          MR. COAN:   If we could go down to Questions 14 and

24   15, please.

25   BY MR. COAN:

1  Q.   In response to the "what is your country of citizenship"

2  question, what is the answer provided?

3  A.   The box "other" is marked.  South Korea is filled out as

4  the information.

5  Q.   All right.  And is an A number provided in Box No. 15?

6  A.   Yes, sir.

7  Q.   On Page 5020, is the prospective buyer's certification

8  attesting to the truth and accuracy of the answers provided

9  in Section A executed here?

10  A.   Yes, sir.  There is a signature and a date, again,

11  12-21-2016.

12  Q.   And what is this FFL?

13  A.   First Cash Pawn No. 88 in Tyler, Texas.

14  Q.   All right.  And was a NICS background check performed?

15  A.   The box is checked no NICS check was required because of

16  the license to carry.

17  Q.   Did an actual transfer of a firearm take place?

18  A.   According to this form.

19  Q.   As part of your investigation, did you apply for and

20  obtain a federal search warrant?

21  A.   Yes, sir, I did.

22  Q.   And what was the location that you obtained the search

23  warrant for?

24  A.   6003 Old Bullard, Tyler, Texas, Apartment 245, which is

25  the Salado Apartments, as well as a black Ford Focus

1   belonging to Mr. Yoo.

2   Q.   Okay.  What had your investigation determined about who

3   resided at that apartment in Salado Complex?

4   A.   Throughout the course of the investigation, it was

5   revealed Mr. Yoo and a gentleman named Mr. Jonathan Hossier

6   resided in that apartment.

7   Q.   Was the search warrant issued by a Federal Judge?

8   A.   Yes, it was.

9   Q.   Did the warrant authorize the search of the apartment?

10  A.   Yes, sir.

11  Q.   And what was that apartment number again?

12  A.   245.

13  Q.   And did it authorize the search of any vehicles?

14  A.   Yes, sir, Mr. Yoo's vehicle.

15  Q.   What was that vehicle?

16  A.   It was a black Ford Focus.

17  Q.   All right.  And what had your investigation revealed for

18  you to connect Mr. Yoo to the Ford Focus?

19  A.   There had been multiple other reports by other law

20  enforcement officials that vehicle belonged to Mr. Yoo, as

21  well as when that vehicle was run, the registration data

22  showed Mr. Yoo being the registered owner of that vehicle.

23  Q.   Okay.  Did you and other law enforcement officials

24  execute the search warrant?

25  A.   Yes, sir.

1    Q.    When was it executed?

2    A.    On April 6th, 2018.

3    Q.    During the search of the apartment, were any items

4    recovered that indicated Mr. Yoo resided in that apartment?

5    A.    Yes, sir, multiple different what we call indicia of

6    ownership documents were discovered.  These included

7    Mr. Yoo's immigration documents, Mr. Yoo's medical records,

8    and agreement between Mr. Yoo and his roommate showing that

9    they were at the apartment.

10   Q.    Okay.  Let's -- let me direct your attention to

11   Government's Exhibit 16 and ask if you recognize that

12   document?

13   A.    Yes, sir.  These are ETMC, East Texas Medical Center,

14   records related to Mr. Yoo.

15   Q.    Okay.  And do those appear to be copies of the

16   documents, medical records that you recovered during

17   execution of the search warrant?

18   A.    Yes, sir.

19         MR. COAN:  Your Honor, at this time we move to

20   admit Government's Exhibit 16.

21         THE COURT:  Any objection?

22         MR. YOO:  Objection, Your Honor.  Because that

23   document does not pertain to my ownership of the place.  If

24   the Government wanted to prove my ownership rather than have

25   a collateral attack, they would have -- they would admit

1  indicia of ownership or any of my rent contract with the
2  apartment complex.
3          THE COURT:  Mr. Coan.
4          MR. COAN:  Your Honor, we are going to get to the
5  lease agreement.  The records -- these are medical records
6  identifying the patient as the Defendant, and they are being
7  offered as indication that he was residing within the
8  apartment.  These are personal documents that belonged to
9  him.
10         THE COURT:  Mr. Yoo, is there any dispute that this
11 was your residence?  I mean, we can avoid this if there is
12 not a dispute about the residence.
13         MR. YOO:  Actually, there is no -- there is no
14 dispute -- dispute about me living in 6003 Old Bullard Road,
15 Apartment No. 245, Tyler, Texas 75703.  There is no dispute,
16 sir.
17         THE COURT:  Can you accept that, Mr. Coan, as a
18 stipulation?
19         MR. COAN:  Yes, Your Honor.
20         MR. YOO:  And there is no dispute that that black
21 Ford Focus was my vehicle, nor that a black Dodge Ram 1500
22 lifted, if he was going to mention it, was my vehicle.  No
23 objection to that fact.  I own both of those vehicles.
24         THE COURT:  Okay.
25         MR. COAN:  Those are acceptable to the Government

1  if the Court will accept those stipulations.

2          THE COURT:  I will.

3          Thank you, Mr. Yoo.

4          Mr. Yoo, if you will --

5          MR. YOO:  Sorry.

6          THE COURT:  Okay.  Mr. Coan, you may proceed.

7          MR. COAN:  Thank you, Your Honor.

8  BY MR. COAN:

9  Q.   As part of the search of the apartment belong -- where

10 Mr. Yoo resided, as well as his vehicle, were any firearms

11 recovered?

12 A.   Five different firearms were recovered, sir.

13 Q.   And were those removed from the scene?

14 A.   Yes, sir, they were, and taken to the ATF Tyler, Texas

15 vault.

16 Q.   And were they stored in compliance with ATF policies and

17 procedures regarding evidence control?

18 A.   Yes, sir.

19 Q.   Okay.  Let's talk about -- let's talk about those

20 firearms that were seized.

21         MR. COAN:  If we can take a look at Exhibit 20?

22         MR. YOO:  Your Honor?

23         THE COURT:  Yes.

24         MR. YOO:  I actually stipulate to the fact that

25 those were my guns.  I have nothing to hide because I was

1   legally owning those guns, so I am just going to admit that I

2   claim ownership of every single one of those firearms.  Those

3   are legally purchased by me and legally owned by me for legal

4   purposes.  Thank you, sir.

5            THE COURT:  Mr. Coan, is that agreeable, or does

6   the Government seek to prove its case with the proof?

7            MR. COAN:  Your Honor, we would still introduce the

8   firearms into evidence, but the Government will accept the

9   stipulation by the Defendant that he is the owner of the

10  seized firearms.

11           THE COURT:  Is that fair enough, Mr. Yoo?

12           MR. YOO:  Yes, sir.

13           THE COURT:  Okay.

14           MR. COAN:  Thank you.

15  BY MR. COAN:

16  Q.   All right.  Tell me if you recognize Exhibit 20.

17  A.   Yes, sir.

18  Q.   All right.  If you could identify it for the record?

19  A.   This is a Mossberg shotgun, Serial No. R 188306.

20  Q.   All right.  And during execution of the search warrant,

21  where was this firearm located?

22  A.   In one of the bedrooms, the bedroom that was being

23  occupied by Mr. Hossier.

24           MR. COAN:  Your Honor, we move to admit Exhibit 20

25  into evidence.

1        THE COURT:  Any objection?

2        MR. YOO:  No objection, Your Honor.

3        THE COURT:  Very well.

4        MR. COAN:  All right.  If we can take a look at

5  Exhibit 22, the DPMS.

6  BY MR. COAN:

7  Q.   All right.  I would ask you to identify that firearm,

8  please?

9  A.   It is a DPMS 308 LR-308, Serial No. FFK027370.

10  Q.   And where was that located during the execution of the

11  search warrant?

12  A.   The closet of the bedroom occupied by Mr. Yoo.

13        MR. COAN:  Your Honor, Government would move to

14  admit Exhibit 22.

15        THE COURT:  Any objection, Mr. Yoo?

16        MR. YOO:  No objections.

17        THE COURT:  Very well.

18        MR. COAN:  All right.  If we can take a look at

19  Exhibit 24, the Smith & Wesson rifle.

20  BY MR. COAN:

21  Q.   I ask you to identify that exhibit.

22  A.   This is a Smith & Wesson M&P 15 rifle,

23  Serial No. TE94562.

24  Q.   All right.  And where was that firearm recovered during

25  the execution of the search warrant?

1  A.   In the closet of the room occupied by Mr. Yoo.

2          MR. COAN:  Your Honor, the Government would move to

3  admit Exhibit 24 --

4          MR. YOO:  Objection, Your Honor, on the accuracy.

5  Those two rifles were actually in my safe.

6          THE COURT:  Mr. Yoo, you will have an opportunity

7  to cross-examine the witness.

8          MR. YOO:  Yes, sir, but I would like to raise that

9  objection.

10          THE COURT:  Okay.  That's fine.

11          Is there any objection to the admission of the

12  exhibit?

13          MR. YOO:  Negative, sir.

14          THE COURT:  All right.  Very well.  It will be

15  received.

16          MR. COAN:  All right.  If we could take a look at

17  Exhibit 26, which is the Smith & Wesson pistol.

18  BY MR. COAN:

19  Q.   I'd ask you to identify that?

20  A.   It is a Smith & Wesson SW40VE pistol, Serial No.

21  RBM9366.

22  Q.   All right.  And where was this firearm recovered during

23  the execution of the search warrant?

24  A.   In the room occupied by Mr. Hossier.

25          MR. COAN:  All right.  At this time the Government

1  would move to admit Exhibit 26?

2         THE COURT:  Any objection?

3         MR. YOO:  No objections, Your Honor.

4         THE COURT:  Very well.  It will be received.

5         MR. COAN:  All right.  And if we can take a look at

6  Exhibit 28, please.

7  BY MR. COAN:

8  Q.   Would you identify that exhibit for us?

9  A.   A Para 1911 pistol, Serial No. 00210NW (sic).

10  Q.   And where was that firearm recovered during the

11  execution of the search warrant?

12  A.   In Mr. Yoo's vehicle.

13         MR. YOO:  No objection, Your Honor.

14         THE COURT:  Very well.  Do you want to move the

15  admission first, Mr. Coan?

16         MR. COAN:  Yes, we would move to admit the exhibit

17  into evidence.

18         THE COURT:  It will be received.

19         MR. COAN:  Thank you.

20  BY MR. COAN:

21  Q.   Was any ammunition recovered during execution of the

22  search warrant?

23  A.   Yes, sir.

24  Q.   And where was that recovered from?

25  A.   In the residence.

```
1    Q.   And approximately how many rounds of ammunition were
2    recovered?
3    A.   Approximately 450 rounds of ammunition.
4              MR. YOO:  No objection, Your Honor. I stipulate to
5    the ownership and possession of all those ammunition and
6    firearm.  I have no shame for it.
7              MR. COAN:  So, based on that stipulation,
8    Your Honor, if the Court is agreeable, we would move to admit
9    Government's Exhibit 29, which consists of the ammunition,
10   ammunition boxes, and magazines?
11             THE COURT:  And that is agreeable, Mr. Yoo?
12             MR. YOO:  Would you please repeat that statement?
13             MR. COAN:  Based on the stipulation regarding
14   ownership of the ammunition and accessories, the Government
15   would move to admit Exhibit No. 29, which consists of the
16   ammunition, the ammunition cases, and the magazines.
17             MR. YOO:  No objection, Your Honor.
18             THE COURT:  Very well.  It will be received.
19   BY MR. COAN:
20   Q.   Were any of the firearms that have been admitted into
21   evidence, Exhibits 20, 22, 24, 26, and 28, were any of those
22   semi-automatic firearms?
23   A.   Yes, sir, they all are except for the shotgun.
24   Q.   Were any of those firearms capable of accepting large
25   capacity magazines?
```

 1  A.    All of them except the shotgun can accept a large

 2  capacity magazine.

 3  Q.    And what is a large capacity magazine?

 4  A.    It is a magazine holding more than 15 rounds.

 5  Q.    Were any of the magazines that were recovered during the

 6  execution of the search warrant and have been admitted into

 7  evidence as Exhibit 29, capable of holding more than 15

 8  rounds of ammunition.

 9  A.    Yes, sir.  There were a couple of magazines that were --

10  have capacity over 15 rounds of ammunition.

11          MR. YOO:  I object to relevancy.  It is -- the type

12  of firearm is not in question.  It is only whether I

13  possessed firearms.  And I did possess firearms.

14          THE COURT:  Mr. Coan.

15          MR. COAN:  The characteristics of the firearms are

16  relevant to whether or not he is in possession of the

17  firearms and elements that the Government is required to

18  prove.

19          THE COURT:  Okay.  Is this the end of this line of

20  inquiry though?

21          MR. COAN:  It is, Your Honor.

22          THE COURT:  Very well.  Move along.

23  BY MR. COAN:

24  Q.    Special Agent Reed, you are the case agent on this

25  matter, correct?

1   A.   Yes, sir.

2   Q.   And in connection with your role as the case agent, have

3   you attended some of the court hearings that have taken place

4   in this case?

5   A.   Yes, sir, I have.

6   Q.   Were you present for a court hearing that took place on

7   October 10th of 2018?

8   A.   Yes, sir, I was.

9   Q.   And where did that hearing take place?

10  A.   Texarkana, Texas.

11  Q.   And did the Defendant testify at that hearing?

12  A.   Yes, sir, he did.

13  Q.   Did he swear or affirm to tell the truth at that

14  hearing?

15  A.   Yes, sir, he did.

16  Q.   During that hearing when the Defendant testified, did he

17  admit that he has falsely represented he is a United States

18  citizen?

19  A.   Yes, sir, he did.

20  Q.   Did he admit that he made such misrepresentations in

21  connection with the acquisition of firearms?

22  A.   Yes, sir, he did.

23  Q.   Did he admit to falsely representing his citizenship to

24  federal firearms licensees in the Eastern District of Texas?

25  A.   Yes, sir, he did.

1  Q.   Did he admit to doing so multiple times?

2  A.   Yes, sir, he did.

3  Q.   Did he admit that he made these representations on ATF

4  Form 4473s?

5  A.   Yes, sir, he did.

6  Q.   Did he admit he had been committed to a mental

7  institution in the State of New Jersey in 2013?

8  A.   Yes, sir, he admitted he had been committed.

9         MR. YOO:   Objection.  I never -- I never admitted

10  to formal commitment.

11         THE COURT:   Mr. Yoo, you will have an opportunity

12  to cross-examine the witness if you choose to do so.

13  BY MR. COAN:

14  Q.   At the hearing on October 10th of 2018 when the

15  Defendant testified under oath, did he admit he had been

16  committed to a mental institution in the State of New Jersey

17  in 2015?

18  A.   Yes, sir, he admitted that he had been committed.

19  Q.   Did the Defendant admit that he knew as of January 2016

20  that the FBI NICS background check system had flagged him as

21  a prohibited person under federal law?

22  A.   Yes, sir.

23         MR. COAN:   I will pass the witness.

24                     CROSS-EXAMINATION

25  BY MR. YOO:

1  Q.   Mr. Reed, so you are -- you are in the ATF -- sorry.

2  You are in -- a BATF -- sorry.  You are a BATFE agent; is

3  that correct?

4  A.   We usually refer to ourselves as ATF agents.

5  Q.   ATF agents.  So -- so -- it is Bureau of Alcohol,

6  Tobacco, Firearms, and Explosives; is that correct?

7  A.   Yes, sir.

8  Q.   I will just go by ATF agent, that's fine.

9  A.   Yes, sir.

10 Q.   Our --

11          MR. YOO:  Your Honor, would you -- I'm sorry.  May

12 I request the Government to pull up that ATF Form 4473 that

13 stated -- one of the forms -- actually two of forms that I

14 stated my citizenship as South Korea, on the screen,

15 please.

16          THE COURT:  Do we know which exhibits those were

17 Mr. Yoo?  That might save us a little time.

18          MR. YOO:  Yes.

19          MR. COAN:  It is Exhibit 5, but there are three

20 different forms where he correctly stated his citizenship.

21          THE COURT:  Okay.  Maybe just bring up --

22          MR. YOO:  Wait.  Permission to address the Court

23 from the podium about that exhibit.

24          THE COURT:  Okay.

25          MR. YOO:  At this point I do believe that

1    exhibit -- those two exhibits are character references.  The

2    Prosecution is trying to prove whether I had intent to

3    deceive.  I mean, if I had intent to deceive, why would I go

4    fill out an ATF 4473 form in the first place, and then fill

5    out name, age, and date of birth and address?

6              THE COURT:  Mr. Yoo, at this point you are in the

7    cross-examination of Mr. Reed.  What I would suggest is, if

8    you want to develop that theory with this witness, now is the

9    time to do that.

10             MR. YOO:  Yes, sir.

11             THE COURT:  But arguing with Mr. Coan is really

12   probably not going to get you anywhere.

13             MR. YOO:  So, yes, will you pull that -- pull that

14   exhibit up, please.

15             Sir, Your Honor.  I was just trying to point out

16   the charge is specifically whether I made a false

17   misrepresentation with the information --

18             THE COURT:  That's fine.  You are entitled to

19   cross-examine the witness.  I'm just -- let's move along.

20             MR. YOO:  Yes, sir.

21             Yeah.  Can we put that on the screen?

22             MR. COAN:  We would be happy to, Your Honor.  We

23   are trying to figure out which -- there are three different

24   forms that are in Exhibit 5.  If he can identify --

25             THE COURT:  Can you identify which one it was?  Is

| | |
|---|---|
| 1 | it the one where citizenship was indicated as South Korea? |
| 2 | MR. YOO:  Yes, any of them. |
| 3 | THE COURT:  Any of them.  Okay. |
| 4 | BY MR. YOO: |
| 5 | Q.   Okay.  Mr. Reed, would you explain to me why this form |
| 6 | is admissible as evidence? |
| 7 | A.   I don't believe I can make that call, sir.  I am not a |
| 8 | lawyer. |
| 9 | Q.   Okay.  Examining these forms, how do I -- what -- what |
| 10 | is my -- my date of birth?  Do you have personal knowledge? |
| 11 | A.   I would have to be -- I mean, I am sure I don't recall |
| 12 | your exact date of birth, but 1993 seems correct. |
| 13 | Q.   Is my name on there correct? |
| 14 | A.   Yes, sir. |
| 15 | Q.   Is my address -- is my address on there fictitious or |
| 16 | false? |
| 17 | A.   I have no indication that the address is fictitious or |
| 18 | false. |
| 19 | Q.   To the -- to the best of your knowledge, do you believe |
| 20 | beyond a reasonable doubt that address is fictitious or |
| 21 | false? |
| 22 | THE COURT:  Just ask the question.  Let's take the |
| 23 | "beyond a reasonable doubt" part out of it.  And I think you |
| 24 | have asked this, but I'm going to let you ask it one more |
| 25 | time. |

1            MR. YOO:  Yes, sir.

2    A.   Yes, sir.  To the best of my knowledge, Boxes 1, 2, and

3    3 are filled out accurately.

4            MR. YOO:  Okay.  Your Honor, I would like to show

5    Defendant's Exhibit 2, which is the U.S. code, Exhibit

6    No. 2.

7            THE COURT:  And the purpose is what?

8            MR. YOO:  He is an ATF agent, and he should be

9    familiar with his code.

10           THE COURT:  Mr. Coan, any objection here?

11           MR. COAN:  I just ask him to lay a foundation of

12   personal knowledge, familiarity with the code.

13           THE COURT:  Let's lay a foundation with the

14   witness.

15   BY MR. YOO:

16   Q.   Special Agent Reed, do you have -- do you have personal

17   knowledge of the code, 18 United States Code, Section 922?

18   A.   Yes, sir.

19   Q.   Do you have -- do you have personal knowledge of

20   information required to be kept personally to FFL record?

21   A.   What -- are you referring to United States Code

22   section --

23   Q.   Yes.

24   A.   -- or can you --

25   Q.   No, no.

1   A.   -- give me a specific citation --

2   Q.   Do you know which information --

3        THE COURT:  Hold on.  One at a time.

4   A.   So I am confused by your question.  Are you talking in

5   general or a specific code?

6   Q.   No.  I am saying do you know which informations are

7   required to be kept pursuant --

8   A.   Yes, sir, I have training --

9   Q.   -- pursuant to 922?

10  A.   -- on the information required to be kept by a federal

11  firearms licensee?

12  Q.   Yes.  Yes.

13  A.   Yes, sir.

14  Q.   Okay.  Could you tell me those information?

15  A.   The information required to be kept by a federal

16  firearms licensee, the two most important ones are the

17  A&D Book, which is guns coming into an FFL, guns coming out

18  of an FFL, and then specifically the 44 -- ATF Form 4473,

19  which is the heart of the documents required to be kept by an

20  FFL.  It is firearms transaction record.  It has to be kept

21  by the physical FFL and is the basis on which we conduct most

22  of our investigations into the transactions of a firearm at

23  an FFL.

24  Q.   I am not disputing the forms are required to be kept --

25        THE COURT:  Mr. Yoo --

1  Q.   -- I am just saying could you give me --

2         THE COURT:  Mr. Yoo --

3  Q.   -- specific information?

4         THE COURT:  Mr. Yoo, let's focus on the questions

5  of the witness.  Okay?

6  BY MR. YOO:

7  Q.   Could you give me the specific information that are

8  required to be kept by FFL dealer?

9  A.   They are required to keep all of the information on the

10  4473, the entire form, all of the pages.  And then with

11  regards to their A&D Book, they are required to have those

12  books both either in a -- some people still have the bound

13  forms or electronic form.  And all that information has to be

14  kept by the FFL.

15         MR. YOO:  Okay.  Let's project 922.

16         THE COURT:  You can use the -- you can use the --

17  there you go.

18  BY MR. YOO:

19  Q.   Special Agent Reed, can you take a look at the screen?

20  A.   Yes, sir.

21  Q.   What does it state precisely on --

22  A.   Can you move it down.  Start on Subsection (b).

23         So this is a specific law -- it is a federal

24  firearms violation for the FFL.  So this does not apply to

25  individuals.  This is an individual law that can be charged

1   for an FFL who takes a gun -- so this is -- we would

2   investigate this charge sometimes as a charge where an FFL

3   has taken a gun and disposes that gun in accordance with not

4   putting it on their A&D Book?

5   Q.   Yes, sir.  Would you please proceed to read it?

6   A.   It should be unlawful for any -- do you want me to read

7   the whole section or just the two circles.

8   Q.   No.  Just -- just the title for now.

9   A.   It should be unlawful for any licensed importer,

10  licensed manufacturer, licensed dealer, or licensed collector

11  to sell or deliver, and then it is the dash.

12  Q.   And I would like for you to read No. 5?

13  A.   Any firearm or armor-piercing ammunition to any person,

14  unless the licensee notes in his records, required to be kept

15  pursuant to Section 923 of this chapter, the name, age, and

16  place of residence of such person, if the person is an

17  individual, or the identity and principal and local places of

18  businesses of such person if the person is a corporation or

19  other business entity.

20  Q.   Am I an individual or a corporation or other business

21  entity?

22  A.   Individual.

23  Q.   Okay.  So the -- are you aware of which code that I am

24  charged with?

25  A.   Yes, sir.

1          MR. YOO:  Sir, the Defendant would like to admit

2     the Exhibit No. 6, United States -- 18 United States Code,

3     Section 924.  Grounds being the code that I am charged with.

4          MR. COAN:  For what purpose, Your Honor?

5          THE COURT:  What is the purpose, Mr. Yoo?

6          MR. YOO:  Mr. Reed -- Special Agent Reed said that

7     he is aware of specific code that I am charged with, so I

8     am --

9          THE COURT:  Well, we are not -- we don't admit the

10    law as an exhibit, so the jury will be instructed at the

11    appropriate time on what the law is they are supposed to

12    follow.  So I don't really see the purpose of admitting the

13    statute into evidence.

14         MR. YOO:  Well, in terms -- I'm trying to get his

15    familiarity and --

16         THE COURT:  And you can do that --

17         MR. YOO:  -- his understanding of what is actually

18    going on in this case.

19         THE COURT:  You can certainly do that.  But I don't

20    think the admission of the statute is necessary.

21         MR. YOO:  Well, I object and reserve my right to

22    appeal, Your Honor.

23         THE COURT:  Okay.

24    BY MR. YOO:

25    Q.   Okay.  So are you familiar with 18 USC 924 and the

1   penalties?

2   A.   Yes, sir.

3   Q.   Would you -- to the best of your knowledge, would you

4   state the 924(a)(1)(A)?

5   A.   Yes, sir.  It is a false statement with regards to the

6   information required to be kept by a federal firearms

7   licensee, just the general.

8            THE COURT:  Mr. Coan?

9            MR. COAN:  Your Honor, I thought we just talked

10  about not publishing this.

11           THE COURT:  Well, he has already published it.  The

12  jury has seen it.  We are talking the admission at this

13  point.

14           MR. YOO:  This is already admitted.

15  BY MR. YOO:

16  Q.   What does this say right here?

17  A.   I have read it already, sir.  I can read it again if you

18  would really like me to.

19  Q.   Yes.

20           THE COURT:  Mr. Yoo, where are we going here, sir?

21  The witness has already read the section that you are

22  pointing to right now.

23  BY MR. YOO:

24  Q.   So, to the best of your knowledge, resulting from your

25  investigation, did I give any false or -- did I state any

1  false information or miss -- false -- did I state any false,

2  mistaken information or misrepresent myself as a different

3  name, different date of birth, or different place that I am

4  living?

5  A.   Well, can you state the question one more time?

6  Q.   Basically, have I ever stated like, oh, yeah, I lived at

7  this address where I never lived?

8  A.   In terms of address, I don't have any knowledge of

9  that.

10  Q.   Okay.  Name.  Were all of my names stated in every

11  single ATF Form 4473 accurately?

12  A.   Yes, sir.

13  Q.   Were all of the date of birth accurate?

14  A.   Yes, sir, to the best of my knowledge.

15  Q.   Is owning a firearm illegal?

16  A.   No, sir.

17  Q.   Is -- where were -- where -- resulting from your search

18  of my premises, where were your -- sorry, where was my DPMS

19  LR-308?

20  A.   They were both -- they were both in a closet in a gun

21  safe.

22  Q.   In a gun safe?

23  A.   Yes, sir.

24  Q.   Is -- is having a gun safe a safe way to own firearms?

25  A.   I think it is one of the ways you can protect your

1   firearms, yes, sir.

2   Q.   Okay.  So where did you find my 1911?

3   A.   In the door -- or in the car, vehicle.

4   Q.   In the car, vehicle.

5        In the State of Texas is it legal for a person to

6   carry a pistol inside of his vehicle or her vehicle?

7   A.   I am not an expert on laws of the State of Texas.

8   Q.   Okay.  Is it illegal to keep a loaded shotgun next to

9   your bed?

10  A.   It entirely depends on the situation.  If you are a

11  multi-convicted felon, for sure.  If you are a prohibited

12  person, for sure.  If -- there is lots of way it could be

13  illegal, yes, sir.  But there is also lots of ways it could

14  be legal.  So that would totally depend on the circumstances

15  of the situation.

16  Q.   So you just mentioned convicted felon, correct?

17  A.   I was giving an example -- you asked is it legal to keep

18  a loaded shotgun by your bed.  It is entirely dependent on

19  who the individual who is sleeping in that bed with the

20  loaded shotgun is.  If they are a multi-convicted felon, then

21  they wouldn't be able to possess that under federal law.

22  There are lots of other examples.  If they were just a

23  run-of-the-mill person with no prohibitions, then they would

24  be able to have that, yes, sir.

25  Q.   In the State of Texas, what is the relief period for

1  felons to possess firearms in terms of shotguns and hunting

2  rifles?

3  A.   I am a federal criminal investigator under federal law,

4  which is the law I investigate.  I am not familiar in the

5  State of Texas, but under federal law it is once a felon,

6  always as felon.

7  Q.   So -- so, to the best of your knowledge, these weapons

8  are not prohibited weapons under the 26 United States Code

9  describing machine guns or automatic firearms or --

10  A.   No, sir.

11  Q.   -- anything?  So without -- without prohibiting factor

12  of 922(g), a person is allowed to legally possess all of

13  these firearms; is that correct?

14  A.   There are other -- there are other reasons why you

15  couldn't possess a firearm, but 922(g) is the main thing we

16  investigate.

17  Q.   Okay.  So what were the calibers of ammunition that you

18  confiscated from my closet?

19  A.   I would have to go back and actually take a look at

20  them, but I believe there is a wide variety of caliber of

21  ammunition.

22  Q.   How did you list out my -- the calibers as -- on the

23  administrative forfeiture form and criminal forfeiture

24  form?

25  A.   I did not produce either one of those forms, so I would

1  not have listed them out.  The primary way we store the

2  ammunition is it is stored over here, it is all put together

3  in one container from the place we seize, so it is all

4  grouped together.

5  Q.   Isn't criminal forfeiture a post-conviction procedure?

6  A.   I'm not a lawyer.  I don't have any knowledge of that.

7           MR. COAN:  Your Honor, I think we are treading into

8  territory covered by a motion in limine.

9           THE COURT:  Mr. Yoo, what is the purpose of this?

10          MR. YOO:  I am trying to address how -- how it was

11  lawful that they -- they seeked -- they seeked administrative

12  forfeiture, and that they have ad -- administratively

13  forfeited my firearms without my -- my knowledge, without

14  informing me before.  I was trying to clarify that in terms

15  of ATF procedure.

16          THE COURT:  All right.  Well, let's -- I tell you

17  what, I think the jury needs a break at this point.  Let's

18  take a break.  And when we return, we will finish with this

19  witness.

20          COURT SECURITY OFFICER:  All rise.

21          (Jury out.)

22          THE COURT:  We can deal with this real quickly.

23          (Bench conference held.)

24          THE COURT:  Mr. Yoo, I do think that violates the

25  agreed motion in limine with respect to No. 2, any punishment

1   the Defendant may face if he is convicted in this case,

2   including, but not limited to, any specific punishment range,

3   any immigration proceedings, or any consequences affecting

4   any rights of the Defendant resulting from a conviction on a

5   specific charge.

6          As I know you know --

7          MR. YOO:  The --

8          THE COURT:  Hold on.

9          MR. YOO:  I'm sorry.

10         THE COURT:  As I know you know, in the event the

11  jury comes back with a guilty verdict, we will a separate

12  proceeding in which the Government will present its evidence

13  on the forfeiture of the weapons and the ammunition.

14         You will, obviously, be entitled to, you know,

15  cross-examine that and put on any evidence you choose to do

16  so, and the jury will ultimately make that determination.

17  But with respect to this witness right now, I don't think it

18  is relevant.

19         MR. YOO:  Yes, sir, but may I state just one thing?

20         THE COURT:  You may.

21         MR. YOO:  I do believe that -- that -- that the

22  Prosecution has stated things about forfeiture first before I

23  did, so that is why I was just trying -- trying to figure out

24  where they stand --

25         THE COURT:  Mr. Coan, did you open the door on

1   this?

2             MR. COAN:  When we read the Indictment, it includes

3   the notice of intent to seek criminal forfeiture which the

4   jury has to consider at some point in the proceedings.

5             The nature of the administrative proceeding

6   regarding forfeiture of some of these firearms, is a

7   totally -- it is not even part of this case.  It is a totally

8   separate action.

9             MR. YOO:  I do believe that administrative

10  forfeiture that they seeked were not part of the pretrial

11  motions.

12            THE COURT:  Okay.  So where do you want to go with

13  this witness?

14            MR. YOO:  I will just move on in terms of the

15  forfeiture.

16            THE COURT:  Okay.  Thank you.

17            (Bench conference concluded.)

18            (Recess was taken at this time.)

19            (Jury out.)

20            THE COURT:  All right.  Let's have the jury brought

21  in.

22            COURT SECURITY OFFICER:  Yes, sir.

23            (Jury in.)

24            THE COURT:  Please be seated.

25            Mr. Yoo, you may continue.

1  BY MR. YOO:

2  Q.   So, Agent Reed, so we were also talking about -- so, to

3  your knowledge, what is the reason for submitting an ATF Form

4  4473 that I answered as South Korea?

5  A.   What are we talking about, sir?  Are we coming back to

6  the 4473?

7  Q.   4473 that Mr. Coan just introduced while -- during

8  direct examination, what is the purpose of it?

9  A.   The purpose of the form?

10 Q.   No, what is the purpose of submitting that

11 to -- submitting that to this direct examination?

12 A.   The form -- are you asking my opinion on the purpose of

13 it?

14 Q.   Yes.

15 A.   The form shows that you have knowledge that you are a

16 citizen of South Korea.  You have an A number.  You can

17 correctly fill out the form, which is a contrast to the other

18 forms that you filled out and a contrast to when -- you know,

19 it is an acknowledgment that you are not a United States

20 citizen when asked on the form.

21 Q.   So, basically, please correct me if I am wrong, but from

22 what I understand, that part -- that you and Mr. Coan are

23 trying to prove that I knowingly did it; is that correct?

24 A.   Oh, I am just -- my testimony would be that it shows

25 that you have a knowing -- you knowingly -- yes, you have a

1  knowing knowledge that you are not a United States citizen,

2  and that you have correctly filled out the form before.

3         Also, we have seen forms that you said you were a

4  United States citizen, and you testified that you knew that

5  you were misrepresenting your citizenship with regards to the

6  4473s.

7  Q.   Testified?

8  A.   Yes, you took the stand and said that you knew you

9  misrepresented your citizenship on ATF forms.

10 Q.   Oh, during the hearing?

11 A.   Yes, sir.

12 Q.   All right.

13        MR. YOO:   Judge, I will take no action regarding

14 it, and I will proceed with cross-examination.

15        THE COURT:   I am not following you, Mr. Yoo.

16        MR. YOO:   No, like, I will take no -- I will take

17 no action regarding the -- if -- if that was the purpose of

18 submission of those forms, I will take no action, and I will

19 proceed with cross-examination.

20        THE COURT:   Okay.

21        MR. YOO:   Permission to approach the witness?

22        THE COURT:   Granted.

23 BY MR. YOO:

24 Q.   Is this the accurate transcript for detention hearing?

25 A.   It appears to be the -- an excerpt from it.  I don't

1  have page numbers -- there it is at the top.  Some pages.

2         THE COURT:  How about just tell us what the page

3  numbers are.

4         MR. YOO:  Okay.  Page 151 of detention hearing

5  transcript.  Wait.  Before we proceed, I would like to ask

6  Agent Reed certain questions pertaining to this page.

7         THE COURT:  Okay.

8         MR. YOO:  Before we put that on the screen.

9  BY MR. YOO:

10 Q.  So, Agent Reed, did I admit that I was involuntarily

11 committed during the hearing?

12 A.  I think your words you used were temporarily

13 committed.

14 Q.  So -- so.  Okay.

15        Did Coan -- did Mr. Coan ask you during direct

16 examination that I admitted that I was voluntarily

17 committed?

18 A.  No, I believe my answer was -- he asked did you admit

19 that you were committed, and you admitted that you were

20 committed.  And just further to expand it, I believe the

21 words you used -- so speaking under correction not having the

22 transcription in front of me, my recollection is the words

23 used is "temporarily committed."

24        MR. YOO:  Would you please put on the Page 151?

25        THE COURT:  Well, I am going to let you show it to

| | |
|---|---|
| 1 | the witness while he is on the witness stand, but I don't |
| 2 | think you have laid a foundation for the jury to see the |
| 3 | testimony from a previous hearing in this case. |
| 4 | BY MR. YOO: |
| 5 | Q.   Did I also testify several times that I was not |
| 6 | committed? |
| 7 | A.   My recollection is you have an argument -- you made an |
| 8 | argument whether you felt your commitment was within the |
| 9 | definition of commitment, but you did -- my recollection is |
| 10 | there is a -- that you specifically said you were temporarily |
| 11 | committed. |
| 12 | MR. YOO:  Grounds for -- Your Honor, grounds for |
| 13 | the exhibit to -- |
| 14 | THE COURT:  Not to the witness.  You can hand it to |
| 15 | the jury.  And if you ask -- I mean, you can hand it to the |
| 16 | witness.  Sorry.  Let me restate that. |
| 17 | Not to the jury but to the witness.  You may hand |
| 18 | the document to the witness and you may lay a foundation for |
| 19 | it; and if you want to impeach him with a prior inconsistent |
| 20 | statement, you may do so.  But you have to do it correctly. |
| 21 | BY MR. YOO: |
| 22 | Q.   That is the right form; is that correct? |
| 23 | A.   Yes.  This appears to be an excerpt from the hearing -- |
| 24 | a transcript from that hearing. |
| 25 | Q.   Okay.  So -- here, what -- could you read -- could you |

1    read the circled ones and underlined ones, please?

2    A.    All the way throughout?

3    Q.    Yes.

4    A.    Okay.

5              MR. COAN:  Your Honor, this is -- he is allowed to

6    impeach the witness based on his recollection of the

7    testimony, and he is certainly permitted to use the

8    transcript to do so, but reading the transcript into the

9    record --

10             THE COURT:  No, he is not reading it.  He is

11   reading it to himself.

12             THE WITNESS:  Okay.

13             THE COURT:  At least that is what I understood

14   Mr. Yoo to ask him.

15             (Pause in proceedings.)

16             THE COURT:  Mr. Yoo?

17   A.    Yes, sir, I am familiar with the underlined and circled.

18             MR. YOO:  I am going to take it back.

19   BY MR. YOO:

20   Q.    So on several occasions over and over again, did I

21   testify that I was not committed?

22   A.    Yes, sir, you testified both that you were committed and

23   that you were not committed.

24   Q.    Could you please -- please point out where -- where I

25   said I was committed?

1  A.   Can I have the documents back, please, sir?

2       The question is:  Then because of that finding, you

3  were involuntarily committed to inpatient treatment.

4       Then you say:  Temporarily, temporarily

5  committed.

6  BY MR. YOO:

7  Q.   Was I testifying or -- or describing that document that

8  I received as in evidence?

9  A.   My understanding is that you were giving an answer that

10  you were temporarily committed.

11  Q.   Then why would I -- why -- then -- why would I,

12  following that statement, use the word "hospitalized" rather

13  than "commitment," over and over again?

14            MR. COAN:  Your Honor, calls for speculation.

15            THE COURT:  Sustained.

16            Move along, Mr. Yoo.

17            MR. YOO:  Motion to impeach witness.

18            THE COURT:  You have got to lay a foundation for

19  that.

20            MR. YOO:  Motion to impeach witness on

21  inconsistency because when -- Mr. Coan did not state

22  anything like -- what Mr. Coan asked Special Agent Reed was

23  did I testify whether I had been -- been committed, just

24  straightforward.  That is not what it is stating here, sir.

25  I was describing --

1    THE COURT:  And I think the witness has

2    acknowledged that at least twice now, Mr. Yoo.

3    MR. YOO:  All right.  Well, do you acknowledge that

4    I actually -- I actually used the word "hospitalized" rather

5    than "commitment" in terms of --

6    A.   You did use the word "hospitalized" sometimes throughout

7    your statement.

8    Q.   Did I ever say that I was -- did I ever admit to being

9    formally committed?

10   A.   I don't have a recollection of that.

11   Q.   Okay.  All right.

12   MR. YOO:  I will pass the witness.

13   THE COURT:  Mr. Coan?

14   MR. COAN:  Your Honor, no specific questions for

15   the Defendant, but I apologize I think I left a couple of

16   evidentiary issues messy for the record.

17   THE COURT:  Okay.

18   MR. COAN:  And there were some of the materials

19   that were seized in connection with the execution of the

20   search warrant that related to ownership, and I kinda left

21   that unresolved.

22   I would like to go ahead and formally admit

23   Government's Exhibit 16 and 17.  16 consists of medical

24   records, and 17 consists of immigration identification

25   documents.

1          THE COURT:  Any objection, Mr. Yoo?

2          MR. YOO:  Objection, because it is not pertinent to

3    this case.  Because -- because why is -- why is ETMC medical

4    record valid in this case?  Is he --

5          THE COURT:  Well, let me ask this, Mr. Coan:  Is

6    that the exhibit that we discussed earlier regarding the

7    stipulation that Mr. Yoo had agreed to regarding his

8    residency at that address.

9          MR. COAN:  I'm sorry.  I had left that unresolved,

10   and it was just kind of hanging out there, so I went ahead --

11         THE COURT:  Okay.  As long as that stipulation

12   between the parties that Mr. Yoo was a resident at that

13   address, I am going to sustain the objection to Exhibit 16.

14         MR. COAN:  Okay.  I will move to admit Exhibit

15   17.

16         THE COURT:  Is there any objection to Exhibit 17,

17   Mr. Yoo?

18         MR. YOO:  17 is what?

19         MR. COAN:  Those are the immigration identification

20   documents.

21         MR. YOO:  No objection, Your Honor.

22         THE COURT:  All right.  Those will be received.

23         MR. COAN:  Thank you.

24         MR. YOO:  I will -- I would like to -- may I ask

25   one question to the Prosecution?

1    THE COURT:  Well, we can deal with that -- let's

2    deal with that outside the presence of the jury, Mr. Yoo.

3    Any further questions for this witness by either

4    side?  May the witness step down?

5    MR. COAN:  Yes, Your Honor.

6    THE COURT:  Okay.  Mr. Reed, you may step down.

7    MR. YOO:  Sir, may I just --

8    THE COURT:  Yes.

9    MR. YOO:  To eliminate the prejudice of -- of the

10   jury regarding Exhibit 16 about ETMC medical records, I would

11   like to just ask one short question.

12   THE COURT:  You may do so.  But I have sustained

13   your objection to Exhibit 16.

14   MR. YOO:  Yes, sir, but --

15   MR. COAN:  Your Honor, the records weren't

16   published --

17   MR. YOO:  But I just mention -- I am not going to

18   go into details of it.

19   THE COURT:  Okay.

20   MR. YOO:  Does it pertain to any form of

21   involuntary commitment or something --

22   THE COURT:  Mr. Yoo, this is a matter that we can

23   take up outside the presence of the jury.  Okay?  I have

24   sustained your objection to Exhibit 16.  It was not admitted

25   into the evidence.  The jury will not see it.  Okay?

 1          MR. YOO:  Okay.

 2          THE COURT:  All right.  You may step down,

 3  Mr. Reed.

 4          The Government may call its next witness.

 5          MR. MACHICEK:  Your Honor, the Government calls

 6  Jonathan Hossier.

 7          (Pause in proceedings.)

 8          JONATHAN HOSSIER, GOVERNMENT'S WITNESS, SWORN,

 9                    DIRECT EXAMINATION

10  BY MR. MACHICEK:

11  Q.  Good afternoon, Mr. Hossier.  How are you today?  I am

12  standing over here to your right, sir.

13  A.  Okay.

14  Q.  How are you today?

15  A.  Pretty well.

16  Q.  Could you do me a favor and for the purposes of the

17  record, would you state your full name?

18  A.  Jonathan Ryan Hossier.

19  Q.  And, Mr. Hossier, in what city do you currently live

20  in?

21  A.  Tyler, Texas.

22  Q.  And are you employed?

23  A.  Yes, sir.

24  Q.  Where are you employed?

25  A.  Big Lots and Fuzzy's Tacos.

```
 1    Q.   And what is your position at each of those businesses?
 2    A.   Freight associate at Big Lots and a line cook at
 3    Fuzzy's.
 4    Q.   Okay.  Are you familiar with an individual named Heon
 5    Jong Yoo, or Hank Yoo?
 6    A.   Yes.
 7    Q.   Do you see him seated in the courtroom here this
 8    afternoon?
 9    A.   Yes, I do.
10    Q.   Would you please point at him and identify an article of
11    clothing that he is wearing?
12    A.   Black coat or black jacket.
13              MR. MACHICEK:  Your Honor, I would ask that the
14    record reflect that the witness has identified the Defendant
15    in open court.
16              THE COURT:  The record will reflect that.
17    BY MR. MACHICEK:
18    Q.   How is it that you know Mr. Yoo?
19    A.   We were roommates.
20    Q.   At what separate locations were you roommates with
21    Mr. Yoo?
22              MR. YOO:  Objection, Your Honor, because -- because
23    I stipulated to the possession, ownership of the firearms.
24    This -- this witness and evidence is not relevant.
25              MR. MACHICEK:  May we approach?
```

1          THE COURT:  You may.

2          (Bench conference held.)

3          MR. MACHICEK:  It is my understanding that there

4  has been testimony about several of the firearms that were

5  located inside the residence at the time of the federal

6  search warrant.

7          Mr. Yoo stipulated to the ownership of those items.

8  However, there were testimony that some of those items were

9  located in Mr. Hossier's bedroom.  I want to clarify for the

10  jury based on his testimony who was in possession of those

11  firearms.  I understand the stipulation, but understanding

12  also that the Government is entitled to present the evidence

13  to the jury.

14          THE COURT:  That's right.

15          MR. YOO:  All right.

16          (Bench conference concluded.)

17  BY MR. MACHICEK:

18  Q.   I apologize, Mr. Hossier.  Would you please inform the

19  jury at what different locations you resided with the

20  Defendant, Mr. Yoo?

21  A.   400 Old Grande.  The second place was Royal Crest.  I

22  can't really remember the address.  I think it might have

23  been 1909 Sybil.  And then the third address was on Old

24  Bullard at Salado.

25  Q.   Okay.  And were each of those locations apartment

1    complexes?

2    A.   Yes, all three were.

3    Q.   When did you begin being roommates with Mr. Yoo?

4    A.   At 400 Old Grande.

5    Q.   And about when in time?  About how long ago was that?

6    A.   I think it was either April or May of last year.

7    Q.   Would that have been April or May of 2017?

8    A.   Yes.

9    Q.   Do you recall during the time that y'all were roommates

10   ever accompanying Mr. Yoo, the Defendant in this case, to a

11   location for the purchase of a firearm?

12   A.   Yes.  At one time we went to -- I think it was First

13   Cash America.

14   Q.   Okay.  And is that a pawn shop located in Tyler,

15   Texas?

16   A.   Yes, it is.

17   Q.   Do you recall about what month that occurred in?

18   A.   I think it was either November or December of last year.

19   I can't recall though.

20   Q.   Would that have been of the year 2017?

21   A.   Yes.

22   Q.   So you believe it was around November or December of

23   2017; is that accurate?

24   A.   Yeah, I think so.  I don't remember exactly which month

25   it was.  But I remember it being kind of cold outside

1  maybe.

2  Q.   Okay.  And you said it was Cash America Pawn; is that

3  correct?

4  A.   Yeah.

5  Q.   Do you recall what firearm -- firearm or firearms were

6  purchased during those occasions?

7  A.   It was a shotgun.  I don't remember what make or model

8  though.

9  Q.   Okay.  And is there anything about that transaction that

10  you recall that might be helpful for the jury to understand

11  how those transactions took place?

12  A.   Just that it had to be returned.  It wasn't

13  functional.

14  Q.   So y'all traveled to First Cash Pawn, a shotgun was

15  purchased.  Was it returned soon thereafter, like the next

16  day?

17  A.   Yeah, I believe it was returned the next day.

18  Q.   And a second firearm, second shotgun was purchased on

19  that next day?

20  A.   Yeah.

21  Q.   And where were you residing with Mr. Yoo at the time

22  those shotguns were purchased?

23  A.   At Royal Crest.

24  Q.   And is that the address located on Sybil?

25  A.   Yes.

1    Q.    If an individual had filled out a form during the

2    purchase of those transactions or the purchase of those

3    firearms indicating that y'all were residing at 400 Old

4    Grande, would that have been true or untrue?

5    A.    That would have been untrue.

6    Q.    With regards to the search warrant that was executed on

7    your residence by federal agents in April of 2018, are you

8    aware of several firearms that were located inside that

9    residence?

10   A.    Yes.

11   Q.    If you look to your right over here on the table,

12   several -- are all of those firearms that are located on the

13   table, you have two rifles, a shotgun, and two handguns, do

14   you recognize those weapons?

15   A.    Yes.

16   Q.    Do any of those weapons belong to you?

17   A.    No.

18   Q.    To whom do all of those weapons belong?

19   A.    Hank.

20   Q.    The weapons that were located inside your bedroom of the

21   residence, from whom did you receive those weapons?

22   A.    From Hank.

23   Q.    And when you refer to "Hank," are you referring to the

24   Defendant in this case?

25   A.    Yes.

1   Q.   During the time that you observed Mr. Yoo purchase a

2   firearm at Cash America Pawn in Tyler, Texas, did you observe

3   him to use a State of Texas Concealed Handgun License to

4   Carry during that transaction?

5   A.   I don't know.

6   Q.   Prior to that transaction, had he made any admissions to

7   you about the status of his CHL with the State of Texas?

8   A.   He told me that he had a CHL.

9   Q.   Okay.  And had he made any admissions to you about the

10   status of that CHL?

11   A.   I think he had it taken away whenever he got in trouble

12   before I had known him.

13   Q.   Okay.  And had that conversation about his CHL being

14   taken away or invalidated occurred prior to the time that he

15   made those purchases at Cash America?

16   A.   Yes.

17        MR. YOO:  Objection, Your Honor, at this point.

18   This is character evidence.

19        MR. MACHICEK:  Your Honor, these are factual

20   elements.  They are elements that are admissible under

21   Rule 404(b) of the Federal Rules of Evidence as other crimes,

22   wrongs, or bad acts.

23        Mr. Yoo has elicited testimony from several other

24   witnesses that all of the other information that he gave to

25   FFLs during the course of firearms transactions was, in fact,

1   true.  This is evidence to rebut those assertions.

2          THE COURT:  I will allow some latitude.  Let's

3   don't get into the details.

4          MR. MACHICEK:  Thank you, Your Honor.

5   BY MR. MACHICEK:

6   Q.  In terms of any other firearms or firearms accessories

7   located inside the evidence that you shared with Mr. Yoo at

8   the time of the execution of the federal search warrant, were

9   there any other items or accessories that Mr. Yoo

10   possessed?

11   A.  Sorry.  Are you talking about other than these firearms

12   here?

13   Q.  Other than the firearms.

14   A.  No, I don't believe so.

15   Q.  Did he possess anything like a ballistic vest or plate

16   carrier?

17   A.  Yes.

18          MR. YOO:  Objection, Your Honor.  Inadmissible.

19   Relevance.

20          THE COURT:  Mr. Machicek, can you lay a foundation

21   for its relevancy.

22          MR. MACHICEK:  Yes, Your Honor.  These are items

23   that are identified in association with the firearms found to

24   be in the Defendant's possession.

25          THE COURT:  I will permit it.

1        MR. YOO:  Also, one more objection actually.

2        Regarding Mr. Machicek inquiring to Jonathan

3   Hossier about whether listing the addresses as 400 Old Grande

4   1201 was it true, I actually corrected that address as soon

5   as I noticed it --

6        MR. MACHICEK:  Your Honor, I'm going to object to

7   the Defendant testifying before the jury --

8        THE COURT:  I will sustain the objection.

9        Mr. Yoo, you will have an opportunity to

10  cross-examine the witness.

11  BY MR. MACHICEK:

12  Q.   In terms of the ammunition and magazines associated with

13  the firearms collected during the federal search warrant, did

14  Mr. Yoo possess any extended magazines?

15  A.   I don't believe so.  I had never seen any.

16  Q.   And did --

17       MR. YOO:  Objection, Your Honor.

18  BY MR. MACHICEK:

19  Q.   And did Mr. Yoo ever express any desires to you about

20  purchasing any additional firearms or firearm accessories?

21  A.   I think he put another firearm on layaway somewhere

22  else.  I have no idea where.

23  Q.   And, finally, did Mr. Yoo make any admissions to you

24  with regards to any previous commitments to a mental health

25  institution?

1  A.   Yes.  He told me that he was committed when he went to

2  school at Rutgers.

3          MR. MACHICEK:   Thank you, Your Honor.  I will pass

4  the witness.

5          THE COURT:  Cross-examination.

6                        CROSS-EXAMINATION

7  BY MR. YOO:

8  Q.   Now, I -- now, Jon -- Jon -- I need you to verify the

9  word very precisely.  Did I say I was committed or I was

10 confined?

11 A.   I don't know.  I don't recall.

12 Q.   Okay.  So -- so, in terms of that 12 -- 400 Old Grande

13 while we were living on Sybil, were you aware of the fact

14 that I actually corrected that address as -- as the -- at the

15 earliest opportunity?

16 A.   I have no idea what addresses you put down on the form.

17 I didn't look at it.

18 Q.   Okay.  So -- so, but 400 Old Grande Boulevard, Apartment

19 No. 1201 is not a fictitious address; we actually lived

20 there, correct?

21 A.   Yes, we did.

22 Q.   So, in terms of -- so, while we were living in all of

23 those addresses, 400 Old Grande, 1909 Sybil, and the -- and

24 the -- and the I believe 6003 Old Grande --

25 A.   Old Bullard.

1    Q.   6003 Old Bullard Road, you know.  I lived in all of

2    those -- sorry, we lived in all of those addresses, and there

3    were frequent law enforcement visits, correct?

4    A.   Yes.

5    Q.   From Tyler PD and the Texas Rangers and the FBI too,

6    right?

7    A.   Yes.  I don't know about 400 Old Grande though.  I don't

8    recall there being any officers at 400 Old Grande.

9    Q.   Thank you.

10         So prior to this search warrant being issued, did

11   any of them confiscate my firearms and not return them?

12   A.   No, they were always returned.

13   Q.   I mean, did -- did -- did any of them get confiscated,

14   period?

15   A.   Yes.  At the time of the Texas Rangers -- I don't know

16   if they had a warrant or not, but whenever -- I wasn't there

17   at that time.  I was at work.  They confiscated all of your

18   firearms, and they were returned to you sometime later.

19   Q.   Okay.  But -- but they were returned to me pretty soon;

20   is that correct?

21   A.   Yes.

22   Q.   So FBI, did they ever confiscate my firearms?

23         MR. MACHICEK:  Your Honor, at this point in time I

24   am going to object as to the relevance.

25         THE COURT:  I am going to overrule the objection.

1          You may answer.

2   BY MR. YOO:

3   Q.   Were there any -- were there any -- were there

4   any -- were there any, sorry.  Let me rephrase that question.

5          Were the law enforcement aware of my possession of

6   firearms?

7   A.   Yeah.

8   Q.   But they never confiscated it, did they?

9   A.   Well, they did, but they returned them.

10  Q.   All right.  Also, to your knowledge, did I -- did I

11  state -- did I state that I was a United States citizen to

12  everyone that -- that you and I know?

13  A.   Yes, you did.

14          MR. YOO:  Your Honor, I would like to -- I would

15  like to admit that as an evidence pursuant to Federal Rules

16  of Evidence exception to hearsay, regularly-conducted

17  activity.

18          THE COURT:  Well, the witness has testified to it.

19  There was no objection to it.  So the jury heard it.  You can

20  argue it in closing if you want to.

21          MR. YOO:  Yes, sir.

22  BY MR. YOO:

23  Q.   Okay.  So you know what was the reason for telling

24  everyone --

25          MR. MACHICEK:  I am going to object.  That is

1  speculative.

2          THE COURT:  I will sustain that objection.

3          MR. YOO:  All right.  I will pass on the witness.

4          THE COURT:  Okay.  Mr. Machicek, any follow-up?

5          MR. MACHICEK:  Your Honor, I have no further

6  questions for this witness.  I would ask that he be finally

7  excused.

8          THE COURT:  May he be excused, Mr. Yoo?

9          MR. YOO:  Yes, sir.

10          THE COURT:  Mr. Hossier, you may step down.

11          The Government may call its next witness.

12          MR. LOCKER:  The Government calls Warren Keener.

13          (Pause in proceedings.)

14      WARREN KEENER, GOVERNMENT'S WITNESS, SWORN,

15                   DIRECT EXAMINATION

16  BY MR. LOCKER:

17  Q.   Good afternoon, Special Agent Keener.

18  A.   Hello.

19  Q.   Have you been previously sworn?

20  A.   Yes, sir, I have.

21  Q.   Can you state your full name for the record?

22  A.   Warren Keener.

23  Q.   Do you go by Ken?  Do your family and friends call you

24  Ken?

25  A.   They do.

1  Q.    Are you a Special Agent with the ATF?

2  A.    Yes, sir, I am.

3  Q.    How long have you been a Special Agent with the ATF?

4  A.    January of 2001; 17 years now.

5  Q.    Where are you currently assigned?

6  A.    Currently I am assigned out of the Tyler field office.

7  I also have an office in Dallas at the Dallas field division

8  office.

9  Q.    What is your current role with ATF?

10  A.    Currently I am the FIC, or firearms instructor

11  coordinator, for the Dallas field division, which means I am

12  in charge of coordinating firearms instructor, use of force

13  tactics, and marksmanship for the division.

14  Q.    How large a region are you the instructor for?

15  A.    All the way over to El Paso, all of Oklahoma, and the

16  northern half of Texas.

17  Q.    How long have you been in law enforcement total in

18  addition to your ATF time?

19  A.    I was in -- prior to ATF, I was a United States Border

20  Patrol agent in Douglas, Arizona for about four years.

21  Q.    And can you give the jury a bit of background in terms

22  of your education?

23  A.    After graduating high school I went into the United

24  States Marine Corps, served there and stayed in the reserves

25  while I went to college.

1    I graduated with a Bachelor of Science Degree from

2  Southwest Texas State University.

3  Q.   Then did you attend FLETC?  And can you tell the Members

4  of the Jury what that is and whether or not you attended?

5  A.   Yes, sir.  For ATF the first thing you do is go to basic

6  criminal investigator school, which is approximately ten

7  weeks of training in basic criminal investigations.

8    Then after that there is a 15-week academy that is

9  basically ATF-delineated instruction, which is firearms,

10  explosives, and fires.

11  Q.   After becoming a Special Agent with the ATF, did you

12  receive any additional specialized training, and do you

13  possess any additional designations or certifications from

14  the ATF?

15  A.   Yes, sir, I do.  Currently I am a Certified Explosive

16  Specialist, which delegates me to be the primary investigator

17  for violations of explosive laws and investigations.

18    I am also a firearms instructor and an interstate

19  nexus expert.

20  Q.   Regarding the last category, interstate nexus expert,

21  can you tell the Members of the Jury what that is and how you

22  became so qualified?

23  A.   Basically they look at your qualifications through the

24  Marine Corps, through my marksmanship stuff and training,

25  firearms instructor status.  And then you go to an interstate

1    nexus training, which is additional training, in Martinsburg,

2    West Virginia.

3            There you go through significant training on how to

4    identify firearms, which includes basically identifying the

5    make, model, caliber, gauge, and serial number.

6            And primarily on that it is very important to

7    identify the firearm correctly because one thing that people

8    don't realize is serial numbers, they think they just need a

9    serial number.  Serial numbers are many times duplicated if

10   you have a different model of a firearm.

11           So one firearm with this designated model may have

12   the same serial number as another designated model.  So

13   ultimately identifying firearms and identifying the

14   manufacture and where they were made.

15   Q.   And what kind of specific training do you receive in

16   order to become an expert in this?  Does this include

17   training with many of the manufacturers to become familiar

18   with their particular products and the nuances of their

19   markings?

20   A.   It does.  We go to that training with ATF.  We also go

21   to many of the manufacturers themselves and tour their

22   plants.  We also have databases and a firearms inventory

23   itself, a vault with almost every firearm that is ever made,

24   of which you research many of those firearms.

25           You, obviously -- they test you on your ability to

1    identify these firearms.  There are proof marks that you have
2    to be familiar with.

3            A proof mark on a firearm -- they start out as
4    typically being a charge that a firearm -- an overcharged
5    round that the firearm could contain that capacity of an
6    overcharged round through the muzzle of the firearm.  But
7    those proof marks also help identify firearms because
8    particularly foreign manufacturers use these proof marks on
9    their guns, so you have to be familiar with that for the
10   identification purposes.
11   Q.   Have you examined thousands of firearms during the
12   course of your history -- of your career as an ATF agent and
13   particularly as an interstate nexus expert?
14   A.   Yes, sir, I have.
15   Q.   And have you served as an ATF liaison to the firearms
16   industry during the course of your career?
17   A.   Yes, sir, I have.
18   Q.   Does ATF maintain a database of just about every firearm
19   or explosive device that has ever been manufactured so you
20   can use that as a law enforcement resource in the course of
21   your duties as a firearms researcher and interstate nexus
22   expert?
23   A.   Yes, sir, they do.
24   Q.   Can you tell the Members of the Jury about the
25   extensiveness of that resource and how you use it during your

1  research into a particular firearm?

2  A.   We have at ATF it is called the firearms technology

3  branch.   The firearms technology branch does several things.

4  One of the things that they do is they maintain this vault of

5  pretty much every firearm that has ever been manufactured.

6        There are other experts there that do that -- full

7  time maintain that, and we can call and liaison with them to

8  make sure that we are all in agreement on -- other experts in

9  the field on identification of firearms.

10        Most modern firearms are relatively easy to

11  identify.   Some -- they get more difficult as they get older.

12  And that's -- I say "some"; some firearms are harder to

13  identify than others.

14        The ATF also maintains a database for marking

15  variances.   And A marking variance in ATF is typically --

16  manufacturers a lot of times farm out -- for lack of a better

17  word -- they get another company to make parts or pieces or

18  receivers of firearms.

19        Ultimately, they may have another company make a

20  firearm and then stamp their company's name on it.   To do

21  that, they have to get a marking variance because actually it

22  is was made by another company maybe at the direction of,

23  let's say, Remington or Smith & Wesson, and then they put

24  that manufacturer on there when it was actually made by

25  another smaller company maybe when they were busy, or maybe

1 they just contracted that piece or part of the firearm to be

2 manufactured by them.

3 Q.   Does that also occur where certain firearms may have a

4 stamp of manufacture that indicate they are manufactured in

5 the United States, when, in fact, some of the major

6 components were manufactured outside of the United States?

7 A.   Yes, sir, that is very common.

8 Q.   And those kinds of variances, are those things that must

9 be reported to the ATF as part of our arms import regulations

10 and laws?

11 A.   That is correct.

12 Q.   Is that something that you have had to become familiar

13 with as an expert in this field when examining firearms?

14 A.   Yes, sir.  I had examined and researched firearms and

15 figure out where different parts and pieces and particularly

16 the frames and receivers are manufactured.

17 Q.   So Members of the Jury may have this notion of

18 interstate nexus or determining the origins of a firearm as

19 simply looking at the serial number, looking at the

20 manufacturer, and looking at the model number, and then they

21 should have stamp on there as to where they were made.

22        Can you tell the Members of the Jury why that is

23 only the beginning of your work in determining where a

24 firearm is manufactured and why that may not be the end of

25 the story in terms of whether or not a firearm was

1    manufactured out of state or out of country?

2    A.   Yeah.  Many times, like I said, it may have a marking

3    variance again which says it is manufactured somewhere.  And

4    the firearm wasn't necessarily manufactured where it was.

5         An example of that would be a Smith & Wesson that

6    says it was manufactured in Massachusetts may have been

7    manufactured elsewhere by a smaller company that they farmed

8    out.

9         Several of the companies do this, and many of them

10   are owned by bigger conglomerates, more common names,

11   Remington, Smith & Wesson.  They own several smaller

12   companies that make parts and pieces and get them from

13   different companies.

14         So there is a lot more to go into the research of a

15   firearm than just what is stamped on there.  And what is

16   stamped on there may not necessarily be where the firearm is

17   manufactured.  It may just be a stamp of the bigger

18   conglomerate firearm manufacturer.

19   Q.   Do you also have training and expertise in the area of

20   firearms tracing in terms of determining where a firearm

21   passed through the -- through the chains of commerce before

22   arriving at either a seizure or encounter by law

23   enforcement?

24   A.   Yes, sir, I do.

25   Q.   Can you tell the Members of the Jury sort of the process

1  that an agent like you would go through upon being assigned a

2  request to trace a firearm until you reach its logical

3  conclusion or hit a dead end?

4  A.   Yes, sir.  Again, it is very important to identify the

5  firearm correctly.  To do that, we go through the same steps

6  that were just mentioned.  You have to identify the make,

7  model, caliber, gauge -- caliber or gauge and serial number

8  of a firearm and identify it correctly.

9         Then that information is sent to our national

10  tracing center.  The national tracing center then contacts

11  the manufacturer.  The manufacturers are required by federal

12  regulation to keep records of those firearms.  So when they

13  get -- they manufacture a new firearm, for example, that

14  manufacturer will then know by their records where -- who

15  they sold it to.

16         May times they are sold to distributors and then

17  wholesalers, and this may go on down the chain until it gets

18  to a retailer.

19         All of them by federal regulation are required to

20  be able to say, we got this gun at this time and sold it or

21  transferred it to this person or this entity, which may be

22  another wholesaler or distributor or retailer.

23         Ultimately, it gets to the end of the line to a

24  retailer, and then retailers or federal firearms licensees

25  are required to keep the records on which individuals they

1  sell firearms to.

2  Q.   Special Agent the Keener, have you testified before in

3  court?

4  A.   Yes, sir, I have.

5  Q.   In both state and federal court?

6  A.   Yes, I have.

7  Q.   Have you been qualified as an expert about the things

8  that you have been testifying about?

9  A.   Yes, sir, I have.

10          MR. LOCKER:  Your Honor at this time I would ask

11  that Special Agent Keener be designated as an expert in

12  firearms, trace, and interstate nexus.

13          THE COURT:  Any objection?

14          MR. YOO:  No objection.

15          THE COURT:  Very well.

16  BY MR. LOCKER:

17  Q.   Special Agent Keener, were you asked to assist in this

18  case?

19  A.   Yes, sir, I was.

20  Q.   What was your role in this case regarding the Defendant,

21  Mr. Yoo?

22  A.   I was asked to conduct an interstate nexus research on

23  the firearms that were obtained from Mr. Yoo.

24  Q.   And how did you obtain those firearms for the purpose of

25  conducting your work in determining interstate nexus and

1    trace?

2    A.    When they were -- when they were gathered from the

3    investigation and the ATF office, I accessed those firearms

4    and researched them.

5    Q.    Were you also present for the execution of the search

6    warrant of the Defendant's home?

7    A.    Yes, sir, I was.

8    Q.    Let's start with the shotgun.  Special Agent Keener, can

9    you turn to the book in front of you to Government's Exhibit

10   marked --

11   A.    I'm sorry?

12   Q.    -- 21?  It should be a five-page document, Special Agent

13   Keener.  Can you flip through that and tell the jury if you

14   recognize it?

15   A.    Yes, sir, I do.

16   Q.    What is that document?

17   A.    It is a trace summary report referring to the Mossberg

18   590, 12-gauge shotgun, Serial No. R -- as in Romeo --

19   188306.

20   Q.    And are the first two pages a certification that this is

21   a true and accurate copy of that trace report?

22   A.    Yes, sir, that is.

23   Q.    It is basically saying, hey, this is what it says it

24   is?

25   A.    Yes, sir.

1    Q.   And are those certification pages, are those present on

2    all final copies of ATF trace reports?

3    A.   Yes, sir, all certified copies.

4         MR. LOCKER:  Your Honor, at this time I move to

5    admit Government's Exhibit 21.

6         THE COURT:  Any objection?

7         MR. YOO:  No objections.

8         MR. LOCKER:  Ms. McCullars, can you please display

9    021003?  Can you zoom in on the firearm information in the

10   upper right quadrant, or just sort of the top third, that

11   section?  That is fine.  Thank you.

12        May I approach the witness, Your Honor.

13        THE COURT:  You may.

14    BY MR. LOCKER:

15   Q.   Special Agent Keener, I have handed you Government's

16   Exhibit 20.  Can you examine that and state whether or not

17   that is the same firearm that is described in Government's

18   Exhibit 21 on the screen?

19   A.   Yes, it is.

20   Q.   And can you tell the Members of the Jury where that

21   firearm was manufactured based on your research?

22   A.   Yes, sir.  Based on my research, this firearm was

23   manufactured in North Haven, Connecticut in 2002.

24   Q.   And then from where was it transported in the stream of

25   commerce?

1  A.   Mossberg then transferred -- transferred the firearm to

2  Maverick Mossberg in Eagle Pass, Texas.  Then it was

3  transferred to an Academy Sporting Goods in Katie, Texas.

4  From there it went to an Academy Sporting Good in Dallas,

5  Texas.  And then Cash America Pawn in Tyler, Texas.  And then

6  on November 17th of 2017 was purchased by Mr. Yoo.

7           MR. LOCKER:  Can we go to the next page, that being

8  021004?  And can we zoom in on the substantive portion,

9  please?  Perfect.

10  BY MR. LOCKER:

11  Q.   It looks like this is continued on the next page, but

12  does this sheet cover the manufacture through transfer to

13  Cash America Pawn in Tyler, Texas?

14  A.   Yes, sir, it does.

15  Q.   And so, if we look at the second block -- so the first

16  block indicates manufactured by the Mossberg Company?

17  A.   Yes, sir.

18  Q.   And the second block indicates transfer to Maverick

19  Arms.  Would that be a wholesaler or distributor?

20  A.   They are a subsidiary company of Mossberg.

21  Q.   And so that transfer from North Haven, Connecticut to

22  Eagle Pass, Texas -- I don't want to overstate the obvious --

23  but that had to travel in interstate commerce to arrive to

24  Texas; is that correct?

25  A.   Yes, sir, it did.

1  Q.   And then we have a couple of more transfers through the

2  Academy Company before purchased by Cash America Pawn in

3  Tyler, Texas; is that correct?

4  A.   Yes, sir.

5        MR. LOCKER:  Can we display the next page, 021005,

6  please?  And just zoom in similarly on this.  Thank you.

7  BY MR. LOCKER:

8  Q.   And does this show the transfer to the Defendant at the

9  end there?

10 A.   Yes, sir, it does.

11 Q.   Special Agent Keener, to move on to Government's Exhibit

12 No. 22.  Can you turn to Government's Exhibit -- in the

13 notebook -- 23, which is the trace report for Government's

14 22.  And like the previous document, is this also a five-page

15 document that as a two-page certification at the front?

16 A.   Yes, sir, it is.

17 Q.   Is it a fair and accurate -- is this a true and correct

18 copy of that document?

19 A.   Yes, sir.

20 Q.   As indicated by the two-page certification at the

21 beginning; is that correct?

22 A.   Yes, sir.

23        MR. LOCKER:  At this time move to admit

24 Government's 23.

25        THE COURT:  Any objection?

1          MR. YOO:  No objection, Your Honor.

2          THE COURT:  Very well.  It will be received.

3          MR. LOCKER:  May I approach the witness, Your

4    Honor?

5          THE COURT:  You may.

6    BY MR. LOCKER:

7    Q.  Special Agent Keener, can you examine that and make sure

8    that is the same kind of firearm that is described in

9    Government's Exhibit 23?

10          MR. LOCKER:  And, Ms. McCullars, can you display

11   023003?  And then zoom in -- just the upper third will be

12   fine.  Thank you.

13   A.  Yes, sir, this is the same firearm that I examined as

14   reflected in the trace report summary.

15   BY MR. LOCKER:

16   Q.  So that is a DPMS LR-308; is that correct?

17   A.  Yes, sir, it is.

18   Q.  Is that what people commonly refer to as an AR-10?

19   A.  Yes, sir.

20   Q.  So it is essentially an AR-15 style platform chambered

21   in a .308 caliber; is that accurate?

22   A.  Yes, sir, that is correct.

23   Q.  And it bears the same serial number that we see on the

24   form; is that correct?

25   A.  Yes, sir, it does.

1  Q.   And did you run the trace on this same firearm, as

2  well -- I see here that this indicates that Special Agent

3  Reed requested the trace.

4  A.   Yes, sir.

5  Q.   Once Special Agent Reed requests a trace or any one of

6  your other colleagues within ATF requests a trace, what is

7  your role then as interstate nexus expert to take a trace

8  report like this and analyze it?

9  A.   What we do is, when it is put into our system, it is

10  automatically traced by the case agent -- which is Special

11  Agent Reed, that is why his name appears on the report --

12  when it is put into our -- into our evidence, the trace

13  reports I get as a -- as a starting place when examining

14  firearms in determining interstate nexus.

15           MR. LOCKER:  Can we display the next page, 023004,

16  please?

17  BY MR. LOCKER:

18  Q.   Can you tell the Members of the Jury where this firearm

19  was manufactured?

20  A.   This firearm was originally manufactured in Huntsville,

21  Alabama in December of 2016.

22  Q.   So DPMS, can you tell the Members of the Jury how they

23  operate in terms of their branding versus their

24  manufacturing?

25  A.   DPMS is actually a subsidiary company of Remington Arms.

1    They still maintain their factory.  Some manufacturers do,

2    some manufacturers don't.  So they still maintain their

3    factory.  And they move around, and they consolidate a lot.

4    But DPMS maintains their factory in Huntsville, Alabama where

5    they still manufacture DPMS -- most DPMS models.

6    Q.   So after manufacture, where was the first transfer?

7    A.   To a distribution center in Lebanon, Indiana.

8    Q.   Owned by which retailer?

9    A.   Gander Mountain.

10   Q.   And then from there was it transferred to a retail

11   outlet of Gander Mountain?

12   A.   It was transferred to Gander Mountain here in Tyler,

13   Texas.

14   Q.   And then who purchased it?

15   A.   On January 9th of 2017, it was purchased by Mr. Yoo.

16   Q.   And, again, not to state the obvious, but in order to be

17   transferred from Huntsville, Alabama to Lebanon, Indiana, did

18   that DPMS LR-308 travel in interstate commerce?

19   A.   Yes, it has.

20   Q.   In order to be transferred from their warehouse to their

21   retail location in Tyler, Texas, did that also have to

22   transfer in interstate commerce?

23   A.   Yes, sir, it did.

24        MR. LOCKER:  Can you now turn the Government's

25   Exhibit 25?

1   BY MR. LOCKER:

2   Q.   Do you recognize that document?

3   A.   Yes, sir, I do.

4   Q.   Is that another trace report?

5   A.   It is.

6            MR. LOCKER:  And, Your Honor, may I approach the

7   witness?

8            THE COURT:  You may.

9   BY MR. LOCKER:

10  Q.   I have handed you Government's Exhibit 24, and you are

11  looking in the notebook at Government's Exhibit 25.

12           Does Government's Exhibit 25, is that the trace

13  report pertaining to the firearm in your hand?

14  A.   Yes, sir, it is.

15  Q.   And is a true and correct copy of that trace report,

16  being this time a four-page document with two pages of

17  certification at the front end?

18  A.   Yes, sir.

19           MR. LOCKER:  At this time, move to admit

20  Government's 25.

21           THE COURT:  Any objection?

22           MR. YOO:  No objection, Your Honor.

23           THE COURT:  Very well.  It will be received.

24           MR. LOCKER:  Ms. McCullars, can you please publish

25  025003?

1  BY MR. LOCKER:

2  Q.    And what kind of firearm is this we are discussing?

3  A.    This is a Smith & Wesson M&P 15, 5.56 caliber assault

4  rifle, Serial No. T -- as in Tango -- E -- as in Echo --

5  94562.

6  Q.    And is this what is commonly referred to as an

7  AR-15-style rifle?

8  A.    It is.

9  Q.    And the primary difference between it and the

10  military-issued M16 or M4 is whether or not it is

11  semi-automatic versus fully automatic; is that correct?

12  A.    Or burst, yes, sir.

13  Q.    Or burst.  So three-round burst is what most of the

14  military has gone to; is that correct?

15  A.    Correct.

16  Q.    Now, to ask you a question in the collective, both this

17  firearm and the DPMS LR-308, the Members of the Jury may see

18  zip ties through the ejection port there making the firearm

19  safe for courtroom purposes.  What is the part of the firearm

20  where the zip ties come out the bottom?  What do you call

21  that part of the firearm?

22  A.    That is the magazine well.

23  Q.    And why is it called the magazine well?

24  A.    That is where high-capacity magazines can be inserted

25  into the firearm.

1   Q.   Now, you have sort of already answered it in that

2   answer, but can that magazine well accept different sizes of

3   magazines holding different numbers of rounds?

4   A.   It can.

5   Q.   And what is the standard size magazine for an AR-10, the

6   DPMS LR -- LR-308?

7   A.   They come in many various sizes.  It is a bigger caliber

8   ammunition.  There are typically 10 or 15 rounds.

9   Q.   Do they also make them in much larger, up to 100 rounds,

10  those Beta Mags where they feed through a series of

11  springs?

12  A.   They do.

13  Q.   And what is the standard size for an AR-15 variant?

14  A.   Again, they come in many various sizes, but the standard

15  size is a 30-round magazine.

16          MR. LOCKER:  So can we turn now and display 025004?

17  BY MR. LOCKER:

18  Q.   That is the next page of the report, Special Agent

19  Keener.

20          Where was this firearm manufactured?

21  A.   This firearm actually was manufactured by Smith & Wesson

22  to a subsidiary or another company that was called

23  L.W. Schneider, and it is in Princeton, Illinois.  It was

24  subsequently transferred -- or Smith & Wesson acquired it in

25  Springfield, Massachusetts on November 14th of 2016.

1   Q.   So the information the jury can see on this trace report

2   only starts with the information regarding Springfield,

3   Massachusetts.  The information regarding -- was it

4   Princeton, Illinois; is that what you stated?

5   A.   Yes, sir.

6   Q.   That is from your additional research as an interstate

7   nexus expert; is that correct?

8   A.   Yes, sir.  This part -- the lower part of the firearm

9   was manufactured there by L.W. Schneider, which is called the

10   receiver of the firearm, and that is where it was

11   manufactured.  And then once -- once Smith & Wesson acquired

12   the firearm, they made it into a rifle.

13   Q.   And on an AR-15-type rifle, is the lower receiver the

14   portion that is the serial number bearing part?

15   A.   Yes, it is.

16   Q.   So in terms of federal law, in terms of ATF's regulation

17   of that item, it's the lower receiver that is the firearm?

18   A.   That is correct.

19   Q.   So, even though it may be stamped Springfield,

20   Massachusetts, it was manufactured in Illinois; is that

21   correct?

22   A.   Yes, sir, that is correct.

23   Q.   With a special designation and permission from the ATF

24   with Smith & Wesson notifying the ATF that is what they were

25   doing; is that correct?

1    A.   Yes, sir.

2    Q.   And that's fairly typical within the firearms industry

3    as you have described; is that correct?

4    A.   It is.

5    Q.   And so upon transfer to the corporate headquarters of

6    Smith & Wesson in Springfield, Massachusetts, what was the

7    next transfer of that item?

8    A.   That firearm was then transferred to Gander Mountain

9    here in Tyler, Texas, and subsequently sold to Mr. Yoo on

10   December 19th of 2016.

11   Q.   Can you turn now to Government's Exhibit 27 in your

12   notebook?

13   A.   (Witness complies.)

14   Q.   Have you had a chance to look at that?

15   A.   Yes, sir, I have.

16   Q.   Do you recognize that document?

17   A.   I do.

18   Q.   And is it a five-page ATF trace report as well?

19   A.   Yes, sir, it is.

20   Q.   Containing a two-page certification at the front?

21   A.   Yes, sir.

22             MR. LOCKER:  Your Honor, may I approach the

23   witness, please?

24             THE COURT:  You may.

25   BY MR. LOCKER:

1    Q.   Have you had a chance to examine it?

2    A.   Yes, I have.

3    Q.   Does Government's 27 appear to be a true and correct

4    copy of that ATF trace report?

5    A.   It does.

6            MR. LOCKER:  At this time move to admit

7    Government's 27.

8            THE COURT:  Any objection?

9            MR. YOO:  No objections.

10           THE COURT:  It will be admitted.

11           MR. LOCKER:  Ms. McCullars, can you please display

12   027003?

13   BY MR. LOCKER:

14   Q.   And you have confirmed that that report we are looking

15   at on the screen and that you are looking at in your binder

16   pertain to the same firearm that you are holding in your

17   hand; is that correct?

18   A.   Yes, sir, it is.

19   Q.   Can you describe that firearm to the Members of the Jury

20   and where it was manufactured?

21   A.   This firearm is a Smith & Wesson Model SW40VE, .40

22   caliber pistol.  Serial Number Romeo, Bravo, Mike 9366, a

23   semi-automatic pistol.

24           This firearm, again, was -- is stamped Smith &

25   Wesson, but this firearm was -- the lower receiver of this

1   firearm, it was manufactured by Tri Town Plastics in Deep

2   River, Connecticut.  And then it was acquired by

3   Smith & Wesson on June 12th of 2008.

4           MR. LOCKER:  Can we please display 027004?

5   BY MR. LOCKER:

6   Q.   And as with the last firearm, Special Agent Keener, the

7   first entry we see here is in the Springfield, Massachusetts

8   location for Smith & Wesson, and your testimony is that your

9   trace report only goes back to when it is first reported at

10  the manufacturer's location; is that correct?

11  A.   Yes.

12  Q.   But in terms of the actual lower receiver, it was

13  manufactured elsewhere?

14  A.   Yes, sir.  Again, the lower receiver was manufactured by

15  Tri Town Plastics; and then when Smith & Wesson receives the

16  firearm, they put the firearm -- the complete pistol

17  together, and that is where they track theirs from.

18  Q.   And the next -- the next time -- or when Smith & Wesson

19  in Springfield, Massachusetts transferred this, to where did

20  they transfer it?

21  A.   They transferred it to a Simon's Gun Specialties in

22  Spring Hill, Kansas.

23  Q.   Does that appear to be a distributor or wholesaler?

24  A.   It appears to be an end-line dealer, as far as I can

25  tell.

1    Q.   And then the next transfer?

2    A.   To a Jerry's Sports Center in Vandling, Pennsylvania.

3    Q.   And then the next transfer?

4    A.   To a Warren Pawn & Gun in Rolla, Missouri.

5    Q.   And then the next transfer?

6    A.   To a First Cash Pawn here in Tyler Texas.

7    Q.   And, again, the transfer -- or the first transfer from

8    Massachusetts to Kansas, the second transfer from Kansas to

9    Pennsylvania, the third transfer from Pennsylvania to

10   Missouri, the fourth transfer from Missouri to Tyler, Texas,

11   did each of those require that firearm to transport --

12   transfer and to be transported in interstate commerce in

13   order to arrive in Texas?

14   A.   Yes, sir, they did.

15              MR. LOCKER:  Can we please display 027005?

16   BY MR. LOCKER:

17   Q.   And what is the next transfer we see displayed here on

18   the screen, Special Agent Keener?

19   A.   That First Cash Pawn on December 21st of 2016 sold this

20   pistol to Mr. Yoo.

21   Q.   Now, Special Agent Keener, are there instances where you

22   cannot run a trace report on a particular firearm?

23   A.   Yes, sir, there are.

24   Q.   Can you describe to the Members of the Jury the

25   circumstances that might lead to that situation?

1   A.   As you can see in these traces, many firearms are traced

2   to a final -- a first user, a first purchaser, an original

3   purchaser of that firearm.

4        Then if that individual happens to sell that

5   firearm to another individual or goes to a gun show and sells

6   a firearm and he doesn't keep any records of it or know who

7   the individual was, we may not be able to follow the trace of

8   that firearm from that point on.

9        So many times we are unable to complete a trace to

10  an individual possessor of a firearm if they were not the

11  original purchaser, or if the original purchaser did not know

12  who it was they sold it to.

13  Q.   Do you often encounter -- when you speak with members of

14  the general public, do you often encounter misperceptions

15  about how firearms are tracked and traced in terms of their

16  sales?

17  A.   Yes, sir.

18  Q.   And related to this in terms of how you may hit a dead

19  end in terms of tracing a firearm, how does the public's

20  general perception about firearms' records sometimes misalign

21  with the way records are actually kept?

22  A.   I think many people think that there is a database where

23  the Government keeps a record of who owns firearms, of which

24  we don't.

25       When we recover a firearm in an investigation, we

1   run a trace, and the trace is run from the manufacturer, as

2   far as we can possibly trace that gun, to see if we can get

3   it to the -- who the last possessor of the firearm was.

4               And many times that is possible, and there are

5   also many times it is not possible to do so.

6               MR. LOCKER:  Your Honor, may I approach the

7   witness?

8               THE COURT:  You may.

9   BY MR. LOCKER:

10  Q.   Special Agent Keener, I have handed you Government's

11  Exhibit 28.  Do you recognize that firearm?

12  A.   I do.

13  Q.   Can you describe it for the jury, please?

14  A.   This is a Para Model 1911 Expert .45 caliber pistol

15  bearing Serial No. 000210 November, Whiskey.

16  Q.   Is it what is commonly referred to as a 1911?

17  A.   It is.

18  Q.   Or 1911 clone, based on John Browning's design; is that

19  correct?

20  A.   It is.

21  Q.   Where was that firearm manufactured?

22  A.   This firearm was manufactured by a subsidiary ultimately

23  of a larger conglomerate, and it was either manufactured in

24  Charlotte, North Carolina, or in D'Shawn USA by two smaller

25  subsidiaries, but it was manufactured on December 18th of

1   2012.

2   Q.   I'm sorry, which was the state of manufacture again?

3   A.   We couldn't determine exactly where it was.  There are

4   two, according to the director of compliance for Para, that

5   this firearm was either manufactured in Charlotte, North

6   Carolina by Precision or by D'Shawn USA in Georgia.

7   Q.   So, just by process of elimination, was it manufactured

8   in Texas?

9   A.   No, sir, it was not.

10  Q.   In fact, does Para-Ordnance have any manufacturing

11  facilities in the State of Texas?

12  A.   No, they do not.

13  Q.   So would that firearm have to have traveled in

14  interstate commerce in order to arrive in the Defendant's

15  possession in the State of Texas?

16  A.   Yes, sir.

17  Q.   But you hit a wall in terms of tracing that gun

18  backwards to the manufacturer; is that correct -- or tracing

19  it down to the end user; is that correct?

20  A.   To the end user, we did, yes, sir.

21          MR. LOCKER:  Your Honor, may I have a moment?

22          THE COURT:  You may.

23          MR. LOCKER:  May I approach the witness?

24          THE COURT:  You may.

25          (Pause in proceedings.)

1    BY MR. LOCKER:

2    Q.   Special Agent Keener, we have gone through this box of

3    evidence in front of the jury.  What are the items that you

4    have pulled out, and do you recognize them?

5    A.   They are magazines for ARs and 308 AR-10-type rifles.

6    Q.   And were those retrieved from the home of the Defendant

7    during the execution of the ATF search warrant?

8    A.   Yes, they were.

9    Q.   Were those featured in Government's Exhibit 19 that was

10   previously admitted, a photograph of those?

11   A.   Yes, sir.

12            MR. LOCKER:  Your Honor, out of an abundance of

13   caution, if not previously admitted, I move to admit these as

14   19A.

15            THE COURT:  The cartridges themselves?

16            MR. LOCKER:  The magazines.

17            THE COURT:  The magazines themselves.

18            Any objection to that, Mr. Yoo?

19            MR. YOO:  Objection.  Relevance.

20            MR. LOCKER:  I'm sorry, Your Honor -- they have

21   already been listed as Government's 29.  These were found in

22   the possession of the Defendant at the time of the execution

23   of the search warrant.  They are accessories that relate to

24   the firearms for which he is charged.

25            THE COURT:  Okay.  I will permit them.

1    BY MR. LOCKER:

2    Q.   Special Agent Keener, do those items in front of you --

3    there are five items in front of you; is that correct?

4    A.   Yes, sir.

5    Q.   Do those fall into, generally, two different

6    categories?

7    A.   Yes, sir, they do.

8    Q.   What are those two categories?

9    A.   Well, they are magazines for AR-15-type rifles and

10   AR-10-type rifles.

11   Q.   And the difference is the caliber between the two?

12   A.   Yes, sir.

13   Q.   So the AR-15 type rifles, they would fit the Smith &

14   Wesson M&P 15 rifle we have already looked at; is that

15   correct?

16   A.   Yes, sir, that's correct.

17   Q.   And those -- the three in front of you, are those Magpul

18   PMAGs?

19   A.   They are all PMAGs.

20   Q.   And that is a manufacture name and model number, PMAG

21   being the model number, and Magpul being the company; is that

22   correct?

23   A.   Yes, sir.

24   Q.   And do you have those in two different sizes in front of

25   you?

1  A.    Yes, sir.  There is one PMAG that is a 45-round

2  magazine, it appears, and then there are two 30-round

3  magazines.

4  Q.    And the other variant to your -- further to your right,

5  those two magazines, what are those?

6  A.    One is a PMAG, which is a plastic magazine.  And the

7  other is a metal mag for a 308 or AR-10-type rifle.

8  Q.    And the PMAG probably has it marked on there, and you

9  may not be able to tell from the other, but what does the

10  capacity appear to be for those two magazines?

11  A.    It appears to be 20-round magazines.

12         MR. LOCKER:  May I approach the witness, Your

13  Honor?

14         THE COURT:  You may.

15  BY MR. LOCKER:

16  Q.    Special Agent Keener, given your expertise and your

17  history with the ATF, have you had the opportunity to observe

18  several different kinds of gun collections or gun assortments

19  that may be found in particular collectors' or users'

20  homes?

21  A.    Yes, sir, I have.

22  Q.    When you look at what is on the table to my left, would

23  you describe this as a hunting or sporting setup, or would

24  you describe this as a tactical setup?

25  A.    All of the firearms except the shotgun are a

1  tactical-type set-up.

2          MR. YOO:  Objection, Your Honor.  Speculative and

3  also interest in tactical stuff is not illegal.

4          THE COURT:  Mr. Yoo, there is not much I can do

5  about it when you object and the question is already out.  So

6  I am going to overrule it.

7          MR. LOCKER:  I will pass the witness.

8          THE COURT:  Cross-examination.

9                    CROSS-EXAMINATION

10  BY MR. YOO:

11  Q.  Are any of these weapons prohibited weapons?

12  A.  None of those weapons are prohibited weapons.

13  Q.  So, if these -- these weapons are used solely --

14  possessed solely for lawful purposes, they are lawful,

15  correct?

16  A.  Correct.

17  Q.  Okay.  So, when you talk about interstate commerce,

18  okay, does -- did I personally -- did I personally

19  participate in -- in interstate commerce, such as, did I buy

20  any of these guns like -- like, let's say out of state?

21  A.  No, sir, I am not aware that you purchased any of them

22  out of state.  The interstate commerce clause is basically if

23  they traveled in interstate commerce and affected interstate

24  commerce.

25  Q.  So me personally, I didn't partake any, I would say,

1    direct involvement in interstate commerce?

2    A.   Besides purchasing the weapons that had affected

3    interstate commerce, that's it, sir.

4    Q.   Okay.  So -- so let's examine these weapons.  Okay?

5            What are the firing mechanisms for on these weapons?

6    A.   The firing mechanisms for which weapon?

7    Q.   Like -- sorry.  Reloading mechanism.  Is it bolt

8    actions, semi-automatic, or automatic?

9    A.   You have a pump-action shotgun, and all of the others

10   are semi-automatic.

11   Q.   Pump-action shotgun and semi -- so, like none of them

12   are auto?

13   A.   No, they are not.

14   Q.   Full auto.  So would you please define prohibited weapon

15   for me?

16   A.   Well, a prohibited weapon, if it is unregistered --

17            MR. LOCKER:  Objection.  Relevance.

18            THE COURT:  What is the relevance, Mr. Yoo?

19            MR. YOO:  They were bringing out what is the

20   purpose of these -- these -- these firearms.  Is it for --

21   for hunting or sporting or -- or tactical.  That border --

22   that lies a borderline on the character reference.  However,

23   I am not afraid to admit that I am interested in tactical

24   stuff.

25            THE COURT:  All right.  I am going to overrule the

1  objection.

2  BY MR. YOO:

3  Q.   Okay.  So -- yeah.  Would you please tell me what are

4  the prohibited weapons?

5  A.   There are many types of prohibited weapons.  But a

6  prohibited weapon in this case would be a shotgun with a

7  barrel of less than 18 inches or an overall length of less

8  than 26.  A rifle would be a fully automatic rifle.  And all

9  of those are prohibited -- they are not necessarily

10  prohibited weapons.  They just need to be registered with

11  ATF.

12  Q.   So -- wait.  Wait.  Does -- does the State of Texas

13  require gun registration?

14  A.   Only on NFA weapons.

15  Q.   Only on what?

16  A.   On NFA Title II weapons.

17  Q.   Okay.

18  A.   Which are machine guns, short-barreled shotguns,

19  short-barreled rifles, and silencers.

20  Q.   Yes.  From my -- from understanding, in order to obtain

21  those weapons, you need some -- some sort of higher-level

22  federal license, is that correct, to possess automatic

23  firearms?

24  A.   Well, you need to pass a background check, sir; and then

25  when you pass a background check, you pay a special

1   occupational tax, and then have that firearm registered to

2   you.  But, as long as you can pass the background check, you

3   can get them, many people, in particular hunters, without --

4   just get -- get what is considered a Class 2 weapon silencers

5   because they want their weapons to be more quiet.

6   Q.   But none of these are --

7   A.   No, sir, they are not.

8   Q.   Is being interested in -- in tactical stuff unlawful?

9   A.   No, sir.

10  Q.   Is -- is practicing, let's say, counter-terrorism

11  courses or any like militia activity, unlawful?

12  A.   Depending on the militia activity.  But, you know, if

13  you are just practicing shooting and practicing doing

14  tactical movement, no, that is not.

15  Q.   What is the Second Amendment of the U.S. Constitution?

16  A.   The right to bear arms.

17  Q.   The right to bear arms.  Would you state it, like,

18  elaborate it?  It's actually pretty short.

19           MR. LOCKER:  Objection, Your Honor.

20           THE COURT:  Mr. Yoo, let's move along.

21           MR. YOO:  Okay.

22  BY MR. YOO:

23  Q.   So -- so these -- these fall under right to bear arms, I

24  believe; is that correct?

25  A.   They are firearms, yes, and so it would fall under that

1    category of concern.

2              MR. YOO:  I will pass on the witness.

3              THE COURT:  Mr. Locker?

4              MR. LOCKER:  No further questions?

5              THE COURT:  May the witness be excused?

6              MR. YOO:  Yes, sir.

7              THE COURT:  All right.  You may stand down.

8              Counsel, approach.

9              (Bench conference held.)

10             THE COURT:  Okay.  Does this complete the

11   Government's witnesses?

12             MR. COAN:  The United States will rest.

13             THE COURT:  Okay.  Mr. Yoo, do you intend to

14   testify?

15             MR. YOO:  Yes.  But I would like -- I need one more

16   document.  I mean --

17             THE COURT:  No, no.

18             MR. YOO:  I filed it with the Court.

19             THE COURT:  I'm sorry?

20             MR. YOO:  I actually filed -- when Mr. Machicek

21   is -- if I -- if there is a 400 Old Grande address; is that

22   correct?  But I have -- I have filed correction on document.

23             THE COURT:  Okay.  That's fine.  My question right

24   now is, do you intend to testify?

25             MR. YOO:  Yes.

1    THE COURT:  Okay.  Let me, I want to explain --

2    well, we will deal with that when we get there.  Do you have

3    any idea how long your testimony is going to take?

4    MR. YOO:  I would say around 30 to 50 minutes.

5    THE COURT:  Okay.  I think we probably should let

6    this jury go home.  It has been a long day.  And I am going

7    to ask them to be back no later than 8:45, and we will start

8    promptly at 9:00 o'clock.

9    And do you -- you are not required to tell me this

10   at this time, but do you intend to call any other witnesses

11   other than your own testimony?

12   MR. YOO:  I would like to call the Court Clerk just

13   for Mr. Machicek's --

14   THE COURT:  Let's deal with that in a bit.

15   MR. YOO:  Mr. Machicek's question.

16   MR. HAAS:  Judge, I would advise, Mr. Yoo asked me

17   to prepare a Rule 29 motion for judgment of acquittal.  I

18   would be happy to file that now if you want me to, or we can

19   talk about it in the morning.

20   THE COURT:  We can do it however you want to do it.

21   You can move orally, or you can file it in written.

22   Is that okay with the Government?  Any objection to

23   that?

24   MR. COAN:  To take it up in the morning?

25   THE COURT:  Well, that it can be considered on the

 1   papers.

 2            MR. COAN:  That is fine.

 3            MR. YOO:  Hey, Judge, Judge.  So do you grant my --

 4            THE COURT:  No.  I am going to send the jury home,

 5   and we will deal with anything else we need to deal with.

 6            MR. YOO:  Okay.

 7            MR. COAN:  Your Honor, just to clarify.

 8            THE COURT:  Mr. Yoo.

 9            MR. COAN:  I am not asking -- we are not asking

10   that he be required to submit a written Rule 29.  I am fine

11   with him making a oral motion, and the response being --

12            THE COURT:  Yeah, I just was trying to clarify if

13   it was okay with you if he filed it.  I am certainly happy to

14   hear it orally.  Whatever you guys want to agree to is fine,

15   we can do it.

16            MR. COAN:  Just given the Defendant's

17   circumstances, that is fine.

18            THE COURT:  However you all -- however you want to

19   do it.

20            MR. HAAS:  There is a written motion.

21            THE COURT:  We don't need to do it right now.  Can

22   we agree that we can send the jury home?

23            MR. COAN:  Yes.

24            THE COURT:  I'm going to ask you if you have any

25   other witnesses, and you can rest.

1          And then, Mr. Yoo, is it okay if I go ahead and

2    tell the jury that you intend to testify, or would you like

3    me not to tell them that at this point?

4          MR. YOO:  Yes, sir.  Please tell them that I would

5    like to testify.

6          THE COURT:  Okay.

7          (Bench conference concluded.)

8          THE COURT:  All right.  Ladies and Gentlemen of the

9    Jury, thank you, once again, for your patience and

10   concentration throughout the day.  We are going to break at

11   this time.

12         The Government has informed me --

13         Mr. Coan, you can do it on the record now if you

14   want to.

15         -- but the Government has informed me that they

16   have completed all of their witnesses for presentation in

17   their case in chief.

18         Mr. Coan, would you like to make that announcement?

19         MR. COAN:  Yes, Your Honor.  Just for the purposes

20   of the record, the United States rests.

21         THE COURT:  What that means, Ladies and Gentlemen,

22   is the Government has completed its case in chief, and

23   Mr. Yoo at this point may call witnesses or may testify, and

24   he has elected to testify, and he has asked me to tell you

25   that.

1    Given the hour, it doesn't make sense to start that

2  testimony now, so I will ask you to be back no later than

3  8:45 in the morning, and we will start promptly at 9:00

4  o'clock.

5    As a reminder, don't discuss the case with anyone,

6  even among yourselves, until all of the evidence has been

7  presented and I have instructed you on the law.

8    Likewise, don't do any independent investigation of

9  your own.  Don't Google the lawyers or anything about the

10  case or look on the Internet or any additional information.

11    And, finally, don't post anything on any social

12  media outlets.

13    So I will look forward to seeing you no later than

14  8:45, and we will have lunch for you tomorrow as well.

15    COURT SECURITY OFFICER:  All rise.

16    (Jury out.)

17    THE COURT:  Okay.  Please be seated.

18    All right.  I think at the bench we may have

19  garbled that discussion about the JMOLs, the Rule 29 motions.

20  I am happy to hear those now.  I am happy to hear them in the

21  morning.  If the parties can agree otherwise, we can submit

22  them on the papers.  Whatever you all want to work out is

23  fine with me.  I don't have strong feelings about it one --

24    MR. HAAS:  If I may address the Court, my wife had

25  some surgery.  She is at home with her sister waiting for me

1   to get home, so I prefer being able to be released as quickly

2   as I could.

3   　　　　THE COURT:  Okay.  Mr. Coan, any objection to

4   submitting this motion on the papers, if that is what -- if

5   that is what Mr. Haas is telling me his preference is?

6   　　　　MR. COAN:  I have no objection.

7   　　　　THE COURT:  Okay.  And Defendant is not waiving

8   anything by not making an oral motion?

9   　　　　MR. COAN:  No.

10   　　　　THE COURT:  All right.  Is that fair enough?

11   　　　　MR. HAAS:  That's good.

12   　　　　THE COURT:  Anything we need to address before we

13   recess for the day?

14   　　　　MR. YOO:  Yes, sir, I would like to tell one thing

15   to the Court.

16   　　　　THE COURT:  Okay.

17   　　　　MR. YOO:  May I approach the podium?

18   　　　　THE COURT:  You may.

19   　　　　MR. YOO:  Okay.  So when Mr. Machicek asked --

20   asked the -- Jon Hossier about is 400 Old Grande Boulevard,

21   you know, is that address accurate, first of all, it wasn't a

22   fictitious address.  I was living -- living in that address

23   like a couple months ago.

24   　　　　And for a second, actually on the ATF Form 4473, it

25   says that if I see any error, I can correct it.

1          I actually corrected it and -- and sent the

2     corrections to the Academy Sports, sent the corrections to

3     the First American Pawn, and to the Court, so I would like --

4     I would like to call the Court Clerk, whoever accepts my

5     paperwork, as a witness.

6          THE COURT:  To testify to what?

7          MR. YOO:  To testify that she actually got those

8     paperwork.

9          THE COURT:  What paperwork?

10          MR. YOO:  Okay.  So --

11          THE COURT:  Mr. Yoo, I mean, the jury is not going

12     to be asked to decide any question related to what your

13     address was on Grande Boulevard.

14          MR. YOO:  Yeah.

15          THE COURT:  I don't quite follow why this is so

16     important to you.

17          MR. YOO:  But, sir, the jury instruction is, did I

18     lie on the -- did I lie on the information --

19          THE COURT:  The Government is going to present a

20     lot of other evidence about that.  It is not going to relate

21     to your address.

22          Correct me if I am wrong about that, Mr. Machicek,

23     or, Mr. Coan?

24          MR. MACHICEK:  Your Honor, there was testimony

25     elicited from the witness Jonathan Hossier regarding his

experience accompanying Mr. Yoo on an occasion in November of 2017 and witnessing the purchase of a firearm.

The previous witnesses have testified about those purchases of firearms in November of 2017 and testified about the Form 4473 completed by the Defendant.

The Defendant indicated at the time of his purchase that his address was 400 Grande Boulevard.  After he was arrested on these federal charges and while in custody, he filed with the Court Clerk corrections to those same forms.

The question propounded to Mr. Hossier was whether or not an individual who had made such a representation at the time of the purchase of the firearm --

THE COURT:  With respect to the address?

MR. MACHICEK:  Yes, sir.  Had been truthful.  It has nothing to do with any indicted charge.  He is not charged with violation of federal law for that false answer. It is simply evidence of yet another lie he has told.

MR. YOO:  Knowingly told?  I mean, that makes a huge difference.  I did not admit that I -- I knowingly told him.  What actually happened was I presented my CHL and they --

THE COURT:  Mr. Yoo --

MR. YOO:  -- computerized.

THE COURT:  Mr. Yoo --

Mr. Machicek, does the Government intend to go into

1   this in closing argument?

2           MR. MACHICEK:  No, Your Honor.

3           THE COURT:  Okay.  So, Mr. Yoo, I mean, I will give

4   you a little bit of latitude here --

5           MR. YOO:  Yes, sir.

6           THE COURT:  -- but I am straining at the importance

7   of this testimony, and I am not sure which Clerk you are

8   talking about calling to testify.

9           MR. YOO:  I just want to ask him or her just one

10  question, did you get the document?  Okay?

11          THE COURT:  Mr. Yoo, you are going to testify

12  tomorrow morning, and you are more than welcome to testify to

13  your personal knowledge, and you certainly are able to

14  testify to that.

15          And, you know, you will be subject to

16  cross-examination, of course.  But I'd say that, if you cover

17  that in your testimony, that is probably enough to cover it.

18          MR. HAAS:  And I said -- I will have my office

19  print that document out and bring it over here.

20          THE COURT:  That's fine.

21          MR. HAAS:  And I'm sure there is not going to be

22  any objection.

23          THE COURT:  I doubt the Government is going to

24  object to it; and if they do, we will address it at that

25  time, Mr. Yoo.

1        MR. COAN:  Your Honor, the Government is willing to

2   make it even easier than that.  If he feels like that is an

3   open issue, he is welcome to testify about that on direct

4   examination.

5        THE COURT:  Okay.

6        Is that all, Mr. Yoo?

7        MR. HAAS:  Okay.  Mr. Yoo gave me permission, and

8   this may kind of assist everybody where we are going, there

9   are a couple of different statutes involved.  Mr. Yoo

10  believes that there is a conflict between 27 CFR 124 and 125.

11       124 consists of the information required to be on

12  an ATF form.

13       There is another statute, CFR 125, that basically

14  talks about name, address, and date of birth.

15       It is Mr. Yoo's contention -- this is a dispute he

16  has about the jury instruction, that the requirements of 124

17  are not applicable, the requirements of 125, that the only

18  requirements actually required by law are those three

19  elements.

20       In addition, he also cites 922(d)(5) in support of

21  that proposition.

22       THE COURT:  Okay.

23       MR. HAAS:  So that is the issue with the first

24  count.

25       The second count -- and he cited some cases as to

1    whether or not the New Jersey procedure is basically

2    constitutional for a commitment under 922(g)(4).

3            THE COURT:  Whether it is constitutional under the

4    New Jersey Constitution or the United States Constitution.

5            MR. HAAS:  No, they are actually -- it is pretty

6    interesting, there actually are some cases -- and it is not

7    like a felon in possession of a firearm where the conviction

8    can't be subject to collateral attack.

9            Courts, and especially one -- the Fifth Circuit in

10   Louisiana, and there is one in -- construing the Maine

11   statute that basically says the process, the procedure that

12   is applied by these particular state statutes are not

13   constitutional.

14           THE COURT:  Are not constitutional?

15           MR. HAAS:  Correct.

16           THE COURT:  Well, I haven't seen these cases.  I

17   will look forward to hearing about them.

18           MR. HAAS:  They are cited, Judge, in the motion for

19   judgment of acquittal.

20           THE COURT:  All right.  Well, perhaps -- could you

21   get that filed tonight so we can take a look at that?

22           MR. YOO:  I can file it right now.  I mean, it is

23   not that long.  But may I address the Court regarding what he

24   said?

25           THE COURT:  Regarding what Mr. Haas said?

1          MR. YOO:  Yes.

2          THE COURT:  Yes, certainly.

3          MR. YOO:  So 27 CFR Section 478.124 actually

4    describes the manner in ATF 4473 to be kept.  I mean, I am

5    not -- I am in no way, shape, or form contesting the fact

6    that ATF 4473s are required to be kept by ATF dealers, but

7    the -- the Federal Code of 924(a)(1)(A) states that

8    information required to be kept, those are name, date of

9    birth, and the address.  And I have not given any false or

10   fictitious information regarding any of those forms in terms

11   of name, date of birth, or address.

12          I mean, what Mr. Machicek, you know, addressed --

13   addressed that -- first of all, the ATF 4473 form does allow

14   individuals to make corrections.  And I made corrections at

15   the earliest opportunity to my -- to -- to my knowledge, at

16   the earliest opportunity.  That is -- that is about right

17   after Mr. Coan sent me those ATF 4473 forms.  And then I even

18   sent them to the -- sent them to the Cash America Pawn and

19   Academy.

20          There was actually one more -- one more wrong

21   address in terms of this, which was the -- the FFL dealer

22   actually took down 17817 Coit Road, but, you know -- but,

23   yeah.  That -- that was what I did.  Basically what I did I

24   just gave driver's license and the concealed -- concealed --

25   concealed handgun license, and none of those addresses were

1  false or fictitious.  It was my handwriting, yeah.  That is

2  me knowingly doing it.

3         THE COURT:  Okay.

4         MR. YOO:  That is proven --

5         THE COURT:  Let me hear from Mr. Coan.

6         MR. COAN:  Are we arguing the Rule 29?

7         THE COURT:  No, I think we are just, you know,

8  giving some previews --

9         MR. COAN:  Previews.  Okay, Your Honor.

10        THE COURT:  Well, I have gotten Mr. Haas's preview,

11 I have gotten Mr. Yoo's preview.  I thought I would give you

12 a chance to give me your preview.

13        MR. COAN:  Thank you, Your Honor, I appreciate it.

14 It is time to dispel the incorrect legal arguments here.

15 This is the way the flow of the statutory and regulatory

16 scheme works on the recordkeeping.

17        Section 923(g)(1)(A) requires FFLs to maintain

18 records of sales or other disposition for such period and in

19 such form as the attorney general regulations may prescribe.

20        Section 926 says that the attorney general is

21 directed to prescribe necessary rules and regulations to

22 carry out the provisions of Chapter 24.

23        27 CFR 478.124(a) requires FFLs to record every

24 transaction on a Form 4473.

25        27 CFR 478.124(b) requires the FFLs to retain each

1   and every Form 4473.

2           The argument that Mr. Yoo is making, has made, is

3   continuing to make is precisely the hypertechnical statutory

4   argument that was considered and rejected by the United

5   States Supreme Court in Abramski vs. United States where the

6   Supreme Court held that a false answer on a Form 4473

7   pertains to information a dealer is statutorily required to

8   maintained.

9           THE COURT:  Thank you, Mr. Coan.

10          MR. YOO:  Actually --

11          THE COURT:  Mr. Yoo, we are not going to hear

12  argument about this this afternoon.  I asked Mr. Coan to just

13  give me a little preview about what his argument is.  I have

14  heard it.  I look forward to reviewing the motion when it is

15  filed on the docket.

16          Anything else we need to address before we adjourn?

17          MR. YOO:  Yes, sir.  What about the corrected jury

18  instructions, and I have the copy of Abramski vs. United

19  States over here.

20          THE COURT:  All right.  So the jury instructions

21  have been exchanged.  I am going to ask each side to look at

22  them tonight and be prepared to very clearly and concisely

23  state your objections to the instructions, on the record.

24  And we will do that starting at 8:15 tomorrow.

25          MR. YOO:  Yes, sir.

1        THE COURT:  Promptly at 8:15.  And I will provide

2   you with a copy of -- well, we will have to work through when

3   we are going to do it.  We will either have them reviewed

4   tonight and I will provide you the instructions that I intend

5   to deliver to the jury, and I will give you an opportunity to

6   object before that happens, or I will hear your argument in

7   the morning and make a determination following that, and then

8   I will provide you with the final instructions following

9   that.

10        MR. YOO:  Yes, sir.  May I just -- may I just

11   address one thing though?

12        THE COURT:  Yes.

13        MR. YOO:  Abramski vs. United States is --

14        THE COURT:  Mr. Yoo, is this a discussion about the

15   motion that is going to be filed by Mr. Haas later this

16   evening?

17        MR. YOO:  Yes.

18        THE COURT:  Okay.  I will hear anything you want to

19   say about that tomorrow.  Let me look at the motion, and we

20   will do some looking at the law, and I will be glad to hear

21   anything you want to say at that point.

22        MR. YOO:  Yes, sir.  Thank you.

23        THE COURT:  I will see you all at 8:15 sharp.

24        (Recess taken.)

25

1        CERTIFICATION

2

3              I HEREBY CERTIFY that the foregoing is a true

4    and correct transcript from the stenographic notes of the

5    proceedings in the above-entitled matter to the best of my

6    ability.

7

8    /s/ Shea Sloan _____                    January 21, 2019
     SHEA SLOAN, CSR, RPR
9    Official Court Reporter
     State of Texas No.:  3081
10   Expiration Date:  7/31/20

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25